IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ANALOG DEVICES, INC., | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) ) | |
| | ) | |
| v. | ) | C.A. No. 06-346 (GMS) |
| | ) | |
| LINEAR TECHNOLOGY CORP., | ) | |
| | ) | |
| Defendant/Counterclaim Plaintiff. | ) ) | |

## LINEAR TECHNOLOGY CORP.'S OPENING CLAIM CONSTRUCTION BRIEF

Jack B. Blumenfeld (#1014)
Karen Jacobs Louden (#2881)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
(302) 658-9200
*Attorneys for Defendant/Counterclaim Plaintiff Linear Technology Corp.*

OF COUNSEL:

Robert C. Morgan
Laurence S. Rogers
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, New York 10036
(212) 596-9000

Mark D. Rowland
ROPES & GRAY LLP
525 University Avenue, Suite 300
Palo Alto, California 94301
(650) 617-4000

June 7, 2007

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................ ii

NATURE AND STAGE OF THE PROCEEDING.......................................................1

THE PATENTS AT ISSUE AND TERMS IN DISPUTE ...........................................2

I.     ADI'S U.S. PATENT NO. 4,929,909 ("THE '909 PATENT") .................2

     A.     Background ..................................................................................2

     B.     The '909 Patent's "Gain-Compensated" Differential Amplifier Circuit.............................................................................4

     C.     Disputed Claim Terms ................................................................6

           1.     "Gain-compensated differential amplifier" (All Claims)................................................................................7

           2.     "Tail current Itail" (All Claims)......................................9

           3.     "Control voltage" (All Claims) .........................................11

           4.     "Control voltage generating means for generating, as the control voltage, a voltage which varies proportionately to absolute temperature" (All Claims)........................................................................12

           5.     "Means for functionally relating the control voltage to the intrinsic emitter resistance of the current source" (All Claims) ............................................14

           6.     "$\Delta V_{BE}$ cell" (Claims 3, 5, 6, 8, 10).......................................16

II.     ADI'S U.S. PATENT NO. 6,262,633 ("THE '633 PATENT").................17

     A.     Disputed Claim Terms ................................................................18

           1.     "Bipolar transistor" (Claims 8, 17) .....................................18

           2.     "Connected" (All Claims)...................................................18

III.     LTC'S U.S. PATENT NOS. '178, '694, '885, '066 AND '258 ("THE WILCOX/FLATNESS PATENTS")...............................................20

     A.     Background ..................................................................................20

B.    Issues Decided by the District Court in Linear Technology Corp. v. Impala Linear Corp., et al. ("Linear v. Impala, et al.") ...................................................................................21

    1.    "coupled" .........................................................................22

    2.    "regulated voltage," "substantially at the regulated voltage" ...........................................................................23

    3.    "signal" ............................................................................26

    4.    "first state of circuit operation," "followed by a first state of circuit operation" ...............................................27

    5.    "second state of circuit operation" .................................28

    6.    "to cause" ........................................................................29

    7.    "output current" .............................................................30

    8.    "load" ..............................................................................30

    9.    "selected sleep mode current level" ..............................31

C.    Previously Agreed to By LTC and ADI in Linear v. Impala, et al. ...............................................................................31

    1.    "generates" .....................................................................31

    2.    "driver circuit" ...............................................................32

    3.    "switch" ...........................................................................33

D.    ADI Has Proposed Limiting The Wilcox/Flatness Patents to a Single Figure .........................................................33

    1.    ADI Has Proposed to Limit '178 Patent Claim 34 to Figure 2 and '885 Claim 32 to Figure 5 ..........................33

    2.    The Restriction Requirement and LTC's Election Do Not Limit Other Claims ...........................................37

E.    ADI Attempts to Limit Additional Claim Terms With Restrictions Not in the Claims .......................................38

    1.    "switching voltage regulator" .......................................38

    2.    "bias source," "current comparator circuit," "current feedback signal" ...........................................................39

3.   "minimum feedback current threshold," "threshold" ........40

4.   "first state" and "second state" ...........................................42

F.   ADI Asks the Court to Rewrite the Language of Certain Claim Terms.......................................................................................42

1.   "prevents the drive circuitry," "second control signal," "inductive element"............................................42

2.   "feedback circuit" .............................................................43

3.   "current to the output terminal" .........................................44

4.   "output inductor" .............................................................44

5.   "off-time control circuit" ...................................................45

IV.  LTC'S U.S. PATENT NO. 6,144,194 ("THE '194 PATENT").............46

A.   "A polyphase synchronous switching regulator" (Claims 1, 13) ..................................................................................................46

B.   "Input node" (Claims 1, 13), "N-phase timing pulses" (Claims 1, 13, 30, 33), "In response to the N phase timing pulses" (Claims 1, 13, 30, 33).......................................................47

C.   "Each of the N regulator stages providing current I/N to the output node" (Claims 1, 13, 30, 33)..............................................50

V.   LTC'S U.S. PATENT NO. 5,212,618 ("THE '618 PATENT").............50

A.   "Semiconductor substrate" (Claims 1, 21), "Formed in said first semiconductor region" (Claims 1, 21).....................................51

B.   "A first semiconductor region" (Claims 1, 21) .............................52

C.   "Said collector region being ... diode-connected to said substrate" (Claim 1), "A PN junction connecting said substrate to said collector region" (Claim 21) ..............................52

D.   "Current limiting resistive element (Claims 1, 21)........................53

E.   "Collector-base breakdown voltage" (Claims 1, 21), "Inactive" (Claims 1, 21), "Forms a current path" (Claims 1, 21)..............................................................................................54

VI.    LTC'S U.S. PATENT NO. 6,100,678 ("THE '678 PATENT").................55

    A.    "Charging and draining circuitry . . ." (Claim 1), "through a single package pin" (Claim 5), "Short circuit timer function" (Claim 5) ........................................................................55

    B.    "Charge the capacitor" (Claim 1), "Discharge the capacitor" (Claims 1, 5) .....................................................57

    C.    "Short circuit" (Claims 1, 5) ............................................58

    D.    "Arming voltage" (Claims 1, 5, 21), "Producing an armed signal" (Claim 21).............................................................58

    E.    "short circuit shutdown signal" (Claims 1, 5, 21), "producing a discharge signal" (Claim 21)....................................59

CONCLUSION...............................................................................................60

v.

# TABLE OF AUTHORITIES

Page(s)

Cases

*Applera Corp. v. Micromass UK Ltd.,*
      186 F. Supp. 2d 487 (D. Del. 2002)...............................................................48, 56

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.,*
      296 F.3d 1106 (Fed. Cir. 2002)............................................................................13

*Gart v. Logitech, Inc.,*
      254 F.3d 1334 (Fed. Cir. 2001)......................................................................49, 54

*Generation II Orthotics, Inc. v. Med. Tech. Inc.,*
      263 F.3d 1356 (Fed. Cir. 2001)......................................................................49, 54

*IMS Tech, Inc. v. Haas Automation, Inc.,*
      206 F.3d 1422 (Fed. Cir. 2000)............................................................................57

*In re Donaldson Co., Inc.,*
      16 F.3d 1189 (Fed. Cir. 1994)..............................................................................14

*Lantech, Inc. v. Keip Mach. Co.,*
      32 F.3d 542 (Fed. Cir. 1994)................................................................................47

*Novo Industries, L.P. v. Micro Molds Corp.,*
      350 F.3d 1348 (Fed. Cir. 2003 ............................................................................13

*Pause Tech. LLC v. TiVo Inc.,*
      419 F.3d 1326 (Fed. Cir. 2005)............................................................................47

*Phillips v. AWH Corp.,*
      415 F.3d 1303 (Fed. Cir. 2005)......................................................43, 48, 51, 56

*R2 Medical Sys., Inc. v. Katecho, Inc.,*
      931 F. Supp. 1397 (N.D. Ill. 1996) ......................................................................36

*Storage Tech. Corp v. Cisco Sys., Inc.,*
      329 F.3d 823 (Fed. Cir. 2003)..............................................................................57

*Vitronics Corp. v. Conceptronic, Inc.,*
      90 F.3d 1576 (Fed. Cir. 1996)), *cert. denied*, 126 S. Ct. 1332
      (2006)..................................................................................................................43

Statutes
35 U.S.C. § 112.................................................................................................12, 14, 36

1.

## NATURE AND STAGE OF THE PROCEEDING

Defendant/Counterclaim Plaintiff Linear Technology Corp. ("LTC") submits this Claim Construction Brief regarding the patents-in-suit in connection with the Claim Construction Hearing, pursuant to ¶ 4 of the Scheduling Order. Plaintiff/Counterclaim Defendant Analog Devices, Inc. ("ADI") asserts that LTC's accused products infringe certain claims of one or more of three patents assigned to ADI: U.S. Patent. Nos. 4,929,909, 6,262,633, and 6,118,326. In its counterclaim, LTC asserts that ADI's accused products infringe one or more of eight patents assigned to LTC: U.S. Patent Nos. 5,481,178, 5,731,694, 5,994,885, 6,304,066, 6,580,258, 6,144,194, 5,212,618, and 6,100,678.

This brief discusses LTC's proposed constructions of various terms and elements of the asserted claims. It is not possible to address in this brief all of the more than one hundred claim terms of LTC's patents that ADI originally sought to construe. LTC believes that the number of claim terms put into dispute by ADI is unreasonable. Many of these terms do not require any construction because they have plain and ordinary meanings. Some of ADI's proposed constructions are different than constructions to which the parties previously agreed in prior litigation. And some were previously rejected by the court in that litigation. LTC will focus on the most important differences herein.[1]

Accompanying this brief is the declaration of LTC's expert, Robert A. Blauschild (hereafter referred to as "Blauschild ¶ _").

---

[1] Since the parties filed their Joint Claim Construction charts, they have reached agreement on additional terms and LTC expects the parties to submit charts revised accordingly.

## THE PATENTS AT ISSUE AND TERMS IN DISPUTE

I.  **ADI'S U.S. PATENT NO. 4,929,909 ("THE '909 PATENT")**

The '909 Patent, entitled "Differential Amplifier with Gain Compensation,"
describes and claims a "gain-compensated" differential amplifier ('909 Patent, col. 1:5-8;
claims 1, 6). A differential amplifier is a type of amplifier circuit, the purpose and operation of
which is to amplify the difference between two input voltages. The design of the patent's
differential amplifier circuit compensates for the effects of temperature and transistor parameter
changes due to lot-to-lot variations so that the amplification (gain) of the amplifier remains
stable. When all of the patent's described compensations are applied, the circuit is said to be
"gain-compensated."

A.  **Background**

The '909 Patent is directed to a particular type of differential amplifier that
includes two bipolar transistors and is commonly referred to as a "long-tail pair." Reproduced
below is FIG. 1 of the '909 Patent, which shows a typical long-tail pair differential amplifier of
the prior art (color annotations added):



FIG. 1 PRIOR ART

In this figure, the $V_{IN}$ and ground points (yellow) are the two input voltages, the difference of
which is amplified by the two transistors 12 and 14. The value of this difference is the
magnitude of the output voltage $V_{OUT}$. The "tail" is identified by the number 18. The

3.

component below the number 18 is a current source which provides a tail current having a magnitude of 2I (I being the magnitude of current flowing through each transistor).[2] ('909 Patent, col. 1:11-23; Blauschild ¶¶ 11-12.)

The patent explains that a long-tail pair differential amplifier, by itself, suffers from certain problems which cause unstable amplification (gain) characteristics. A first problem is that the amplifier's gain varies as temperature changes. This temperature dependence is based in large part on the "intrinsic emitter resistance" of the differential amplifier's transistors, which the patent explains varies as a function of temperature in accordance with the equation kT/qI (where T is temperature) ('909 Patent, col. 1:24-47; Blauschild ¶¶ 15, 30, 32).

A second problem is the amplifier's gain depends on the "ohmic resistance" of its transistors. Not only is this parameter temperature dependent ('909 Patent, col.1:48-50), but it also "varies significantly from one production lot to the next" ('909 Patent, col. 2:25-44). This variation is due to the fact that ohmic resistance is "very geometry sensitive" and a transistor's geometry (length and width) "can … vary from wafer to wafer (and lot to lot) in the fabrication process" ('909 Patent, col. 1:50-55; Blauschild ¶¶ 16, 30, 34).

A third problem is that the differential amplifier's amplification, or gain, also depends on the current gain "β" (beta) of the amplifier's transistors ('909 Patent, col. 1:41-42). Because the current gain of the transistors is not infinite, gain errors appear in the circuit ('909 Patent, col. 4:35-61; Blauschild ¶¶ 13-14, 30, 34).

The object of the '909 patent is to solve these problems by providing a differential amplifier design that compensates for all three sources of gain variability ('909 Patent, col. 1:62-67; *cf.*, col. 1:52-59; Blauschild ¶¶ 30, 34). According to the patent, the circuit of the alleged

---

[2]     The other components in the circuit, denoted as "r" and "R$_c$," are resistors.

4.

invention "is adjusted to compensate for the non-ideal transistor geometries and properties, including finite beta and non-zero, temperature-dependent intrinsic resistances, so as to result in an amplification ratio which is substantially independent of all component variations" ('909 Patent, Abstract). When all of these errors are corrected, the patent says the differential amplifier is "gain-compensated" ('909 Patent, col. 2:20-22, 4:10-15; Blauschild ¶¶ 31, 35, 41).

### B.     The '909 Patent's "Gain-Compensated" Differential Amplifier Circuit

As the '909 Patent states, it was well-known in the prior art how to solve the first problem of a differential amplifier's temperature dependency by using circuitry known as a "delta-$V_{BE}$" ($\Delta V_{BE}$) cell to compensate for intrinsic emitter resistance ('909 patent, col. 2:46-54, 3:60-63, 4:67-5:1). In general, a $\Delta V_{BE}$ cell is a circuit that uses the difference ("delta") between the base-emitter voltages of two transistors to create an output voltage the magnitude of which varies with temperature in a defined way. By using this output voltage to control or bias a transistor current source that provides the differential amplifier's tail current, a PTAT tail current (*i.e.*, a tail current the magnitude of which varied Proportionally To Absolute Temperature) can be generated.[3] As the patent states:

> The use of a $\Delta V_{BE}$ as a means to generate a tail current which is PTAT is well documented in the literature, as prior art.

('909 Patent, col. 2:52-54; *cf.*, col. 3:60-63.)

Figure 2 of the patent illustrates such a known $\Delta V_{BE}$ cell to bias a transistor current source to produce a PTAT current. The $\Delta VB_E$ cell 20 of Figure 2 provides a bias or control voltage to the base of a current source transistor 24. The current identified in Figure 2 as

---

[3]     *See* Blauschild ¶¶ 17-21. Long before the '909 Patent application was filed, many different types of $\Delta V_{BE}$ cell circuits were well known (Blauschild ¶¶ 22-28, Exs. 1-6).

"2I (PTAT)," which flows through the collector and emitter of transistor 24, is – as stated in the

figure and at col. 2:46-49 – a PTAT current.

The patent notes that the circuit of Figure 2 does not fully compensate for all gain

errors of a differential amplifier.  This is because the Figure 2 circuit "failed to consider a

number of other sources of error" in addition to the error caused by intrinsic emitter resistance

('909 Patent, col. 4:1-10).  The patent says, however, that with "proper design," a $\Delta V_{BE}$ cell can

be used to bias the transistor current source (transistor 24) to add to the tail current additional

corrections ('909 Patent, col. 3:60-68).  *See also* Blauschild ¶ 34.

The patent then proceeds to describe the claimed invention with respect to

Figure 3, reproduced below with color annotations ('909 Patent, col. 2:20-22, 4:11 et seq.):



In Figure 3, all emitter-related ohmic resistances, denoted by "r," are shown explicitly ('909

Patent, col. 4:9-15).[4]  According to the patent, these ohmic resistances, which are geometry-

---

[4]      The '909 Patent initially defines "r" to represent ohmic emitter resistance ('909 Patent,
col. 1:39-40), though with respect to the description of Figure 3 it refers to "r" as intrinsic
emitter resistance ('909 Patent, col. 4:16-61).  (Blauschild ¶ 48)  This latter use of "r" is
likely a clerical error in which "intrinsic" was mistakenly used in place of "ohmic" in col.
4:16-61.

dependent, as well as the effects of the transistors' finite beta, are compensated for when the following relationships exist between the various $\Delta V_{BE}$ cell components and the differential amplifier components:

- $R_g/R_c = (1-1/A)/2G$, where G is the desired amplification gain of the differential amplifier;

- Transistors 28 and 32 of the $\Delta V_{BE}$ cell are driven to equal current densities and operate at different collector currents[5]; and

- The unit area emitter geometries of the transistors in Figure 3 are the same.

('909 Patent, col. 1:43-2:5, 3:27-34, 3:60-68, 4:10-5:7, and Figure 3; B14-17.)  In addition, the current in the tail must be set to a value "$I_{tail}$", which the patent defines to be equal to:

$2I(1+1/\beta_0)$, where $I=([V_T\ln(A)]/R_g)/(1-(r/R_g)(1-1/A))$.  ('909 Patent, col. 3:10, 4:37-42; Figure 3.)  The use of resistor SRe in the $\Delta V_{BE}$ cell compensates for beta errors.  "S is a factor chosen to eliminate the beta-dependence in the system" ('909 Patent, col. 4:62-66).  (Blauschild ¶¶ 35-41.)

### C.    Disputed Claim Terms

Claim 1, reproduced below, purports to claim the disclosed "gain-compensated" differential amplifier.  The terms in dispute are highlighted:

1.    A gain-compensated differential amplifier circuit comprising:

   a.    a transistor differential amplifier, with reasonably matched current gains, operating at a *tail current $I_{tail}$*;

   b.    a transistor current source responsive to a *control voltage* for generating said *tail current* as a function of the control voltage;

   c.    *control voltage generating means for generating, as the control voltage, a voltage which* varies *proportionately to absolute temperature*; and

   d.    the *control voltage generating means* including *means for functionally relating the control* voltage *to the intrinsic emitter resistance of the current source.*

---

[5]    Although the '909 Patent disclosure requires this equal current density and different collector current condition to exist (see '909 Patent, col. 4:21-23), such a condition would make the circuit inoperable for its intended purpose (*see* Blauschild ¶¶ 29, 43, 49).

7.

Independent claim 6 is identical to claim 1, except for added language in element (c) that the control voltage generated by the control voltage generating means is "provided by a $\Delta V_{BE}$ cell" and in element (d) that "the $\Delta V_{BE}$ cell" includes the means of that element. In addition, the word "transistor" was removed from "transistor current source" in element (b).

### 1. "Gain-compensated differential amplifier" (All Claims)

| LTC's Construction | ADI's Construction |
|---|---|
| "Differential amplifier" means a circuit, the purpose and operation of which is to amplify the difference between two input voltages.<br><br>"Gain-compensated" means that the gain of the differential amplifier is compensated simultaneously for geometry dependent parameters, temperature dependencies, and lot-to-lot variations (*i.e.*, compensated for ohmic emitter and base resistance, intrinsic emitter resistance, and beta). | A circuit that amplifies the difference between two input voltages, wherein the amplification is adjusted for environmental, process, or structural variations. |

**Gain-Compensated.** To achieve the goal of a gain-compensated differential amplifier, the '909 Patent describes a differential amplifier which uses a particular type of $\Delta V_{BE}$ cell that is specifically designed to compensate simultaneously for three errors. First, the circuit compensates for intrinsic emitter resistance temperature dependencies by causing the amplifier's current source to produce a PTAT tail current. Second and third, the '909 circuit compensates for errors due to "ohmic resistance" of the differential amplifier transistors and for errors caused by "finite beta" of those transistors ('909 Patent, col. 1:60-67). The *only* circuit disclosed by the patent that compensates for all three errors, and the *only* circuit characterized by the patent as being "gain-compensated," is the circuit of Figure 3 ('909 Patent, col. 2:14-22, 4:10-15). As discussed above, in this circuit temperature effects are compensated for by generating a PTAT

tail current, lot-to-lot ohmic resistance variations are compensated for by relating the geometries of the circuit's transistors, and finite beta variation is compensated for by resistor SRe.

The prosecution history confirms that the "gain-compensated differential amplifier" must be compensated in each of these three respects. ADI emphasized each of these requirements of the "gain-compensated differential amplifier" of claim 1 to distinguish the prior art. ADI explained that a PTAT current, as in the prior art, is required by the claims. It then argued that the prior art, unlike the claimed invention, "does not correct for the ohmic resistance" (B14). ADI also said that "errors due to finite beta" were not "addressed by" the prior art (B15). ADI then represented that "[n]o one knew how to use a control voltage to compensate *simultaneously* for geometry-dependent-parameters, temperature dependencies and lot-to-lot variations in a differential amplifier" and "the present application teaches [this] for the first time" (B15; emphasis added). Finally, ADI told the Examiner that the "present application focuses on a design approach that compensates for the differential transistors geometry-dependent-parameters which vary from lot-to-lot with temperatures . . . . In fact, no previous designer has shown a way to compensate for junction resistance and beta . . . ." (B16.)

Accordingly, LTC has included in its proposed definition of "gain-compensated" the factors that ADI stated in the patent and told the Patent Office are required for a differential amplifier circuit to be "gain-compensated."

ADI's proposed construction is incorrect. The '909 patent and prosecution history nowhere refer to ADI's vague "environmental variations." They do specifically refer to temperature and require a PTAT tail current to be generated for this purpose only. Likewise, the only "process or structural variations" referred to in the '909 Patent and required by the prosecution history are lot-to-lot geometry variations in ohmic emitter resistance ('909 Patent,

col. 1:62-2:5, 3:63-68, and B14-17).  Finally, the patent teaches, and ADI told the Examiner, that "gain-compensated" must also include the effects of the transistors' finite beta ('909 Patent, 4:62-66' and B9, B10).  ADI omits all of this from its proposed claim construction.

   **Differential Amplifier.**  The difference between LTC's and ADI's proposed constructions of "differential amplifier" is the inclusion in LTC's construction that "the purpose and operation" of the circuit is to amplify the difference between two input voltages.  The reason for this is that circuits may be structurally similar to a differential amplifier, but they are not operated as one or used for that purpose.  The claimed gain compensation has no applicability to such circuits.  The patent defines "differential amplifier" as a "very common circuit configuration *used* to amplify the difference between two input signals" ('909 Patent, col. 1:11-13) (emphasis added).  Accordingly, LTC's definition includes the requirement of "purpose and operation . . . ."

   2.  <u>**"Tail current I$_{tail}$" (All Claims)**</u>

| LTC's Construction | ADI's Construction |
|---|---|
| "Tail current" – The current drawn through the long-tail portion of a pair of transistors of a differential amplifier, wherein the long-tail portion is formed by the connection of the emitters of the transistors.  The value of the tail current is required to be " I$_{tail}$" (see below). | "Tail current" – The current drawn through the long tail portion of a pair of transistors of a differential amplifier, wherein the long-tail portion is formed by the connection of the emitters of the transistors. |
| "I$_{tail}$" – I$_{tail}$" is a "PTAT" current (*i.e.*, a current the value of which varies linearly with absolute (Kelvin) temperature).  In addition, "I$_{tail}$" = 2I(1+1/$\beta_0$), where I=[(V$_T$ln (A))/R$_g$]/[1-(r/R$_g$)(1-1/A)] as defined in the '909 patent (equation 40). | "I$_{tail}$" – The current drawn through the long tail portion of a pair of transistors of a differential amplifier, wherein the long-tail portion is formed by the connection of the emitters of the transistors. |

   The parties generally agree on the definition of the term "tail current" (except for the last sentence in LTC's construction).  Their dispute is whether the term I$_{tail}$ itself is a term of

the claim requiring construction and, if so, what it means.  LTC contends that the term $I_{tail}$ has a defined meaning in the claim, as it does in the patent, and as such it needs to be construed.  ADI appears to take the position that the term carries no meaning separate and apart from, or beyond, "tail current."

$I_{tail}$ has no common meaning outside the description of the '909 patent, and ADI does not contend otherwise (Blauschild ¶¶ 52, 54).  As explained below, its meaning is expressly defined by the patent to be not just "tail current," but rather tail current of a ***particular value***.  Gain compensation requires setting the current to this particular value.

The '909 patent says it is a "requirement that the tail current be PTAT in order to make the intrinsic emitter resistance constant" ('909 Patent, col. 2:46-50).  In addition, the patent says that the "tail current which is PTAT … includes a component of current which compensates for the ohmic resistances of the transistors and finite beta" ('909 Patent, col. 1:61-67).

$I_{tail}$ is the tail current of a defined value which provides for all of this compensation.  The patent defines "$I_{tail}$" for the "gain-compensated" differential amplifier in column 4 at lines 39-42, where it states in the context of Figure 3 – the only "gain-compensated" differential amplifier disclosed by the patent ('909 Patent, col. 2:20-22, 4:10-15) – that:

> "the tail current $I_{tail}$ (i.e. I*tail* = 2I as shown in Fig. 1 and Fig. 2), which is also the collector current of  transistor 24, ***must be*** 2I(1+ 1/beta)."

(Emphasis added; *cf.,* Fig. 3.)  Moreover, equation 40 of the patent requires the value of I in this equation to be:  $I = [(V_T \ln (A))/R_g]/[1-(r/R_g)(1-1/A)]$ ('909 Patent, col. 3:10-12).  (*See also* Blauschild ¶¶ 54-55.)

Because the claims were drafted with the two distinct terms – "tail current" and $I_{tail}$ – appearing one after the other – they must, and do, mean different things.  "$I_{tail}$" is a current of a required value specified in the patent for the "gain-compensated" amplifier.

ADI, on the other hand, proposes only a generalized definition of tail current that it applies to both the terms "tail current" and "$I_{tail}$." If the term $I_{tail}$ had no meaning separate and apart from "tail current," the claim instead would have been written to recite simply "operating at a tail current." That is not, however, how the claim was written.

### 3. "Control voltage" (All Claims)

| LTC's Construction | ADI's Construction |
|---|---|
| The "control voltage" is the voltage at the base of the transistor current source. | A voltage used to control a device in a circuit. |

Element (b) of independent claims 1 and 6 requires a "transistor current source" (claim 1) or "current source" (claim 6) to be "responsive to a control voltage." Element (c), in turn, requires a "control voltage generating means for generating, as the control voltage, a voltage which varies proportionately with absolute temperature."

The term "control voltage" is not used in the written description of the '909 Patent. Rather, the patent uses the term "bias" voltage. The patent states that the purpose of its $\Delta V_{BE}$ cell is to "bias the current source" ('909 Patent, col. 3:63-65) and that "$\Delta V_{BE}$ cell 20 . . . provides on line 60 a drive voltage $V_{bias}$ which produces PTAT" ('909 Patent, col. 4:68-5:1). Line 60 is the base of the current source transistor (see '909 Patent, Fig. 3). The patentees represented to the Examiner during prosecution of the '909 patent application that the '909 Patent's $\Delta V_{BE}$ cell is a "control voltage generator" (B15).

Thus, when the patent's written text refers to the bias voltage, it is referring to the voltage at the base of the transistor current source (item 24 in Fig. 3) that controls that transistor ('909 Patent, col. 2:2-5, 2:46-58, 3:60-68, 4:32-34, 4:47:51, and 4:67-5:7; Blauschild ¶¶ 56-58).

Thus, the context of its use in the claim, the specification and the prosecution history all require that the claimed "control voltage" generated by the claimed "control voltage generating means" is the voltage at the base of the claimed transistor current source (claim 1) or current source (claim 6).

ADI generalizes its definition beyond anything the patent can support.

4.      **"Control voltage generating means for generating, as the control voltage, a voltage which varies proportionately to absolute temperature" (All Claims)**

| LTC's Construction | ADI's Construction |
|---|---|
| This is a means-plus-function element that must be construed pursuant to 35 U.S.C. § 112, ¶ 6. | This is a means-plus-function limitation, and should be construed to cover the corresponding structure(s) and equivalents thereof. |
| "A voltage which varies proportionately to absolute temperature" means a PTAT voltage (*i.e.*, a voltage the value of which varies linearly with absolute (Kelvin) temperature). | |
| There is no circuit structure disclosed in the patent which functions to generate the claimed PTAT control voltage. Alternatively, if there is structure in the patent for performing the claimed function, the corresponding structure of the "control voltage generating means" is $\Delta V_{BE}$ cell 20 of FIG. 3, where (1) transistor 28 has an emitter area A times that of transistor 32, and (2) transistors 28 and 32 are driven to equal current densities. | The corresponding structure(s) described in the specification is circuitry that includes a $\Delta V_{BE}$ cell. |

The parties agree that element (c) of independent claims 1 and 6 is in means-plus-function format and must be construed in accordance with 35 U.S.C. § 112, ¶ 6. Accordingly, LTC construes this means-plus-function limitation to be the particular structure disclosed in the patent for performing the claimed function.

**Claimed Function.** The claimed function is "generating, as the control voltage, a voltage which varies proportionately to absolute temperature." The patent defines a voltage which varies "proportionately to absolute temperature" to be a PTAT voltage ('909 Patent, col.

13.

1:44-47; Blauschild ¶ 18, 56). The "control voltage," defined *supra*, is the voltage to which the preceding element (b) says the current source of that element is responsive.

**Disclosed Structure.** There is <u>no structure</u> disclosed in the patent for performing the claimed function of generating the claimed PTAT control voltage to which the current source of element (b) is responsive. The only control voltage generating structure in the patent is the $\Delta V_{BE}$ cell, of which there is only a single embodiment disclosed for use in the invention. The patent states that this $\Delta V_{BE}$ cell produces a PTAT *current* in the tail, <u>not</u> a PTAT voltage ('909 Patent, col. 2:46-50, 4:67-5:1). Indeed, to generate a PTAT *current*, the control voltage itself *cannot be* PTAT. Nowhere does the patent disclose to make the control or bias voltage, itself, PTAT. In other words, the claim – as filed and issued – is incorrect. (Blauschild ¶¶ 58-59,) Whatever the reason for this, it cannot now be corrected. E.g., *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1115 (Fed. Cir. 2002) ("this court will not rewrite claims").[6] Accordingly, this claim element cannot be construed or, alternatively, must be construed as having no corresponding structure in the written description.

If the claimed function could be corrected to recite generating a control voltage which causes the current source of element (b) to produce a PTAT current (it cannot be), then the corresponding structure would be the disclosed $\Delta V_{BE}$ cell 20 of Figure 3, with all of the disclosed design requirements to produce this function. These design requirements include the unequal emitter area and equal current density requirements of LTC's construction. *See* the '909 Patent at 4:16-19 and 4:21-23.[7]

---

[6]     The claim error is substantive, not typographical. Even if typographical, it cannot now be corrected. *Novo Industries, L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003).

[7]     LTC notes, although it does not argue at this time, that the patent's failure to disclose any
(continued . . .)

For its proposed construction, ADI simply says that the corresponding structure is circuitry that includes a $\Delta V_{BE}$ cell. But as earlier explained, there are many different types of $\Delta V_{BE}$ cell, and the patent discloses only one particularly designed type for use with the invention. Moreover, undefined "circuitry that includes a $\Delta V_{BE}$ cell" does not perform the claimed function, whether generating a PTAT voltage (as claimed) or a PTAT tail current. To perform either function, the $\Delta V_{BE}$ cell must include specified design requirements. ADI's vague circuitry with a $\Delta V_{BE}$ cell does not.

   5.   **"Means for functionally relating the control voltage to the intrinsic emitter resistance of the current source" (All Claims)**

| LTC's Construction | ADI's Construction |
|---|---|
| This element is a means-plus-function element that must be construed pursuant to 35 U.S.C. § 112, ¶ 6.<br><br>The "intrinsic emitter resistance" of a transistor is defined as $kT/qI$, where k is Boltzmann's constant, T is absolute temperature, q is electronic charge, and I is the current conducted by the transistor.<br><br>There is no circuit structure disclosed in the patent which performs the claimed function, because there is no disclosed structure corresponding to the recited "control voltage generating means" (see element (c), above). Alternatively, if there is structure in the patent for performing the claimed function, the structure for performing the claimed function of "functionally relating the control voltage to the intrinsic emitter resistance of the current source," is $\Delta V_{BE}$ cell 20 of FIG. 3, having all indicated component values, mathematical relationships, and device relationships such that the gain of the | This is a means-plus-function limitation, and should be construed to cover the corresponding structure(s) and equivalents thereof. The corresponding structure(s) described in the specification includes the $\Delta V_{BE}$ cell structured to satisfy Equation 42. |

(. . . continued)

structure for performing the claimed function of generating the PTAT control voltage renders all claims invalid for indefiniteness under 35 U.S.C. § 112. See, *e.g.*, *Cardiac Pacemakers*, 296 F.3d at 1116; *In re Donaldson Co., Inc.*, 16 F.3d 1189 (Fed. Cir. 1994) (*en banc*). Moreover, even if the claim could be re-written to recite generating a control voltage for producing a PTAT tail current, the claims still would be invalid under 35 U.S.C. § 112 because the disclosure of the only $\Delta V_{BE}$ cell according to the invention requires equal current densities. As such a $\Delta V_{BE}$ cell would not function (Blauschild ¶ 49), the claims still would lack written description support and not be enabled. LTC intends at the appropriate time to seek leave to file a motion for summary judgment for invalidity based on the multiple failures of the claims to comply with Section 112.

> differential amplifier is compensated for geometry-dependent
> parameters, temperature dependencies, and lot-to-lot variations.  In
> addition,  $\Delta V_{BE}$ cell 20 has the following properties:
>
> The value of resistor 34 ($R_g$) is chosen such that, for a desired
> differential mode gain G, $R_g/R_c=(1-1/A)/2G$.
>
> The unit area emitter geometries of the transistors of $\Delta V_{BE}$ cell 20
> and of the other transistors of Fig. 3 are the same.
>
> Transistors 28 and 32 operate at different collector currents.

This disputed language is in element (d) of independent claims 1 and 6.  For the reasons discussed above with respect to element (c), the means of element (d) – which the claims recite is included within the non-disclosed PTAT voltage generating means of element (c) – likewise is <u>not disclosed</u> by the written description of the '909 patent.

However, in adding this means-plus-function element to claim 1 to overcome a rejection, ADI made representations to the Examiner as to why this addition would distinguish the claim over prior art $\Delta V_{BE}$ cells, which only produced a PTAT tail current and did not compensate for any other errors.  (*See* B14-17.)  In particular, ADI argued that "[t]he specification derives the equations . . . that relate parameters in the control circuit to a component of the tail current that is proportional to, and tracks, ***both*** the ***ohmic resistances associated with the device geometries, and*** the ***current gain***, of the differential amplifier transistors" (B14; emphasis added).  ADI went on to state that:

> No one previously knew how to use a control voltage to compensate
> simultaneously for geometry-dependant-parameters, temperature-dependencies
> and lot-to-lot variations in a differential amplifier.  Nor was it obvious to those
> already using a $\Delta V_{BE}$ cell (to generate a PTAT tail current) that a $\Delta V_{BE}$ cell could
> be configured to accomplish this very desirable end.  (B15)

Thus, the means-plus-function element at issue here, if it is disclosed at all by the patent, must be a $\Delta V_{BE}$ cell configured as in Fig. 3 to compensate simultaneously for temperature (intrinsic emitter resistance), ohmic resistance (device geometries) and beta (current gain), as

enumerated by ADI to the Patent Office.[8]  The only disclosed $\Delta V_{BE}$ cell in the '909 Patent that

supposedly does this is $\Delta V_{BE}$ cell 20 of Figure 3, having all of the indicated component values,

mathematical relationships, and device relationships ('909 Patent, col. 1:43-2:5, 3:27-34, 3:60-

68, 4:10-5:7; and Fig. 3).  In particular:  (1) the value of resistor 34 ($R_E$) is chosen such that, for a

desired differential mode gain G, $R_E/R_c = (1-1/A)/2G$ ('909 Patent, col. 3:26-34); (2) the unit area

emitter geometries of the transistors of $\Delta V_{BE}$ cell 20 and of the other transistors of Figure 3 are

the same ('909 Patent, col. 2:2-5, 4:16-27, 5:1-3); and (3) transistors 28 and 32 operate at the

same current density but different collector currents ('909 Patent, col. 4:21-23).  (Blauschild ¶¶

62-65, 68.)

ADI's proposed construction, "a $\Delta V_{BE}$ structured to satisfy equation 42" is

impermissibly vague.  It omits most of the design factors the patent says are necessary to

perform the compensation which ADI told the Patent Office this claim element requires.

### 6.    "$\Delta V_{BE}$ cell" (Claims 3, 5, 6, 8, 10)

| LTC's Construction | ADI's Construction |
|---|---|
| A circuit which produces a control voltage using the difference between the base-emitter voltages of two transistors, as shown in FIG. 3 (circuit 20). | A circuit that provides a control voltage that produces a current that is proportional to absolute temperature (Kelvin). |

The patent and its prosecution history define the claimed $\Delta V_{BE}$ cell as circuit 20

in Figure 3, as discussed above.  That is LTC's definition.  ADI's construction, referring to a

---

[8]    Although ADI told the Examiner that element (d) concerned current gain (beta) and ohmic compensation, and it was on that basis that the claim was allowed, the element instead recites functionally relating the control voltage to "intrinsic emitter resistance." Beta and ohmic compensation have nothing to do with intrinsic emitter resistance (Blauschild ¶¶ 60-61).  This is another, independent reason why the claimed means of element (d) is not disclosed in the patent.

PTAT "current," is perhaps ADI's way of trying to dance around the error in the independent

claims, to avoid the fact that a PTAT voltage – <u>not</u> a PTAT current – is what the claims specify.

## II.    <u>ADI'S U.S. PATENT NO. 6,262,633 ("THE '633 PATENT")</u>

The '633 Patent is directed to an output stage for an operational amplifier.  The

circuit of the '633 Patent allegedly improves upon the prior art by providing an output stage that

includes an additional base drive path to provide additional current to the base of each output

transistor.  This is done to increase the maximum output current of the amplifier without

substantially increasing its quiescent current or distortion.[9]

One arrangement offered by the '633 Patent to create an additional drive path is

through the use of cross-connected clamp transistors.  Reproduced below (with highlighting

added) is FIG. 2b of the '633 Patent, which shows a portion of the output stage in which clamp

transistors Q15' and Q16' are respectively cross-connected to output transistors Q2 and Q1.

Specifically, the collectors of Q15' and Q16' are connected, respectively, to the bases of Q2 and

Q1 (see blue and red paths).  Q15' provides an additional base drive path to the base of Q2 (red),

and Q16' provides an additional base drive path to the base of Q1 (blue):



FIG.2b

---

[9]    "Quiescent current" refers to the operating current required to run the circuitry in the
amplifier (Blauschild Dec. ¶ 73).

### A.    Disputed Claim Terms

The parties dispute two terms in the asserted claims:  "bipolar transistor" and "connected" (the latter term, only when used in the context of one terminal being "connected to" another).  The pertinent portions of the claims where the disputed terms appear are:

Claims 8, 17:    "complementary *bipolar* output *transistors* …";

"complementary *bipolar* clamp *transistors* …, the collectors of said clamp transistors *connected* to the bases of their opposing output transistors …";

Claim 10:    first and second transistors connected as emitter followers, the bases of which are *connected* to said first and second inputs, respectively …"; and

third and fourth transistors connected *as* emitter followers, the bases of which are *connected* to said first and second inputs, respectively …".

### 1.    "Bipolar transistor" (Claims 8, 17)

| LTC's Construction | ADI's Construction |
|---|---|
| A three-electrode semiconductor device with a layer of n- (or p-) type semiconductor (the base region) sandwiched between two regions of p- (or n-) type semiconductors (the collector and emitter regions), thus forming two p-n junctions back to back.  The current flowing into or out of the base electrode controls the amount of current flowing between the collector and emitter electrodes. | A three-terminal semiconductor device with an n- (or p-) type semiconductor region between two p- (or n-) type semiconductor regions. |

"Bipolar transistor" is not explicitly defined in the '633 Patent.  The patent refers only to individual NPN and PNP transistors.  LTC's proposed construction accurately defines what a bipolar transistor is.  ADI's construction, on the other hand, lacks important definitional attributes and is, as a result, overbroad and incorrect.  Indeed, it is so broad that it describes devices that are not bipolar transistors – such as a different type of transistor known as a Junction Field-Effect Transistor ("JFET") (Blauschild ¶ 12, Ex. 12).

### 2.    "Connected" (All Claims)

| LTC's Construction | ADI's Construction |
|---|---|
| The term "connected," when used, as here, to describe one | Coupled. |

| component terminal being connected to another, means connected directly with no intervening components. | |
|---|---|

The dispute with respect to the term "connected" is when the claims use the word in the context of describing one terminal of a component being "connected" to another, as in: "the collectors of said clamp transistors *connected* to the bases of their opposing output transistors." When "connected" is used in this context, the '633 Patent's written description always points to direct physical connections – *i.e.*, ones that have no intervening components. *See* the '633 Patent, at col. 1:43-46, 1:61-64, 3:11-14, 4:1-2, 4:22-24, 4:37-40, 5:62-64, 6:30-32, 7:3-5, 7:8-9, 7:21-22; and FIGS. 1, 2a, 2b, 3a, 3b. Every use of the term "connected" in the patent to describe the connection of one terminal to another is consistent with this construction.[10] LTC's proposed construction is consistent with how the term as used in the '633 patent and claims would be understood by a person of ordinary skill in the art (Blauschild ¶¶ 90-96).

LTC's construction is also compelled by the prosecution history. Claims 8 and 17 were amended by adding that "the collectors of said clamp transistors [are] connected to the bases of their opposing output transistors" (B37-B45 at B42-B43). This changed the claims' original recitation of "the collector-emitter circuits of said clamp transistors [are] connected between the bases of said output transistors." The change was made "*to better clarify the structural relationships* between their respective elements" (B41; emphasis added).

ADI proposal of "coupled" for the definition of "connected" is an apparent attempt to end-run its claim amendments. In electronics, two components can be "coupled" even

---

[10]    The patent also uses "connected" in other contexts having no bearing on how the word should be construed when used to describe the physical attachment of one component to another. For instance, the claims recite "first and second inputs *connected to receive* a differential voltage" (claim 10, first element) and a "second current mirror *connected to mirror* said third current to said eighth transistor" (claim 10, seventh element). "Connected" here does not describe how two components are physically attached, but rather the functional result of the circuit organization (Blauschild ¶ 97).

if other components, such as transistors, are in between.  Thus, a transistor may be said to be "coupled" to a voltage supply even if other devices are between it and the voltage.  In the patent's Figure 3a, transistor Q10's collector (at the head of arrow 54) is "coupled" to the Vcc line, even though transistor Q14 intervenes.  But the collector of transistor Q10 is not "connected" to the Vcc line.  Rather, it is "connected" to the collector of transistor Q14.

"Coupled," therefore, is a looser term than "connected."  There is no support in the '633 patent for ADI's definition of "connected" as meaning "coupled."  (Blauschild ¶¶ 98-99.)  By ADI's definition, virtually everything in the disclosed circuit is, one way or another, "connected" ("coupled") to everything else in the circuit.  That would render the carefully stated relationships between the components in the claims meaningless.

### III.   LTC'S U.S. PATENT NOS. '178, '694, '885, '066 AND '258 ("THE WILCOX/FLATNESS PATENTS")

#### A.   Background

The U.S. Patent and Trademark Office issued five patents to Milton Wilcox and Randy Flatness based on a patent application they filed in March 1993: the '178, '694, '885, '066 and '258 patents.  These patents, which all have the same specifications (i.e., figures and descriptive text), relate to voltage regulators.  Voltage regulators of the "switching" type use transistors, which are turned on and off like switches to control the electrical power supplied by a power source, such as a battery, to a load, such as a cell phone or laptop.  (L-Appx, Tab 4, 1:8-30.)[11]

Some regulator designs, called synchronous or synchronously switched regulators, alternately turn on and off two switching transistors to provide these pulses.  Figure 1

---

[11]     "L-Appx" refers to LTC's Joint Appendix in Support of Final Joint Claim Construction Charts filed on April 30, 2007.  (D.I., 45.)

of the Wilcox/Flatness patents illustrates a prior art synchronously switched regulator, in which the "top" transistor 16 and "bottom" transistor 17 are controlled so that they are switched alternately on and off always. If one transistor is on, the other is off, and vice versa. (L-Appx, Tab 4, 3:49-4:52.) Another type of regulator design has one switching transistor that it turns on and off, and a diode, and is sometimes referred to as an asynchronous regulator. (L-Appx, Tab 4, 7:38-47.)

The inventions of the Wilcox/Flatness patents pertain to improving the efficiency and other characteristics of switching regulators. For example, the patents disclose improving synchronous regulators by designing them to automatically transition between synchronous switching and a reduced-power sleep mode operation. (L-Appx, Tab. 4, 5:44-7:47, 12:1-13:67, 15:5-16:16.) They also disclose reverse current protection. Reverse current protection can be incorporated in or used independently of sleep mode to extend the efficiency of a synchronous regulator at low load currents. (L-Appx, Tab 4, 12:52-55, 14:1-15:4, 15:66-16:4.) Additional features disclosed are "variable off time" and control circuitry for asynchronous regulators having sleep mode. (L-Appx, Tab 4, 7:43-8:15, 9:36-12:6, 12:41-45, 15:59-66.)

**B.** **Issues Decided by the District Court in Linear Technology Corp. v. Impala Linear Corp., et al. ("Linear v. Impala, et al.")**[12]

The District Court, in *Linear v. Impala, et al.*, construed nine (9) of the claim terms currently at issue (with respect to the '178 patent). LTC submits that there is no reason to

---

[12] In 1997, LTC sued a number of companies, including ADI, for infringement of claims 1-3, 31-35, 41, and 55-57 of the '178 patent. The parties submitted a joint claim construction chart proposing constructions of these claims. (L-Appx Tab 3.) On June 9, 1999, the District Court issued an order construing the claims (L-Appx Tab 2.) On August 17, 2004, the Federal Circuit issued an opinion in which it construed certain limitations, including ones at issue in this case. (L-Appx, Tab 1.)

disturb the constructions previously adopted by the District Court with respect to these claims,

and proposes their adoption in this case.

### 1.   "coupled"

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
| --- | --- | --- |
| coupled<br>'178 (claims 1, 34, 41, 44, 51, 55, 57)<br>'694 (claim 1)<br>'885 (claims 1, 11, 32, 35)<br>'066 (claim 1)<br>'258 (claims 1, 34, 35) | circuit elements are "coupled" when a current path exists between them | circuit elements are "coupled" when there is an electrical or magnetic connection between them |

In the specification of the Wilcox/Flatness patents, circuit elements are described

as being "coupled" when there exists a current path between them.  For example, the

specification describes a switching transistor which provides current to a load as being coupled

to the load. (L-Appx, Tab 4, 1:17-24.)  This current may pass through an intervening element, as

shown by Figure 1, in which current from switching transistors 16, 17 passes through inductor 32

(L1) on its way to the load 14 ($R_L$) to which the transistors are coupled.  Alternatively, the

current path between two elements can be established by connecting them together as illustrated

in the patent figures.

ADI's proposed construction substitutes for "coupled" the ambiguous phrase

"electrical or magnetic connection," which does not appear in the patents.  To the extent that

ADI's construction implies a direct connection requirement (i.e., no intervening elements), it

would be inconsistent with the specification, as discussed above.  Indeed, a definition requiring

direct connection was rejected by the District Court in *Linear v. Impala, et al.*, which adopted the

construction proposed herein by LTC. (L-Appx, Tab 2, A20).

2.     "regulated voltage," "substantially at the regulated voltage"

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| regulated voltage<br>'178 (claims 1, 34, 41, 44, 51, 55, 57)<br>'694 (claim 1, 5)<br>'885 (claims 1, 32)<br>'066 (claim 1)<br>'258 (claims 1, 34, 35)<br>'194 (claim 1)[13] | a voltage having a controlled value | a predetermined and constant output voltage |
| substantially at the regulated voltage<br>'178 (claims 1, 34, 41)<br>'066 (claim 1)<br>'258 (claims 1, 34) | "substantially at the regulated voltage" allows for, but does not require, greater variation in the voltage having a controlled value | A voltage that has a different average value than the regulated voltage |

A switching voltage regulator controls the voltage at its output around a nominal (i.e., theoretical or designated) value that is different than the voltage at its input. The nominal value of the output is set by the value $V_{REF}$ of a reference voltage and the values R1 and R2 of a resistor divider. The specification refers to this nominal value of the regulated voltage as $V_{REG}$. (L-Appx, Tab 4, 5:64, 6:41, 6:55-56, 7:4, 7:63, 8:8, 8:44, 8:52.)

The output voltage varies around and is controlled to be substantially equal to the nominal value set by the reference voltage and the resistor divider. (L-Appx, Tab 4, 4:24-30, 4:46-52, 6:61-7:21.) Accordingly, the regulator supplies current to a load at a regulated voltage that is not a constant. Rather, current is supplied at a voltage having a controlled value, as the

---

[13]     On occasion, claims of LTC patents-in-suit other than the Wilcox/Flatness patents contain a limitation discussed in this section of the brief, and therefore are included in this section as well.

*Linear v. Impala* District Court ("*Linear* Court") previously determined. (L-Appx, Tab 2, A21; Tab 3, A58.)

When the current demanded by a load is low (such as when the load is an electronic device that has been turned off), energy that is stored in the output capacitor can maintain the output voltage substantially at the regulated voltage level $V_{REG}$ for a period of time that may extend for many switch cycles, without need for the regulator to supply current pulses to the capacitor during that time. In accordance with the invention of the Wilcox/Flatness patents, the regulator may enter into a sleep mode for this time period, during which switching ceases. (L-Appx, Tab 4, 5:59-65, 7:6-10, 8:1-16, 13:8-10.) When the capacitor needs more energy to maintain the output voltage substantially at the regulated voltage $V_{REG,}$ the regulator commences switching again at least as long as necessary to recharge the capacitor. (L-Appx, Tab 4, 7:2-5, 8:61-9:3, 13:10-19.)

As the regulator enters into and awakens from sleep mode, the output voltage is varying around its nominal value $V_{REG}$. During both states (switching and sleep mode), the output voltage is regulated to be substantially equal to the nominal value set by reference voltage $V_{REF}$ and the resistor divider R1/R2. (L-Appx, Tab 4, 4:24-30, 4:46-52, 6:55-58.)

In some embodiments, the regulator may create an "over voltage condition" to indicate that the demand for output current is sufficiently low to warrant entering sleep mode. This condition is detected by a hysteretic comparator. (L-Appx, Tab 4, 6:34-60, 12:46-59.) However, the specification teaches that other means can be used to cause the switching regulator to go into and awake from sleep mode. (L-Appx, Tab 4, 16:5-10.) The patent gives specific examples of generating a sleep mode control signal in response to a monitored current, and taking the regulator out of sleep mode after a predetermined time period. (L-Appx, Tab 4,

16:11-16.) These examples demonstrate that the regulator need not generate an over voltage condition to enter sleep mode as described for some embodiments, and that there need not be any difference in the voltage of the first (switching) and second (sleep mode) states to operate. (*See also* Blauschild ¶¶ 124-126.)

In all embodiments, including embodiments in which a hysteretic comparator is used, the average value of the output voltage may be the same in the first and second states. For example, in the preferred embodiment of Figs. 2 and 7, the output voltage in the second state is limited by the upper and lower thresholds of the hysteretic comparator (L-Appx, Tab 4, 7:6-17.) The upper and lower thresholds are set above and below the nominal regulated voltage level $V_{REG}$. (L-Appx, Tab 4, 6:55-58, 7:10-15.) The amount of variation in the output voltage above and below $V_{REG}$ depends on the comparator's hysteresis, and there is no limit specified for the hysteresis or the thresholds. (L-Appx, Tab 4, 6:64-7:5, 7:15-17.) The comparator thresholds can be chosen to correspond to output voltages above and below $V_{REG}$ by the same amounts, resulting in an average output voltage in the second state that is the same as the average output voltage in the first state.

Thus, there is nothing in the specification that requires the average voltage during the second state to be different than the regulated voltage in the first state. Furthermore, as described above, the regulated voltage varies during the first state, being controlled around the same nominal value $V_{REG}$ around which the thresholds for the second state are set. Therefore, as determined by the District Court, the claim language requiring the regulator to maintain the output voltage "substantially at the regulated voltage" during the second state "allows for, but does not require, greater variation in the voltage having a controlled value. (L-Appx, Tab 2, A38-30; *see also* Blauschild ¶ 123.)

ADI did not challenge this construction in this case until a few days ago, after an administrative law judge in the International Trade Commission issued an Initial Determination construing this claim term in the '258 patent as now proposed by ADI. LTC understands that ADI will submit the Initial Determination to this Court. It has not been reviewed by the ITC or the Federal Circuit and is not binding. In any event, as the Court will see, the administrative law judge declined to give the term "substantially" its ordinary meaning as indicating tolerance or leeway because, in his view, the '258 patent did not use the term this way. LTC respectfully submits that, as discussed above, the specification uses "substantially" in accordance with this ordinary meaning, both as to the first and second states, and that the administrative law judge erred in his construction.

3.    "signal"

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| signal<br>'178 (claims 1, 41, 44, 51)<br>'694 (claim 5)<br>'885 (claims 1, 11, 32) | a voltage or current by which information can be transmitted | a voltage or current by which information is transmitted |
| output signal<br>'194 (claim 1) | an output that can convey information | an output that conveys information |
| input signal<br>'194 (claims 1, 13) | an input that can convey information | an input that conveys information |

The specification and claims of the Wilcox/Flatness patents use the term "signal" in a broad sense to refer to voltages and currents, which can convey information but do not always do so. For example, claim 1 of the '178 patent refers to "a first circuit for monitoring a signal from the output terminal." The signal can be as simple as the output voltage or inductor current. (L-Appx, Tab 4, 4:19-24.) The claims and specification also refer to control and feedback signals, which can be currents or voltages that convey information at some times (e.g.,

during a particular state of operation, or to initiate a certain event) and not necessarily at others.

(L-Appx, Tab 4, 6:6-16, 9:39-45.) The District Court reached the same conclusion, adopting

LTC's proposal and rejecting ADI's proposal. (L-Appx, Tab 2, A21; Tab 3, A59.) Consistently,

claim 1 of the '194 patent uses the phrases "input signal" and "output signal" generally to refer

to currents and voltages at the input and output of a regulator, respectively. Neither the

specification nor the prosecution history defines "signal" to require transmission of information.

**4.    "first state of circuit operation," "followed by a first state of circuit operation"**

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| first state of circuit operation '178 (claims 1, 34, 41, 44, 51) '885 (claim 1) '066 (claim 1) '258 (claim 1, 34) | the state in which the switching transistors are both enabled for switching and are synchronously switched, such that one transistor is ON and the other is OFF, with a varying duty cycle to maintain a regulated voltage at the output terminal; if there is only one transistor ('885, claim 1), the transistor is enabled for switching with a varying duty cycle to maintain a regulated voltage at the output terminal. | a state in which both switching transistors are enabled for being synchronously switched |

The *Linear* Court adopted the construction now proposed by LTC for "first state

of operation" of the '178 patent using language proposed by ADI and other defendants. (L-

Appx, Tab 2, A21; Tab 3, A61.) After having persuaded that court to accept this construction,

now ADI seeks to broaden the first state to encompass regulators that do not alternately switch

the transistors such that one is on and the other off, and regulators that do not vary duty cycle of

the switching transistors to maintain a regulated voltage at the output terminal. There is no basis

for this turnabout. Furthermore, ADI cites the same intrinsic evidence in support of its new

construction that it and the other defendants previously cited in support of the construction

adopted by the District Court. The specification repeatedly demonstrates that the operational

characteristics ADI seeks to eliminate from the first state are inherent to that state. (L-Appx, Tab 4, 8:1-13, 12:1-19.) The language of the claims of the '178, '066 and '258 patents also confirms these characteristics, reciting that duty cycle of the switching transistors is varied to maintain the output at the regulated voltage.

Claim 1 of the '885 patent also recites a first state of operation, but it does not require two transistors ("one or more"), and therefore merits a caveat that, if there is only one transistor, it is enabled for switching with a varying duty cycle. (L-Appx, Tab 11, 11:60-67; Blauschild ¶¶ 116-117.) LTC has added this caveat to its chart set forth herein.

### 5. "second state of circuit operation"

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| second state of circuit operation '178 (claims 1, 34, 41) '066 (claim 1) '258 (claims 1, 34, 35) | During the second state of operation in which the switching transistors are simultaneously off, current is supplied to the load by the output capacitor.<br><br>The time in which "the switching transistors are simultaneously off" does not refer to dead time. | when both synchronously switched switching transistors are caused to be simultaneously OFF and held OFF in response to the changing of the state of the second control signal |

The specification of the Wilcox/Flatness patents describes the second state of operation as one in which both transistors are simultaneously off. (L-Appx, Tab 4, 5:61-64, 8:7-11.) The District Court adopted similar language for the second state, which LTC now proposes. (L-Appx, Tab 2, A39.) ADI had proposed that the transistors be "held off" in response to the second control signal. (L-Appx, Tab 3, A63.) ADI's current proposal adds even a further requirement that the transistors are held off in response to the "state" of the second signal.

The specification, the language of the claims and the prosecution history do not impose such a requirement on the second state. ADI attempts to define the second state based on

the particular operation of the hysteretic comparator 74 in the embodiment of Fig. 2, but the second state is not defined as requiring this comparator. Indeed, the specification explicitly teaches using other means for causing the regulator to go into and awake from sleep mode. (L-Appx, Tab 4, 16:6-15.) Claim 41 of the '178 patent and claim 34 of the '258 patent do not even mention a second control signal, and the other independent claims do not impose requirements on its state. The cited prosecution history does not refer to the second control signal either. (*See also* Blauschild ¶ 118.)

6.    <u>"to cause"</u>

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| to cause<br>'178 (claims 1, 34)<br>'885 (claim 11)<br>'066 (claim 1)<br>'258 (claim 1, 35) | To bring about a result. Unmediated causality is not required. What is important is that a chain of events is initiated that acts not just on one but on both transistors. | to bring about a result |

Both parties agree that "to cause" means "to bring about a result." ADI disputes, however, the *Linear* Court's (L-Appx, Tab 2, A23-24) and LTC's construction that unmediated causality is not required.

ADI again bases its position on limiting the claims to a narrow view of the specifics of the embodiment of Figure 2, ignoring other embodiments. If unmediated causality were required, the claims would exclude the preferred embodiments of Figures 2 and 7, among others. In both figures, the output of the hysteretic comparator initiates a chain of events that eventually brings about the result with the assistance of other circuitry and signals. (L-Appx, Tab 4, 6:44-46, 12:55-13:2.)

7.     **"output current"**

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| output current<br>'178 (claims 1, 34, 41, 57)<br>'694 (claim 5) | the current that flows from the output terminal to the load having a value that is dependent upon characteristics of the load | the current flowing in the load |

LTC's construction, i.e., "current that flows from the output terminal to the load," is consistent with the claim language ("output terminal . . . for supplying current . . . to a load"). This construction was previously proposed by ADI and adopted by the District Court. (L-Appx, Tab 2, A24-25; Tab 3, A63.)

ADI's new proposed construction of "output current," e.g., "the current flowing in the load," is too broad. Current may flow in a load from sources other than the regulator. (*See also* Blauschild ¶ 120.)

8.     **"load"**

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| load<br>'178 (claims 1, 34, 41, 44, 51, 55, 57)<br>'694 (claims 1, 5)<br>'885 (claims 1, 32)<br>'066 (claim 1)<br>'258 (claims 1, 34, 35) | a device, circuit, or system coupled to the output terminal to which the regulator can supply current | a device, circuit, or system that consumes electric power |

The parties agree that a load may comprise a device, a circuit, or a system. However, ADI seeks to impose the additional limitation that a load "consumes electric power." The term "electric power" is not used in the Wilcox/Flatness patents, and furthermore there is no support for a limitation requiring a load to "consume" electric power at all times. ADI's construction seeks to include unsupported limitations to the claim language, which should be

construed in accordance with the construction the District Court adopted in *Linear v. Impala, et al.* (*See* L-Appx, Tab 2, A20.) (*See also* Blauschild ¶ 115.)

### 9.    "selected sleep mode current level"

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
| --- | --- | --- |
| selected sleep mode current level '178 (claim 55) | a current level below which the regulator enters into a second mode of operation | a predetermined current level that represents a percentage of maximum rated output current below which the regulator is operated in a second mode of circuit operation when both transistors are off |

The Wilcox/Flatness patents teach embodiments in which a regulator enters sleep mode if inductor current or output current falls below some level, setting the design of the circuit. (L-Appx, Tab 4, 6:47-69, 12:46-59, 16:5-12.) The plain language of claim 55 indicates that this "selected sleep mode current level" is a level, and need not represent a percentage. The District Court in *Linear v. Impala, et al.*, rejected a similar attempt by ADI to impose a fraction limitation on the claim. (L-Appx, Tab 2, A43.)

### C.    Previously Agreed to By LTC and ADI in *Linear v. Impala, et al.*

In *Linear v. Impala, et al.*, LTC and the defendants (including ADI) came to agreed claim constructions for the following three (3) terms with respect to the '178 patent. (*See* L-Appx, Tab 3, A57, 59, 98.) These constructions should apply to the other Wilcox/Flatness patents, as LTC proposes.

### 1.    "generates"

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
| --- | --- | --- |
| generates '885 (claim 11) | the switching voltage regulator "generates" in that an output is provided by it | the function of producing an output in response to at least one input |

Claim 11 of the '885 patent recites "a switching voltage regulator that generates an output at an output node from an input at an input node." Thus, the switching voltage regulator generates in that it provides an output, as previously agreed upon by the parties. (L-Appx, Tab 3, A59.) The claim also mentions generation from an input node, which simply refers to the fact that a switching voltage regulator receives an input and provides an output. ADI essentially proposes to rewrite "generates an output at an output node from an input at an input node" to read more narrowly "producing an output in response to at least one input." ADI provides no justification for re-drafting the claim language. Moreover, ADI's characterization that the output is generated in response to the input is inaccurate. The general purpose of the regulator is not to respond to the input. (L-Appx, Tab 4, 1:22-24.)

### 2.    "driver circuit"

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| driver circuit '885 (claims 11, 35) | a circuit for providing the necessary currents or voltages for turning the switching transistors ON and OFF | a circuit that functions to turn the switching transistor ON and OFF |

Claim 11 of the '885 patent recites "a driver circuit having a first terminal, and a second terminal coupled to the second terminal of the switching transistor," wherein the driver is "cause[d]" "to place the switching transistor in an off state." The driver circuit places the one or more switching transistors in an ON or OFF state by providing a current or voltage. During the *Linear v. Impala et al.* case, ADI agreed that this was the correct construction. (L-Appx, Tab 3, A98.) The switching regulator as a whole "functions to turn the switching transistor on and off." ADI's proposal is not a definition of the driver circuit.

3.    "switch"

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| switch<br>'066 (claim 1)<br>'258 (claim 1) | a circuit which includes synchronously switched switching transistors | a switch circuit that is connected directly between an input voltage and an output circuit |

The parties agree that a switch is a circuit, and previously agreed to a definition of "switch circuit" for the '178 patent. (L-Appx, Tab 3, A57.) Under ADI's new construction, the word "switch" conveys some requirement that the switch be directly connected between an input voltage and an output circuit. The claim language imposes no such limitation on the term "switch." (*See*, e.g., L-Appx, Tab 14, claim 1: "a switch coupled to receive an input voltage and including a pair of synchronously switched switching transistors.") According to the claim language, the switch and input voltage need only be coupled. "Coupled" does not require a direct connection. (*See* Section III.B.1, *supra*.)

D.    **ADI Has Proposed Limiting The Wilcox/Flatness Patents to a Single Figure**

1.    **ADI Has Proposed to Limit '178 Patent Claim 34 to Figure 2 and '885 Claim 32 to Figure 5**

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| a first means for generating a voltage feedback signal indicative of the voltage at the output<br><br>'178 (claim 34) | The corresponding structures described in the specification include:<br><br>a resistor divider, with or without an operational amplifier, or other conventional voltage feedback circuits. | The "first means" is disclosed as a combination of resistors 36A and 36B. |
| a second means for generating a first control signal during a first state of circuit operation, the | The corresponding structures described in the specification include:<br><br>the combination of drive | The second means is disclosed as the combination of transconductance amplifier 38, current comparator 39, |

| first control signal being responsive to the voltage feedback signal to vary the duty cycle of the switching transistors to maintain the output terminal at the regulated voltage<br><br>'178 (claim 34) | circuit 20, transconductance amplifier 38, offset voltage VOS 76, reference voltage 37, current comparator 39, a feedback current path between inductor L1, and current comparator 39 and constant off-time one-shot circuit 25, which outputs the first control signal;<br><br>combinations having a pulse width modulator circuit or a variable-off-time one-shot circuit (e.g., circuit 240 or the circuit described at 10:15-16); and<br><br>the combination illustrated in the Fig. 7 (resistors RSENSE and R3, one-shot circuit 245, off-time controller 250, capacitor CCON and VREF) and the circuitry described at 13:36-46. Tab 4. | constant OFF time one-shot circuit 25, and inverter 69. |
| a third means for generating a second control signal . . . the period of time having a duration which is a function of the current supplied to the load by the regulator<br><br>'178 (claim 34) | hysteretic comparator 74, current source I1 72, and logic circuits 66, 68, and 69;<br><br>combinations such as the circuitry as disclosed in Fig. 7 (including 72, 74, 315, 316 and related sleep control logic); and<br><br>combinations such as those disclosed at 16:5-15. Tab 4. | The third means is disclosed as the combination of offset VOS 76, hysteretic comparator 74, current source 72, and logic gates 66 and 68. |

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| means for generating a current feedback signal<br><br>'885 (claim 32) | The corresponding structures described in the specification include:<br><br>inductor L1 32 (Fig. 2), a resistance in the current path (e.g., Rsense in Fig. 7); or other conventional feedback circuits | The corresponding steps in the specification for carrying out the step of this paragraph are disclosed as the steps performed by the feedback control circuit 210. |

| | such as current feedback circuit 210 in Fig. 5. Tab 4. | |
|---|---|---|
| means for generating a voltage feedback signal '885 (claim 32) | The corresponding structures described in the specification includes: a resistor divider, with or without an operational amplifier, or other conventional voltage feedback circuits. | The corresponding steps in the specification for carrying out the step of this paragraph are disclosed as the steps performed by the voltage feedback circuit 220. |
| means for generating a trigger signal responsive to the current feedback signal and the voltage feedback signal '885 (claim 32) | The corresponding structures described in the specification include: conventional feedback control circuits such as 230 (Fig. 5), and control loop circuitry such as current mode circuitry of Fig. 2 and Fig. 7 (e.g., 37, 38, and 39). Tab 4. | The corresponding steps in the specification for carrying out the step of this paragraph are disclosed as the steps performed by the voltage feedback circuit 220. |
| means for generating an off-time control signal responsive to at least one of the input voltage and the output voltage '885 (claim 32) | The corresponding structures described in the specification include: off-time control circuits such as 250 (Fig. 5), and Fig. 6. Tab 4. | The corresponding steps in the specification for carrying out the step of this paragraph are disclosed as the steps performed by the off-time control circuit 250 that includes the combination of boxes in Fig. 5 labeled "off-time control" and "ICON." |
| one-shot means for placing the switch into an off state responsive to the trigger signal, the switch remaining-in the off state for a period of time responsive to the off-time control signal '885 (claim 32) | The corresponding structures described in the specification include: one-shot generator circuits such as 245 (Fig. 5), and box 245 of Fig. 7. Tab 4. | The corresponding steps in the specification for carrying out the step of this paragraph are disclosed as the steps performed by the combination of one-shot generator 245, CCON 246, ICON, and the box labeled Off-time control. |

The parties agree that limitations of claim 34 of the '178 patent and claim 32 of the '885 patent are in "means-plus-function" language defined in 35 U.S.C. § 112(6). LTC has accordingly identified all corresponding structures disclosed in the specification.[14]

Contrary to the provisions of 35 U.S.C. § 112(6), ADI proposed to define these "means-plus-function" limitations using the structure of a single figure, Figs. 2 and 5, respectively, purportedly "elected" by LTC in response to a "restriction requirement." ADI's original proposal was based on a misunderstanding of patent prosecution procedures.[15]

A restriction requirement allows the PTO to better administrate its case management and filing and search fees. It does not serve to restrict or otherwise interpret the scope of the claims that ultimately issue. *R2 Medical Sys., Inc. v. Katecho, Inc.*, 931 F. Supp. 1397, 1438 (N.D. Ill. 1996). In this case, the restriction requirement simply acknowledged that the applications contained three groups of claims defining patentably distinct species of inventions, each of which could be patented independent of the others.

ADI misunderstands what a "restriction requirement" is in arguing that LTC "elected" Figure 2 when it elected claims related to the first species identified by the Examiner (claims 1-33, 66-72, 80-82 and 86-96). Nothing in the restriction or LTC's election excluded from any species the embodiments that combined features of that species with features of other species. Indeed, certain claims listed by the Examiner for one species group include features of

---

[14]    LTC's identification of corresponding structures for the second and third means of claim 34 of the '178 patent contains errors. Current source 72 should not be listed in the first paragraph of the second means, and in the third paragraph Tab 2N should be replaced by $C_{CON}$ and $V_{REF}$. The third means should include $V_{REF}$. These corrections have been made in the chart set forth herein.

[15]    ADI has recently offered to modify its proposal to be more like LTC's proposal, i.e., to include structures from multiple figures, and the parties may reach agreement on these terms. ADI's original proposal is set forth in this brief.

one or more of the other species groups. Nor were the species groups limited to any particular

Figure. For example, claim 32 (first species) has a characteristic of Fig. 9 that is incompatible

with Fig. 2. Fig. 2 shows a step-down switching voltage regulator, i.e., input voltage is higher

than voltage at the load. (L-Appx, Tab 4 at 5:44-48, 18:60-62; Blauschild ¶ 111.) But claim 32

specifies that the circuit is a step-up voltage regulator (i.e., input voltage is less than voltage at

the load, (L-Appx, Tab 4 at 3:37-39, 18:65-67), which is shown in Fig. 9. Also, claims 14-17

(first species) include features of Figs. 5 and 7 that are not shown in Fig. 2, including timing

dependency on inputs from the regulator input and output voltages. (*See also* Blauschild ¶ 115.)

In connection with the "second means of claim 34 of the '178 patent," LTC

further notes that a pulse width modulation circuit ("PWM") is a structure that corresponds to the

"varying the duty cycle" functional language of this claim. The claim language states that the

function of the "second means" is to generate a first control signal to vary the duty cycle of the

switching transistors to maintain the output terminal at the regulated voltage. The patent

specification links the structure of the PWM circuitry to the function of the duty cycle of the

switching transistors. (L-Appx, Tab 4 at 9:12-22.) The Federal Circuit reached the same result.

(L-Appx, Tab 1 at A 7.)

## 2. The Restriction Requirement and LTC's Election Do Not Limit Other Claims

ADI relies on the same restriction/election argument to limit the interpretation of

other claims of the Wilcox/Flatness patents to a single embodiment. Repeatedly throughout its

proposed claim constructions, ADI refers to generally limiting claims of the '178, '066 and '258

patents to the embodiment of Fig. 2, claims of the '694 patent to the embodiment of Fig. 3, and

claims of the '885 patent to the embodiment of Fig. 5. As discussed above, ADI's proposed

constructions that rely on this argument are based on a false premise that the restriction

requirement and election are procedures that serve to restrict or otherwise interpret the scope of claims that ultimately issue. Accordingly, they should not be adopted.

### E. ADI Attempts to Limit Additional Claim Terms With Restrictions Not in the Claims

#### 1. "switching voltage regulator"

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| switching voltage regulator '178 (claims 1, 34, 41, 51, 55, 57) '694 (claims 1, 5) '885 (claims 1, 11, 32, 35) '066 (claim 1) '258 (claims 1, 34, 35) | a device or circuit that receives an input voltage and provides a predetermined and regulated output voltage by controlling the opening and closing of one or more switching transistors<br><br>(Predetermined means determined by design, and includes voltages that may be fixed or variable.) | a device or circuit capable of receiving a poorly-specified and fluctuating input voltage and provides a predetermined and constant output voltage by controlling the opening and closing of a switch |

The parties dispute whether the "switching voltage regulator" must maintain the output voltage at a (1) "predetermined and constant" value or (2) "predetermined and regulated" value, wherein "predetermined" in (2) means "determined by design, and includes voltages that may be fixed or variable."

ADI proposes that the "switching voltage regulator" must provide a voltage at a "constant" value. ADI bases its construction on a superficial reading of the background section of the specification, which states the "purpose of a voltage regulator is to provide a predetermined and constant output voltage." (L-Appx, Tab 4 at 1:12-13.) This description is meant to be general, not to define this claim limitation. In fact, no embodiment of the Wilcox/Flatness patents shows a switching voltage regulator that provides a constant output

voltage. (*See* discussion of "regulated voltage" and "substantially at the regulated voltage," *supra*.) (*See also* Blauschild ¶¶ 121-122.)

Finally, in the parties' Joint Claim Construction Chart filed April 30, 2007, ADI relies on the restriction requirement and election made by LTC during the prosecution of the '178 application to limit the "switching voltage regulator" to Fig. 2 in connection with the '178, '066, and '258 patents, to Fig. 3 in connection with the '694 patent, and to Fig. 5 in connection with the '885 patent. As discussed *supra*, the restriction requirement and election did not limit any claims within a species group to any particular embodiment or preclude claims within a species group from sharing elements with other species groups. LTC's construction is consistent with the claim language as a whole, and with the entirety of the specification.

### 2. "bias source," "current comparator circuit," "current feedback signal"

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| bias source '694 (claim 1) | "bias source" is not limited to a separate circuit that generates a current | a separate circuit that generates a current at a constant predetermined value |
| current comparator circuit '694 (claim 1) | a "current comparator" compares currents, or signals indicative of currents, to determine which signal is greater. The output of the current comparator normally has one of two values, but it can have a third indeterminate value. | a "current comparator circuit" compares two current signals and supplies a voltage signal based on the difference in the two input current signals |
| current feedback signal '694 (claim 1) | a feedback signal indicative of a current level | a current signal proportional to the current in the inductive element generated by monitoring the current in the inductive element |

ADI seeks to limit each of these claim terms to a particular implementation in which the inputs and outputs of the recited circuit elements are specified as being current signals

or voltage signals.  Neither the claim language nor the specification give the claim terms such a restricted meaning.

For example, the language of the claim does not limit "bias source" to a circuit that generates a current.  The claim recites: "a bias source coupled to an input of said current comparator circuit, said bias source setting a minimum feedback current threshold."  The inputs to the current comparator circuit, which come from the bias source and a current feedback signal, can be a voltage indicative of a current level, or a current.  This reading is supported by the specification.  *See,* e.g., the embodiment depicted in Fig. 7, in which the inductive element current feedback signal is a voltage measured across $R_{SENSE}$.  (L-Appx, Tab 4 at 12:25-29.) Accordingly, "current comparator circuit" compares currents, or signals indicative of currents, and the bias source may provide a current or a voltage indicative of a current level, and the current feedback signal can be a current or voltage indicative of a current level through the inductor.  (*See also* Blauschild ¶¶ 142-143.)  Further, nothing required the output of the current comparator circuit to be a voltage, or the current feedback signal to be generated by monitoring the current in the inductive element.

Finally, the bias source's output is not constant; ADI bases its assertion that the output is constant on a misunderstanding of the patent.  (Blauschild ¶ 145.)

### 3. "minimum feedback current threshold," "threshold"

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| minimum feedback current threshold '694 (claims 1, 5) | a predetermined current or voltage level to which a current feedback is compared (Predetermined means determined by design, and includes currents or voltages that may be fixed or variable.) | a constant current level to which a current feedback signal is compared and which it will not go below |

| threshold '178 (claims 1, 34, 41, 44) '694 (claims 1, 5) '258 (claim 35) | predetermined level or value at which some change in circuit operation takes place (Predetermined means determined by design, and includes levels or values that may be fixed or variable.) | a fixed value at which some operational characteristic of the circuit changes |
|---|---|---|

The plain meaning of "threshold" is a level (here, a voltage or current) to which something is compared, or at which a change takes place. ADI proposes additional limitations that do not appear in the language of the claims, and which find no support in the specification.

ADI restricts the "minimum feedback current threshold" to be a constant current level. ADI's construction thus ignores the detailed teaching of Fig. 7, wherein the threshold is a voltage indicative of a current level, and varies with the voltage drop across $R_3$. (L-Appx, Tab 4 at 12:19-22.)

Also, ADI incorrectly asserts that the current feedback will not go below the "minimum feedback current threshold." This is the opposite of what the '694 patent teaches. With the '694 control circuit, when the switching transistor turns on, current through the inductor ramps up. At low load currents, the switch is held on at levels of inductor current that would otherwise cause the switch to be turned off. The switch is held on until at least a minimum level of current is reached, corresponding to the minimum feedback current threshold. Thus, once the switching transistor is turned on, the current feedback signal will start at a low level and increase until it at least reaches the minimum feedback current threshold. (L-Appx, Tab 4 at 6:47-53; Blauschild ¶ 146.)

ADI similarly restricts the term "threshold" to having "a fixed value," a limitation unsupported by the specification of the Wilcox/Flatness patents. The term is used in the specification to refer to variable levels or values. (*See* L-Appx, Tab 4, 4:36-41: "When $I_L$ ramps up to a threshold level set by output 38A of transconductance amplifier 38, current comparator

39 trips and triggers the one-shot OFF pulse, initiating the cycle of switch 15"; L-Appx, Tab 4,

12:14-22: "The inductor current is sensed by means of the voltage drop across resistor $R_{SENSE}$,

and the threshold for the current comparator 39 is set by the voltage drop across resistor $R_3$.").

### 4.    "first state" and "second state"

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| first state '694 (claim 1) | a first output value | a first output value of the hysteretic comparator indicative of the voltage regulator operating in a first way of operating |
| second state '694 (claim 1) | a second output value | a second output value of the hysteretic comparator different from the first output value that is indicative of the voltage regulator operating in a second way |

ADI attempts to insert limitations here that are unwarranted.  Claim 1 of the '694

patent states that "the hysteretic output changing from a first state to a second state when the first

and second inputs compare in a predetermined manner."  This shows that the "first state" and

"second state" refer to output values of the hysteretic comparator.  This is further supported in

the specification, which refers to the hysteretic comparator outputting "high" and "low" signals,

corresponding to the claimed first and second states of the hysteretic comparator.  (See L-Appx,

Tab 9, 6:19-46.)  Each output value need not indicate a particular mode of operation of the

regulator.

### F.    ADI Asks the Court to Rewrite the Language of Certain Claim Terms

#### 1.    "prevents the drive circuitry," "second control signal," "inductive element"

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| prevents the drive circuitry from turning on either of | both transistors must be prevented from turning ON | both transistors must be held OFF for a period of time |

| the pair of synchronously switched switching transistors '178 (claim 55) | | |
|---|---|---|
| second control signal '178 (claim 44) | a signal separate and distinct from the first signal. It is generated by the third circuit during a second state of circuit operation | a signal separate and distinct from the first control signal. It is generated by the third circuit when the regulator is in the second state of circuit operation |
| inductive element '694 (claims 1, 5) | an element that acts as an inductor | a magnetic energy storage element |

ADI's proposed constructions of these terms rewrite the language of the claims, and should be denied. No construction is required because the words should be given their plain and ordinary meanings. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312, 1313 (Fed. Cir. 2005) (en banc) (*quoting Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)), *cert. denied*, 126 S. Ct. 1332 (2006). ("[T]he words of a claim 'are generally given their ordinary and customary meaning.'") That ordinary meaning "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."

Accordingly, LTC's proposed construction is the claim language itself.

   2.    **"feedback circuit"**

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| feedback circuit '885 (claims 11, 35) | a circuit for producing a signal at a second terminal that is indicative of a signal at the first terminal | a circuit for producing a signal at a second terminal |

ADI's construction of "feedback circuit" – "a circuit for producing a signal at a second terminal" – completely removes the concept of feedback. A feedback signal is indicative of another signal. A feedback circuit produces a signal that is indicative of another signal. In the

context of the language of '885 claims 11 and 35, the feedback circuit produces a signal at a

second terminal that is indicative of a signal at the first terminal (e.g., "a feedback circuit . . .

producing a feedback signal at a second terminal," (L-Appx, Tab 11 claim 1.) (*See also*

Blauschild ¶ 147.)

### 3.    "current to the output terminal"

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| current to the output terminal '178 (claim 44) | the current that flows to the output terminal from the switching transistors | the output current |

This term should be construed in accordance with its plain meaning. "Current to

the output terminal" is current that flows from the switching transistors, as shown in the figures

of the patent. ADI proposes to replace this plain meaning with another phrase, "output current."

This does not make sense, particularly in light of ADI's proposed construction for "output

current," which is current flowing in the load. The claim makes explicit reference to current

flowing to the output terminal, not current flowing in the load, which can come from anywhere.

(*See also* Blauschild ¶ 132-134.)

### 4.    "output inductor"

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| output inductor '178 (claims 44, 51) | an inductor in the output circuit | an inductor that is coupled to the output terminal |

Claim 44 of the '178 patent recites: "[a] switching voltage regulator . . .

having . . . an output circuit including . . . an output inductor." Claim 51 is similar. This

limitation does not require construction because the "output inductor" is necessarily an "inductor

in the output circuit" <u>and</u> "coupled to the output terminal." ADI's proposed construction

attempts to broaden this limitation by including inductors merely coupled to the output terminal.

Such a definition encompasses inductors coupled to the output terminal but which are not part of

the switching voltage regulator or output circuit.  For example, an inductor in the load would not

be part of the regulator, but could be coupled to the regulator output terminal.  (*See also*

Blauschild ¶ 131.)

### 5.    "off-time control circuit"

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| off-time control circuit '885 (claims 11, 35) | a circuit that provides an output to control the OFF time of the one-shot generator based on one or both of the voltages at the input node and output node | a circuit that provides an output to control the OFF time of the one-shot generator based on both voltages at the input and output nodes |

The parties dispute whether the output of the off-time control circuit is based on

"both voltages at the input and output nodes" or on "one or both of the voltages at the input and

output node."

Claim 11 of the '885 patent provides that the off-time control circuit have a "first

terminal and a second terminal, the off-time control circuit producing an off-time control signal

at the first terminal . . . the second terminal being coupled to one of the input node or the output

node." (L-Appx, Tab 11, claim 11.)  Therefore, the claim language explicitly provides that the

off-time control circuit provide an output to control the off time of the one-shot generator based

on "one of the input node or output node," which is consistent with LTC's construction in which

the signal is based on one or more of the voltages at the input node and output node.

ADI's proposed construction inserts the requirement that the signal be based on

both (rather than one or more of) the voltage at the input node and the output node.  This

contradicts the plain language of claim 11.  Moreover, the doctrine of claim differentiation

prevents the term "off-time control circuit" from being construed to require the signal to be based on both. Claim 19 of the '885 patent, which depends from claim 11, explicitly provides an additional "third terminal" (not in claim 11) so that the "off-time control circuit" can be coupled to both the input node and output node. To define "off-time control circuit" as generating a signal based on both the voltage and the input and output node would impermissibly eliminate any distinction between claims 11 and 19 of the '885 patent. (*See also* Blauschild ¶¶ 148-150.)

### IV.    LTC'S U.S. PATENT NO. 6,144,194 ("THE '194 PATENT")

The inventions of the '194 patent pertain to synchronous switching regulator circuits ("SSRC"). Conventional SSRCs provide a predetermined and substantially constant output voltage from a fluctuating or inappropriate source voltage using ON-OFF switches timed by a single-phase clock. Single-phase SSRCs are inefficient, however, for applications that require low voltage at high current, such as power supplies for advanced microprocessors. Large input capacitors are needed to filter the large, undesirable "ripple current" that such regulators generate. The '194 patent solves these problems by dividing the input current among a multiple number N of parallel regulator stages, each of which supplies a substantially equal current $I_{OUT}/N$, whereby each stage's cycle begins at a different time (i.e., out of phase from the others). These stages are controlled by timing circuitry that generates pulses to time each of the N different phases of the N stages. (L-Appx, Tab 18, 5:15-6:7.)

### A.    "A polyphase synchronous switching regulator" (Claims 1, 13)

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| a polyphase synchronous switching regulator (Claims 1, 13) | a switching regulator comprising multiple regulator stages connected in parallel, each supplying current that is out of phase from the other stages | a switching regulator consisting of multiple regulator stages |

This limitation appears in the preamble of claims 1 and 13. The body of each claim describes a regulator including N synchronous voltage regulator stages coupled in parallel (i.e., each stage is coupled to the input and output of the regulator). "Polyphase" is a term used in the '194 patent to indicate that each of the multiple parallel stages of the regulator supplies current that is out of phase from current supplied by the other stages. (L-Appx, Tab 18, 3:8-13.) Accordingly, this limitation should be construed as a switching regulator comprising multiple synchronous regulator stages connected in parallel, each supplying current that is out of phase from the other stages.

In interpreting claim terms, courts "must give each claim term the respect that it is due." *Pause Tech. LLC v. TiVo Inc.*, 419 F.3d 1326, 1334 (Fed. Cir. 2005). *See also Lantech, Inc. v. Keip Mach. Co.*, 32 F.3d 542, 546-47 (Fed. Cir. 1994) ("All limitations in a claim must be considered meaningful," and it is clear error to read out limitations from a claim). ADI's proposed construction, which says nothing about parallel stages supplying current out of phase from one another, reads the word "polyphase" out of the disputed limitation.

**B.**    **"Input node" (Claims 1, 13), "N-phase timing pulses" (Claims 1, 13, 30, 33), "In response to the N phase timing pulses" (Claims 1, 13, 30, 33)**

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| input node (Claims 1, 13) | the node at which the input voltage is applied to the regulator | the junction between the unregulated supply voltage and the voltage regulator |
| N phase timing pulses (Claims 1, 13, 30, 33) | pulses that provide the timing for N phases | a set of N single phased timing pulses operating at a common frequency such that the timing pulses are 360°/N out of phase from each other and applied to each stage |
| in response to the N phase timing pulses | in response to the N phase timing pulses | as a result of the N phase timing pulses |

| (Claims 1, 13, 30, 33) | | |

The jury needs no assistance in understanding the meaning of these claim

limitations; they mean what they say, require no construction and should be given their plain and

ordinary meanings. *See Phillips*, 415 F3d at 1312-1313, *supra*; *Applera Corp. v. Micromass UK

Ltd.*, 186 F. Supp. 2d 487, 526 (D. Del. 2002) (construction "self-evident from the face of the

claims"). There is nothing in the specification to indicate the patentee ascribed meanings to

these terms other than their plain meaning.

"Input node" means the node at which the input voltage is applied to the

regulator, as stated in the claims themselves. ADI improperly seeks to add limitations to the

claims by inserting the superfluous text "junction between the unregulated supply voltage."

"Node" does not need construction and, even if it did, "junction" as a substitute provides no

clarification. ADI also unnecessarily inserts the limitation "unregulated supply voltage," which

has no support in the intrinsic record.

Likewise, "N-phase timing pulses" means pulses that provide the timing for N

phases. ADI's construction improperly attempts to rewrite this limitation to read in part "a set of

N single phased timing pulses operating at a common frequency." The claims recite N regulator

stages each operating out of phase from one another. Thus, there are N phases, and the timing

pulses provide the timing for these phases. (L-Appx, Tab 18, 5:50-53, 6:47-53.) There is no

requirement in the intrinsic record that the timing pulses for the N phases be implemented

specifically as a set of N single-phase clock signals operating at a common frequency. The '194

patent illustrates examples of a "three phase clock" and a "three phase waveform" in Figs. 4A

and 4B, respectively. (L-Appx, Tab 18, 3:36-40.) These examples of implementation details do

not define "N-phase timing pulses," or exclude other implementations from being within the

49.

scope of the invention.  Indeed, the specification states that the examples are not limiting.  (L-Appx, Tab 18, 7:55-67.)

ADI further proposes that "N-phase timing pulses" should be construed to include the limitation "such that the timing pulses are 360°/N out of phase from each other and applied to each stage."  This aspect of ADI's proposed construction again attempts to improperly add limitations to the claims.  Claims 1, 13 and 30 state that the regulator stages provide current in response to the timing pulses "such that N regulator stages operate 360/N out of phase from one another."  Claim 33 similarly recites providing current in response to the timing pulses "from N synchronous switching stages that operate 360/N out of phase from one another."  Thus, the language of the claims indicates that what matters is that the regulator stages operate 360°/N out of phase from one another, not that the timing pulses are 360°/N out of phase from one another or that the timing pulses are applied in some particular way.  This is consistent with the description of the invention in the specification.  (L-Appx, Tab 18, 5:60-6:27, 7:55-8:9.)  It is "well established that broad claims supported by the written description should not be limited in their interpretation to a preferred embodiment."  *See Gart v. Logitech, Inc.,* 254 F.3d 1334, 1343 (Fed. Cir. 2001); *Generation II Orthotics, Inc. v. Med. Tech. Inc.,* 263 F.3d 1356, 1367 (Fed. Cir. 2001) ("The district court should have construed the claim limitation 'controlled' according to its ordinary and accustomed meaning, rather than importing a characteristic of a disclosed or preferred embodiment into that term.").

Finally, "in response to N-phase timing pulses" means in response to N-phase timing pulses.  Instead of allowing "in response" to mean what it says, ADI proposes it to mean "as a result."  ADI's proposed construction implies a requirement that the timing pulses cause the regulator stages to generate current, as opposed to providing timing for the regulator stages so

that they operate out of phase from one another. The latter meaning of "in response to," which is less restrictive than "as a result" and better aligned with the other language of the claim, also is consistent with the description of the invention in the specification. (*See* L-Appx 18, 3:8-11; 5:49-58; 6:47-52; 7:55-67.) There is no indication that the patentee ascribed a meaning to "in response" other than its plain meaning.

### C.    "Each of the N regulator stages providing current I/N to the output node" (Claims 1, 13, 30, 33)

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| each of the N regulator stages providing current I/N to the output node (Claims 1, 13, 30, 33) | each regulator stage provides a substantially equal amount of current I/N to the output node | each regulator stage provides an equal amount of current I/N to the output node |

ADI's construction of this limitation, requiring that the current I/N provided by each regulator stage be strictly equal, is not supported by the specification, which allows for variation in the current. The specification states that each regulator stage provides a <u>substantially</u> equal amount of current I/N to the output node, and is therefore the correct construction of this disputed claim term. (*See* L-Appx 18, 5:60-63; 6:61-63.)

### V.    LTC'S U.S. PATENT NO. 5,212,618 ("THE '618 PATENT")

The '618 patent describes an electrostatic discharge clamp. Electrostatic discharge protection devices such as clamps are used to protect circuits designed to operate at a low voltage levels from high voltage or current levels resulting from electrostatic discharge ("ESD"). ESD protection devices protect against damage by providing a low-resistance path to conduct excessive current at a high voltage that might otherwise flow to and damage other parts of the circuit. (L-Appx, Tab 20, 1:9-17; 61-62.) The ESD clamp described in the '618 patent uses a vertical transistor to achieve ESD protection in which the elements of a transistor are

stacked on top of one another, and may be formed in an epitaxial layer on top of a substrate, or partially in a diffused well in a substrate. A resistive element is implemented between the base region and the emitter region of the transistor. The transistor is configured to provide a diode between the collector and the substrate. (L-Appx, Tab 20, Abstract; Figs. 2A, 3A, 7; 2:46-3:8; 4:41-43.)

**A.** **"Semiconductor substrate" (Claims 1, 21), "Formed in said first semiconductor region" (Claims 1, 21)**

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| Semiconductor substrate (Claims 1, 21) | a substrate made out of semiconductor material | an underlying layer or substratum below the integrated circuits on a chip |
| formed in said first semiconductor region (Claims 1, 21) | formed in said first semiconductor region | the first semiconductor region forms an element of the transistor |

The jury needs no assistance in understanding these limitations; they require no construction and should be given their plain and ordinary meanings. *See Phillips*, 415 F.3d at 1312-1313, *supra*. There is nothing in the specification to indicate that the patentee ascribed meanings to these terms other than their plain meanings.

"Semiconductor substrate" means a substrate made out of a semiconductor material. There is no mention in the specification of a requirement that the substrate be "below the integrated circuits on a chip." The specification states that the transistor elements can be "in" or "on" the substrate. (*See* L-Appx, Tab 20, 1:18-21; 2:48-49; 2:53-54.)

"Formed in said first semiconductor region" means what is says: formed in said first semiconductor region. Instead, ADI proposes that it means "the first semiconductor region forms an element of the transistor." This incorrectly requires that the first semiconductor region

<u>act</u> as one element of the transistor, as opposed to the phrase's plain language that the vertical

bipolar transistor is <u>formed</u> in the first semiconductor region.

### B.     "A first semiconductor region" (Claims 1, 21)

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| a first semiconductor region (Claims 1, 21) | a region formed in or on the substrate and contacting substrate material | a region formed on the substrate and contacting substrate material |

ADI's proposed construction limiting the semiconductor region to one formed

"on" the substrate, as opposed to "on" or "in" the substrate, is incorrect.  The specification states

that the transistor elements may be formed either "on" or "in" the substrate.  (*See* L-Appx,

Tab 20, 1:18-21; 2:48-49; 2:53-54.)  ADI's proposed construction also does not make sense

when considered in conjunction with other claims.  Claims 2 and 3 are dependent claims that, by

definition, add further limitations to those of claim 1.  Claim 2 states that the first semiconductor

region of claim 1 is "on" the substrate, whereas claim 3 states that it is "in" the substrate.

Therefore, the first semiconductor region of claim 1 must be construed broadly enough to be

either "in" or "on" the substrate, so that it could be further limited to "in" or "on" by claims 2

and 3.

### C.     "Said collector region being . . . diode-connected to said substrate" (Claim 1), "A PN junction connecting said substrate to said collector region" (Claim 21)

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| said collector region being . . . diode-connected to said substrate (Claim 1) | the interface between the abutting collector and the substrate forms a PN junction, or diode | the substrate interface between the abutting collector and the substrate forms a PN junction |
| a PN junction connecting said substrate to said | an interface formed by a collector region of one | a substrate interface formed by a collector region of one dopant |

| collector region (Claim 21) | dopant type abutting the substrate of an opposite dopant type | type abutting the substrate of an opposite dopant type |

   LTC and ADI generally agree upon the construction of these limitations, except that ADI inserts the limitation "substrate interface." "Substrate interface" is not known to have a particular meaning in the art, and is not used in the specification of the '618 patent. There is no valid reason to insert the word "substrate" into the construction of these limitations.

   **D.** **"Current limiting resistive element (Claims 1, 21)**

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
| --- | --- | --- |
| current limiting resistive element (Claims 1, 21) | a resistance that may comprise transistor base resistance and/or an external resistance | The "current limiting resistive element" is circuitry having more than nominal resistance of at least several ohms between the base region and the emitter region. It may comprise transistor base resistance and/or an external resistance. |

   ADI's proposed construction of "current limiting resistive element" introduces vague limitations and impermissibly attempts to restrict the patent to an embodiment described in the patent specification. ADI defines the phrase "current limiting resistive element" in part as "circuitry having more than nominal resistance." ADI's definition is not in the specification, introduces an ambiguous word, "nominal," and contributes nothing to an understanding of the claim. Claim construction is not a process for rewriting claims in different words.

   ADI's insertion of the limitation "resistance of at least several ohms" impermissibly attempts to restrict the patent to an embodiment described in the patent specification. Referring to Figure 2A of the '618 patent, the specification states that "the value of the resistor from the base of the clamp to ground is noncritical and can vary from several ohms to several hundred ohms." (L-Appx, Tab 20, 3:6-8.) However, the specification clearly states that Figure 2A is a "section view . . . of **one embodiment** of the clamp of FIG. 1." (L-

Appx, Tab 20, 2:51-52.) There's nothing inherent that would prevent the invention from working with a resistance of less than several ohms. (Blauschild ¶ 153.) ADI's construction therefore imports limitations from one embodiment into the claims in an impermissible manner. See *Gart*, 254 F.3d at 1343; *Generation II Orthotics*, 263 F.3d at 1367, *supra*.

> E.   "Collector-base breakdown voltage" (Claims 1, 21), "Inactive" (Claims 1, 21), "Forms a current path" (Claims 1, 21)

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| collector-base breakdown voltage (Claims 1, 21) | a voltage, when applied between the collector and base, above which the junction between the collector and the base breaks down | the voltage, when applied between the collector and base, above which the transistor conducts current from an electrostatic discharge pulse |
| Inactive (Claims 1, 21) | where the transistor functions as a open circuit | where the transistor functions as a open circuit and no current from an electrostatic discharge pulse is being conducted to ground |
| forms a current path (Claims 1, 21) | where the transistor conducts current | where the transistor conducts current from an electrostatic discharge pulse to ground |

ADI's proposed constructions of these limitations are more restrictive than their well-understood meaning in the art. "Collector-base breakdown voltage" is an inherent characteristic of a given transistor. A transistor that "forms a current path" is conducting current. An inactive transistor functions as an open circuit. The well-understood meaning of these limitations does not require definition with reference to "an electrostatic discharge pulse," or conduction "to ground." (Blauschild ¶ 154-156.) ADI's proposed constructions improperly insert these requirements into the limitations.

## VI.    LTC'S U.S. PATENT NO. 6,100,678 ("THE '678 PATENT")

The '678 patent provides circuits and methods for implementing both a soft-start function and a short-circuit timer function in voltage regulator controller circuits using a single package pin. (L-Appx, Tab 21, 1:12-16.) Soft-start functions gradually increase the current limit of the controller circuit so that the current builds to a normal operating level. (L-Appx, Tab 21, 1:34-39.) Short-circuit latch off functions protect voltage regulators from short circuits by causing the regulator to be shut down when a short circuit is detected. The '678 patent implements a soft-start function by charging an external capacitor, attached to a package pin, from a completely discharged state, and using its voltage as the current limit signal. The charge and discharge times of the same capacitor are used to delay the shutdown of the voltage regulator in response to a short-circuit detection. Thus, the circuit will not be unnecessarily turned off when a temporary surge occurs, the short-circuit timer function can be controlled externally, and only a single package pin is used to perform this and the soft-start functions. (L-Appx, Tab 21, 2:35-65; 3:1-11.)

### A.    "Charging and draining circuitry . . ." (Claim 1), "through a single package pin" (Claim 5), "Short circuit timer function" (Claim 5)

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| charging and draining circuitry, coupled to the single package pin, that charges and drains voltage on the capacitor (Claim 1) | charging and draining circuitry, coupled to the single package pin, that charges and drains voltage on the capacitor | charging and draining of the capacitor is performed using the same package pin, i.e., both the charging current and the draining current pass through the single package pin |
| through a single package pin (Claim 5) | using a single package pin | charging and draining of the capacitor is performed using the same package pin, i.e., both the charging current and the draining current pass through the single package pin |

| short-circuit timer function (Claim 5) | a function for timing a short-circuit condition | a predetermined period of time for which a short circuit condition must exist before a short circuit shutdown signal is generated |
|---|---|---|

The jury needs no assistance in understanding what these limitations mean; they mean what they say, require no construction, and should be given their plain and ordinary meanings. *See Phillips* and *Applera*, *supra*. There is nothing in the specification to indicate the patentee ascribed meanings to these terms other than their plain meanings.

"Charging and draining circuitry, coupled to the single package pin, that charges and drains voltage on the capacitor" means charging and draining circuitry, coupled to the single package pin, that charges and drains voltage on the capacitor. The claim language does not specify that the charging and draining circuitry must be coupled to the pin in a particular way, i.e., there is no requirement that the pin be coupled to the charging and draining circuitry so that particular currents – a charging current or a draining current, or both – must pass through the pin. Similarly, "providing a short-circuit timer function . . . through a single package pin coupled to an external capacitor" (preamble of claim 5) does not require that either or both of a charging current and a draining current must pass through the pin. Where the patentee intended that a claim require that both the charging current and the draining current pass through the single package pin, the patentee explicitly stated so (*see* claim 21: "providing current to the capacitor through the single package pin" and "draining current from the capacitor through the single package pin"). Because "through a single package pin" appears in the preambles of both claims 5 and 21, ADI's proposed construction would make these limitations in claim 21 redundant

"Short-circuit timer function" appears in the preamble of claim 5 and is defined by the steps of the claim itself. It serves as a convenient label for the invention as a whole. Therefore, it is not a limitation of the claim and does not require construction. *Storage Tech.*

*Corp v. Cisco Sys., Inc.*, 329 F.3d 823, 831 (Fed. Cir. 2003) (holding that preamble terms "policy

caching method" or "policy cache" did not limit claim scope and simply referred to the invention

set forth in the body of the claim); *IMS Tech, Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1434

(Fed. Cir. 2000) (holding that preamble phrase "control apparatus" does not limit claim scope

when it merely gives a descriptive name to the claimed invention). If it is to be construed, it

should be given its plain meaning, which is "a function for timing a short-circuit condition."

ADI's proposed construction improperly attempts to import an embodiment into

the claim. In the preferred embodiment, the "predetermined period of time" to which ADI refers

is not characterized as an explicit requirement of the invention; it is a period of time that can be

calculated based on the particular design of the embodiment. The specification also states that

other embodiments exist in which the components can be varied, which would vary the times

referred to in the context of Fig. 2. (*See* L-Appx, Tab 21, 4:65-5:13; 6:27-42.)

**B.    "Charge the capacitor" (Claim 1), "Discharge the capacitor" (Claims 1, 5)**

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| charge the capacitor (Claim 1) | providing a current that increases the voltage across the capacitor | provide a current charge to the capacitor greater than the amount of current being drained from the capacitor, thereby increasing the voltage across the capacitor |
| discharge the capacitor (Claims 1, 5) | drawing a current that decreases the voltage across the capacitor | provide a current charge to the capacitor less than the amount of current being drained from the capacitor, thereby decreasing the voltage across the capacitor |

LTC and ADI agree that "charge the capacitor" and "discharge the capacitor"

entail increasing and decreasing the voltage across the capacitor, respectively. ADI, however,

inserts "greater than the amount of current being drained from the capacitor" and "less than the

amount of current being drained from the capacitor" into these terms. There is no intrinsic

58.

support for inserting these requirements. One of ordinary skill in the art would understand

charging or discharging a capacitor to simply require providing a current or drawing a current

that increases or decreases the voltage across the capacitor. (Blauschild ¶ 157.)

### C.    "Short circuit" (Claims 1, 5)

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
| --- | --- | --- |
| short circuit (Claims 1, 5) | a low resistance connection between two nodes in a circuit | zero or substantially zero resistance between two connected nodes such that there is no voltage difference between the two nodes |

ADI's proposed construction is overly restrictive. LTC's construction is the well-

known and accepted meaning. (*See* Blauschild ¶¶ 158-161; copies of dictionary definitions

attached as Exhibits 8-10 thereto.)[16] There is nothing in the intrinsic record changing this

limitation's ordinary meaning.

### D.    "Arming voltage" (Claims 1, 5, 21), "Producing an armed signal" (Claim 21)

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
| --- | --- | --- |
| arming voltage (Claims 1, 5, 21) | a predetermined voltage above which the short-circuit timer function is activated | a predetermined voltage above which the short circuit detection circuit is enabled |
| producing an ARMED signal (Claim 21) | a signal indicating that the short-circuit timer function is activated | producing a signal based on a predetermined voltage above which the short circuit detection circuit is enabled |

---

[16]    *See* Webster's Ninth New Collegiate Dictionary, 1986 ("a connection of comparatively low resistance accidentally or intentionally made between points on a circuit between which the resistance is normally much greater"); Random House Dictionary, 2nd Edition, 1987 ("an abnormal, usually unintentional condition of relatively low resistance between two points of different potential in a circuit, usually resulting in a flow of excess current"); *The American Heritage® Dictionary of the English Language, Fourth Edition*, retrieved May 30, 2007, from Dictionary.com website ("a low-resistance connection established by accident or intention between two points in an electric circuit"). (Blauschild Exs. 9-11.)

ADI's constructions mischaracterize the '678 patent. These limitations refer to the arming voltage for the short-circuit timer function. As stated in the specification, after the soft-start function is executed, the voltage across the capacitor $V_c$ increases to the arming voltage, at which point an armed signal activates the short-circuit timer function" (*See* L-Appx, Tab 21, 5:44-50.) What is armed is the system's shutdown response that occurs when a short circuit is detected. This has nothing to do with the operation or enablement of the short circuit detection circuit itself, which is a different aspect of the invention represented as element 130 in Figure 1. The '678 patent does not address the arming of the short circuit detection circuit.

E.    **"short circuit shutdown signal" (Claims 1, 5, 21), "producing a discharge signal" (Claim 21)**

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| SHORT CIRCUIT SHUTDOWN signal (Claims 1, 5, 21) | a signal that can be used to indicate to other circuitry that it should stop operating | a signal that causes the remainder of the regulator circuitry to shutdown |
| producing a DISCHARGE signal (Claim 21) | producing a signal that indicates that the external capacitor is to discharge | producing a signal which causes the external capacitor to start discharging |

On their face, claims containing the "short circuit shutdown signal" do not require the circuitry that actually shuts down the regulator, or the act(s) involved in shutting down the regulator. (Neither is described in the specification.) These claims only require providing the signal. Similarly, claim 21 does not contain a step in which the discharge signal actually causes the external capacitor to discharge. The discharge signal is produced and, when it is present, the external capacitor starts discharging.

60.

## CONCLUSION

For the foregoing reasons, LTC respectfully requests that its proposed claim constructions be adopted by the Court.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B. Blumenfeld*

_____

Jack B. Blumenfeld (#1014)
Karen Jacobs Louden (#2881)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
  *Attorneys for Defendant*
  *Linear Technology Corporation*

OF COUNSEL:

Robert C. Morgan
Laurence S. Rogers
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036
(212) 596-9000

Mark D. Rowland
Ropes & Gray LLP
525 University Avenue
Suite 300
Palo Alto, CA 94301
(650) 617-4000

June 7, 2007
853220

## CERTIFICATE OF SERVICE

I, Jack B. Blumenfeld, hereby certify that on June 7, 2007 I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

> Frederick L. Cottrell, III
> RICHARDS, LAYTON & FINGER

I also certify that copies were caused to be served on June 7, 2007 upon the following in the manner indicated:

### BY ELECTRONIC MAIL & HAND DELIVERY

> Frederick L. Cottrell, III
> Richards, Layton & Finger
> One Rodney Square
> Wilmington, DE  19801

### BY ELECTRONIC MAIL & FEDERAL EXPRESS (on June 8, 2007)

> Wayne L. Stoner
> Wilmer Cutler Pickering Hale and Dorr LLP
> 60 State Street
> Boston, MA  02109

> */s/ Jack B. Blumenfeld (#1014)*
> Morris, Nichols, Arsht & Tunnell LLP
> 1201 N. Market Street
> P.O. Box 1347
> Wilmington, DE  19899
> (302) 658-9200
> jblumenfeld@mnat.com