IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ANALOG DEVICES, INC.,

        Plaintiff/Counterclaim
        Defendant,

     vs.

LINEAR TECHNOLOGY CORP.,

        Defendant/Counterclaim
        Plaintiff.

)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 06-346-GMS

**JURY TRIAL DEMANDED**

## ANALOG DEVICES, INC.'S OPENING *MARKMAN* BRIEF

OF COUNSEL:

Wayne L. Stoner
Wayne M. Kennard
Donald R. Steinberg
Benjamin M. Stern
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
(617) 526-6000

Frederick L. Cottrell III (#2555)
cottrell@rlf.com
Kelly E. Farnan (#4395)
farnan@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square, P.O. Box 551
Wilmington, DE 19899
(302) 651-7700

*Attorneys for Plaintiff/Counterclaim Defendant
Analog Devices, Inc.*

Dated:  June 29, 2007

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................... iv

I.    INTRODUCTION ..................................................................................................... 1

II.   TECHNICAL BACKGROUND .............................................................................. 2

      A.    The Analog Patents ........................................................................................ 2

            1.    The '909 Patent ................................................................................... 2

            2.    The '633 Patent ................................................................................... 6

      B.    The LTC Patents ............................................................................................ 6

            1.    The '194 Patent ................................................................................... 6

            2.    The '618 Patent ................................................................................... 7

            3.    The '678 Patent ................................................................................... 9

            4.    The Wilcox Patents ........................................................................... 10

III.  BASIC PRINCIPLES OF CLAIM CONSTRUCTION ........................................ 11

IV.   THE DISPUTED CLAIM LIMITATIONS OF THE ANALOG PATENTS ........ 12

      A.    The '909 Patent ............................................................................................ 12

            1.    "Gain Compensated Differential Amplifier" ................................... 12

            2.    "Tail Current $I_{tail}$" ............................................................................. 14

            3.    "Control Voltage" ............................................................................. 15

            4.    "Control Voltage Generating Means for Generating as the Control
                  Voltage, a Voltage Which Varies Proportionally to Absolute
                  Temperature" .................................................................................... 16

            5.    "Means for Functionally Relating the Control Voltage to the Intrinsic
                  Emitter Resistance of the Current Source" ...................................... 17

            6.    "$\Delta V_{BE}$ Cell" ........................................................................................ 19

      B.    The '633 Patent ............................................................................................ 20

            1.    "Bipolar Transistor" ........................................................................ 20

            2.    "Connected" ..................................................................................... 21

V.    DISPUTED CLAIM LIMITATIONS OF THE LTC PATENTS ........................... 22

      A.    '194 Patent ................................................................................................... 22

            1.    "Input Signal" and "Output Signal" ................................................ 22

2.  "Each of the N Regulator Stages Providing Current I/N to the Output
    Node" ........................................................................................................24

3.  "N-Phase Timing Pulses" .............................................................................25

B.  The '618 Patent .......................................................................................................26

1.  "Semiconductor Substrate" ..........................................................................26

2.  "A First Semiconductor Region" .................................................................27

3.  "Formed in Said First Semiconductor Region" ...........................................27

4.  "Current Limiting Resistive Element" .........................................................29

5.  "Collector-Base Breakdown Voltage," "Inactive," and "Forms A
    Current Path" ...............................................................................................30

C.  The '678 Patent .......................................................................................................31

1.  "Charging and Draining Circuitry, Coupled to the Single Package
    Pin, That Charges and Drains Voltage on the Capacitor" ...........................31

2.  "Short Circuit" .............................................................................................32

3.  "SHORT CIRCUIT SHUTDOWN Signal" ..................................................33

4.  "Through a Single Package Pin" ..................................................................34

5.  "Arming Voltage" .........................................................................................34

D.  Common Claim Limitations of the Wilcox Patents ................................................35

1.  "Switching Voltage Regulator" ....................................................................35

2.  "Coupled" .....................................................................................................36

3.  "Load" ...........................................................................................................37

4.  "Regulated Voltage" .....................................................................................38

5.  "Substantially at the Regulated Voltage" .....................................................39

6.  "Signal" .........................................................................................................40

7.  "First State of Circuit Operation" and "Second State of Circuit
    Operation" .....................................................................................................41

8.  "To Cause" ....................................................................................................42

9.  "Threshold" ...................................................................................................42

10. "Output Current" ...........................................................................................43

11. "A First Means for Generating a Voltage Feedback Signal Indicative
    of the Voltage at the Output" and "Means for Generating a Voltage
    Feedback Signal" ..........................................................................................44

12. "Turning Both Switching Transistors Simultaneously OFF" .......................45

13. "Output Inductor" ....................................................................45

E. The '178 Patent .........................................................................46

   1. "A Second Means for Generating a First Control Signal . . . to
Maintain the Output Voltage at the Regulated Voltage" ....................46

   2. "A Third Means For Generating a Control Signal . . . To Cause Both
Switching Transistors To Be Simultaneously OFF . . ." ....................47

   3. "Current to the Output Terminal" ..............................................47

   4. "Threshold Indicative of a Polarity Reversal Condition" ...............48

   5. "Prevent the Current to the Load from Reversing Polarity" ............49

   6. "Prevents the Drive Circuitry from Turning on Either of the Pair of
Synchronously Switched Switching Transistors" .............................50

   7. "Selected Sleep Mode Current Level" .......................................50

F. The '694 Patent .........................................................................51

   1. "Inductive Element" ................................................................51

   2. "Current Comparator Circuit" ...................................................51

   3. "Current Feedback Signal" .......................................................52

   4. "Minimum Feedback Current Threshold" ....................................52

   5. "First State" and "Second State" ...............................................53

   6. "Bias Source" ........................................................................54

G. The '885 Patent .........................................................................54

   1. "One-Shot" and "One-Shot Circuit" ...........................................54

   2. "Terminal" ............................................................................55

   3. "Input Node" .........................................................................55

   4. "Feedback Circuit" .................................................................56

   5. "Off-Time Control Circuit" ......................................................56

   6. "Means for Generating a Trigger Signal Responsive to the Current
Feedback Signal and the Voltage Feedback Signal" .........................57

   7. "One-Shot Means for Placing the Switch into an Off State
Responsive to the Trigger Signal, the Switch Remaining in the Off
State for a Period of Time Responsive to the Off-Time Control
Signal" .....................................................................................57

   8. "Variable Current Source" ........................................................58

VI. CONCLUSION ...............................................................................59

iii

# TABLE OF AUTHORITIES

Cases

*Bicon, Inc. v. Straumann Co.*,
    441 F.3d 945 (Fed. Cir. 2006)................................................................................... 16

*Ethicon Endo-Surgery, Inc. v. United States Surgical Corp.*,
    93 F.3d 1572 (Fed. Cir. 1996)................................................................................... 21

*Fin Control Systems Pty, Ltd. v. OAM Inc.*,
    265 F.3d 1311 (Fed. Cir. 2001)............................................................................. 22-23

*Genentech, Inc. v. Chiron Corp.*,
    112 F.3d 495 (Fed. Cir. 1997)................................................................................... 21

*Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*,
    381 F.3d 1111 (Fed. Cir. 2004)................................................................................. 21

*Modine Mfg. Co. v. United States Int'l Trade Comm'n*,
    75 F.3d 1545 (Fed. Cir. 1996)............................................................................ *passim*

*Omega Eng'g, Inc. v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003).................................................................................. 12

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc)............................................ 11, 12, 29, 37

*Rambus Inc. v. Infineon Techs. Ag*,
    318 F.3d 1081 (Fed. Cir. 2003).................................................................................. 15

Statutes

35 U.S.C. § 112.................................................................................................... *passim*

# I.    **INTRODUCTION**

This brief addresses:  (1) disputed claim limitations in U.S. Patent Nos. 4,929,909 (the "'909 patent") and 6,262,633 (the "'633 patent") asserted by Analog Devices, Inc. ("Analog") against Linear Technology Corp. ("LTC");[1] and (2) disputed claim limitations in U.S. Patent Nos. 6,144,194 (the "194 patent"), 5,212,618 (the "'618 patent"), 6,100,678 (the "'678 patent"), 5,481,178 (the "'178 patent"), 5,731,694 (the "'694 patent"), 5,994,885 (the "'885 patent"), 6,304,066 (the "'066 patent"), and 6,508,258 (the "'258 patent") (the '178, '694, '885, '066, and '258 patents are collectively the "LTC Wilcox patents") asserted by LTC against Analog.

These ten patents all relate to electronic integrated circuits.  The two Analog patents address gain compensated differential amplifiers (the '909 patent) and operational amplifier output stages (the '633 patent).  The three LTC non-Wilcox patents relate to using regulator stages to smooth ripples in output current (the '194 patent), electrostatic discharge protection (the '618 patent), and soft-start and short circuit detection through a single package pin to protect voltage regulators (the '678 patent).  The five LTC Wilcox patents, which are all related and share the same specification, relate to power management circuits to increase efficiency at low current levels.

---

[1]      Analog has also accused LTC of infringing U.S. Patent No. 6,118,326 (the "'326 patent).  Neither party, however, seeks to have the Court construe any claim limitation in the '326 patent.

## II.    TECHNICAL BACKGROUND

### A.    The Analog Patents

#### 1.    The '909 Patent

The '909 patent teaches an improved "differential amplifier."[2]  A differential amplifier is a circuit that amplifies the difference between two input signals.  *See* A.J.A. at B56, *IEEE Standard Dictionary of Electrical and Electronics Terms* at 260 (4th ed. 1988).[3]  One of the important building blocks of a differential amplifier is the transistor, a semiconductor device that controls the flow of current between two terminals (such as an "emitter" and a "collector") by varying the current or voltage applied to a third terminal (such as a "base").  *See* A.J.A. at B59, *Webster's New Universal Unabridged Dictionary* at 2010 (1996 ed.).

FIG. 1 of the '909 patent illustrates a type of differential amplifier implemented as a "long-tailed pair."  This long-tailed pair includes two bipolar transistors (reference numbers 12 and 14), a resistor Rc, and a current source.  The emitters of the two transistors are connected together to form the "long-tail" (labeled 18).  In FIG. 1 of the '909 patent, the two input signals are (1) the "input voltage" $V_{IN}$ applied to the base of transistor 12, and (2) the voltage applied to the base of transistor 14 which as shown in the figure is ground.



FIG 1 PRIOR ART

---

[2]    The '909 patent is attached to the A J A as Exhibit 1

[3]    All citations to "A J A " are to the Joint Claim Construction Appendix for the Patents asserted by Analog Devices, Inc   All citations to "L J A " are to the Joint Appendix of Evidence Relating to the Linear Patents.  Both appendices are filed contemporaneously herewith

In operation, the input voltage $V_{IN}$ drives the base of transistor 12. As $V_{IN}$ increases, the amount of current flowing through transistor 12 (from the collector to emitter) increases. This current then flows down through the tail 18. But the amount of current flowing through the tail is held constant by the current source. Thus, as the current flowing into the tail from transistor 12 increases, the current flowing into the tail from transistor 14 must decrease. As the current flowing through transistor 14 decreases, the voltage "drop" across resistor Rc decreases.[4] As a result, when $V_{IN}$ increases, $V_{OUT}$ increases. In a typical differential amplifier, small changes in $V_{IN}$ result in large changes in $V_{OUT}$.

"Gain" is the measure of the ability of a differential amplifier to amplify the difference between input voltages (here $V_{IN}$ and zero). The gain multiple is determined, in part, by the value of "collector resistor" Rc, and by the amount of tail current. See 1:26-42. The larger the Rc, the larger the gain; likewise, the larger the tail current, the larger the gain.

In many applications, it is important that the gain of a differential amplifier be stable and predictable. However, gain depends on factors that are not easily controlled or predicted. Variables that distort the gain of a differential amplifier include, for example, (a) temperature variations, and (b) "lot-to-lot" variations of the components of the differential amplifiers, including geometric parameters, that vary with each manufactured semiconductor wafer or lot.

Distortions in gain can, in theory, be corrected by adjusting the amount of current being "pulled" through the tail of the long-tailed pair. FIG. 2 of the '909 patent shows a simplified schematic of the "tail current generator" according to the '909 patent. See 2:16-19. This circuit controls the amount of current drawn through the tail of the long-tailed pair. In FIG. 2, the

---

[4]      The voltage drop across a resistor is given by the equation V=IR, where V is the voltage drop, I is the current, and R is the resistor value. As the current I increases, so does the voltage drop across the resistor.

voltage applied to the base of transistor 24 controls the amount of current being pulled through the tail of the long-tailed pair.

The ability to use a control voltage to control the tail current of a differential amplifier so that it is "proportional to absolute temperature" ("PTAT") was well known in the art. Although a circuit (known as a "$\Delta V_{BE}$ cell") that generates this control voltage existed in the prior art, it was not known how to modify this circuit to compensate for **both** temperature variations and "lot-to-lot variations." Correcting for lot-to-lot variations is particularly difficult because these variations cannot be predicted.

The '909 patent solved this problem and achieves this "dual compensation." It does so by a circuit that includes a $\Delta V_{BE}$ cell, labeled as 20 in FIGS. 2 and 3, having particular component values. This "gain" compensation is achieved by the selection of appropriate component values for the circuitry that includes the $\Delta V_{BE}$ cell, and can be understood by comparing elements (a) – (d) of claim 1 to FIG. 3 (a detailed schematic circuit diagram of an embodiment of a gain-compensated differential amplifier).



FIG 3

Element (a), the transistor differential amplifier, operates at tail current $I_{tail}$. The transistor current source – element (b) – generates the tail current, and is "responsive" to a "control voltage," applied at reference number 60 in FIG. 3. Element (c) specifies that the control voltage

varies proportionately to absolute temperature (PTAT). The $\Delta V_{BE}$ cell (reference 20) does this, and adjusts the gain of the circuit so as to correct for temperature distortions.

Element (d) achieves compensation for lot-to-lot variations by accounting for the "intrinsic emitter resistance," which is a characteristic of the current source. Element (d) requires that "the control voltage generating means includ[es] means for functionally relating the control voltage to the intrinsic emitter resistance of the current source." The specification describes how setting certain component values in the $\Delta V_{BE}$ cell will "functionally relate" the "control voltage to the intrinsic emitter resistance of the current source." *See, e.g.*, 2:25-3:34; 3:63-68.[5]

In particular, the specification teaches a designer to select component values that satisfy equation 42, *see* 3:30-35, so as to achieve compensation for lot-to-lot variations in intrinsic emitter resistances.[6] Simply put, the '909 patent teaches a designer to select a value of the resistor component Rg in the $\Delta V_{BE}$ cell that achieves this compensation given a desired gain ("G") of the circuit, a particular ratio for the emitter areas of the transistors in the $\Delta V_{BE}$ cell ("A"), and a particular value for the collector resistor Rc of the differential amplifier. A circuit following these teachings will be gain-compensated, both for temperature ***and*** for lot-to-lot variations in intrinsic emitter resistance. *See, e.g.*, 3:60-68.

---

[5]     *See also* A.J.A. at B14 ("The specification derives the equations ... that relate parameters in the control circuit to a component of the tail current that is proportional to, and tracks, both the resistances associated with the device geometries, and the current gain, of the differential amplifier transistors.")

[6]     Equation 42 provides that $Rg/Rc = (1-1/A)/2G$, where G is the desired gain, and Rc, Rg, and A are component values depicted, for example, in FIGS. 2 and 3. *See* 3:30-35

2.    The '633 Patent

The '633 patent describes an improved "operational amplifier output stage."[7]   An operational amplifier is a fundamental building block widely used in electronic devices such as filters, feedback controllers, and high-precision amplifiers.  In many instances, it is desirable for an operational amplifier to generate high output current.  One way of increasing the output current is to increase the current that naturally flows in the circuit when no signal is applied, *i.e.,* the "quiescent current" of the output stage.  *See* 1:14-16; 2:44-59.  However, increasing the quiescent current leads to undesirable power dissipation.  *See* 2:44-59.  The '633 patent describes how to increase the output current of an operational amplifier without increasing its quiescent current, and thus without the resulting power dissipation.[8]  *See* 2:62-65.

B.    The LTC Patents

1.    The '194 Patent

The '194 patent relates to synchronous switching voltage regulator circuits.[9]  Switching regulators are used to "provide a predetermined and substantially constant output voltage from a source voltage that may be poorly-specified or fluctuating, or that may be at an inappropriate amplitude for the load."  *See* 1:14-17.  "Single stage" switching regulators are inefficient for applications that require low voltage at high current, such as laptops and consumer electronics. In addition, the large input "ripple" current in a single-stage switching uses requires large input capacitors that use additional circuit board space and increase component cost.  The '194 patent

---

[7]    The '633 patent is attached to the A J.A  as Exhibit 3.

[8]    Because the only two limitations at issue with the '633 patent relate to basic concepts, we have kept the discussion of this patent brief

[9]    The '194 patent is attached to the L. J A  as Exhibit 18.

attempted to solve these problems by creating a "multi-stage" regulator, where each stage applies

an even fraction of the output current to create an output "signal." This is illustrated in FIG. 2:



FIG 2

FIG. 2 shows a three-stage switching voltage regulator, with each the of the three stages

virtually identical to the prior art single-stage regulator shown in FIG. 1. A set of three-phase

timing pulses is generated, causing each stage to operate sequentially – stage 1 is followed by

stage 2, which is followed by stage 3. Because each individual stage is only operating for 1/3 of

the time, and is driven by the same feedback loop, the stages each produce 1/3 of the total current

of the regulator. This allows the inductor in each stage to be smaller than the inductor required

for a single stage design producing the same overall current. Also, because each stage operates

"out of phase" with each other, current ripple is reduced along with the output capacitor

requirements.

### 2.    The '618 Patent

The '618 patent relates to the problem of electrostatic discharge ("ESD").[10]   ESD is

_____

[10]     The '618 patent is attached to the L. J. A. as Exhibit 20.

"[t]he sudden transfer of charge between bodies of differing electrostatic potentials."[11]  *See* L.J.A. at A477, IEEE Std C62.47-1992 at 9.  ESD is a well-known problem within the semiconductor industry – even small and unnoticeable discharges can damage parts.  The '618 patent discloses a particular design of an "ESD clamp" to address this common problem.  The design is described in connection with FIGS. 1 and 2A, below.



FIG 1                    FIG 2A

The ESD clamp comprises a vertical bipolar transistor 10 with its collector connected to input terminal 12 and a substrate diode 14 connected to the emitter of the transistor 10.  A resistor $R_B$ is connected to the base of the transistor 10.  The emitter of the transistor is connected to ground.  FIG. 2A shows a side view of the circuit of FIG. 1 as it would appear when fabricated on a semiconductor chip.  It shows a P-doped substrate 20 upon which an N-doped layer 22 is formed.  The transistor is created with the N+ layer 26 and the layer 22 forming the collector, the P-doped region 28 forming the base, and the N-doped region 30 functioning as the emitter.

The disclosed ESD protection clamp operates by discharging an electric current above a "breakdown" voltage.  *See* 1:60-61.  Below a particular breakdown voltage, "the clamp will look like an open circuit [*i.e.*, not conduct current]," 1:61-62, but above that breakdown voltage "the transistor will start conducting current."  1:62-63.

––––––––––––––––––––

[11]     One example of ESD is the shock a person sometimes feels when touching a doorknob after walking across the carpet.  That shock is the transfer of charge between the person, who is at a higher electrostatic potential based on charge collected from the carpet, and the doorknob, which is at a lower electrostatic potential.  Although ESD is a common phenomenon, rarely is the discharge large enough to be felt.

3.     **The '678 Patent**

The '678 patent relates to providing (a) a known function of a "soft-start" to avoid power surges to the input portion of voltage regulators, and (b) a "short-circuit timer function" to protect against short-circuits to the output section of voltage regulators.[12]  According to the patent, each of these functions is associated with a single package pin (output terminal) as illustrated below in FIG. 1. Accordingly, the claimed invention is a particular implementation of a known circuit to address a known problem with the use of a single package pin.



FIG. 1

The soft-start function is active from when the voltage regulator is initially powered on until the voltage across an external capacitor, indicated by reference 104, is just below an "armed" level. *See* 2:50-53. While the soft-start function is active, the voltage across the capacitor rises as current flows into the capacitor through the single package pin. *See* 2:53-55; 3:60-61. When the charge on the capacitor rises above the "armed threshold," the remainder of the voltage regulator circuitry is activated, 2:58-61; 3:64-4:1, and the soft-start function ends.

The external capacitor coupled to the single package pin is also used as part of the short-circuit timer function. *See* 2:66-3:1. The capacitor starts to discharge when the circuit is "armed" and a short circuit is detected. *See* 4:28-37. As the capacitor discharges, the voltage

---

[12]     The '678 patent is attached to the L. J. A. as Exhibit 21

across the capacitor drops. *See* 4:37-38. When the voltage across the capacitor drops below the shutdown threshold, the short circuit shutdown signal is generated and the voltage regulator is shut down. *See* 4:39-46. The time between the initial detection of a short circuit and the generation of shutdown signal depends on the size of the capacitor and the selection of the various threshold voltages. *See* 6:35-42.

### 4.    The Wilcox Patents

The five Wilcox patents all have the same specification, but different claims.[13] The patents are directed to improving the efficiency of a switching voltage regulator in two principal ways: (1) turning OFF part of a regulator at low load current levels (*i.e.*, when the "load" [device being powered] is not using much power) in order to save power ("sleep mode"), and (2) preventing the instantaneous inductor current from reversing direction and preventing power that could have been delivered to the load from being delivered ("polarity reversal").

The basic elements of a switching voltage regulator are a drive circuit, a switch circuit, an output circuit, and a control circuit. The drive circuit is controlled by the control circuit to generate the signals that operate the switches of the switch circuit. The switch circuit has two synchronously switched switching transistors (and in one case a switching transistor and a diode) that alternatively provide currents to the output circuit in the form of a sawtooth-shaped wave. The output circuit includes two electronic devices, an inductor and output capacitors, that smooth the sawtooth wave to provide a steady output voltage that is delivered to the load. The control circuit monitors the output circuit and controls the switching voltage regulator to provide the regulated voltage to the load.

---

[13]    The Wilcox patents are attached to the L.J.A. as Exhibits 4, 9, 11, 14, and 16.

The Wilcox patents have been construed several times in the past. In 1999, LTC sued Analog (and other companies) for infringing the '178 patent in the Northern District of California in an action captioned *Linear Technology Corp. v. Impala, et al.*, Civ.A.No. 97-1727-FMS (N. D. Cal.) (the "*Impala* Litigation"). The district court in the *Impala* Litigation issued an opinion, on June 9, 2001, construing several claim limitations of the '178 patent (several of which are used throughout the Wilcox patents). *See* L.J.A. at Exhibit 2. The Federal Circuit subsequently modified the construction of several disputed claim limitations on August 17, 2004. *See* L.J.A. at Exhibit 1. More recently, the International Trade Commission ("ITC"), on May 22, 2007, issued an Initial Determination construing several claim limitations of the '258 patent (the last patent in the Wilcox patent family).[14] *See* L.J.A. at A479-507, May 22, 2007 Initial Determination, *In the Matter of Certain Voltage Regulators, Components Thereof, and Products Containing Same*, Investigation No. 337-TA-564 (the "Initial Determination").

## III.    BASIC PRINCIPLES OF CLAIM CONSTRUCTION

The Court is extremely familiar with the basic principles of claim construction, which the Federal Circuit reaffirmed in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*). Briefly stated, those principles are: the words of a claim are to be given the ordinary and customary meaning that a person of ordinary skill in the art would have understood the claim language to have in light of the patent documents at the time the patent application was filed. *See id.* at 1313. A court should derive this "ordinary and customary meaning" by looking to the claim language, the specification, and the prosecution history. *See id.* at 1314-17. In conjunction with this intrinsic evidence, a court may also consider extrinsic evidence – such as

---

[14]    Because the ITC issued the Initial Determination after the parties filed their Joint Appendices of Intrinsic Evidence, Analog was unable to provide the Court with this document at that time.

- 11 -

dictionaries – although such evidence is generally "less significant" than the intrinsic record in determining the meaning of claim language. *See id.* at 1317-18.

Under 35 U.S.C. § 112, ¶ 6, a claim limitation may be expressed as a "means or step for performing a specified function without the recital of structure, material, or acts in support thereof." In determining whether a claim limitation is subject to Section 112, ¶ 6, a court considers the phrasing of the limitation. If Section 112, ¶ 6 applies, a court must first determine the function that is being performed, while "staying true to the claim language and the limitations expressly recited by the claims." *Omega Eng'g v. Raytek Corp.,* 334 F.3d 1314, 1322 (Fed. Cir. 2003). Second, a court must determine what structure, material, or acts provided in the written description correspond to the function performed. *Id.*

## IV.    THE DISPUTED CLAIM LIMITATIONS OF THE ANALOG PATENTS

### A.    The '909 Patent

#### 1.    "Gain Compensated Differential Amplifier" (claims 1, 6)

| Analog's Proposal | LTC's Proposal |
|---|---|
| A circuit that amplifies the difference between two input voltages, wherein the amplification is adjusted for environmental, process, or structural variations. | "Differential amplifier" means a circuit, the purpose and operation of which is to amplify the difference between two input voltages. <br><br> "Gain-compensated" means that the gain of the differential amplifier is compensated simultaneously for geometry dependent parameters, temperature dependencies, and lot-to-lot variations (*i.e.,* compensated for ohmic emitter and base resistance, intrinsic emitter resistance, and beta). |

The parties agree that a differential amplifier "amplifies the difference between two input voltages," but disagree about the meaning of "gain-compensated."

- 12 -

As noted above, "gain" is the measure of the ability of a circuit to amplify signals. This amplification can be distorted by temperature ("environmental") changes, and also by lot-to-lot ("process" or "structural") changes in component variables. Accordingly, under Analog's proposed construction, to offset the changes in gain, a differential amplifier is "gain compensated" if its "amplification is adjusted for environmental, process, or structural variations." This construction comports with the plain meaning of the claim language and is supported by the intrinsic evidence. *See, e.g.,* 1:53-59 ("It is object of the present invention to provide a differential amplifier with improved temperature stability of gain.... [and] in which gain uncertainty is minimized from lot to lot in the fabrication process"); 1:50-51 ("resistance values are very geometry sensitive and can ... vary from wafer to wafer (and lot to lot) in the fabrication process").

LTC proposes an exceedingly narrow construction, under which a differential amplifier is only "gain-compensated" if its gain is *simultaneously* compensated for (i) geometry dependent parameters, (ii) temperature dependencies, *and* (iii) lot-to-lot variations. However, gain compensation can be achieved without simultaneous compensation for all these factors. By construing the term this way, LTC improperly limits the claim's broad use of "gain-compensation" to a particular disclosed embodiment.

LTC supports its suggested construction with a citation to a fragment of prosecution history, in which the applicant, in distinguishing prior art, stated that "[n]o one previously knew how to use a control voltage to compensate simultaneously for geometry-dependent-parameters, temperature-dependencies and lot-to-lot variations in a differential amplifier." *See* A.J.A. at B15. But this sentence did not *define* a gain-compensated differential amplifier; it simply described a benefit that was enabled by one embodiment of the '909 invention.

2.     **"Tail Current $I_{tail}$" (claims 1(a), 6(a))**[15]

| Analog's Proposal | LTC's Proposal |
|---|---|
| The current drawn through the long-tail portion of a pair of transistors of a differential amplifier, wherein the long-tail portion is formed by the connection of the emitters of the transistors. | "tail current" – The current drawn through the long-tail portion of a pair of transistors of a differential amplifier, wherein the long-tail portion is formed by the connection of the emitters of the transistors. The value of the tail current is required to be $I_{tail}$ (see below).<br><br>"$I_{tail}$" – a "PTAT" current (*i.e.*, a current, the value of which varies linearly with absolute (Kelvin) temperature).<br><br>In addition, "$I_{tail}$" = $2I(1+1/\beta_0)$, where $I=[(V_T \ln (A))/R_g]/[1-(r/R_g)(1-1/A)]$ as defined in the '909 patent (equation 40). |

$I_{tail}$ is the shorthand symbolic expression for tail current ("I" is used in electronics as the symbol for current). The claims and the specification repeatedly refer to "tail current $I_{tail}$," making clear that the two terms are interchangeable in the '909 patent. *See, e.g.*, Claims 1(a) and 6(a); 4:39-44. Accordingly, Analog construes both terms the same.

Analog's proposed construction is consistent with the ordinary meaning of the terms "tail current" and "$I_{tail}$" and the usage of those terms throughout the specification and prosecution history. *See* 1:38-39 ("I is half of the tail current in the lead 18"); *see also* 1:62-67; 2:32-35; 2:46-54; 2:66-68; 3:60-63; 4:39-42; 4:44; 5:1-7; A.J.A. at B14-15; A.J.A. at B17-18.

LTC appears to agree with the basic definition of "tail current" and $I_{tail}$ but limits it to one complicated specific value disclosed in the specification. LTC states that "[t]he value of the tail current is required to be '$I_{tail}$'," and then elaborates that "$I_{tail}$" is specified by the equation

---

[15]     In context, the claim limitation is "a transistor differential amplifier . . . operating at a tail current $I_{tail}$."

$2I(1+1/\beta_0)$.  But this equation is not part of the ordinary meaning of "tail current" and is not

recited in claims 1 or 6.

Comparing independent claims 1 or 6 to respective dependent claims 4 or 9 confirms that

the "tail current" in claims 1 and 6 is not limited to the above equation.  Dependent claims 4 and

9 specifically recite "a tail current of $2I(1+1/beta)$."  The inventor could have recited this specific

equation in claims 1 and 6, but did not.  Reading this limitation into claims 1 and 6 would render

the recitation of that equation in claims 4 and 9 meaningless.  *See Rambus Inc. v. Infineon Techs.*

*Ag*, 318 F.3d 1081, 1093 (Fed. Cir. 2003) (construction of independent patent claim in manner

that would render claim language in dependent claims meaningless is disfavored).

3.    "Control Voltage" (claims 1(b), 6(b); *see also* claims 3, 5, 8, 10)[16]

| Analog's Proposal | LTC's Proposal |
|---|---|
| A voltage used to control a device in a circuit. | The "control voltage" is the voltage at the base of the transistor current source. |

The meaning of "control voltage" in the asserted claims is simply "a voltage used to

control a device in a circuit."  In claims 1 and 6, the device that the control voltage "controls" is

the "current source."

LTC's suggested construction of the term "control voltage" – "the voltage at the base of

the transistor current source" – reads the word "control" out of the claim.  Rather than defining

"control voltage" in terms of what it *does* ("*control* a device"), LTC construes "control voltage"

as the voltage at a particular place ("the voltage at the base of the transistor current source").  A

person of ordinary skill in the art would not understand "control voltage" necessarily to be the

voltage in a particular place but rather the voltage that serves a particular purpose – *controlling*

---

[16]    In the context of claims 1(b) and 6(b), the claim limitation is a "current source responsive to a control voltage..."

another device. *See Bicon, Inc v Straumann Co*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("[C]laims are interpreted with an eye toward giving effect to all terms in the claim").

> **4.**    **"Control Voltage Generating Means for Generating as the Control Voltage, a Voltage Which Varies Proportionally to Absolute Temperature"** (claims 1(c), 6(c)).

| Analog's Proposal | LTC's Proposal |
|---|---|
| This is a means-plus-function limitation, and should be construed to cover the corresponding structure(s) and equivalents thereof. The corresponding structure(s) described in the specification is circuitry that includes a $\Delta V_{BE}$ cell. | This element is a means-plus-function element that must be construed pursuant to 35 U.S.C. § 112, ¶ 6. As such, the claimed "control voltage generating means" must be construed to be the corresponding circuitry described in the specification for performing the claimed function of "generating, as the control voltage, a voltage that varies proportionally to absolute temperature," and structural equivalents thereof. "A voltage which varies proportionally to absolute temperature" means a PTAT voltage (i.e., a voltage the value of which varies linearly with absolute (Kelvin) temperature). There is no circuit structure disclosed in the patent which functions to generate a PTAT control voltage. Alternatively, if there is a structure in the patent for performing the claimed function, the corresponding structure of the "control voltage generating means" is the $\Delta V_{BE}$ cell of FIG. 3, where (1) transistor 28 has an emitter area A times that of transistor 32 and (2) transistors 28 and 32 are driven to equal current densities. |

As LTC agrees, the "control voltage generating means" in claims 1(c) and 6(c) is a means-plus-function limitation. The specification clearly identifies the corresponding structure that performs the claimed function: "The operation of $\Delta V_{BE}$ cell 20 is well documented in the literature. It provides on line 60 a drive voltage $V_{bias}$ which produces PTAT." 4:67-5:1. Similarly, claim 6(c) specifically refers to $\Delta V_{BE}$ cell as the structure that "provide[s]" the control voltage.

LTC first asserts that the '909 patent fails to disclose a corresponding structure. As explained above, however, the specification clearly identifies the circuitry that performs the recited function as circuitry that includes a $\Delta V_{BE}$ cell. Indeed, the specification illustrates a $\Delta V_{BE}$ cell in FIG. 2, and describes its design at 2:58-66. It is therefore unsurprising that LTC readily identifies a $\Delta V_{BE}$ cell, in their alternative construction, as the structure that performs the claimed function. Yet, LTC limits the $\Delta V_{BE}$ cell to two specific transistors (transistors 28 and 32), having specific (*i e ,* equal) current densities, with specific sizes (emitter area of transistor 28 is A times that of transistor 32). Not only has LTC failed to list *all* the corresponding circuitry of the $\Delta V_{BE}$ cell, but, more importantly, the claim language does not require LTC's selective identification of circuit components with specific characteristics.

### 5.    "Means for Functionally Relating the Control Voltage to the Intrinsic Emitter Resistance of the Current Source" (claims 1(d), 6(d))

| Analog's Proposal | LTC's Proposal |
|---|---|
| This is a means-plus-function limitation, and should be construed to cover the corresponding structure(s) and equivalents thereof.<br><br>The corresponding structure(s) described in the specification includes the $\Delta V_{BE}$ cell structured to satisfy Equation 42. | This element is a means-plus-function element that must be construed pursuant to 35 U.S.C. § 112, ¶ 6. As such, the claimed means must be construed to be the corresponding circuitry described in the specification for performing the claimed function of "functionally relating the control voltage to the intrinsic emitter resistance of the current source" and structural equivalents thereof.<br><br>The "intrinsic emitter resistance" of a transistor is defined as kT/qI, where k is Boltzmann's constant, T is absolute temperature, q is electronic charge, and I is the current conducted by the transistor.<br><br>There is no circuit structure disclosed in the patent which performs the claimed function, because there is no disclosed structure corresponding to the recited "control voltage generating means" (see element (c), above). Alternatively, if there is structure in the patent for performing the claimed function, the structure for performing the claimed function of "functionally relating the control voltage to the intrinsic emitter resistance of the |

| | current source," is $\Delta V_{BE}$ cell 20 of FIG. 3, having all indicated component values, mathematical relationships, and device relationships such that the gain of the differential amplifier is compensated for geometry-dependent parameters, temperature dependencies, and lot-to-lot variations. In addition, $\Delta V_{BE}$ cell 20 has the following properties:<br><br>• The value of resistor 34 ($R_g$) is chosen such that, for a desired differential mode gain G, $R_g/R_c=(1-1/A)/2G$.<br><br>• The unit area emitter geometries of the transistors of $\Delta V_{BE}$ cell 20 and of the other transistors of Fig. 3 are the same.<br><br>Transistors 28 and 32 operate at different collector currents. |
|---|---|

The parties agree that this claim limitation, in claims 1(d) and 6(d), is in means-plus-function language. Analog believes that the structure that "functionally relates the control voltage to the intrinsic emitter resistance of the current source" includes the $\Delta V_{BE}$ cell, structured to satisfy equation 42. In the course of deriving equation 42, the specification explains the intrinsic emitter resistance "is not easy to measure and … varies significantly from one production lot to the next," and therefore "[a] design is needed … which is self compensating." 2:40-46. Using equation 42 allows a designer to "select[ ] parameters to achieve [this] compensation." 3:33-34. After deriving equation 42, the specification explains that "this invention shows how, with proper design, [the] $\Delta V_{BE}$ cell [which generates the control voltage] can be used to bias the current source … to a point which adds to the tail current a component keyed to and tracking the ohmic [*i.e.*, intrinsic emitter] resistances associated with the device geometries." 3:63-68. In other words, satisfying equation 42 (for certain component values of a $\Delta V_{BE}$ cell) causes the control voltage to be functionally related to the intrinsic emitter resistance of the current source.

After first asserting that there is no structure that "functionally relat[es] the control voltage to the intrinsic emitter resistance," LTC (again) identifies the $\Delta V_{BE}$ cell as that structure. However, LTC defines the structure too narrowly by stating that the structure must have *all* the component values, mathematical relationships, and device relationships "indicated" in FIG. 3, and then describes those relationships in excessive detail. Again, LTC's construction needlessly overcomplicates the meaning of the claim language, recites limitations that do not appear in the claims, and are not required in the corresponding structure disclosed in the specification.

Furthermore, LTC unnecessarily and incorrectly defines "intrinsic emitter resistance" of a transistor as kT/qI. As stated in the specification, the equation kT/qI is the "intrinsic '*electronic*' emitter resistance," denoted as $r_e$, *see* 1:35-39. This intrinsic electronic emitter resistance is ***not*** the same as the intrinsic emitter resistance recited in claim 1(d). Rather, the "intrinsic emitter resistance" recited in claim 1(d) is denoted as "r", not "$r_e$". *See* 3:6-10; *see also* 1:35-42 (describing r and $r_e$ as separate variables); 4:17-27 (referring repeatedly to "intrinsic emitter resistance r").

### 6.     "$\Delta V_{BE}$ Cell" (claims 3, 6, 8)

| Analog's Proposal | LTC's Proposal |
|---|---|
| A circuit that provides a control voltage that produces a current that is proportional to absolute temperature (Kelvin). | A circuit which produces a control voltage using the difference between the base-emitter voltages of two transistors, as shown in FIG. 3 (circuit 20). |

The claim limitation "$\Delta V_{BE}$ cell" is used broadly in claims 3, 6, and 8 to refer to a circuit that provides a control voltage that produces a current that is proportional to absolute temperature. LTC seeks to limit the claim language to the particular $\Delta V_{BE}$ cell illustrated in FIG. 3. But a $\Delta V_{BE}$ cell need not have all the particulars shown in that figure. For example, Claims 3

and 8 do not recite that the tail current equals $2I(1+1/\beta_0)$, as FIG. 3 specifies. As noted, this equation is not recited until dependent claims 4 and 9, and should not be read into other claims.

### B.    The '633 Patent

#### 1.    "Bipolar Transistor" (claims 8, 17)

| Analog's Proposal | LTC's Proposal |
|---|---|
| A three-terminal semiconductor device with an n- (or p-) type semiconductor region between two p- (or n-) type semiconductor regions. | "Bipolar transistor" means a three-electrode semiconductor device with a layer of n- (or p-) type semiconductor (the base region) sandwiched between two regions of p- (or n-) type semiconductors (the collector and emitter regions), thus forming two p-n junctions back to back. The current flowing into or out of the base electrode controls the amount of current flowing between the collector and emitter electrodes. |

Analog's construction of this claim limitation is consistent with its plain meaning and its usage throughout the '633 patent. *See* transistors in FIGS. 1-3b; 1:24-27; 2:8; 3:65-4:11; 4:33-43; 5:30-40; 6:30-32; *see also* A.J.A. at B62, *McGraw-Hill Dictionary of Scientific and Technical Terms* at 230 (5th ed. 1994) (defining "bipolar transistor" as "a transistor that uses both positive and negative charge carriers"); A.J.A. at B65, *IEEE 100 The Authoritative Dictionary of IEEE Standards Terms* at 1205 (7th ed. 2000) (defining "transistor" as "[a] semiconducting device for controlling the flow of current between two terminals, the emitter and collector, by means of variations in the current flow").

LTC construes "bipolar transistor" to require that a semiconductor be "sandwiched" between other layers of semiconductor, and that two p-n junctions be positioned "back to back." This construction invokes ambiguous terms – "sandwiched" and "back to back" – that themselves require construction. In contrast, Analog's suggested construction is an easily understood definition that does not impose extraneous structural limitations on the ordinary meaning of "bipolar transistor."

- 20 -

2.    **"Connected"** (claims 8, 10, 17)

| Analog's Proposal | LTC's Proposal |
|---|---|
| Coupled. | The term "connected," when used, as here, to describe one component terminal being connected to another, means connected directly with no intervening components. |

The term "connected" is used throughout the asserted claims, in accordance with its plain and ordinary meaning, to mean "coupled."

LTC's proposed construction provides that two elements are "connected" *only* if they are "connected *directly with no intervening components.*" This additional limitation is not part of the plain and ordinary meaning of "connected," and is unsupported by the intrinsic evidence. The Federal Circuit has noted that "[i]n the absence of modifiers, general descriptive terms are typically construed as having their full meaning." *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1118 (Fed. Cir. 2004). Accordingly, courts generally construe "connected" to include the indirect joining of elements unless the intrinsic evidence compels a narrower construction.[17] Nothing in the '633 patent suggests a connection must be direct, with no intervening components.

The specification of the '633 patent *contradicts* LTC's proposed construction. Referring to the embodiment shown in FIG. 1, the specification states: "The output stage also includes a transistor Q17 **connected** between mirror transistor Q11 and VCC **via a resistor R2**, and a

---

[17]    *Compare Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997) (holding that "joined or connected does not necessitate a direct joining or connection" but could include DNA with nucleotide sequences joined through intervening sequences) *and Innova*, 381 F.3d at 1118 (Fed. Cir. 2004) (reversing district court construction of "operatively connected" requiring a physical engagement between the connected elements) *with Ethicon Endo-Surgery v. United States Surgical Corp.*, 93 F.3d 1572, 1578 (Fed. Cir. 1996) (construing "connected to" to require direct connection in claim for surgical stapler because in the context of that particular mechanical invention, no other meaningful connection was possible)

transistor Q18 **connected** between mirror transistor Q13 and VEE **via a resistor R3**." *See* 2:4-7

(emphasis added). Thus, the specification makes clear that two items (*e.g.*, a transistor and a

voltage source [VCC or VEE]) can be "connected" despite the presence of an "intervening

component" (*e.g.*, a resistor).

## V.   DISPUTED CLAIM LIMITATIONS OF THE LTC PATENTS[18]

### A.   '194 Patent

#### 1.   "Input Signal" and "Output Signal" (claims 1, 13, 30, 33)

| Analog's Proposal | LTC's Proposal |
|---|---|
| "input signal" – An input that conveys information. | "input signal" – An input that can convey information. |
| "output signal" - An output that conveys information. | "output signal" – An output that can convey information. |

Each of the asserted claims of the '194 patent requires both an "input signal" applied to

an input node, and an "output signal" generated at an output node. As well understood in the art,

a signal "conveys information." It is not, as LTC contends, merely an input or output that "can

convey information," which makes the term meaningless, because anything "can" convey

information. *See infra* at Section V.D.6. Moreover, LTC specifically amended the claim during

prosecution to require an input *signal* and output *signal*, not merely an input or an output.

The claim language indicates that a signal conveys information. Asserted claim 13, for

example, requires "feedback circuitry providing N feedback signals that control a duty cycle of

the regulator." Clearly these "signals" are providing information to the voltage regulator –

telling it when and how to execute the N stages. And there is no reason to believe that "signal"

would have a different meaning when coupled with the words "input" and "output." *See Fin*

---

[18]    Exhibit A to the LTC Patent Joint Claim Chart contains a list of stipulated constructions. The parties respectfully request that, if the Court deems appropriate, it include such constructions in its claim construction order.

- 22 -

*Control Systems Pty, Ltd v OAM Inc.*, 265 F.3d 1311, 1318 (Fed. Cir. 2001) (noting presumption that "same terms appearing in different portions of the claims should be given the same meaning").

The specification contains several examples showing that a signal "conveys information." *See, e g.*, 1:40-49, 1:57-61 (control circuitry generates a "feedback signal" that determines the duty cycle of the voltage regulator); 3:5-13 (describing a "timing control signal" that regulates the N power stages); 5:60-63 (describing a "control signal" that determines the voltage output for each stage). *Cf infra* at Section V.D.6.

The file history also supports Analog's proposed construction. During prosecution, the applicants amended the asserted claims, adding the word "signal" to the words "output" and "input" to form the limitations "output signal" and "input signal." *See* L.J.A. at A330-36. Yet, now LTC argues that the Court should construe these terms to mean simply "output" and "input" – as if these amendments meant nothing. LTC cannot recapture in litigation what it gave up in prosecution.

Finally, Analog's construction is consistent with the plain meaning of the term "signal." *See, e g.*, L.J.A. at A516, *Oxford English Dictionary* Vol. XV at 453 (2nd ed. 1989) (defining "signal" as "[a] modulation of an electric current, electromagnetic wave, or the like by means of which information is conveyed from one place to another").

2.    **"Each of the N Regulator Stages Providing Current I/N to the Output Node" (claims 1, 13, 30, 33)**

| Analog's Proposal | LTC's Proposal |
|---|---|
| Each regulator stage provides an equal amount of current I/N to the output node. | Each regulator stage provides a substantially equal amount of current I/N to the output node |

All the asserted claims of the '194 patent require "each of the N regulator stages providing current I/N to the output node." The parties' disagreement is limited to whether the claim limitation requires an "equal" (Analog), or a "substantially equal" (LTC) amount of current I/N to the output node.

The claims state mathematically that *each stage provides I/N current.* For example, if there are three stages, the first stage would provide a current in the amount of I/N; the second, current in the amount I/N; and the third, too, current in the amount I/N. I/N is "equal" to I/N. Therefore, the claims require each stage to produce equal currents.

The asserted claims never use the word "substantially," as LTC wishes to expand the claim. This omission is intentional. When the patent meant to claim *substantially equal* current, it used that very language. *See* claims 10, 28. It must therefore be presumed that the inventor was not claiming "substantially equal" current in the asserted claims, where that term is not used.[19] *See Modine Mfg. Co. v. United States Int'l Trade Comm'n*, 75 F.3d 1545, 1551 (Fed. Cir.

---

[19]    LTC will likely point out snippets of the specification to support its "substantially equal" construction. But the specification also clearly describes that the currents be "equal" at every stage. 5:21-22. To the extent that the stages are anything other than equal, it is only because "small variations in component values ... cause slightly different ... output voltages from stage to stage." 6:55-58. To address this problem, the voltage regulator contains "additional circuitry that force [sic] the currents in each stage to be substantially equal." 6:62-63; *see also* 6:63-7:46 (describing some of this additional circuitry). Therefore, to the extent it is inclined to adopt LTC's "substantially equal" terminology, the Court should make clear that "substantially equal" accounts only for minor variations due to component variations between stages and does not cover regulator designs that are intended to produce unequal currents between stages.

1996) ("When a limitation is included in several claims but is stated in terms of apparently different scope, there is a presumption that a difference in scope is intended and is real."); *see also infra* at Section V.D.4-5.

### 3. "N-Phase Timing Pulses" (claims 1, 13, 30, 33)

| Analog's Proposal | LTC's Proposal |
|---|---|
| The set of pulses that operate out of phase to provide timing for the N-phases. | Pulses that provide the timing for N-phases. |

Each asserted claim of the '194 patent requires "N-phase timing pulses." "N-phase timing pulses" refers to the "N" stages (described above). For example, in a three-stage regulator (N is equal to 3), there are three (also "N") phase timing pulses (labeled $\phi 1$, $\phi 2$ and $\phi 3$; also described as "clock signals," *see* 3:64-66), as illustrated in FIG. 4A below:



FIG. 4A

Each phase timing pulse ($\phi_1$, $\phi_2$ and $\phi_3$) is *out of phase* from the others by 360° divided by the number of stages (*i.e.*, 360°/N). *See* 5:50-52 ("Clock signals $\phi_1$, $\phi_2$ and $\phi_3$ ... are 360°/3 = 120° out of phase from each other."); *see also* claims 1, 13, 30, 33 (N-phase timing pulses causing N regulator stages to operate "360°/N out of phase from one another"). Therefore, for a three-stage regulator (N being equal to 3), phase $\phi_1$ pulses start at the beginning of each period, phase $\phi_2$ pulses start 120° (or 1/3) of the way through each period, and phase $\phi_3$ pulses start 240° (or 2/3) of the way through each period. Further, the limitation requires "N-phase timing pulses."

Accordingly, Analog's construction appropriately identifies the "set of pulses" that form $\phi_1$, $\phi_2$ and $\phi_3$.

Analog's proposed construction is also consistent with the plain meaning of the term "phase" applied to periodic signals. *See, e.g.*, L.J.A. at A549, *McGraw-Hill Dictionary of Scientific and Technical Terms* at 1406 (4th ed. 1989) (defining "phase" as "[t]he fractional part of a period through which the time variable of a periodic quantity ... has moved, ... usually expressed in terms of angular measure, with one period being equal to 360°"); L.J.A. at A520, *Oxford English Dictionary* Vol. XI at 667 (2nd ed. 1989) (defining "phase angle" as "[a]n angle representing a difference in phase, 360 degrees ... corresponding to one complete cycle").

### B.    The '618 Patent

#### 1.    "Semiconductor Substrate" (claims 1, 21)

| Analog's Proposal | LTC's Proposal |
|---|---|
| An underlying layer or substratum below the integrated circuits on a chip. | A substrate made out of semiconductor material. |

In electrical engineering, the plain meaning of a "substrate" is the layer beneath the integrated circuits on a chip. *See* L.J.A. at A550, *McGraw-Hill Dictionary of Scientific and Technical Terms* at 1850 (4th ed. 1989) (defining "substrate" as "[t]he physical material on which a microcircuit is fabricated"); L.J.A. at A533, *Oxford English Dictionary* Vol. XVII at 73 (2nd ed. 1989) (defining "substrate" as a "substratum," and "[a]ny underlying bulk phase, layer, etc., on which something is deposited"). This definition is also consistent with the way the limitation is used in the patent. *See, e.g.*, FIGS. 2A, 3A, 7, 8 (all showing "substrate" 20 as the layer underlying all other circuitry); 2:53-54 (referring to the "substrate" with an epitaxial layer formed "thereon").

LTC's proposed construction does not define the term at all, and does not specify what part of a chip the substrate is.

### 2.     "A First Semiconductor Region" (claims 1, 21)

| Analog's Proposal | LTC's Proposal |
|---|---|
| A region formed on the substrate and contacting substrate material. | A region formed in or on the substrate and contacting substrate material. |

The parties, again, substantially agree on their suggested constructions, except for one important difference:  the patent teaches that the first semiconductor region can only be formed "on" the substrate.  Analog's proposal captures this, but LTC tries to broaden the claim limitation by suggesting that it can be formed "in or on" the substrate.

Claims 1 and 21 require that the "first semiconductor region" be "abutting" the "surface" of the substrate. The parties agree that the term "abutting" means "directly contacting."  In other words, the "first semiconductor region" is directly contacting the surface of the substrate, which, as explained above, sits beneath the chip's circuitry.  In the specification, FIGS. 2A, 3A, 7, and 8 all depict a P-doped substrate (20) with N-doped material (22) – the "first semiconductor region" of opposite conductive type – sitting "on" the substrate.  The specification *never* shows the region formed "in" (as opposed to "on") the substrate, as LTC proposes.

### 3.     "Formed in Said First Semiconductor Region" (claims 1, 21)

| Analog's Proposal | LTC's Proposal |
|---|---|
| The first semiconductor region forms an element of the transistor. | Formed in said first semiconductor region. |

Claims 1 and 21 require a vertical bipolar transistor "formed in said first semiconductor region."

The specification provides that "[t]he NPN transistor of the clamp ... is fabricated in the isolated tub with an N+ buried layer 26 between the substrate 20 and the isolated epitaxial layer 22 which functions as the collector." 2:56-59.  In other words, the N+ layer 26 is the collector of the transistor.  This N+ layer 26 is also part of the "first semiconductor region" – the region "of opposite conductive type" that is "abutting" the substrate.  *See* 2:57-59 (noting that the N+ buried layer 26 is "*between* the substrate 20 and the isolated epitaxial layer 22") (emphasis added); FIGS. 2A, 3A (depicting collector 26 as the region "of opposite conductive type" that is "abutting" substrate 20).  Therefore, the "first semiconductor region" is an "element [*i.e.*, the collector] of the transistor."  LTC's suggestion, that the claim limitation should have its "plain and ordinary meaning," does not define anything.

### 4. "Current Limiting Resistive Element" (claims 1, 21)

| Analog's Proposal | LTC's Proposal |
| --- | --- |
| The "current limiting resistive element" is circuitry having more than nominal resistance of at least several ohms between the base region and the emitter region. It may comprise transistor base resistance and/or an external resistance. | A resistance that may comprise transistor base resistance and/or an external resistance. |

Although all substances, even conductors, have some resistance, the claims explicitly require a "resistive element." The plain meaning of a "resistive element" is a device that provides meaningful (not just nominal) resistance. *See* L.J.A. at A551-52, *McGraw-Hill Dictionary of Scientific and Technical Terms* at 1605-06 (4th ed. 1989) (defining "resistor" as "[a] device designed to have a definite amount of resistance; used in circuits to limit current flow or to provide a voltage drop"; and defining "resistor element" as "[t]hat portion of a resistor which possesses the property of electric resistance").

The specification indicates a range of values which provides meaningful resistance in the context of the invention. Analog's proposed construction is based on this range of meaningful resistance from the specification, and requires that the "current limiting resistive element" provide a resistance of "at least several ohms." *See* 3:6-8 ("[T]he value of the resistor from the base of the clamp to ground is noncritical and can vary from several ohms to several hundred ohms."). These characterizations properly are incorporated in Analog's suggested construction.[20] *See Phillips*, 415 F.3d at 1314-17 (characterizing the specification as "the single best guide to the meaning of a disputed term").

---

[20]    LTC's proposed construction of term as requiring "a resistance" avoids defining what the "resistance" is, and instead states only where this undefined resistance is located. Proper claim construction defines what a term means, and not necessarily where it is located.

5.    "Collector-Base Breakdown Voltage," "Inactive," and "Forms A Current Path" (claims 1, 21)

| Analog's Proposal | LTC's Proposal |
|---|---|
| "collector-base breakdown voltage" – The voltage, when applied between the collector and base, above which the transistor conducts current from an electrostatic discharge pulse. | "collector-base breakdown voltage" – A voltage, when applied between the collector and base, above which the junction between the collector and the base breaks down. |
| "inactive" – Where the transistor functions as an open circuit and no current from an electrostatic discharge pulse is being conducted to ground. | "inactive" – Where the transistor functions as a open circuit. |
| "forms a current path" – Where the transistor conducts current from an electrostatic discharge pulse to ground. | "forms a current path" – Where the transistor conducts current. |

Claims 1 and 21 require a vertical bipolar transistor having a "collector-base breakdown voltage" below a pre-selected voltage level such that said vertical bipolar transistor is "inactive" at input voltages applied to said input terminal *below* the pre-selected breakdown voltage and "forms a current path" for discharging excess charge on said input terminal when said input voltage *exceeds* the pre-selected voltage level. *See* Claims 1 and 21 (stating that when the "collector-base breakdown voltage" is "exceed[ed]," the transistor "forms a current path for discharging excess charge on said input terminal").

The specification echoes the claims. *See, e.g.*, 1:48-52 ("One feature of the invention is an electrostatic discharge clamp including a vertical NPN transistor which can clamp an input terminal to $BV_{CEO}$ of the transistor after a voltage exceeding $BV_{CES}$[21] of the transistor is applied to the terminal."); 1:62-63 ("Above $BV_{CES}$ the transistor will start conducting current ...."); 4:52-54 ("[B]elow $BV_{CES}$ the clamp is an open circuit, and above $BV_{CES}$ the breakdown current will flow ...."). Thus, the "collector-base breakdown voltage" is the voltage above which the

---

[21]     "$BV_{CES}$" is the abbreviation used throughout the patent to refer to breakdown from the collector to the emitter with the base shorted to the emitter.

transistor is performing its primary function of conducting an electrostatic discharge pulse to ground.

Correspondingly, an "inactive" transistor means that it is an open circuit that is not performing its normal function of discharging current from an electrostatic pulse to ground. *See* L.J.A. at A553, *McGraw-Hill Dictionary of Scientific and Technical Terms* at 1320 (4th ed. 1989) (defining "open circuit" as "[a]n electric circuit that has been broken, so that there is no complete path for current flow").

The transistor, therefore, "forms a current path" when "the transistor conducts current from an electrostatic discharge pulse to ground."

### C.    The '678 Patent

#### 1.    "Charging and Draining Circuitry, Coupled to the Single Package Pin, That Charges and Drains Voltage on the Capacitor" (claim 1)

| Analog's Proposal | LTC's Proposal |
|---|---|
| Charging and draining of the capacitor is performed using the same package pin, *i e*, both the charging current and the draining current pass through the single package pin. | Charging and draining circuitry, coupled to the single package pin, that charges and drains voltage on the capacitor. |

Claim 1 describes a single package pin coupled to charging and draining circuitry [*i e*, the voltage regulator control circuit] at one end and an external capacitor at the other. The voltage regulator control circuit functions "through" the single package pin "to" an external capacitor, and in doing so "charges and drains voltage on the capacitor." There is only one reasonable interpretation of this claim language: that the charging and draining of the capacitor is done "using" the single package pin, and that "both the charging current and the draining current pass through the single package pin."

The specification is consistent. FIG. 1 shows that current source 110 – which is *inside* the voltage regulator control circuit – provides a first current I1 to *external* capacitor 104 through package pin 106 – which connects the control circuit to the capacitor. *See* 3:59-60. This "charging current" passes "through" the single package pin on its way to the external capacitor.

The discharging of the capacitor occurs via a second current source 116 – located *in* the function control circuit. 3:7-8; *see also* FIG. 1. The current that had previously flowed from inside the function control circuit to charge the external capacitor now discharges from the capacitor again flowing through the single package pin and back into the function control circuit, where it then makes its way to current source 116. *See* 4:28-38; FIG. 1.

### 2.    "Short Circuit" (claims 1, 5)

| Analog's Proposal | LTC's Proposal |
|---|---|
| Zero or substantially zero resistance between two nodes such that there is no voltage difference between the two nodes. | A low resistance connection between two nodes in a circuit. |

Although the claims do not define this claim limitation, "short circuit" is used in the specification to describe a condition at the output of the voltage regulator. This condition is sufficiently serious that the voltage regulator should be shut down in order to protect the voltage regulator from damage. *See, e.g.,* 1:49-53 ("This function protects a voltage regulator from short circuits at the output of the voltage regulator by causing the regulator to be shutdown when a short circuit at the output of the voltage regulator is detected.").

A "short circuit" has a well-defined meaning in the art: where there is no (or almost no) resistance, and therefore no voltage, between two nodes. *See, e.g.,* L.J.A. at A558, *Van Nostrand's Scientific Encyclopedia* at 2834 (8th ed. 1995) (a "short circuit" occurs "when the terminals are connected directly together with only the impedance of the short connecting leads

between them, thus for all practical purposes there is no resistance between them, hence no voltage can exist between them"); L.J.A. at A512, *IEEE 100: The Authoritative Dictionary of IEEE Standards Terms* at 1042 (7th ed. 2000) (defining "short circuit" as "[t]he condition in which the output terminals of the power supply are directly connected together, resulting in near-zero output voltage"); *id.* (defining "short-circuit current" as "[a]n overcurrent resulting from a fault of negligible impedance between live conductors having a difference in potential under normal operating conditions"). Analog's proposed construction best reflects this well-defined meaning.

### 3.    "SHORT CIRCUIT SHUTDOWN Signal" (claims 1, 5, 21)

| Analog's Proposal | LTC's Proposal |
|---|---|
| A signal that causes the remainder of the regulator circuitry to shutdown. | A signal that can be used to indicate to other circuitry that it should stop operating. |

Claims 1, 5, and 21 require a "SHORT CIRCUIT SHUTDOWN signal." The specification says that this signal does exactly what its name suggests: it shuts down the remainder of the circuitry. *See, e.g.*, 3:9-11 ("[T]he function control circuit outputs a short circuit shutdown signal that causes the rest of the voltage regulator to shutdown."); 4:43-46 ("This HIGH output of logic device 126 is then provided to the rest of the voltage regulator controller circuit as short circuit shutdown signal 142 to shutdown the regulator due to a shorted output.").

LTC's construction – that the signal *can* be used to indicate that other circuitry should stop operating – is meaningless. There is no indication in the patent whatsoever that the "SHORT CIRCUIT SHUTDOWN signal" has *any* purpose other than to shut down the circuitry upon detection of a short circuit.

4.    **"Through a Single Package Pin"** (claims 1, 5, 21)

| Analog's Proposal | LTC's Proposal |
|---|---|
| Charging and draining of the capacitor is performed using the same package pin, *i.e.*, both the charging current and the draining current pass through the single package pin. | Using a single package pin. |

Claims 1, 5, and 21 require that the short-circuit timer and/or soft-start function be provided "through a single package pin." As explained above, the claims and specification make clear that the charging and draining of the capacitor must occur *through* the single package pin, not merely that the single package pin is "used" in some undefined way. LTC's suggestion fails, once again, to include this necessary portion of the claim limitation. The Court should therefore adopt Analog's proposed construction.

5.    **"Arming Voltage"** (claims 1, 5, 21)

| Analog's Proposal | LTC's Proposal |
|---|---|
| A predetermined voltage above which the short-circuit detection circuit is enabled. | A predetermined voltage above which the short-circuit timer function is activated. |

Claims 1, 5, and 21 require an "arming voltage." The parties agree that an "arming voltage" is a predetermined voltage above which a change in circuit operation occurs, but disagree as to what changes. Analog's suggested definition, which is entirely consistent with the claims and is fully supported by the specification, makes clear that the "timing function" provided by the discharging capacitor only starts once a "short circuit detection signal" is present. *See, e.g.,* Claim 1(b) (requiring an "arming voltage" *and* a "short circuit detection signal" *prior to* using the capacitor to provide a timing function); *see also* 4:23-27 (noting that the capacitor discharges only when a "short circuit detection signal" is present *and* the armed voltage has been reached.)

LTC's proposal obscures the definition of the short circuit timer function by misdescribing the conditions necessary to activate that function. *See, e g,* 4:23-27 (noting that the short circuit detection signal is also required to activate the short circuit timer function and discharge the capacitor).

### D.    Common Claim Limitations of the Wilcox Patents

#### 1.    "Switching Voltage Regulator" ('178 patent, claims 1, 34, 41, 44, 51, 55, 57; '694 patent, claims 1, 5; '885 patent, claims 1, 11, 32, 35; '066 patent, claim 1; '258 patent, claims 1, 34, 35)

| Analog's Proposal | LTC's Proposal |
|---|---|
| A device or circuit capable of receiving a poorly-specified and fluctuating input voltage and provides a predetermined and constant output voltage by controlling the opening and closing of a switch. | A device or circuit that receives an input voltage and provides a predetermined and regulated output voltage by controlling the opening and closing of one or more switching transistors.<br><br>(Predetermined means determined by design, and includes voltages that may be fixed or variable.) |

As defined in the Wilcox patents, switching voltage regulators "provide a predetermined and regulated output voltage . . . from a poorly specified and fluctuating input source." 1:12-14. They therefore have two characteristics:  a non-stable (*i e ,* non-constant) input source and a stable (*i e ,* constant) output.[22]  Analog's proposed construction explains the characteristics of the "input voltage" – "poorly specified and fluctuating" – as well as the output voltage – "predetermined and constant."   LTC's, which merely describes the output of the switching voltage regulator, does not.

Although the parties agree that the output voltage must be "predetermined and constant," LTC seeks to add language to indicate that such voltage may be "fixed or variable."   LTC's

---

[22]      For example, if a battery is the "input voltage," it will fluctuate as the battery charge decreases   A voltage regulator is therefore necessary to ensure that the "output voltage" is constant   If, however, the "input source" is constant and stable, there is no need for a voltage regulator

position has not only been previously rejected by the district court in the *Impala* Litigation, but is also at odds with a plain reading of the claims. The output voltage in the "first state" cannot merely be "determined by design," but rather, as the district court in the *Impala* Litigation suggested, must not vary.[23] *See* L.J.A. at A26.

2. **"Coupled" ('178 patent, claims 1, 34, 41, 44, 51, 55, 57; '694 patent, claim 1; '885 patent, claims 1, 11, 32, 35; '066 patent, claim 1; '258 patent, claims 1, 34, 35)**

| Analog's Proposal | LTC's Proposal |
|---|---|
| When there is an electrical or magnetic connection between circuit elements. | Circuit elements are "coupled" when a current path exists between them. |

Elements of electrical circuits may be "coupled" to transfer a voltage, a current signal, or both, between them. Basic knowledge of electronics teaches that there are two ways to accomplish this: electrically (requiring a physical connection) or magnetically (not requiring a physical connection). An example of an electrical (or physical) connection is a wire conducting current from one circuit element to another. An example of a magnetic (not physical) connection is a wire wrapped around an iron core (known as a "transformer") that transfers current to another circuit element using a magnetic field. *See, e.g.*, L.J.A. at A564-65, Horowitz and Hill, "The Art of Electronics" at 24-25 (1980).[24]

The claims do not indicate which type of "coupling" is required (electrical or magnetic). Because of this, and because one of ordinary skill in the art understands that there are two possible ways to "couple" circuit elements, the proper definition of this claim limitation must encompass both an electrical or a magnetic connection.

---

[23]    There is, however, some variation of the output voltage in the "second state."

[24]    For example, transformers are in the "bricks" that are used to couple electrical power from a wall outlet to many consumer electronic devices (such as a laptop).

LTC's suggestion –  which requires a "current path" – is limited to an electrical connection and relies on the specification to read a limitation into the claims.[25]  *See Phillips*, 415 F.3d at 1323 (acknowledging the danger of reading limitations from the specification into the claims).

3.    **"Load" ('178 patent, claims 1, 34, 44, 51, 55, 57; '694 patent, claims 1, 5; '885 patent, claims 1, 32; '066 patent, claim 1; '258 patent, claims 1, 34, 35)**

| Analog's Proposal | LTC's Proposal |
|---|---|
| A device, circuit or system that consumes electrical power. | A device, circuit, or system coupled to the output terminal to which the regulator can supply current. |

The parties disagree on what a "load" is.  Analog's proposed construction is a generic understanding of the term, and is consistent with the specification and the ordinary meaning, while LTC's renders the term meaningless, as it suggests that virtually anything "can be" a "load." *See, e g ,* 1:12-14; 2:26-31; 2:35-36; ; *see also* L.J.A. at A554, *McGraw-Hill Dictionary of Scientific and Technical Terms* at 1094 (4th ed. 1989) (defining "load" as "a device that consumes electric power"); L.J.A. at A541, *Oxford English Dictionary* Vol. VIII at 1063 (2nd ed. 1989) (defining "load" as "an impedance or circuit that receives the output of a transistor or other device"); L.J.A. at A511, *IEEE 100   The Authoritative Dictionary of IEEE Standards Terms* at 629 (7th ed. 2000) (defining "load" as "a power consuming device connected to a circuit").

---

[25]    LTC points to the construction that the district court adopted in the *Impala* Litigation to support its position  *See* L J A  at A20  Although that court stated that "coupled" means that there is a "current path," the district court also clearly stated that the connection need not be direct (*i e ,* electrical)  Thus, should the Court adopt LTC's proposal, it should make clear that its use of a "current path" is not limited to an electrical (*i e ,* direct) connection

4. **"Regulated Voltage"** ('178 patent, claims 1, 34, 41, 44, 51, 55, 57; '694 patent, claims 1, 5; '885 patent, claims 1, 32; '066 patent, claim 1; '258 patent, claims 1, 34, 35)

| Analog's Proposal | LTC's Proposal |
|---|---|
| A predetermined and constant output voltage. | A voltage having a controlled value. |

The Wilcox patents describe two states for the operation of the switching voltage regulator, a "first" state of circuit operation (also known as "continuous operation") and a "second" state of circuit operation (also known as "sleep mode"). *See, e.g.*, '178 patent, claim 1; FIG. 2. In the first state of circuit operation, during high load currents, the voltage regulator generates a predetermined and constant voltage at the output terminal. *See* 1:12-14, 6:17-19; FIGS. 1-2. During low load conditions, however, the voltage regulator changes state to the second state of circuit operation. 6:34-36 ("regulator circuit 50 goes into sleep mode at low output current levels as follows"). The second state is triggered when the output voltage is "in excess of the regulated voltage," 6:40-41, and "[t]his *overvoltage* condition is intentionally induced at low average output currents." 6:41-42 (emphasis added).

The parties' dispute centers on whether the "voltage regulator" supplies the same "regulated voltage" during both the "first" and "second" states of circuit operation. Analog's suggested construction is consistent with the claims and the specification, which require that the voltage supplied during the first state of circuit operation be equal to the regulated voltage. *See, e.g.*, '258 patent, claim 1 ("a first state of circuit operation" ... "varying the duty cycle ... to maintain ... the regulated voltage *during a first state of circuit operation*") (emphasis added); *cf.* '258 patent, claim 1 ("a second state of circuit operation" ... "during which the output capacitor maintains the output *substantially* at the regulated voltage") (emphasis added). LTC's proposed construction, in contrast, merely substitutes "controlled" for "regulated" and provides no

additional guidance to the actual meaning of "regulated voltage." Moreover, the specification refers to a "regulated" (not a "controlled") voltage.

### 5. "Substantially at the Regulated Voltage" ('178 patent, claims 1, 34, 41; '066 patent, claim 1; '258 patent, claims 1, 34)

| Analog's Proposal | LTC's Proposal |
|---|---|
| A voltage that has a different average value than the regulated voltage. | "Substantially at the regulated voltage" allows for, but does not require, greater variation in the voltage having a controlled value. |

The Wilcox patents use the claim limitations "regulated voltage" (discussed above) and "substantially at the regulated voltage" to describe different aspects of the alleged invention. For example, claim 1 of the '258 patent describes a "second circuit" (in the "first state of circuit operation") that maintains the output "at the regulated voltage," but identifies a "third circuit" (in the "second state of circuit operation") that maintains the output "substantially at the regulated voltage." *See* '258 patent, claim 1 ("a second circuit for generating a first control signal during a first state of circuit operation ... to maintain the output terminal at the regulated voltage"); *id* ("a second state of circuit operation" ... "during which the output capacitor maintains the output *substantially* at the regulated voltage") (emphasis added); *see also* 7:14-15 ("Therefore, $V_{OUT}$ will oscillate between the upper and lower thresholds ..."). These two claim limitations cannot mean the same thing. *See Modine Mfg Co*, 75 F.3d at 1551. Analog's proposed construction – which is consistent with the ITC's Initial Determination – states that "substantially at the regulated voltage" must be "different" from "regulated voltage." *See* L.J.A. at A501-05, Initial Determination at 19-23.

In contrast, LTC's proposed construction, by including the "does not require" language, effectively equates "regulated voltage" with "substantially at the regulated voltage." This cannot be the case. *Cf. supra* at Section V.A.2.

- 39 -

6.    **"Signal"** ('178 patent, claims 1, 41, 44; '694 patent, claim 5; '885 patent, claims 1, 11, 32)

| Analog's Proposal | LTC's Proposal |
|---|---|
| A voltage or current by which information is transmitted. | A voltage or current by which information can be transmitted. |

The claims do not define what a "signal" is. The specification, however, uses "signal" to describe the transmission of information from one circuit location to another and often describes the type of information being transmitted.[26]  *See* 9:20-21 ("control signal"); 15:2-3 ("feedback signal"); 9:20 ("pulse-width modulated signal"); 9:44-45 ("trigger signal"); 9:24-25 ("constant OFF-time signal"); and 12:30 ("switch signal"). In contrast, the patents use different language (such as "current" or "voltage") when there is *no* transmission of information from one location to another. *See, e.g.,* '178 patent, claim 1 (using "current" in the context of "supplying current at the regulated voltage to the load").

LTC's proposed construction of "signal" would allow mere current or voltage – even that which is not transmitting any information at all – to be a "signal" as long as information "can be" transmitted by the current or voltage. This would render the term meaningless and is not consistent with the specification or the understanding of one skilled in the art. *See supra* at Section V.A.1 (discussing the meanings of "input signal" and "output signal" in the '194 patent).

---

[26]    There are a few situations in which the term "signal" is used without a modifier. However, in these situations, the language makes it clear that information is being transmitted by these signals. *See* '178 patent, claim 44 ("monitoring a signal from the output terminal to generate a first feedback signal").

7.    **"First State of Circuit Operation" and "Second State of Circuit Operation" ('178 patent claims, 1, 34, 41; '885 patent, claim 1; '066 patent, claim 1; '258 patent, claims 1, 34, 35)**

| Analog's Proposal | LTC's Proposal |
|---|---|
| "first state of circuit operation" – A state in which the output voltage is maintained during high load current conditions by switching the switching transistors in a complementary manner to provide power to the load. | "first state of circuit operation" – The state in which the switching transistors are both enabled for switching and are synchronously switched, such that one transistor is ON and the other is OFF, with a varying duty cycle to maintain a regulated voltage at the output terminal. |
| "second state of circuit operation" – A state in which, as a result of low load current conditions, the output capacitor maintains the output voltage substantially at the regulated voltage, while the switching transistors are disabled | "second state of circuit operation" – During the second state of operation in which the switching transistors are simultaneously off, current is supplied to the load by the output capacitor.<br><br>The time in which "the switching transistors are simultaneously off" does not refer to dead time. |

As mentioned previously, the Wilcox patents describe a "first state of circuit operation" (*i e*, "continuous operation") and a "second state of circuit operation" (*i e*, "sleep mode"). *See supra* at Section II.B.4. The "load" in the "first state" requires constant power. This means that the switching transistors are enabled, thereby generating the "maximum rated output." *See* 1:12-14, 6:17-19; FIGS. 1-2. In the "second state," the load requires less power and the switching transistors are therefore both disabled. 6:43-46. Although the parties generally agree about the purposes of the two states of "circuit operation," they disagree as to whether the two states of operation require either high load (in the "first state") or low load (in the "second state") current levels.

Analog's proposed construction – which requires the "first state" to be associated with high load current levels and the "second state" to be associated with low load current levels – is not only consistent with the claims and the specification, but also parallels the ITC's recent claim construction in its Initial Determination. *See* L.J.A. at A505-07, Initial Determination at 23-25 ("it is found that the first state of operation is linked to high load currents, and the second state is

- 41 -

linked to low load currents). Indeed, the purpose of the alleged invention, as discussed in the specification, is to make sure that the "load" only gets the voltage it requires, thereby increasing efficiency of the circuit. *See* 7:6-20, 8:1-16. If, as LTC's proposal suggests, the "first state" could include low current, there would be no need to enter the "second state" (and vice versa).

8.    **"To Cause"** ('178 patent, claims 1, 34; '885 patent, claim 11; '066 patent, claim 1; '258 patent, claims 1, 35)

| Analog's Proposal | LTC's Proposal |
|---|---|
| To bring about a result. | To bring about a result. Unmediated causality is not required. What is important is that a chain of events is initiated that acts not just on one but on both transistors. |

Analog and LTC agree that "causing" something means bringing about a result. However, by adding that "[u]nmediated causality is not required," LTC goes farther and suggests that there is *no limit* to such causation (all LTC requires is the "initiation" of a "chain of events"). Adopting LTC's suggested definition would mean, for example, that an action by a completely different circuit in a completely different area of the device could "cause" the switching transistors to turn off within the meaning of the claims. This notion of endless causality is hopelessly broad and is inconsistent with the claims and the specification.

9.    **"Threshold"** ('178 patent, claims 1, 34, 41, 44; '694 patent, claims 1, 5; '066 patent, claim 1; '258 patent, claim 35)

| Analog's Proposal | LTC's Proposal |
|---|---|
| A fixed value at which some operational characteristic of the circuit changes. | Predetermined level or value at which some change in circuit operation takes place. (Predetermined means determined by design, and includes levels or values that may be fixed or variable.) |

Analog and LTC substantially agree on the construction of the term "threshold." Once again, however, LTC seeks to add additional language, this time by stating the threshold can be "fixed or variable." This is incorrect. Because the output of the switching voltage regulator is constant, the threshold it is based on must be constant as well.[27] *See* L.J.A. at A26; *see also supra* at Section V.D.1 (discussing "switching voltage regulator" claim limitation).

### 10. "Output Current" ('178 patent, claims 1, 34, 41, 57; '694 patent, claim 5)

| Analog's Proposal | LTC's Proposal |
|---|---|
| The current flowing in the load. | The current that flows from the output terminal to the load having a value that is dependent upon characteristics of the load. |

The parties agree that "output current" connotes current flowing in the load.[28] By requiring the current to "flow" *from* one thing (the output terminal) *to* another (the load) – rather than transference through a magnetic field – LTC requires that the current only move electrically. As mentioned above, current that flows in the load may be delivered either electrically *or* magnetically. *See supra* at Section V.D.2 (discussing "coupled"). In addition, LTC's proposed definition fails to explain in what way the output current is "dependent" upon the load or what specific "characteristics" of the load are required.

---

[27]    The district court in the *Impala* Litigation previously rejected LTC's argument about a "variable" threshold. *See* L.J.A. at A26 ("Because the maximum rated output is constant, the Court has difficulty discerning how the threshold fraction of that output could be anything other than a constant percentage."). Therefore, LTC's citation to the *Impala* court's opinion undercuts, rather than supports, its proposed construction.

[28]    The specification refers to the term "output current" by various names. When it is used as "output current," it refers simply to the current flowing to the load:" 1:58-66. Other times, it is referred to as a "load current," 1:24-28, or an "output load current." *See* 4:46-50.

- 43 -

11.    "A First Means for Generating a Voltage Feedback Signal Indicative of the Voltage at the Output ('178 patent, claim 34) and "Means for Generating a Voltage Feedback Signal" ('885 patent, claim 32)

| Analog's Proposal | LTC's Proposal |
|---|---|
| This paragraph of Claim 32 recites a means-plus-function and is interpreted under 35 U.S.C. § 112, ¶ 6. As such, the claim should be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof. | This is a means-plus-function limitation, and is to be construed to cover the corresponding structure(s) and equivalents thereof. The corresponding structures described in the specification include: |
| The corresponding structure in the specification for carrying out the recited function is: | a resistor divider, with or without an operational amplifier, or other conventional voltage feedback circuits |
| (i) the combination of resistors 36A and 36B; | |
| (ii) the combination of resistors R1 and R2 and operational amplifier 602 (acting as an inverter); and | |
| (iii) voltage feedback circuit 220. | |

The parties disagree on the corresponding structures of this "means-plus-function" claim limitation. Analog's proposed construction, which is the same as the district court's in the *Impala* Litigation, is firmly rooted in the specification: all the figures show the "voltage feedback signal" being generated by a "resistor divider network." *See, e.g.,* FIGS. 1-4; L.J.A. at A35-36. This signal subsequently being used as an ***input*** to a "downstream" operational amplifier. *See* FIGS. 1-4. Therefore, the "operational amplifier" is not part of the structure that "generates the voltage feedback signal." LTC's proposal, however, suggests that the "operational amplifier" can be part of the structure for "generating the voltage feedback signal."[29]

---

[29]    The other figures in the specification do not support LTC's suggested construction. FIG. 5 has a "box" for "the voltage feedback circuit." FIG. 10 shows the use of an "operational amplifier" functioning as an "inverter" in addition to the "resistor divider network."

12.    **"Turning Both Switching Transistors Simultaneously OFF"** ('178 patent, claims 41, 57; '258 patent, claim 34)

| Analog's Proposal | LTC's Proposal |
|---|---|
| The limitation only requires that both switching transistors be held off or be disabled for an overlapping period of time. The switching transistors do not need to be turned off or disabled at the same instant. | The limitation requires that both switching transistors be held off or be disabled for an overlapping period of time. The switching transistors do not need to be turned off or disabled at the same instant. |

The parties' proposals are almost identical. Analog's proposal, however, matches the construction the Federal Circuit gave to this limitation in the *Impala* litigation and makes clear that the claim limitation can "only" mean one thing (that the "switching transistors be held off or be disabled for an overlapping period of time"). *See* L.J.A. at A9 (the "simultaneously off" limitations . . . *only require* that both switching transistors be held off or be disabled for an overlapping period of time. The switching transistors do not need to be turned off or disabled at the same instant.") (emphasis added). LTC's suggested definition is not so limited.

13.    **"Output Inductor"** ('178 patent, claims 44, 51; '258 patent, claim 35)

| Analog's Proposal | LTC's Proposal |
|---|---|
| An inductor that is coupled to the output terminal | An inductor in the output circuit. |

Analog's proposed construction is virtually verbatim from the claims. *See, e.g.,* '178 patent, claim 44 (describing the output circuit that "include[es] an output terminal and an output inductor coupled thereto ..."); *see also* FIG. 9; 3:36-38. Since the claims require the inductor to be "coupled" to the output terminal, it is illogical to characterize – as LTC has – the inductor as "in" the output circuit.

E.      The '178 Patent

1.      "A Second Means for Generating a First Control Signal . . . to
         Maintain the Output Voltage at the Regulated Voltage" (claim 34)

| Analog's Proposal | LTC's Proposal |
|---|---|
| This paragraph of Claim 32 recites a means-plus-function and is interpreted under 35 U.S.C. § 112, ¶ 6. As such, the claim should be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof. | This is a means-plus-function limitation, and is to be construed to cover the corresponding structure(s) and equivalents thereof. The corresponding structures described in the specification include: |
| The corresponding in the specification for carrying out the recited function is: | The combination of drive circuit 20, transconductance amplifier 38, offset voltage $V_{OS}$ 76, reference voltage 37, current source $I_1$ 72, current comparator 39, a feedback current path between inductor $L_1$, and current comparator 39 and constant off time one-shot circuit 25, which output the first control signal; |
| (i) the combination of drive circuit 20, transconductance amplifier 38, offset voltage $V_{OS}$ 76, reference circuit 37, current source $I_1$ 72, current comparator 39, and constant off time one-shot circuit 25, which output the first control signal; | |
| (ii) combinations having a pulse width modulator circuit that provides a pulse width modulated signal in response to a control signal; | Combinations having a pulse width modulator circuit or a variable off time one-shot circuit (e.g., circuit 240 or the circuit described at 10:15-16); and |
| (iii) circuit 240 in Fig. 5; | The combination illustrated in the Fig. 7 (resistors $R_{SENSE}$ and $R_3$, one-shot circuit 245, off-time controller 250 and capacitor Tab $2_N$) and the circuitry described at 13:36-46. |
| (iv) the combination illustrated in the Fig. 7 (resistors $R_{SENSE}$ and $R_3$, one-shot circuit 245, current comparator 39, current source $I_1$ 72, transconductance amplifier 38, offset voltage $V_{OS}$, reference circuit 37, off-time controller 250 (operated in the constant off-time mode) and capacitor $C_{CON}$); | |
| (v) an operational amplifier; and | |
| (vi) the circuitry described at 13:36-46. | |

Analog's proposed construction mirrors the construction the District Court provided in

the *Impala* Litigation, with the additional clarification to make (i) – the corresponding structure

in FIG. 2 – and (iv) – the corresponding structure in FIG. 7 – consistent. *See* L.J.A. at A35.

Moreover, the specification notes that, when operating in the "first state of circuit operation,"

FIG. 7 "is substantially similar to that of [FIG] 1 [same as FIG. 2 in relevant part]." 12:18-19.

### 2. "A Third Means For Generating a Control Signal . . . To Cause Both Switching Transistors To Be Simultaneously OFF . . ." (claim 34)

| Analog's Proposal | LTC's Proposal |
|---|---|
| This paragraph of Claim 32 recites a means-plus-function and is interpreted under 35 U.S.C. § 112, ¶ 6. As such, the claim should be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof. | This is a means-plus-function limitation, and is to be construed to cover the corresponding structure(s) and equivalents thereof. The corresponding structures described in the specification include: |
| The corresponding in the specification for carrying out the recited function is: | Hysteretic comparator 74, current source $I_1$ 72, and logic circuits 66, 68, and 69; |
| (i) the combination of hysteretic comparator 74, the offset voltage $V_{OS}$ 76, constant current source $I_1$ 72, logic gates 66, 68 and 69, and reference voltage 37; and | combinations such as the circuitry as disclosed in Fig. 7 (including 72, 74, 315, 316 and related sleep control logic); and |
| (ii) the circuitry disclosed in Figure 7 (72, 74, $V_{OS}$, comparator 315, NAND gate 316 and related sleep control logic. | combinations such as those disclosed at 16:5-16 |

Analog's proposed construction of this means-plus-function limitation is consistent with

the one the district court adopted in the *Impala* Litigation. *See* L.J.A. at A35-36. The only

difference is typographical. For clarity, Analog has provided the names of the circuit elements

that the *Impala* court listed ("$V_{os}$," "comparator, and "NAND gate").

### 3. "Current to the Output Terminal" (claim 44)

| Analog's Proposal | LTC's Proposal |
|---|---|
| The output current. | The current that flows to the output terminal from the switching transistors. |

The patent describes pulses of current ("sawtooth" waveform) that flow from the switching transistors to the "inductor" and the "output capacitor." The output capacitor "smoothes" (*i.e.*, "regulates") the current. It is this "smoothed" current that then flows to the "output terminal." *See* 3:64-4:3; 14:15-17; FIG. 1. Analog's proposed construction makes clear that the "current to the output terminal" is the "smoothed" current that flows directly to the output terminal. LTC's suggested definition, however, not only includes the "smoothed" current that is supplied to the output terminal, but also the "sawtooth" pulses of current that are supplied to the inductor and output capacitor. The specification supports Analog's proposal. *See* 3:64-4:3 (stating that pulses of current are first "suppl[ied] to an output circuit," which "smoothes" such pulses and then provides "current to the output terminal").

### 4.    "Threshold Indicative of a Polarity Reversal Condition" (claim 44)

| Analog's Proposal | LTC's Proposal |
|---|---|
| Based on "polarity reversal condition" (as previously agreed to by the parties)<br><br>(The parties agreed that "polarity reversal condition" means "the condition in which the instantaneous inductor current is negative or flowing away from the load." *See* Exhibit A, Joint Claim Chart for the Linear Patents.) | A measure of when either the current to the output terminal or a variable that depends on that current predicts that the switching voltage regulator is about to or has entered the polarity reversal condition. |

The parties' dispute centers on whether the "threshold" must prevent a "polarity reversal condition" from occurring. Analog's proposal combines the plain and ordinary meaning of two previously construed claim limitations – "threshold" and "polarity reversal" – to indicate that the proper "threshold" is one that prevents the "instantaneous inductor current" from being "negative or flowing away from the load." LTC's suggestion, however, broadens the claim limitation by including when the "instantaneous inductor current" "has entered" the "polarity reversal condition." The specification states that, regardless of what the "threshold" is, it cannot result in

- 48 -

"polarity reversal."[30]  *See* 14:28-45 ("Control circuit 470 works by monitoring the inductor current $I_1$ ... and turns off MOSFET 17 *before such current reversals can occur*") (emphasis added).  Moreover, because, as the parties previously agreed, a "polarity reversal condition" is "negative," the "threshold indicative of the polarity reversal condition," the instantaneous current must be positive (as the specification states).

5.    **"Prevent the Current to the Load from Reversing Polarity" (claim 51)**

| Analog's Proposal | LTC's Proposal |
|---|---|
| The condition effected by opening (turning OFF) one of the transistors before the instantaneous inductor current reverses direction and removes power that could have been delivered to the load. | Maintaining a transistor off when there is an indication of a polarity reversal condition. |

As above, the parties' disagreement hinges on whether the transistor must be turned off before a "polarity reversal condition" can occur.  Analog's proposal, consistent with the claims and the specification, requires that this is necessary so as to "prevent" the polarity reversal.  LTC's suggested definition – which essentially equates "prevent" with "indication" – allows the transistor to turn off  "when there is an indication" of "polarity reversal."  An "indication" of "polarity reversal" does not state whether or not "polarity reversal" has already occurred, or will ultimately occur, but rather it is when it is first identified.  *See* L.J.A. at A545, *Oxford English Dictionary* Vol. VII at 861 (2nd ed. 1989) (defining "indication" as "[t]he degree of some physical state, as pressure, temperature, etc., indicated by an instrument ...").

Analog's proposed construction also mirrors the pertinent claim (Claim 51), which requires "decoupling the output circuit from ground ... so as to prevent the current to the load from reversing."  In this context, "decoupling" the output circuit means turning it off, at some

---

[30]    In its opinion in the *Impala* Litigation, the District Court made clear that the "threshold" in question must be set "so as to prevent *any and all* power from being drawn from the load."  L.J.A. at A49 (emphasis added)

positive value, before "polarity reversal" occurs. *See* 14:28-45 ("and turns N-MOSFET 17 OFF *before* such current reversals can occur") (emphasis added). It does ***not*** mean turning off when there is an "indication" of "polarity reversal."

> ### 6. "Prevents the Drive Circuitry from Turning on Either of the Pair of Synchronously Switched Switching Transistors" (claim 55)

| Analog's Proposal | LTC's Proposal |
|---|---|
| Both transistors must be held OFF for a period of time | Both transistors must be prevented from turning ON. |

The parties' proposed constructions are (again) substantially similar, except that Analog's suggestion requires that the switching transistors be OFF for a period time, while LTC's makes no mention of the period of time.[31] Analog's suggested construction, however, incorporates the language of the pertinent claim (Claim 55), which states that "the synchronously switched switching transistors are prevented from being turned on ***for a period of time*** that is a function of the current supplied to the load by the regulator." (emphasis added). LTC's proposal ignores this claim language.

> ### 7. "Selected Sleep Mode Current Level" (claim 55)

| Analog's Proposal | LTC's Proposal |
|---|---|
| A predetermined current level that represents a percentage of maximum rated output current below which the regulator is operated in a second mode of circuit operation when both transistors are off. | A current level below which the regulator enters into a second mode of operation. |

The "selected sleep mode level" is the current level below which the switching voltage regulator switches from operating in "continuous mode" to "sleep mode." *See* Claim 55. The "selected sleep mode" is triggered when the "threshold fraction" is reached. Because, as previously explained, the "threshold," must be "fixed" (and cannot vary), the "selected sleep

---

[31]     Analog's proposal is in terms of holding the switching transistors off, and LTC's is in terms of preventing the switching transistors from turning on. This is, to some extent, a distinction without a difference.

mode level" must be constant. *See supra* at Section V.D.9. LTC's proposal does not make this clear.

### F.    The '694 Patent

#### 1.    "Inductive Element" (claims 1, 5)

| Analog's Proposal | LTC's Proposal |
|---|---|
| A magnetic energy storage element. | An element that acts as an inductor. |

Analog's proposed construction actually defines the claim limitation with reference to the claims and the specification, while LTC's simply rearranges the words of the limitation.

An "inductive element" must include an inductor. Basic electrical engineering teaches that inductors store energy magnetically. *See* L.J.A. at A564, Horowitz and Hill, "The Art of Electronics" at 24. Analog's proposed construction provides that the "inductor element" must be capable of storing energy magnetically. LTC's suggested construction, however, does not give any guidance on the meaning of the term, as it vaguely refers to something that "acts as" an inductor.

#### 2.    "Current Comparator Circuit" (claim 1)

| Analog's Proposal | LTC's Proposal |
|---|---|
| A "current comparator circuit" compares two current signals and supplies a voltage signal based on the difference in the two input current signals. | A "current comparator" compares currents, or signals indicative of currents, to determine which signal is greater. The output of the current comparator normally has one of two values, but it can have a third indeterminate value. |

The term "current" modifies the term "comparator." This means that the comparator must use the "current" and not, as LTC suggests, "signals indicative of currents." The use of the term "current" in the claim, rather than anything else, must be presumed to have meaning. *See Modine Mfg. Co.*, 75 F.3d at 1551. LTC's proposal also seeks to add a third "indeterminate

value" to its definition.   Yet, the claims and specification only speak in terms of *two* values.

LTC's reliance on the District Court's claim construction in the *Impala* Litigation to support its

positions is misplaced.   First, as the *Impala* court (and the claims) make clear, a "current

comparator" compares currents or signals indicative of *voltage* (not current).  *See* L.J.A. at A31.

Second, the *Impala* court rejected LTC's previous attempt to add a "third indeterminate value."

*See id.* ("[a]s plaintiff [LTC] conceded at the hearing, the ['694 p]atent does not establish the

existence of a 'third indeterminate level'.").

### 3.      "Current Feedback Signal" (claim 1)

| Analog's Proposal | LTC's Proposal |
|---|---|
| A current signal proportional to the current in the inductive element generated by monitoring the current in the inductive element. | A feedback signal indicative of a current level. |

The term "current" modifies the generic term "feedback signal" and is used to distinguish

the "current feedback signal" from other types of feedback signals.   LTC's choice of "current,"

rather than "signals indicative of a current level" in the claims must have meaning.  *See Modine*

*Mfg. Co.*, 75 F.3d at 1551.  The specification echoes that a "current feedback signal" must be a

"current."  *See, e.g.,* 4:25-27; 4:39-42.  Further, as Analog's proposed construction requires, the

current in the feedback signal must change "proportional[ly] to the inductor current." *See* 4:41-

42; *see also supra* Sections V.A.2 and V.D.6.

### 4.      "Minimum Feedback Current Threshold" (claims 1,5)

| Analog's Proposal | LTC's Proposal |
|---|---|
| A constant current level to which a current feedback signal is compared and which it will not go below. | A predetermined current or voltage level to which a current feedback is compared. |
| | (Predetermined means determined by design, and includes currents or voltages that may be fixed or variable.) |

- 52 -

Once again, the parties' dispute largely rests on whether the "current threshold" must be fixed or if it can vary. As mentioned previously, the "threshold" must be fixed (*i.e.*, constant) and "predetermined" cannot include variation in the current level. *See supra* at Section V.D.9. Moreover, LTC's suggested definition seeks to transform the language of the claims – in which "current" modifies "threshold" – to allow for a "current or voltage." This, as explained above, cannot be the case.

### 5.    "First State" and "Second State" (claim 1)

| Analog's Proposals | LTC's Proposal |
|---|---|
| "first state" – A first output value of the hysteretic comparator indicative of the voltage regulator operating in a first way of operating. | "first state" – a first output value. |
| "second state" – A second output value of the hysteretic comparator indicative of the voltage regulator operating in a second way of operating. | "second state" – a second output value. |

The claims require a "first state" and a "second state." The specification provides guidance on the generic use of "first state" and "second state" in the claims. There is no question that the "hysteretic comparator" (a term that the parties agreed on how to construe) determines when the switching circuitry operates in the "first state" of circuit operation or in the "second state" of circuit operation.[32] *See* 6:25-29, 6:40-50, 7:1-6; *see also supra* at Section V.D.7 (discussing "first state of circuit operation" and "second state of circuit operation"). Analog's proposed constructions – which are also consistent with the ITC's recent construction of these claim limitations – describe what the "hysteretic comparator" does in these two states.[33] *See supra* Section V.D.7 (discussing "first state of circuit operation" and "second state of circuit operation").

---

[32]    The agreed construction of "hysteretic comparator" is "a type of comparator that has different trip points depending on the state of the output of the comparator."

[33]    *See* L.J.A. at A505-07, Initial Determination at 23-25 ("the first state of operation is linked to high load current levels, and the second state is linked to low load current levels").

### 6.    "Bias Source" (claim 1)

| Analog's Proposal | LTC's Proposal |
|---|---|
| A separate circuit that generates a current at a constant predetermined value | "Bias source" is not limited to a separate circuit that generates a current. |

Claim 1 requires that the "bias source" be "coupled to an input of said current comparator" and that the "bias source" set "a minimum feedback current threshold." *See* 16:47-53. Analog's proposed construction defines what a "bias source" *is* and is consistent with what is disclosed and claimed in the '694 patent. Conversely, LTC's suggested construction states what a "bias source" *is not* but fails to offer any positive definition of the limitation.

### G.    The '885 Patent

### 1.    "One-Shot" (claims 1, 11, 15) and "One-Shot Circuit" (claim 32)

| Analog's Proposal | LTC's Proposal |
|---|---|
| A circuit that outputs a pulse of predetermined duration once it is triggered by an input and then returns to its original state where it remains until triggered again. | A circuit that outputs a pulse once it is triggered by an input and then returns to its original state where it remains until triggered again. |

Similar to the previously described disagreement, the parties' dispute with these claim limitations hinges on whether the "pulse" that the "one-shot circuit" outputs must be "predetermined" or not. Basic electrical engineering teaches that a "one-shot" is an "off the shelf" part that generally stays in one output state until it is forced to change output states by the input signal but will automatically return to the original state output state after a time delay. *See* L.J.A. at A566, Horowitz and Hill, "The Art of Electronics" at 351 ("[t]he monostable multivibrator, or one-shot, is a variation of the flip-flop ...").

The specification states that, although the "pulse" that triggers the "one shot" can vary from one cycle (*i.e.,* "state") to another, it cannot vary *within* the same cycle "predefined" within

a particular cycle. *See* 10:1-10. Analog's proposal makes this clear by including the word "predetermined." LTC's, in contrast, allows the "pulse" to vary both across and within cycles.

### 2.    "Terminal" (claims 11 and 35)

| Analog's Proposal | LTC's Proposal |
|---|---|
| A point of a circuit or element to which a circuit or element can be coupled. | A point of a circuit or element to which a circuit or element can be connected or coupled. |

The parties' disagreement with this claim limitation is whether circuit elements must be "coupled" (Analog) or "connected or coupled" (LTC). Analog's proposed construction is consistent with the parties' previous constructions involving "coupling" circuits or elements; adding "connected" to the definition injects needless confusion into the dispute over "coupled" (*i.e.*, electrically or magnetically). *See supra* at Section V.D.2 (discussing "coupled").

### 3.    "Input Node" (claims 11 and 35)

| Analog's Proposal | LTC's Proposal |
|---|---|
| A point of the switching voltage regulator to which the input voltage is coupled | A point of the switching voltage regulator to which an input can be coupled. |

Consistent with its position with respect to "terminal," and with the specification, Analog believes that the "input node" must be "coupled" to another circuit or element (such as the voltage regulator). If, as LTC suggests, the "input node" may not be "coupled" to anything – including the voltage regulator – there is no way that the "poorly specified and fluctuating input voltage" can get to the voltage regulator. *See* 1:12-14; *see also supra* at Sections V.D.1-2. Analog's proposal, however, makes clear that the "input node" is "coupled" to a circuit or element, thereby allowing it to conduct current.

- 55 -

4.    "Feedback Circuit" (claims 11, 35)

| Analog's Proposal | LTC's Proposal |
|---|---|
| A circuit for producing a signal at a second terminal. | A circuit for producing a signal at a second terminal that is indicative of a signal at the first terminal. |

Claim 11 requires "a feedback circuit having a first terminal coupled to the output node, and a second terminal, the feedback circuit producing a feedback signal at the second terminal of the feedback circuit." Thus, according to its terms, a "feedback circuit," among other things, "produces a feedback signal" at the "second terminal." It does not, as LTC suggests, say anything about the characteristics of the "signal."[34]

5.    "Off-Time Control Circuit" (claims 11, 35)

| Analog's Proposal | LTC's Proposal |
|---|---|
| A circuit that provides an output to control the OFF time of the one-shot generator based on both voltages at the input and output nodes. | A circuit that provides an output to control the OFF time of the one-shot generator based on one or both of the voltages at the input node and output node. |

Analog and LTC substantially agree on the construction of the term "OFF-time control circuit." The disagreement is whether the output of the OFF-time circuit is based on "both" (as Analog contends) or "one or both" (as LTC contends) voltages at the input and output nodes.

The specification makes clear that the "off-time control circuit" is dependent on voltage at both the input and output nodes. *See* 9:56-58 ("OFF-time control circuit monitors the input and the output voltages") (emphasis added); 10:17-19 ("a one-shot circuit . . . provides a variable OFF-time control signal that adapts to the input and output voltage levels") (emphasis added). By consistently using the conjunction "and" (rather than "or"), the specification demonstrates that the one-shot generator is based on both the input and output voltages (rather than just one).

_____

[34]    LTC's citation to FIG. 5 as relevant intrinsic evidence is unilluminating. FIG. 5 merely shows the "current feedback circuit" and the "voltage feedback circuit" as blank boxes.

6.  **"Means for Generating a Trigger Signal Responsive to the Current Feedback Signal and the Voltage Feedback Signal" (claim 32)**

| Analog's Proposal | LTC's Proposal |
|---|---|
| This paragraph of Claim 32 recites a means-plus-function and is interpreted under 35 U.S.C. § 112, ¶ 6. As such, the claim should be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.<br><br>The corresponding in the specification for carrying out the recited function are the conventional feedback control circuits such as 230 (FIG. 5), and control loop circuitry such as current mode circuitry of FIG. 2 and FIG. 7 (e.g., 37, 38, 39, $V_{OS}$, and 72). | This is a means-plus-function limitation, and is to be construed to cover the corresponding structure(s) and equivalents thereof. The corresponding structures described in the specification include:<br><br>conventional feedback control circuits such as 230 (FIG. 5), and control loop circuitry such as current mode circuitry of FIG. 2 and FIG. 7 (e.g., 37, 38, and 39). |

The parties' identification of the appropriate structure for this means-plus-function claim limitation are virtually identical. Analog's suggestion, however, includes all the relevant circuit elements in FIG. 2 and 7. LTC's does not.

7.  **"One-Shot Means for Placing the Switch into an Off State Responsive to the Trigger Signal, the Switch Remaining in the Off State for a Period of Time Responsive to the Off-Time Control Signal" (claim 32)**

| Analog's Proposal | LTC's Proposal |
|---|---|
| This paragraph of Claim 32 recites a means-plus-function and is interpreted under 35 U.S.C. § 112, ¶ 6. As such, the claim should be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.<br><br>The corresponding steps in the specification for carrying out the step of this paragraph are disclosed as the steps performed by the combination of the one-shot generator 245 and the off-time control circuit 250. | This is a means-plus-function limitation, and is to be construed to cover the corresponding structure(s) and equivalents thereof. The corresponding structures described in the specification include:<br><br>one-shot generator circuits such as 245 (FIG. 5), and box 245 of FIG. 7. |

The parties agree that this claim limitation is in "means-plus-function" language but disagree as to the corresponding structure. There are two aspects to this claim limitation: (1)

"one-shot means for placing the switch into an off state responsive to the trigger signal; and (2)

"the switch remaining in the off state for a period of time responsive to the off-time control

signal." Analog's suggested construction provides structure for all aspects of this claim

limitation. LTC's proposal, however, only provides a structure for the first part.

### 8. "Variable Current Source" (claim 35)

| Analog's Proposal | LTC's Proposal |
|---|---|
| A current source that has its current output varied to control the discharging rate of the control capacitor. | A current source that has its current output varied. |

Analog's proposed construction is *verbatim* from the language of Claim 35, which

requires that the "off-time control circuit include[] a variable current source that controls the

discharging rate of the control capacitor." In contrast, LTC's – which rearranges the words of

the claim limitation – fails to explain what the "current source" does, as expressed in the claim

itself.

## VI.    CONCLUSION

For the foregoing reasons, Analog respectfully requests that the Court construe the claims

of the Analog patents (the '909 and '633 patents) and the LTC patents (the '178, '694, '885,

'066, '258, '194, '618, and '678 patents) in accordance with Analog's proposed constructions.


*Kelly E. Farnan*
Frederick L. Cottrell III (#2555)
Cottrell@rlf.com
Kelly E. Farnan (#4395)
Farnan@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square, P.O. Box 551
Wilmington, DE 19899
Tel: (302) 651-7700
Fax: (302) 651-7701

OF COUNSEL:                              *Attorneys for Plaintiff/Counterclaim-Defendant*
                                        *Analog Devices, Inc.*

Wayne L. Stoner
Wayne M. Kennard
Donald R. Steinberg
Benjamin M. Stern
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-5000


Dated: June 29, 2007

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I hereby certify that on June 29, 2007, I electronically filed the foregoing with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following and which has also been served as noted:

### BY HAND DELIVERY:

Jack B. Blumenfeld
Karen Jacobs Louden
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
Wilmington, DE 19899

I hereby certify that on June 29, 2007, the foregoing document was sent to the following non-registered participants in the manner indicated:

### BY E-MAIL and FEDERAL EXPRESS (Monday delivery):

Robert C. Morgan
Laurence S. Rogers
Ropes & Gray, LLP
1251 Avenue of the Americas
New York, NY 10020

Mark D. Rowland
Ropes & Gray, LLP
525 University Avenue
Suite 300
Palo Alto, CA 94301

Kelly E. Farnan (#4395)