# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| ANALOG DEVICES, INC.,<br><br>　　　　Plaintiff/Counterclaim<br>　　　　Defendant,<br><br>　vs.<br><br>LINEAR TECHNOLOGY CORP.,<br><br>　　　　Defendant/Counterclaim<br>　　　　Plaintiff. | Civil Action No. 1:06-346-GMS<br><br>**JURY TRIAL DEMANDED** |

## ANALOG DEVICES, INC.'S ANSWERING *MARKMAN* BRIEF

OF COUNSEL:

Wayne L. Stoner
Wayne M. Kennard
Donald R. Steinberg
Benjamin M. Stern
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
(617) 526-6000

Frederick L. Cottrell III (#2555)
(cottrell@rlf.com)
Kelly E. Farnan (#4395)
(farnan@rlf.com)
Richards, Layton & Finger, P.A.
One Rodney Square, P.O. Box 551
Wilmington, DE 19899
(302) 651-7700

*Attorneys for Plaintiff/Counterclaim Defendant
Analog Devices, Inc.*

Dated: June 29, 2007

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................ iv

I.    INTRODUCTION ................................................................................................. 1

II.   THE DISPUTED CLAIM LIMITATIONS OF THE ANALOG PATENTS ............ 5

    A.    The '909 Patent ........................................................................................... 5

        1.    "Gain Compensated Differential Amplifier" .................................... 5

        2.    "Tail Current $I_{tail}$" .................................................................... 8

        3.    "Control Voltage" ........................................................................... 9

        4.    "Control Voltage Generating Means for Generating as the Control Voltage, a Voltage Which Varies Proportionally to Absolute Temperature" ................................................................................. 10

        5.    "Means for Functionally Relating the Control Voltage to the Intrinsic Emitter Resistance of the Current Source" ...................................... 12

        6.    "$\Delta V_{BE}$ Cell" ...................................................................... 14

    B.    The '633 Patent ......................................................................................... 14

        1.    "Bipolar Transistor" ...................................................................... 14

        2.    "Connected" .................................................................................. 15

III.  DISPUTED CLAIM LIMITATIONS OF THE LTC PATENTS ............................ 15

    A.    '194 Patent ................................................................................................ 15

        1.    "Input Signal" and "Output Signal" ............................................... 15

        2.    "Each of the N Regulator Stages Providing Current I/N to the Output Node" .......................................................................................... 17

        3.    "N-Phase Timing Pulses" .............................................................. 18

    B.    The '618 Patent ......................................................................................... 19

        1.    "Semiconductor Substrate" ............................................................ 19

        2.    "Formed in Said First Semiconductor Region" .............................. 20

        3.    "Current Limiting Resistive Element" ........................................... 21

        4.    "Collector-Base Breakdown Voltage," "Inactive," and "Forms a Current Path" ............................................................................... 22

    C.    The '678 Patent ......................................................................................... 23

        1.    "Charging and Draining Circuitry, Coupled to the Single Package Pin, That Charges and Drains Voltage on the Capacitor" (claim 1) and "Through a Single Package Pin" .............................................. 23

2.   "Short Circuit" ...................................................................................................25

3.   "SHORT CIRCUIT SHUTDOWN Signal" and   "Producing a
      DISCHARGE Signal" (claim 21) ...................................................................26

4.   "Arming Voltage" and "Producing an ARMED   Signal"...............................27

5.   "Charge the Capacitor" and "Discharge the Capacitor" ..............................28

D.  Common Claim Limitations of the Wilcox Patents..............................................29

1.   "Switching Voltage Regulator" .....................................................................29

2.   "Coupled" ......................................................................................................30

3.   "Load"............................................................................................................31

4.   "Regulated Voltage" ......................................................................................32

5.   "Signal".........................................................................................................34

6.   "First State of Circuit Operation" and "Second State of Circuit
      Operation"......................................................................................................35

7.   "To Cause".....................................................................................................36

8.   "Threshold"....................................................................................................37

9.   "Output Current"...........................................................................................38

10.  "A First Means for Generating a Voltage Feedback Signal Indicative
      of the Voltage at the Output and "Means for Generating a Voltage
      Feedback Signal" ..........................................................................................38

11.  "Output Inductor" .........................................................................................40

E.  The '178 Patent......................................................................................................40

1.   "A Second Means for Generating a First Control Signal . . . to
      Maintain the Output Voltage at the Regulated Voltage".................................40

2.   "A Third Means for Generating a Control Signal . . . To Cause Both
      Switching Transistors To Be Simultaneously OFF . . ."..................................41

3.   "Current to the Output Terminal".................................................................42

4.   "Threshold Indicative of a Polarity Reversal Condition"...............................43

5.   "Prevent the Current to the Load from Reversing Polarity"...........................43

6.   "Prevents the Drive Circuitry from Turning on Either of the Pair of
      Synchronously Switched Switching Transistors".............................................44

7.   "Selected Sleep Mode Current Level".............................................................44

F.  The '694 Patent......................................................................................................45

1.   "Inductive Element".......................................................................................45

2.   "Current Comparator Circuit".......................................................................45

3.  "Current Feedback Signal" ........................................................................46

4.  "First State" and "Second State" ...........................................................46

5.  "Bias Source" ...........................................................................................47

6.  "Minimum Feedback Current Threshold" ...............................................47

G.  The '885 Patent ...............................................................................................48

1.  "One-Shot" and "One-Shot Circuit" ......................................................48

2.  "Feedback Circuit" ..................................................................................49

3.  "Means for Generating a Trigger Signal Responsive to the Current Feedback Signal and the Voltage Feedback Signal" ...............................49

4.  "One-Shot Means for Placing the Switch into an Off State Responsive to the Trigger Signal, the Switch Remaining in the Off State for a Period of Time Responsive to the Off-Time Control Signal" ......................................................................................................50

5.  "Variable Current Source" ......................................................................51

IV.  CONCLUSION ............................................................................................................52

# TABLE OF AUTHORITIES

*Asyst Techs., Inc. v. Empak, Inc.*,
    268 F.3d 1364 (Fed. Cir. 2001)..................................................................13

*Athletic Alternatives, Inc. v. Prince Mfg., Inc.*,
    73 F.3d 1573 (Fed. Cir. 1996).....................................................................29

*Bell & Howell Document Management Prods. Co. v. Altek Systems*,
    132 F.3d 701 (Fed. Cir. 1997).......................................................................1

*Bicon, Inc. v. Straumann Co.*,
    441 F.3d 945 (Fed. Cir. 2006)....................................................................22

*Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.*,
    214 F.3d 1302 (Fed. Cir. 2000)............................................................17, 20

*In re Paulsen*,
    30 F.3d 1475 (Fed. Cir. 1994)....................................................................25

*Lantech, Inc. v. Keip Mach. Co.*,
    32 F.3d 542 (Fed. Cir. 1994) .....................................................................22

*Linear Tech. Corp. v. Monolithic Power Sys., Inc.*,
    Civ.A.No. 06-476-GMS .......................................................................30, 39

*Modine Mfg. Co. v. United States Int'l Trade Comm'n*,
    75 F.3d 1545 (Fed. Cir. 1996)............................................................18, 33

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) .....................................1, 16, 26

*SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.*,
    242 F.3d 1337 (Fed. Cir. 2001)............................................................*passim*

*Tandon Corp. v. United States Int'l Trade Comm'n*,
    831 F.2d 1017 (Fed. Cir. 1987)...................................................................33

*Toro Co. v. White Consol. Industries, Inc.*,
    199 F.3d 1295 (Fed. Cir. 1999)...................................................................25

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996)........................................................1-2, 21, 47

*Wang Laboratories, Inc. v. America Online, Inc.*,
    197 F.3d 1377 (Fed. Cir. 1999)...................................................................25

*Yoon Ja Kim v. Conagra Foods, Inc.*,
   465 F.3d 1312 (Fed. Cir. 2006)......................................................................................9

## I.    <u>INTRODUCTION</u>

Linear Technology Corp.'s ("LTC") proposed constructions of the disputed claim limitations run afoul of the Federal Circuit's canons of claim construction as expressed in *Phillips v AWH Corp*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) and its progeny. LTC cherry-picks claim construction arguments and selectively uses claim construction principles depending on the result it wishes to achieve.

First, instead of beginning with the intrinsic evidence, LTC submitted a 48-page "expert declaration" (with 11 exhibits) from Robert A. Blauschild ("Blauschild Decl."), a highly paid expert that has testified several times for LTC in the past.[1] This is in addition to LTC's 59-page opening brief. Mr. Blauschild's declaration alternates between offering impermissible extrinsic opinion testimony and discussions of intrinsic evidence that could have been (but were not) included in LTC's brief.[2] As the Federal Circuit has repeatedly emphasized, expert testimony has little utility in claim construction and should be accorded limited weight. *See, e.g., Phillips*, 415 F.3d at 1318-19 (noting potential bias in expert testimony generated for purposes of litigation and directing district courts to discount expert testimony that is "conclusory" or "unsupported," or conflicts with the intrinsic evidence); *Bell & Howell Document Management Prods. Co. v Altek Systems*, 132 F.3d 701, 707 (Fed. Cir. 1997) (reversing claim construction where district court relied on expert testimony even though the intrinsic record was clear);

---

[1]    Mr. Blauschild has testified on LTC's behalf at least five times in the past four years and has been an expert for LTC for several years prior to that, including in the *Impala* Litigation. *See* Joint Claim Construction Appendix for the Patents Asserted by Analog Devices, Inc. ("A.J.A.") at B74, Blauschild Decl. ¶ 6; *see also* Joint Appendix of Evidence Relating to the Linear Patents ("L.J.A.") at A362. He is charging LTC $450 an hour for his services in this case (including preparing his declaration). *Id.* at ¶ 5.

[2]    The Court recently struck Mr. Blauschild's declaration and required it, as well as other material the parties filed, to be submitted as part of the joint appendix. The parties are filing revised joint appendices (one for the Analog patents and one for the LTC patents). In so doing, however, Analog is not agreeing that Mr. Blauschild's declaration is proper evidence for the Court to consider.

*Vitronics Corp v Conceptronic, Inc*, 90 F.3d 1576, 1584 (Fed. Cir. 1996) ("[W]here the patent

documents are unambiguous, expert testimony regarding the meaning of a claim is entitled to no

weight.")  The Court should therefore ignore the contents of Mr. Blauschild's declaration, which

contains improper extrinsic and opinion evidence and allows LTC to advance arguments that it

could not fit within the (already increased) *Markman* brief page limitations.[3]

Second, LTC picks and chooses claim construction theories to arrive at result-oriented

constructions.  In so doing, it ignores the purpose of claim construction – to provide to the Court,

the parties, and the jury the meaning of the disputed claim limitations.  Rather, LTC offers

needlessly complicated definitions, constructions containing words that themselves require

construction, meaningless constructions that do not assist in understanding how the claims

limitations fit into the patent, and it alternatively expands or limits the scope of the claim based

on snippets in the specification.  This failure to apply a principled approach to claim construction

repeats itself (in many different forms) throughout LTC's opening brief.

Third, LTC mischaracterizes Analog Devices Inc.'s ("Analog") positions as

impermissible attempts to import specific embodiments from the specification into the claims.

This is untrue.  Not only does Analog properly limit its use of the specification to instances when

the claim language fails to offer guidance on the meaning of the disputed claim limitation, but

LTC fails to appreciate that many of Analog's citations are to general descriptions of the claimed

invention and ***not*** to specific embodiments.  Such language in the specification may

appropriately limit the scope of the claims.  *See, e g , SciMed Life Systems, Inc v Advanced*

---

[3]    The Court has previously expressed its preference that parties not submit expert reports during the
*Markman* process.  *See, e g ,* A.J.A. at B67, *Thermo Finnigan LLC v Applera Corp* , No. 04-CV-1505-
GMS, 4/27/05 Scheduling Conference Transcript at 24:7-12.  Furthermore, the Court informed the parties
in this case that expert declarations and testimony were not allowed at the technology tutorial.  *See* A.J.A.
at B69, 9/21/06 Scheduling Conference Transcript at 24:9-10.

*Cardiovascular Systems, Inc*, 242 F.3d 1337, 1343-44 (Fed. Cir. 2001) (when the specification describes the invention generally, it is not referencing a preferred embodiment but instead is "strong evidence" of what the claim limitations require).

Fourth, throughout its discussion of the Wilcox patents, LTC cites the district court's construction in the *Impala* Litigation to support its claim construction arguments. As an initial matter, several of LTC's current positions actually ***contradict*** the constructions and analysis of the district court in the *Impala* Litigation. Further, LTC fails to explain *why* such positions are correct (even though the district court in the *Impala* Litigation itself changed its constructions) – or why Analog's positions are wrong. This effort – simplistically arguing that the Court should blindly accept the district court's seven-year-old constructions from the *Impala* Litigation – has already been rejected by the International Trade Commission ("ITC") in its recent Initial Determination. *See* L.J.A. at A493-95, Initial Determination at 11-13. Moreover, LTC's observation that the ITC's determination "is not binding" applies equally to LTC's arguments suggesting that the Court adopt the district court's claim constructions in the *Impala* Litigation. Yet, the difference between those two opinions is the Federal Circuit's intervening decision in *Phillips*, which clarified and changed the procedures for claim construction and suggests that the Court revisit the previously construed, but still disputed, claim limitations of the Wilcox patents. LTC's blind reliance on the district court's dated constructions of the '178 patent in the *Impala* Litigation and disparagement of the ITC's claim construction in the Initial Determination, arrived at after voluminous briefing, a lengthy hearing, and a well-reasoned decision that applies

the Federal Circuit's post-*Phillips* claim construction guidance, is puzzling to say the least. *See* LTC Op. Br. at 26.[4]

Finally, during the June 13, 2007 status conference, the parties (and the Court) discussed filing an Amended Joint Claim Chart that reflects the parties' positions as described in the opening brief. *See* A.J.A. at B71-72, 6/13/07 Hearing Tr. at 4:21-5:15 (counsel agreeing to file amended claim charts that reflect the parties' positions in their opening *Markman* briefs and to identify portion(s) of such briefs that the Court need not consider). Yet, LTC, in its portion of the Amended Joint Claim Charts for the LTC Patents, D.I. 59, has significantly changed several of its proposed constructions of disputed claim limitations from what it had originally suggested in its opening brief. These changes came *two weeks* after LTC had received Analog's opening brief. LTC's explanation for its abrupt turnaround is that its revisions were made to conform to the district court's claim construction in the *Impala* Litigation. However, it appears that LTC altered its proposed constructions in response to Analog's arguments in its opening brief, and in a further effort to refine its result-oriented claim construction positions.

---

[4]    All citations to "LTC Op. Br." are to LTC's Opening Claim Construction Brief filed on June 7, 2007 (D.I. 53). In accordance with the Court's June 26, 2007 Order, Analog is filing the joint appendix for the asserted Analog patents and an amended opening brief with proper citations the parties' joint appendices. LTC, however, has informed Analog that its amended opening brief will not only have changed citations, but will also remove any discussion to claim limitations that the parties agreed (before the opening briefs were filed) were not in dispute. This is contrary to Analog's understanding of the Court's June 26, 2007 Order and the parties representations to the Court during the June 13, 2007 conference. *See* A.J.A. at B71-72 (counsel for LTC stating that it will identify portion(s) of its opening briefs that the Court "may not have to consider"). In any event, if LTC files a corrected opening brief with substantive changes and different pagination, Analog will, if the Court wishes, file a revised answering brief with corrected citations to LTC's altered opening brief.

## II.    THE DISPUTED CLAIM LIMITATIONS OF THE ANALOG PATENTS

### A.    The '909 Patent[5]

#### 1.    "Gain Compensated Differential Amplifier" (claims 1, 6)

| Analog's Proposal | LTC's Proposal |
|---|---|
| A circuit that amplifies the difference between two input voltages, wherein the amplification is adjusted for environmental, process, or structural variations. | "Differential amplifier" means a circuit, the purpose and operation of which is to amplify the difference between two input voltages. <br><br> "Gain-compensated" means that the gain of the differential amplifier is compensated simultaneously for geometry dependent parameters, temperature dependencies, and lot-to-lot variations (*i e*, compensated for ohmic emitter and base resistance, intrinsic emitter resistance, and beta). |

LTC asserts that a circuit is "gain compensated" only if it compensates simultaneously for three errors, and further specifies that one of these errors must be finite "beta" (*i e*, "β" or "current gain" in the parlance of the patent). *See* LTC Op. Br. at 7-8.

This proposed construction is inconsistent with the specification, which makes clear that a differential amplifier that compensates for temperature and intrinsic emitter resistance of the current source is "gain compensated" within the meaning of claims 1 and 6 regardless of whether it compensates for a finite beta. For example, the first three columns of the '909 patent, together with FIGS. 1 and 2, describe an operational circuit "according to the present invention" that *does not* compensate for beta. *See* 2:16-19. Yet, this circuit, which meets every limitation of claims 1

---

[5]    The Amended Joint Claim Construction Chart for the '909 patent (D I. 58 at Exhibit A) contains an agreed-upon construction of one claim limitation. The parties respectfully request that, if the Court deems appropriate, it include such construction in its claim construction order.

and 6, achieves gain compensation.[6]  FIG. 3, in contrast, depicts a "more rigorous, more generalized circuit model" that is refined to adjust for beta.  *See* 4:10-15; 4:35-40.  Therefore, nothing in the independent claims or specification *requires* the circuit to compensate for beta.

LTC's suggested construction is also flawed for an additional reason.  It imports all of the limitations of claim 1 *and* its dependent claims and claim 6 *and* its dependent claim, into the plain and ordinary meaning of "gain compensated," as stated in the preambles to claims 1 and 6.  Although the particular differential amplifier recited in independent claims 1 and 6 compensates for "geometry dependent parameters" ["intrinsic emitter resistance" of element(d)], "temperature dependencies" ["absolute temperature" of element(c)], and "lot-to-lot variations" ["intrinsic emitter resistance" of element (d)], it does *not* follow that a person of ordinary skill would understand that a "gain compensated differential amplifier" must include *all* of these limitations as well as correction for "beta."  A differential amplifier that corrects for any one of these factors is "gain compensated."[7]

Independent claims 1 and 6 are *silent* as to correction for beta.  It is improper to import this limitation (tracking the current gain characteristics) from unasserted dependent claims 4 and 9 (or from claims 2 and 7) into independent claims 1 and 6, respectively.

---

[6]    3:33-34 (using equation 42, "Rg can be selected to achieve compensation"); 3:63-68 ("this invention shows how, with proper design, this $\Delta V_{BE}$ cell can be used to bias the current source... to a point which adds to the tail current a component keyed to and tracking the ohmic resistances associated with the device geometries."); 4:1-10 (FIG. 2 used a "simplified analysis" that "failed to consider a number of... sources of error."); 4:38-39 ("an increase must be made to the tail current to compensate for finite $\beta$").

[7]    LTC acknowledges that "ohmic resistance" – what the claims refer to as "intrinsic emitter resistance" – is both geometry-dependent and varies lot-to-lot.  *See* LTC's Op. Br. at 3; *see also* 1:50-52 ("these resistance values [*i.e.*, the electronic emitter resistance and ohmic emitter resistance] are very geometry sensitive and can, with Rc and beta, vary from wafer to wafer (and lot to lot) in the fabrication process.").

LTC supports its suggested construction by rewriting the prosecution history. According to LTC, Analog told the Examiner that "no previous designer has shown a way to compensate for junction resistance *and* beta ..." LTC Op. Br. at 8 (emphasis added). This argument suggests that Analog told the Examiner that compensating simultaneously for both of these factors (junction resistance and beta) was necessary. However, LTC's premise is incorrect. In fact, Analog told the Examiner that "no previous designer has shown a way to compensate for junction resistance *or* beta...." *See* A.J.A. at B16 (emphasis added).[8] This language does not support LTC's contention that a differential amplifier, according to the patent, must compensate for beta. Rather, it shows that the claimed differential amplifier might compensate for junction resistance or for beta (or for both). Similarly, the other fragments of prosecution history cited by LTC also do not support its argument.[9]

LTC also attempts to limit the definition of a differential amplifier to a circuit whose "purpose" is to amplify the difference between two input voltages. LTC Op. Br. at 9. According to LTC, a circuit that is structured as a differential amplifier, and which functions as a differential amplifier, is *not* a differential amplifier unless it is has that specific "purpose." This requirement is nonsensical and is not supported by any language in the claims (which recite the structure of a circuit). The subjective intent of a designer is irrelevant to whether a circuit is a differential amplifier.

---

[8]    *See also* A.J.A. at B16 ("Maeda's patent... is not a method for compensating for the lot-to-lot *or* β variations of a differential amplifier"); *id.* ("Neither Hester's current source nor Maeda's current source accounts for the ohmic resistances *or* β of the differential transistors.") (emphasis added).

[9]    *See, e.g.*, A.J.A. at B14 ("Even Maeda *et al*... does not correct for the ohmic resistances."); A.J.A. at B15 ("There is also a need for special care when dealing with ... errors that are due to finite beta.... This is also not addressed in any of the patents which the Examiner cited.")

2.    **"Tail Current $I_{tail}$" (claims 1(a), 6(a))**[10]

| Analog's Proposal | LTC's Proposal |
|---|---|
| The current drawn through the long-tail portion of a pair of transistors of a differential amplifier, wherein the long-tail portion is formed by the connection of the emitters of the transistors. | "tail current" – The current drawn through the long-tail portion of a pair of transistors of a differential amplifier, wherein the long-tail portion is formed by the connection of the emitters of the transistors. The value of the tail current is required to be $I_{tail}$ (see below).<br><br>"$I_{tail}$" – a "PTAT" current (*i e* , a current, the value of which varies linearly with absolute (Kelvin) temperature).<br><br>In addition, "$I_{tail}$" = $2I(1+1/\beta_0)$, where $I=[(V_T \ln (A))/R_g]/[1-(r/R_g)(1-1/A)]$ as defined in the '909 patent (equation 40). |

LTC contends that "tail current $I_{tail}$" is limited to a specific value disclosed in the specification, $2I(1+1/\beta_0)$, even though that formula does not appear in claims 1 or 6.

As noted above, the patent fully describes a simplified circuit, depicted in FIG. 2, that does not compensate for finite beta and yet meets all of the limitations of claims 1 and 6 (although, again, it does appear in narrower, dependent claims). The tail current shown in FIG. 2 is $2I$, not $2I(1+1/\beta_0)$. The formula $2I(1+1/\beta_0)$ appears only in the "more rigorous, more generalized" embodiment shown in FIG. 3 and recited in dependent claims 4 and 9 (both of which are unasserted).

LTC argues that $I_{tail}$ in claims 1 and 6 must be $2I(1+1/\beta_0)$ because the specification states that "the tail current $I_{tail}$ (*i e* , $I_{tail}$ = $2I$ as shown in FIG. 1 and FIG. 2), which is also the collector current of transistor 24, *must be* $2I(1+1/\text{beta})$." LTC Op. Br. at 10 (emphasis in original). This excerpt is taken out of context. As the first paragraph of column 4 of the patent makes clear, the

---

[10]    In context, the claim limitation is "a transistor differential amplifier ... operating at a tail current $I_{tail}$ ."

cited language describes how to design a circuit according to a more rigorous model that accounts for beta. *See also* 4:37-39 ("*to set the collector current to the desired value*, an increase must be made to the tail current to compensate for finite B") (emphasis added). In other words, setting current to 2I(1+1/beta) is optional.

LTC also relies on a statement from the "summary of the invention" that the tail current "includes a component of current which compensates for the ohmic resistances of the transistors *and finite beta.*" LTC Op. Br. at 10 (emphasis added). Again, LTC quotes the specification out of context. The quoted excerpt is part of a description of a differential amplifier that achieves various "objects of the invention." 1:62. Although it is true that *one* "object of the invention" is to compensate for beta, and that a designer can achieve this by setting the tail current to $2I(1+1/\beta_0)$ as recited in claims 4 and 9, the quoted language should not be read to import this limitation into every claim. *See, e.g., Yoon Ja Kim v. Conagra Foods, Inc.*, 465 F.3d 1312, 1319 (Fed. Cir. 2006) ("The mere fact that one object of the invention is to produce a slow acting oxidant which is functional throughout the entire manufacturing process does not mean that this particular feature was adopted as a limitation in each claim of the patent.") As noted above, the circuit depicted in FIG. 2 is gain compensated, yet does not compensate for beta.

3.    **"Control Voltage" (claims 1(b), 6(b); *see also* claims 3, 5, 8, 10)**[11]

| Analog's Proposal | LTC's Proposal |
|---|---|
| A voltage used to control a device in a circuit. | The "control voltage" is the voltage at the base of the transistor current source. |

LTC displays a basic misunderstanding of the patent by asserting, in its proposed construction, that the control voltage in the asserted claims must be located at the "base of the

---

[11]    In the context of claims 1(b) and 6(b), the claim limitation is a "current source responsive to a control voltage…."

transistor current source."   Such a requirement does not appear anywhere in claims 1 or 6 and is inconsistent with the design of the $\Delta V_{BE}$ cell that makes up part of the claimed invention. As explained more fully below, a person of ordinary skill would not construe the term "control voltage" in the narrow manner suggested by LTC. *See infra* at Section II.A.4.

### 4.    "Control Voltage Generating Means for Generating as the Control Voltage, a Voltage Which Varies Proportionally to Absolute Temperature" (claims 1(c), 6(c))

| Analog's Proposal | LTC's Proposal |
|---|---|
| This is a means-plus-function limitation, and should be construed to cover the corresponding structure(s) and equivalents thereof<br><br>The corresponding structure(s) described in the specification is circuitry that includes a $\Delta V_{BE}$ cell. | This element is a means-plus-function element that must be construed pursuant to 35 U.S.C. § 112, ¶ 6. As such, the claimed "control voltage generating means" must be construed to be the corresponding circuitry described in the specification for performing the claimed function of "generating, as the control voltage, a voltage that varies proportionally to absolute temperature," and structural equivalents thereof.<br><br>"A voltage which varies proportionally to absolute temperature" means a PTAT voltage (*i.e.*, a voltage the value of which varies linearly with absolute (Kelvin) temperature).<br><br>There is no circuit structure disclosed in the patent which functions to generate a PTAT control voltage. Alternatively, if there is a structure in the patent for performing the claimed function, the corresponding structure of the "control voltage generating means" is the $\Delta V_{BE}$ cell of FIG. 3, where (1) transistor 28 has an emitter area A times that of transistor 32 and (2) transistors 28 and 32 are driven to equal current densities. |

This claim limitation is a means-plus-function limitation, with the claimed function being "generating, as the control voltage, a voltage which varies proportionately to absolute temperature" (*i.e.*, a "PTAT voltage"). The structure that performs the claimed function is circuitry that includes a $\Delta V_{BE}$ cell. LTC argues that there is no structure for performing the

claimed function because the $\Delta V_{BE}$ cell disclosed in the specification does not "generat[e] the claimed PTAT voltage to which the current source of element (b) is responsive." LTC Op. Br. at 13.[12]

LTC's (correct) observation that the specification does not explicitly state that the $\Delta V_{BE}$ cell generates a PTAT voltage (*see* LTC Op. Br. at 13) fails to address the issue: A person of ordinary skill would readily understand that the $\Delta V_{BE}$ cell of the '909 patent generates at least one PTAT voltage (hence the name $\Delta$"$V_{BE}$" cell, referring to voltage). Contrary to LTC's theory, this PTAT voltage is a "control voltage," because the current source of element (b) is "responsive" to it, as required by claims 1 and 6. As a person of ordinary skill would understand, the PTAT voltage in the $\Delta V_{BE}$ cell causes a voltage to be applied to the base of the current source, which in turn causes the current source to generate a PTAT current. *See* 3:60-63; 4:67-5:1. The current source is thus "responsive" to the PTAT voltage of the $\Delta V_{BE}$ cell. It is irrelevant whether the voltage at the base of the current source is a PTAT voltage.

LTC's confusion arises from its incorrect construction of "control voltage," under which the control voltage can *only* exist "at the base of the transistor current source." A person of ordinary skill, however, would understand that the PTAT voltage generated by a $\Delta V_{BE}$ cell "controls" the current of the current source.

---

[12]    LTC also argues that if there is a structure, it is $\Delta V_{BE}$ cell, wherein "transistors 28 and 32 are driven to equal current densities." LTC Op. Br. at 12. This is incorrect. It is true, as LTC points out, that the specification states that "[t]ransistors 28 and 32 operate at the same current density, although different collector currents." *See* 4:21-22. However, as a person of ordinary skill would understand (and as LTC appears to recognize), this was a clerical error, and the sentence should read "[t]ransistors 28 and 32 operate at the same *collector current*, although different *current densities*." *See also* 2:64-65 (repeating clerical error); LTC Op. Br. at 6 n 5

- 11 -

5. **"Means for Functionally Relating the Control Voltage to the Intrinsic Emitter Resistance of the Current Source" (claims 1(d), 6(d))**

| Analog's Proposal | LTC's Proposal |
|---|---|
| This is a means-plus-function limitation, and should be construed to cover the corresponding structure(s) and equivalents thereof.<br><br>The corresponding structure(s) described in the specification includes the $\Delta V_{BE}$ cell structured to satisfy Equation 42. | This element is a means-plus-function element that must be construed pursuant to 35 U.S.C. § 112, ¶ 6. As such, the claimed means must be construed to be the corresponding circuitry described in the specification for performing the claimed function of "functionally relating the control voltage to the intrinsic emitter resistance of the current source" and structural equivalents thereof.<br><br>The "intrinsic emitter resistance" of a transistor is defined as kT/qI, where k is Boltzmann's constant, T is absolute temperature, q is electronic charge, and I is the current conducted by the transistor.<br><br>There is no circuit structure disclosed in the patent which performs the claimed function, because there is no disclosed structure corresponding to the recited "control voltage generating means" (see element (c), above). Alternatively, if there is structure in the patent for performing the claimed function, the structure for performing the claimed function of "functionally relating the control voltage to the intrinsic emitter resistance of the current source," is $\Delta V_{BE}$ cell 20 of FIG. 3, having all indicated component values, mathematical relationships, and device relationships such that the gain of the differential amplifier is compensated for geometry-dependent parameters, temperature dependencies, and lot-to-lot variations. In addition, $\Delta V_{BE}$ cell 20 has the following properties:<br><br>  • The value of resistor 34 ($R_g$) is chosen such that, for a desired differential mode gain G, $R_g/R_e=(1-1/A)/2G$.<br><br>  • The unit area emitter geometries of the transistors of $\Delta V_{BE}$ cell 20 and of the other transistors of FIG. 3 are the same<br><br>Transistors 28 and 32 operate at different collector currents. |

LTC first argues that there is no structure that "functionally relat[es] the control voltage to the intrinsic emitter resistance of the current source" because no structure generates a control

voltage. LTC Op. Br. at 15. This is incorrect because, as noted above, the "control voltage generating means" is fully disclosed in the specification. *See supra* at Section II.A.4.

LTC next argues that if there is a structure that performs the recited function, that structure must compensate for several factors, including beta. However, as explained above, the specification describes a simplified structure (according to claims 1 and 6) that is gain compensated despite not compensating for beta.[13] *See supra* at Section II.A.1. Moreover, the recited function refers only to relating the control voltage to the intrinsic emitter resistance of the current source. It is improper to add structure (to compensate for beta) that is not required by the claimed function. *See Asyst Techs., Inc. v. Empak, Inc.*, 268 F.3d 1364, 1370 (Fed. Cir. 2001) ("Structural features that do not actually perform the recited function do not constitute corresponding structure and thus do not serve as claim limitations.").[14]

LTC also insists that the "intrinsic emitter resistance" referred to in claims 1(d) and 6(d) is the "intrinsic *electronic* emitter resistance," denoted as "$r_e$" and described by the equation $kT/qI$. *See, e.g.*, LTC Op. Br. at 3, 5 n.4. According to LTC, this is "another, independent reason why the claimed means of element (d) is not disclosed in the patent." *Id.* at 16 n.8. However, as stated in Analog's opening brief, the intrinsic emitter resistance recited in the claims refers to ("$r$"), *not* the electronic emitter resistance ("$r_e$"). *See* Analog Op. Br. at 19.

---

[13]     LTC also asserts that the "unit area emitter geometries of the transistors of $\Delta V_{BE}$ cell 20 and of the other transistors of FIG. 3 are the same." LTC Op. Br. at 15; *see also id.* at 6. This is incorrect. The specification states that "[t]ransistor 32... ha[s] a unit area emitter geometry," "transistor 28 has emitter area of A units," "transistors 12 and 14 have N-unit emitter areas," and "current-source transistor 24 has emitter area of M units...." 4:15-27.

[14]     As LTC points out, Analog told the Examiner that "[t]he specification derives the equations (see pp. 5-11) that relate parameters in the control circuit to a component of the tail current that is proportional to, and tracks, both the resistances associated with the device geometries, and the current gain, of the differential amplifier transistors." *See* LTC Op. Br. at 15; A.J.A. at B15. This statement does not limit the scope of the claim. Its purpose was merely to orient the Examiner by describing the various functional relationships that were disclosed in the specification.

### 6. "$\Delta V_{BE}$ Cell" (claims 3, 6, 8)

| Analog's Proposal | LTC's Proposal |
|---|---|
| A circuit that provides a control voltage that produces a current that is proportional to absolute temperature (Kelvin). | A circuit which produces a control voltage using the difference between the base-emitter voltages of two transistors, as shown in FIG. 3 (circuit 20). |

LTC asserts that Analog's construction of the $\Delta V_{BE}$ cell is flawed because the claims require a PTAT voltage, not a PTAT current. LTC Op. Br. at 16-17. However, as discussed above, the reference to a PTAT control voltage in the claims is perfectly consistent with the specification and with the understanding of a person of ordinary skill in the art. *See supra* at Section II.A.4. As the patent acknowledges, the "operation of the $\Delta V_{BE}$ cell is well documented in the literature." 4:67-68.

### B. The '633 Patent

### 1. "Bipolar Transistor" (claims 8, 17)

| Analog's Proposal | LTC's Proposal |
|---|---|
| A three-terminal semiconductor device with an n- (or p-) type semiconductor region between two p- (or n-) type semiconductor regions | "Bipolar transistor" means a three-electrode semiconductor device with a layer of n- (or p-) type semiconductor (the base region) sandwiched between two regions of p- (or n-) type semiconductors (the collector and emitter regions), thus forming two p-n junctions back to back. The current flowing into or out of the base electrode controls the amount of current flowing between the collector and emitter electrodes. |

As stated in Analog's opening brief, LTC's construction invokes ambiguous terms – "sandwiched" and "back to back" – that themselves require construction. *See* Analog Op. Br. at 20. These vague terms appear nowhere in the claims or specification, and provide no meaningful guidance regarding the structure or function of a "bipolar transistor." *Id.* Furthermore, LTC has not cited any dictionary definitions in support of its construction.

### 2. "Connected" (claims 8, 10, 17)

| Analog's Proposal | LTC's Proposal |
|---|---|
| Coupled | The term "connected," when used, as here, to describe one component terminal being connected to another, means connected directly with no intervening components. |

LTC argues that its narrow construction of "connected" (which is inconsistent with the specification) is "compelled" by an amendment in the prosecution history. LTC Op. Br. at 19. LTC, however, misunderstands the purpose of the amendment on which it relies. The claim originally recited "collector-emitter circuits of said clamp transistors [are] connected between the bases of said output transistors." A.J.A. at B43. This ambiguous language was revised to state that the "collectors of said clamp transistors [are] connected to the bases of their opposing output transistors." *Id* This revision had nothing to do with the "directness" of the connection, but rather merely clarified an unclear structural relationship.

LTC's opening brief states that "[w]hen 'connected' is used [to describe the connection of one terminal to another], the '633 Patent's written description always points to direct physical connections." LTC Op. Br. at 19-20. This is incorrect. *See* Analog Op. Br. at 21-22.

## III. DISPUTED CLAIM LIMITATIONS OF THE LTC PATENTS[15]

### A. '194 Patent

#### 1. "Input Signal" and "Output Signal" (claims 1, 13, 30, 33)

| Analog's Proposal | LTC's Proposal |
|---|---|
| "input signal" – An input that conveys information. | "input signal" – An input that can convey information. |

---

[15]    Exhibit A to the Amended Joint Claim Chart for the LTC Patents contains a list of stipulated claim constructions. The parties respectfully request that, if the Court deems appropriate, it include such constructions in its claim construction order.

| "output signal" – An output that conveys information. | "output signal" – An output that can convey information. |
| --- | --- |

LTC does not address these claim limitations in the context of the '194 patent, but rather makes oblique reference to them when discussing claim limitations in the Wilcox patents with similar language.  *See* LTC Op. Br. at 27.  This is improper; there is no reason why a claim limitation in one patent must mean the same thing in an entirely different patent.  Moreover, as Analog noted in its opening brief, both the '194 patent specification and plain meaning of the claims indicate that a "signal" actually conveys information; it does not merely state, as LTC does, that a signal "can" convey information.  *See* Analog Op. Br. at 22-23.

LTC's suggestion that the prosecution history of the '194 patent supports its proposed definition is wrong.  *See* LTC Op. Br. at 27.  In fact, the opposite is true.  The applicants amended the asserted claims to *add* the word "signal" to the words "output" and "input" during prosecution of the '194 patent.  Analog Op. Br. at 23; *see also* L.J.A. at A330-36.  Construing the disputed claim limitations merely as "output" and "input," as LTC does, renders the word "signal" meaningless.  *See, e.g., Phillips*, 415 F.3d at 1317 ("[T]he prosecution history can often inform the meaning of the claim language by demonstrating ... whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be.").

2.    **"Each of the N Regulator Stages Providing Current I/N to the Output Node" (claims 1, 13, 30, 33)**

| Analog's Proposal | LTC's Proposal |
|---|---|
| Each regulator stage provides an equal amount of current I/N to the output node. | Each regulator stage provides a substantially equal amount of current I/N to the output node. |

Despite frequently criticizing Analog for allegedly seeking to construe unambiguous claim limitations, LTC asks the Court to ignore the plain and ordinary meaning of this claim limitation. Here, the claim language mathematically *requires* that each of the N regulator stages provides current in the amount of I/N to the output node. *See* Analog Op. Br. at 24-25.

LTC seeks to expand the clear claim language with unclaimed language from the specification. It does so by pointing out isolated portions of the specification that refer to "substantially equal" currents, *see* LTC Op. Br. at 50, but ignores other parts that require "equal" currents. *See, e.g.,* 5:21-22. LTC's resort to the specification is therefore improper, as it does not express an intent to alter the meaning of an otherwise unambiguous claim limitation. *See Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.,* 214 F.3d 1302, 1307 (Fed. Cir. 2000) ("Absent an express intent to impart a novel meaning, claim terms take on their ordinary meaning."). LTC did not add the word "substantially" to the asserted claims during prosecution so cannot now rewrite them in litigation through claim "construction."

Further, LTC's proposed construction – which inserts "substantially equal" into the claim language – fails to appreciate that when the inventors meant to indicate "substantially equal" current, they said so. *See* claims 10 and 28. This means there is a presumption that the inventor

did *not* mean "substantially equal" in the asserted claims.[16] *See Modine Mfg. Co. v. United States Int'l Trade Comm'n*, 75 F.3d 1545, 1551 (Fed. Cir. 1996) ("When a limitation is included in several claims but is stated in terms of apparently different scope, there is a presumption that a difference in scope is intended and is real."); *see also* Analog Op. Br. at 24-25.

In any event, even if the Court is inclined to look beyond the unambiguous language and structure of the claim, the specification makes clear that any current variations from mathematical equality are the products of "small variations in component values," Analog Op. Br. at 24 n.19, rather than something that the alleged invention is designed to achieve. Therefore, if the Court adopts LTC's "substantially equal" construction, Analog requests that the Court make clear that "substantially equal" I/N current to the "output node" is limited to circuits that only have "small variations in component values." *See id.*

### 3.    "N-Phase Timing Pulses" (claims 1, 13, 30, 33)

| Analog's Proposal | LTC's Proposal |
|---|---|
| The set of pulses that operate out of phase to provide timing for the N-phases. | Pulses that provide the timing for N-phases. |

LTC's assertion that "N-phase timing pulses" needs no construction is belied by its circular proposal; it simply rearranges the words of the disputed term and offers no guidance as to the meaning of this claim limitation. This is tantamount to no construction at all.

LTC accuses Analog of attempting to read limitations into the claims from a preferred embodiment. *See* LTC Op. Br. at 48-49. LTC is mistaken. The patent states that *the invention*

---

[16]    LTC applies this principle of claim differentiation to support its proposed constructions of "charging and draining circuitry ..." and "through a single package pin" in the '678 patent. *See* LTC Op. Br. at 56. In so doing, however, LTC fails to explain why this principle applies in those situations, but not in this one.

(and not merely a particular embodiment) requires N-phase timing pulses that operate "out of

phase." *See* 7:58-64 ("[T]he ***present invention*** more generally involves connecting N regulator

stages, with each stage synchronized to a clock ... or sawtooth waveform ... that is 360°/N ***out

of phase*** from the adjacent stage") (emphases added); *see also SciMed*, 242 F.3d at 1343-44.[17]

### B.    The '618 Patent

#### 1.    "Semiconductor Substrate" (claims 1, 21)

| Analog's Proposal | LTC's Proposal |
|---|---|
| An underlying layer or substratum below the integrated circuits on a chip. | A substrate made out of semiconductor material. |

LTC's proposed definition merely describes what the "substrate" is made of (an

unhelpful definition in the context of the claimed invention) rather than (as Analog's does)

articulate ***where*** the "semiconductor substrate" is in the circuit – an important aspect of the

claims. The asserted claims describe the relative locations of various circuit elements, including

the location of the "semiconductor substrate." *See* claims 1 and 21. LTC's suggested definition

is not only unhelpful to understanding the meaning of the claim limitation in the context of the

patent, but, by suggesting that the claimed "substrate" is something other than a layer below the

integrated circuits on a chip, flies in the face of the widely understood meanings of the prefix

"sub" (which means "under, underneath, below, at the bottom (of)") and "strate" (a form of

"stratum," which means "layer"). *See* L.J.A. at A523, A536, *Oxford English Dictionary* Vol.

XVII at 3, 855 (2d ed. 1989).

LTC does not dispute Analog's proffered dictionary definitions (from both technical and

non-technical dictionaries) that show the plain meaning of a semiconductor substrate to one of

---

[17]    The specific embodiments in the specification also support Analog's suggested construction. *See, e.g.*, 5:50-52; FIG. 4A.

ordinary skill in the art during the relevant time period. *See* Analog Op. Br. at 26. Rather, LTC

suggests that "[t]here is no mention in the specification of a requirement that the substrate be

'below the integrated circuits on a chip.'" LTC Op. Br. at 51. Although the specification

supports Analog's proposed construction, *see* Analog Op. Br. at 26; *see also* FIGS. 2A, 3A, 7, 8;

2:53-54, any ambiguity in the specification would suggest that the Court place even greater

emphasis on Analog's undisputed dictionary definitions. *See Elekta Instrument*, 214 F.3d at

1307 ("Absent an express intent to impart a novel meaning, claim terms take on their ordinary

meaning.").

    2.    **"Formed in Said First Semiconductor Region"** (claims 1, 21)

| Analog's Proposal | LTC's Proposal |
|---|---|
| The first semiconductor region forms an element of the transistor. | Formed in said first semiconductor region. |

Without any explanation or justification, LTC asserts that this claim limitation does not

need to be construed because "[t]he jury needs no assistance in understanding [it]." LTC Op. Br.

at 51. If this is so, LTC should not object to Analog's suggested construction, which follows the

plain language of asserted claims 1 and 21. Both claims describe the "first semiconductor

region" and the "collector" as parts of the transistor. *See, e g ,* claim 1 ("first semiconductor

region ... abut[s] a surface of said substrate"; "collector region being ... diode-connected to said

substrate"). Therefore, the "first semiconductor region" must be an "element" of the transistor.

This important distinction – although fully supported by the language of the claims – should be

explained to one not skilled in the art.

3.    **"Current Limiting Resistive Element"** (claims 1, 21)

| Analog's Proposal | LTC's Proposal |
|---|---|
| The "current limiting resistive element" is circuitry having more than nominal resistance of at least several ohms between the base region and the emitter region. It may comprise transistor base resistance and/or an external resistance. | A resistance that may comprise transistor base resistance and/or an external resistance. |

Although it criticizes Analog's proffered construction as "contribut[ing] nothing to an understanding of the claim," *see* LTC Op. Br. at 53, LTC fails to offer a construction that addresses the question of *when* something is considered a "resistive" element. Because everything has *some* resistance, whether something is considered a "resistive element" depends on the value of the resistance. This value must be "more than nominal resistance."

This is clear from the specification, which describes the invention *generally* (rather than a specific embodiment). *See* 3:1-8 (explaining that no matter where the resistance is located in a particular embodiment, its value is at least "several ohms"). This generic description helps define the scope of the purported invention. *See SciMed*, 242 F.3d at 1343-44 (when the specification describes the invention generally, it is not referencing a preferred embodiment but rather provides "strong evidence" of what the claim limitations require). [18]

Finally, LTC's construction – rejecting the notion that the resistance must be "more than nominal" – would render meaningless the claim requirement for a *"current limiting* resistive

---

[18]    Because the specification supports Analog's construction, the Court should lend no weight to the opinion of Mr. Blauschild. *See Vitronics Corp.*, 90 F.3d at 1584 ("[W]here the patent documents are unambiguous, expert testimony regarding the meaning of a claim is entitled to no weight."). In any event, Mr. Blauschild's assertion that "there is nothing that would prevent the invention from working with a resistance of less than several ohms" provides no insight into the meaning of the disputed term, and his argument with respect to the specification, at 1:65-2:4, is nothing more than improper attorney argument masquerading as expert testimony. *See* L.J.A. at A403-04, Blauschild Decl. ¶ 153.

element." Because the "resistive element" must limit "current," any such resistance must be

more than "nominal." *See Bicon, Inc v Straumann Co*, 441 F.3d 945, 950 (Fed. Cir. 2006)

("[C]laims are interpreted with an eye toward giving effect to all terms in the claim"). LTC

agrees – when convenient – with the proposition that claims must be interpreted so as to make all

of their limitations meaningful. *See* LTC Op. Br. at 47 (citing *Lantech, Inc v Keip Mach Co*,

32 F.3d 542, 546-47 (Fed. Cir. 1994), for the proposition that "'[a]ll limitations in a claim must

be considered meaningful,' and it is clear error to read out limitations from a claim").

> **4.** **"Collector-Base Breakdown Voltage," "Inactive," and "Forms a Current Path"** (claims 1, 21)

| Analog's Proposal | LTC's Proposal |
|---|---|
| "collector-base breakdown voltage" – The voltage, when applied between the collector and base, above which the transistor conducts current from an electrostatic discharge pulse. | "collector-base breakdown voltage" – A voltage, when applied between the collector and base, above which the junction between the collector and the base breaks down. |
| "inactive" – Where the transistor functions as an open circuit and no current from an electrostatic discharge pulse is being conducted to ground. | "inactive" – Where the transistor functions as a open circuit |
| "forms a current path" – Where the transistor conducts current from an electrostatic discharge pulse to ground. | "forms a current path" – Where the transistor conducts current. |

LTC raises two objections to Analog's proposed constructions: (1) current other than

electrostatic discharge pulse ("ESD") can be conducted, and (2) current can be discharged

somewhere other than to ground. Neither of these arguments offers any assistance defining the

disputed claim limitation. Further, both of them are based on improper extrinsic evidence (Mr.

Blauschild's declaration) and are at odds with the purpose of the claimed invention.

Analog's references to "ESD" are proper because the alleged invention is, as the title of

the patent makes clear, an "electrostatic discharge protection clamp" – not a more general

"current protection clamp." *See, e.g.*, claims 1 and 21 (requiring an "electrostatic discharge

protection clamp"); *see also* 1:60-61 ("Summary of Invention" states that "[i]n operation, the clamp will break down collector to base to limit positive electrostatic discharge"). The claimed invention therefore requires the clamping of ESD, not of current in general. LTC's proffered construction improperly seeks to expand the scope of the claims. *See SciMed*, 242 F.3d at 1343-44.

That the ESD pulse is to be conducted "to ground" is also evident from the purpose of the claimed invention, as described in the "Summary of Invention" and demonstrated in the specification. *See, e.g.*, 3:6-8 (focusing on the relevant resistance point as that between the base and ground); FIG. 1 (showing current traveling from the transistor 10 to ground (represented by an inverted pyramid of three horizontal parallel lines)). LTC's proposed construction, once again, seeks to ignore the scope of the invention it claimed during prosecution and expand the patent to include any "clamp" and allow the "current" (ESD or otherwise) to go anywhere in the circuit. [19]

### C.    The '678 Patent

1.    **"Charging and Draining Circuitry, Coupled to the Single Package Pin, That Charges and Drains Voltage on the Capacitor" (claim 1) and "Through a Single Package Pin" (claim 5)**

| Analog's Proposal | LTC's Proposal |
|---|---|
| "Charging and draining circuitry, coupled to the single package pin, that charges and drains voltage on the capacitor" – Charging and draining of the capacitor is performed using the same package pin, *i.e.*, both the charging current and the draining current pass through the single package pin. | "Charging and draining circuitry, coupled to the single package pin, that charges and drains voltage on the capacitor" – Charging and draining circuitry, coupled to the single package pin, that charges and drains voltage on the capacitor. |
| "Through a single package pin" – Charging and draining of the capacitor is performed using the | "Through a single package pin" – Using a single |

---

[19]    Even if Mr. Blauschild is correct that the current could theoretically pass through additional circuitry on its way to ground, *see* L.J.A. at A405, Blauschild Decl. ¶ 156, this does not change the fact that discharged current must ultimately go to ground, in accordance with the alleged invention.

| same package pin, *i.e.*, both the charging current and the draining current pass through the single package pin. | package pin. |
|---|---|

Once again, LTC states that "[t]he jury needs no assistance in understanding what these claim limitations mean; they mean what they say...." LTC Op. Br. at 56. However, despite arguing for the "plain meaning" of the "charging and draining circuitry" claim limitation, LTC proceeds to construe "through a single package pin" to mean "*using* a single package pin" (emphasis added). In so doing, LTC fails to explain why one claim limitation does not need to be construed, but the other one does. Again, LTC's inconsistent (and selective) position is therefore little more than an attempt to expand the claim limitations beyond the scope of the alleged invention.

The "Summary of the Invention" in the patent describes "the present invention" as providing a soft-start and short-circuit timer function using "only" a single package pin that connects a function control circuit within the chip to an external capacitor. 2:39-45. The claimed invention begins by performing the soft-start function – with the function control circuit charging the external capacitor. 2:50-55. Then, when the alleged invention shifts to performing the short-circuit timer function, the function control circuit discharges the external capacitor. 2:66-3:11. Because the function control circuit and external capacitor are connected by "only" a single package pin, 2:42, the charging and draining current *must* pass through that pin. *See SciMed*, 242 F.3d at 1343-44.

Not only does "the present invention" require the charging and draining current to pass through the single package pin, it is the *only* embodiment described in the patent. *See* FIG. 1 (showing external capacitor 104 connected to function control circuit 102 by "only" single package pin 106); 3:59-60 ("[C]urrent source 110 provides a first current I1 to capacitor 104

- 24 -

through package pin 106."). The failure of the specification to describe – or even suggest – any other embodiment limits the scope of the claims. *See Wang Laboratories, Inc. v. America Online, Inc.*, 197 F.3d 1377, 1383 (Fed. Cir. 1999) (restricting claim limitation to the only embodiment described in the specification because it was the only embodiment enabled by the specification and as such constituted "the invention itself" rather than merely a "preferred" embodiment); *Toro Co. v. White Consol. Industries, Inc.*, 199 F.3d 1295, 1300-02 (Fed. Cir. 1999) (same).

Similarly, the "through a single package pin" language in the preambles of claims 1, 5, and 21 acts as a limitation – one that requires both the charging and draining current to pass through the single package pin. *See, e.g., In re Paulsen*, 30 F.3d 1475, 1479 (Fed. Cir. 1994) ("[T]erms appearing in a preamble may be deemed limitations of a claim when they give meaning to the claim and properly define the invention.") (internal quotation omitted).

In an attempt to undercut Analog's proffered construction, LTC confusingly suggests, without sufficient explanation, that the identical language "through a single package pin" means something different in claim 5 than in claim 21. *See* LTC Op. Br. at 56. However, LTC's argument is at odds with the specification and impermissibly seeks to broaden the claims.

### 2.     "Short Circuit" (claims 1, 5)

| Analog's Proposal | LTC's Proposal |
|---|---|
| Zero or substantially zero resistance between two nodes such that there is no voltage difference between the two nodes. | A low resistance connection between two nodes in a circuit |

LTC's proposal is a litigation-inspired attempt to expand upon the plain meaning of the claim by defining "short circuit" as merely a "low resistance" connection between two nodes in a

circuit. The universally recognized meaning of "short circuit" requires not merely "low" resistance, but "zero or substantially zero resistance."

Analog has provided the Court with several definitions from technical dictionaries, all from the relevant time period, which characterize a "short circuit" as "zero or substantially zero resistance." *See* Analog Op. Br. at 32-33. LTC, on the other hand, has only offered – via Mr. Blauschild's declaration – general purpose dictionaries and, even more egregiously, an entry from an Internet dictionary from 2007. *See* LTC Op. Br. at 58. Clearly, Analog's technical dictionaries offer superior guidance as to the meaning of a technical term – "short circuit" – to a person skilled in the art in a case involving complex electronic integrated circuits. *See Phillips*, 415 F.3d at 1318 (emphasizing the unique usefulness of technical dictionaries in helping a court "to better understand … the way in which one of skill in the art might use the claim terms") (internal quotation omitted). Indeed, LTC does not offer any explanation how its non-technical and untimely dictionary definitions offered guidance to one of ordinary skill in the art at the time the patent was applied for or issued. Presumably, LTC relies on general dictionaries because it has not (and cannot) find any technical dictionaries to support its position.[20]

### 3. "SHORT CIRCUIT SHUTDOWN Signal" (claims 1, 5, 21) and "Producing a DISCHARGE Signal" (claim 21)

| Analog's Proposal | LTC's Proposal |
|---|---|
| "SHORT CIRCUIT SHUTDOWN signal" – A signal that causes the remainder of the regulator circuitry to shutdown. | "SHORT CIRCUIT SHUTDOWN signal" – A signal that can be used to indicate to other circuitry that it should stop operating. |

---

[20]    Moreover, LTC's dictionary definitions actually introduce more ambiguity into the process. "Low resistance" itself is a vague concept, but "relatively" or "comparatively" low resistance is even more nebulous. There is no hint in these definitions, or in the patent itself, as to the appropriate reference point for determining when the resistance is low enough to constitute a "short circuit." Analog's proposed construction – which is supported by numerous technical dictionaries demonstrating the term's meaning to those skilled in the art – has the benefit of being both specific and useful.

| "Producing a DISCHARGE signal" – Producing a signal which causes the external capacitor to start discharging. | "Producing a DISCHARGE signal" – Producing a signal that indicates that the external capacitor is to discharge. |
|---|---|

LTC's proposed construction of "SHORT CIRCUIT SHUTDOWN signal" as "not requir[ing] the circuitry that actually shuts down the regulator, or the act(s) involved in shutting down the regulator," *see* LTC Op. Br. at 59, renders the claim limitation meaningless.

LTC's assertion, *see* LTC Op. Br. at 59, that the specification nowhere mentions that the shutdown signal actually shuts down the regulator is wrong. In fact, the specification states – in the "Summary of the Invention" – that "the function control circuit outputs a short circuit shutdown signal *that causes the rest of the voltage regulator to shutdown.*" 3:9-11 (emphasis added). This is exactly what Analog's proposed construction says and what the claims mean. *See SciMed,* 242 F.3d at 1343-44.

Finally, LTC's argument that "producing a DISCHARGE signal" does not actually "cause" the capacitor to discharge, *see* LTC Op. Br. at 59, is belied by the language of claim 21, which states that "current from the capacitor" is "drain[ed] … through the single package pin when the DISCHARGE signal is present." *See* claim 21.

> 4.    **"Arming Voltage" (claims 1, 5, 21) and "Producing an ARMED Signal" (claim 21)**

| Analog's Proposal | LTC's Proposal |
|---|---|
| "Arming voltage" – A predetermined voltage above which the short circuit detection circuit is enabled. | "Arming voltage" – A predetermined voltage above which the short-circuit timer function is activated. |
| "Producing an ARMED signal" – producing a signal based on a predetermined voltage above which the short circuit detection circuit is enabled. | "Producing an ARMED signal" – a signal indicating that the short-circuit timer function is activated. |

Claims 1, 5, and 21 provide that *both* an arming voltage (which produces, in the words of claim 21, an "ARMED signal"), and a short circuit detection signal are required before the

circuit performs the short-circuit timer function of draining current from the capacitor. *See, e.g.*, claim 1(b). LTC's proposed construction fails to recognize these dual requirements.

The specification says that once the arming voltage is reached, "the function control circuit performs the short-circuit timer function … when … a short circuit detection signal is provided by the short circuit detection circuit to the function control circuit." *See* 2:67-3:6. In other words, the arming voltage enables the short circuit detection circuit so that it can ***then*** perform the short-circuit timer function of discharging the capacitor in the event of a short circuit. *See* 2:46-49 (characterizing the short-circuit timer function as "measuring the voltage across the external capacitor as the capacitor is charged and discharged by the function control circuit").

LTC's argument – that the patent does not address the arming of the short circuit detection circuit – is incorrect. *See, e.g.*, 4:29-33 ("[a] short circuit detection signal … is gated by the output of [a] logic device … *when the armed signal output by latch 124 is HIGH*") (emphasis added); FIG 1 (showing the voltage across the capacitor is compared with V4, a triggering latch, producing an "armed" signal, which enables the short circuit detection signal).

5.    **"Charge the Capacitor" (claim 1) and "Discharge the Capacitor" (claims 1, 5)**

| Analog's Proposal | LTC's Proposal |
|---|---|
| "Charge the capacitor" – provide a current charge to the capacitor greater than the amount of current being drained from the capacitor, thereby increasing the voltage across the capacitor. | "Charge the capacitor" – providing a current that increases the voltage across the capacitor. |
| "Discharge the capacitor" – provide a current charge to the capacitor less than the amount of current being drained from the capacitor, thereby decreasing the voltage across the capacitor. | "Discharge the capacitor" – drawing a current that decreases the voltage across the capacitor. |

- 28 -

Although the parties' proposed constructions for "charge the capacitor" and "discharge the capacitor" are similar, Analog's is more specific and explicitly recognizes something that the specification makes clear: that charging the capacitor requires more current than is being drained and discharging the capacitor requires adding less current than is being drained. *See, e g*, 3:11-16; *see also Athletic Alternatives, Inc v Prince Mfg, Inc*, 73 F.3d 1573, 1581 (Fed. Cir. 1996) (when there is an equal choice between a broader and narrower claim meaning, the patent's function of putting the public on notice "is best served by adopting the narrower meaning").

### D.  Common Claim Limitations of the Wilcox Patents

1.  **"Switching Voltage Regulator" ('178 patent, claims 1, 34, 41, 44, 51, 55, 57; '694 patent, claims 1, 5; '885 patent, claims 1, 11, 32, 35; '066 patent, claim 1; '258 patent, claims 1, 34, 35)**

| Analog's Proposal | LTC's Proposal from Its Opening Brief | LTC's Proposal from the Amended Joint Claim Chart |
|---|---|---|
| A device or circuit capable of receiving a poorly specified and fluctuating input voltage and provides a predetermined and constant output voltage by controlling the opening and closing of a switch. | A device or circuit that receives an input voltage and provides a predetermined and regulated output voltage by controlling the opening and closing of one or more switching transistors.<br><br>(Predetermined means determined by design, and includes voltages that may be fixed or variable.) | A device or circuit that receives an input voltage and provides a predetermined and regulated output voltage by controlling the turning on and off of a switch.<br><br>(Predetermined means determined by design.) |

The parties originally both identified the characteristics of the "output voltage" of a "switching voltage regulator" as the focus of their disagreement.[21] Two weeks after receiving Analog's opening brief, however, LTC's proposed construction changed dramatically by no

---

[21]     As mentioned in Analog's opening brief, Analog's proposed construction also describes the characteristics of the "input voltage" to the switching voltage regulator, while LTC's does not. *See* Analog Op. Br. at 35. LTC, in its opening brief, fails to dispute this portion of Analog's suggested construction. *See* LTC Op. Br. at 38-39. Therefore, Analog understands LTC to have conceded this point.

longer contending the "output voltage" to be "fixed or variable." LTC's newly suggested construction is not only at odds with its other proffered constructions in this case, but also with LTC's proposed construction of the same claim limitation in another case currently pending in this Court. *See Linear Tech. Corp. v. Monolithic Power Sys., Inc.*, Civ.A.No. 06-476-GMS, D.I. 52 at 11 (proposing construction where "predetermined" means "fixed or variable").

LTC's concession suggests that Analog's proposed construction is correct. If the "output voltage" cannot be "variable," as LTC now (at least implicitly) agrees, then it must be constant and not merely "regulated."[22] This concept of non-variability is also consistent with the district court's decision in the *Impala* Litigation. *See* L.J.A. at A26 (explaining how the output must be "constant"). LTC's use of "regulated" in its proposed construction is at odds with this, as it would allow the "output voltage" to vary across a certain range.[23]

In addition, LTC fails to explain what "determined by design" means, and, as with the '909 patent, it seeks to add the subjective intent of the designer to the meaning of the claim limitation. *See supra* at Section II.A.1.

### 2. "Coupled" ('178 patent, claims 1, 34, 41, 44, 51, 55, 57; '694 patent, claim 1; '885 patent, claims 1, 11, 32, 35; '066 patent, claim 1; '258 patent, claims 1, 34, 35)

| Analog's Proposal | LTC's Proposal |
|---|---|
| When there is an electrical or magnetic connection between circuit elements. | Circuit elements are "coupled" when a current path exists between them. |

---

[22]    As Analog previously explained, although the "output voltage" is constant in one state (either the "first" or the "second"), it is different between states. *See* Analog Op. Br. at 41-42; *see also infra* at Sections III.D.6 and III.F.4 (discussing the differences between the "first state" and the "second state").

[23]    It is, of course, true that voltage coming out of the regulator cannot be perfectly "fixed" or "constant," as there are small component variations and physical limitations of circuits that could very slightly change the current at a particular moment in time. LTC's definition goes beyond this by suggesting that these fluctuations can be larger than nominal.

Contrary to LTC's opening brief, *see* LTC Op. Br. at 22, Analog does not suggest that "coupled" is only limited to direct connections. Rather, Analog argues that "coupled" includes both electrical and magnetic connections between circuit elements, while LTC argues that it can only refer to electrical connections. Analog Op. Br. at 36-37. However, the ordinary meaning of "coupled" is both electrically (requiring a physical connection) or magnetically (not requiring a physical connection). *See* Analog Op. Br. at 36; *see also* L.J.A. at A564-65, Horowitz and Hill, "The Art of Electronics" at 24-25 (1980). LTC provides no support for its definition, while attacking Analog's construction as "ambiguous."

LTC's reliance on the district court's construction in the *Impala* Litigation is misplaced. As Analog previously explained, although the *Impala* court adopted LTC's proposed construction, it did so with the understanding that it was not limited to an electrical (*i.e.,* direct) connection. *See* Analog Op. Br. at 37 n.25; *see also* L.J.A. at A20.

### 3.    "Load" ('178 patent, claims 1, 34, 44, 51, 55, 57; '694 patent, claims 1, 5; '885 patent, claims 1, 32; '066 patent, claim 1; '258 patent, claims 1, 34, 35)

| Analog's Proposal | LTC's Proposal |
|---|---|
| A device, circuit or system that consumes electrical power. | A device, circuit, or system coupled to the output terminal to which the regulator can supply current. |

Analog's proposed construction of "load" is consistent with both the intrinsic evidence and the ordinary meaning of the term. *See, e.g.,* 1:22-24 (stating in the "Background of Invention" that "the regulator controls the turning ON and turning OFF of the switch in order to *regulate the flow of power to the load*") (emphasis added); 2:31-37 (noting during low current conditions "the load does not consume power from the input power source" but rather from the output capacitor); *see also* L.J.A. at A554, *McGraw-Hill Dictionary of Scientific and Technical Terms* at 1094 (4th ed. 1989) (defining "load" as "a device that consumes electric power");

- 31 -

L.J.A. at A541, *Oxford English Dictionary* Vol. VIII at 1063 (defining "load" as "an impedance or circuit that receives the output of a transistor or other device"); L.J.A. at A511, *IEEE 100 The Authoritative Dictionary of IEEE Standards Terms* at 629 (7th ed. 2000) (defining "load" as "a power consuming device connected to a circuit"). Despite LTC's assertions to the contrary, Analog's proposed construction does not require the load to consume power "at all times."

LTC argues that the Wilcox patents do not disclose that the load consumes electrical power. LTC Op. Br. at 30-31. This is simply incorrect. As noted above, the specification states that "the regulator controls the turning ON and turning OFF of the switch in order to *regulate the flow of power to the load*." *See* 1:22-24 (emphasis added); *see also* 2:29-30 (stating that the circuit has "an output adapted to supply current at a regulated voltage to a load...."); 2:31-37 (noting during low current conditions "the load does not consume power from the input power source" but rather from the output capacitor). Because electrical power is the product of current and voltage, *see* L.J.A. at A561, Horowitz and Hill, "The Art of Electronics" at 3 (defining P=VI, where P is power, V is voltage, and I is current), LTC's assertion that the "load" does not consume electrical power is also contrary to the ordinary meaning of the term.

> **4.** **"Regulated Voltage"** **('178 patent, claims 1, 34, 41, 44, 51, 55, 57; '694 patent, claims 1, 5; '885 patent, claims 1, 32; '066 patent, claim 1; '258 patent, claims 1, 34, 35) and "Substantially at the Regulated Voltage" ('178 patent, claims 1, 34, 41; '066 patent, claim 1; '258 patent, claims 1, 34)**

| Analog's Proposal | LTC's Proposal |
|---|---|
| regulated voltage – A predetermined and constant output voltage. | regulated voltage – A voltage having a controlled value. |
| substantially at the regulated voltage – A voltage that has a different average value than the regulated voltage. | "Substantially at the regulated voltage" allows for, but does not require, greater variation in the voltage having a controlled value. |

The claim limitation "regulated voltage" is used only when describing the "first state of circuit operation," and the claim limitation "substantially at the regulated voltage" is only used when describing the "second state of circuit operation." Because the claims describe different things and use different words to do so, it is presumed that the inventors did so intentionally. *See Modine Mfg. Co.*, 75 F.3d at 1551; *see also Tandon Corp. v. United States Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987) ("There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims."). Analog's proposal merely suggests that these two claims must have "different" voltages.

In addition to being consistent with the language of the claims, Analog's proposed construction is, contrary to LTC's assertions, also consistent with the district court's claim construction in the *Impala* Litigation. In the *Impala* Litigation, the district court rejected LTC's arguments and determined that the "regulated voltage" can only be associated with the "first state of circuit operation" and that it cannot "initiate" the "second state of circuit operation." *See* L.J.A. at A22. The ITC's Initial Determination echoes this sentiment (and Analog's proposed construction). *See* L.J.A. at A501-05, Initial Determination at 19-23 (requiring "regulated voltage" in the "first state of circuit operation" and "substantially at the regulated voltage" in the "second state of circuit operation"); *see also* Analog Op. Br. at 38-39. LTC's response, that it disagrees with the ITC's Initial Determination, is hardly a basis upon which the Court should reject it. On the contrary, the ITC's Initial Determination, reached after voluminous briefing, a hearing, and lengthy analysis using Federal Circuit (post-*Phillips*) precedent as its guide, is not only well reasoned and fully supported, but echoes the claim language, the specification, the

purpose of the claimed invention, and the district court's view of the patent in the *Impala* Litigation.[24]

LTC's failure to mention the structure of the claim language, and instead base its arguments on the specification and improper extrinsic evidence in the form of Mr. Blauschild's declaration, is striking. Basic claim construction principles require that the Court look first to the claims themselves. Only if the claims are ambiguous or susceptible to multiple interpretations does the Court look to the specification. Because LTC has failed to demonstrate – or even suggest – the that claim language is ambiguous, the Court need not concern itself with LTC's specification-based arguments.

> **5.    "Signal" ('178 patent, claims 1, 41, 44; '694 patent, claim 5; '885 patent, claims 1, 11, 32)**

| Analog's Proposal | LTC's Proposal |
|---|---|
| A voltage or current by which information is transmitted. | A voltage or current by which information can be transmitted. |

Analog's proposed construction of "signal" is consistent with the specification, which always uses the term "signal" to denote the transmission of information. *See, e g ,* 9:20-21 ("control signal"); 15:2-3 ("feedback signal"); 9:20 ("pulse-width modulated signal"); 9:44-45 ("trigger signal"); 9:24-25 ("constant OFF-time signal"); and 12:30 ("switch signal"). The claims do not use "signal" to refer to voltage or current alone. *See, e g ,* claim 1 (using "current" in the context of "supplying current at the regulated voltage to the load").

---

[24]    LTC's statement that Analog did not "challenge" the construction of "substantially at the regulated voltage" prior to the ITC's issuance of its Initial Determination misstates the facts. As an initial matter, neither party sought to have the Court construe this claim limitation prior to the ITC's issuance of the Initial Determination. Moreover, there is nothing improper with Analog providing LTC with an additional claim limitation and proposed definition in light of the ITC's actions. Indeed, the parties requested, and the Court approved, extensions to the filing deadline for opening briefs which allowed them time to analyze the impact of the ITC's Initial Determination.

LTC's proposed construction of "signal" as anything that *can* transmit information (as opposed to something that *does* transmit information) eliminates the distinction drawn by the specification and the claims and makes the claim limitation meaningless. *See* Analog Op. Br. at 40; *cf. supra* at Section III.A.1 (discussing "signal" in the context of the '194 patent). LTC's reliance on the *Impala* court's construction is misplaced. The dispute in that case (unlike here) focused on whether the voltage or current had to be at the output terminal, not whether a signal actually transmits information. *See* L.J.A. at A59.

6.    **"First State of Circuit Operation" and "Second State of Circuit Operation" ('178 patent claims 1, 34, 41; '885 patent, claim 1; '066 patent, claim 1; '258 patent, claims 1, 34, 35)**

| Analog's Proposal | LTC's Proposal in the Amended Joint Claim Charts |
|---|---|
| "first state of circuit operation" – A state in which the output voltage is maintained during high load current conditions by switching the switching transistors in a complementary manner to provide power to the load. | "first state of circuit operation" – The state in which the switching transistors are both enabled for switching and are synchronously switched, such that one transistor is ON and the other is OFF, with a varying duty cycle to maintain a regulated voltage at the output terminal; if there is only one transistor ('885 claim 1), the transistor is enabled for switching with a varying duty cycle to maintain a regulated voltage at the output terminal.[25] |
| "second state of circuit operation" – A state in which, as a result of low load current conditions, the output capacitor maintains the output voltage substantially at the regulated voltage, while the switching transistors are disabled. | "second state of circuit operation" – During the second state of operation in which the switching transistors are simultaneously off, current is supplied to the load by the output capacitor.<br><br>The time in which "the switching transistors are simultaneously off" does not refer to dead time. |

Instead of addressing the intrinsic evidence relevant to the proper construction of these claim limitations, LTC merely argues that Analog is bound by the construction that it, acting in

---

[25]    Although LTC's proposed construction of "first state of circuit operation" changed from its opening brief, Analog understands it to be stylistic, not substantive, and collapsing proposed definitions for all the Wilcox patents.

concert with numerous other defendants, proffered (pre-*Phillips*) in the *Impala* Litigation. *See* LTC Op. Br. at 27. This argument is incongruous, as LTC's proposed construction is also inconsistent with what it previously advocated in the *Impala* Litigation. *Compare* L.J.A. at A61, *with, e.g.,* Amended Joint Claim Charts for the LTC Patents, Exhibit B at 5 and Exhibit D at 5.

As mentioned above, the two "states of circuit operation" are limited to a "regulated voltage" (the "first state") and "substantially at the regulated voltage" (the "second state"). *See supra* at Sections III.D.4, 6; *see also* Analog Op. Br. at 41-42. The ITC, in its Initial Determination, made this clear. *See* L.J.A. at A505-06, Initial Determination at 23-24; *see also* Analog Op. Br. at 41-42. It is illogical to contend, as LTC does, that the "first state" can include low current operation and that the "second state" can include high current operation, as it would render the distinction between the two "states" unnecessary and run contrary to the purpose of the alleged invention – to reduce power consumption in the "second state." *See* Analog Op. Br. at 42.

Contrary to LTC's assertion, Analog does not base its proposed constructions on particular embodiments in the specification. *See* LTC Op. Br. at 28-29. Indeed, Analog's opening brief does not even mention FIG. 2 during its discussion of these claim limitations. *See* Analog Op. Br. at 41-42.

7.    **"To Cause" ('178 patent, claims 1, 34; '885 patent, claim 11; '066 patent, claim 1; '258 patent, claims 1, 35)**

| Analog's Proposal | LTC's Proposal |
|---|---|
| To bring about a result. | To bring about a result. Unmediated causality is not required. What is important is that a chain of events is initiated that acts not just on one but on both transistors. |

The parties agree that "to cause" means "to bring about a result." But, by including additional language that "unmediated causality is not required," LTC suggests that there is *no*

*limit* to such causation. LTC's proposed construction includes *any* action, no matter how remote, if that action is part of a chain of events that eventually leads to a final result. Such a definition of "to cause" is unsupported by the intrinsic evidence and is broader than the ordinary meaning of the term. *See* Analog Op. Br. at 42.

8.    **"Threshold" ('178 patent, claims 1, 34, 41, 44; '694 patent, claims 1, 5; '066 patent, claim 1; '258 patent, claim 35)**

| Analog's Proposal | LTC's Proposal |
|---|---|
| A fixed value at which some operational characteristic of the circuit changes. | Predetermined level or value at which some change in circuit operation takes place.<br><br>(Predetermined means determined by design, and includes levels or values that may be fixed or variable.) |

LTC's proposed definition (which suggests "predetermined" can be "fixed or variable," thus rendering the term meaningless) contradicts its newly-revised suggested construction for "switching voltage regulator" (which suggests that "predetermined" is only "determined by design"). LTC offers no reason why "predetermined" should mean different things.

LTC's reliance on the specification as demonstrating that the "threshold" is "variable" is incorrect. The term "threshold" is always used in the patent to refer to a value that is fixed or selected by the user or other circuitry. *See, e.g.*, 4:36-39 ("When $I_L$ ramps up to a threshold level set by output 38A of transconductance amplifier 38, current comparator 39 trips and triggers the one-shot OFF pulse, initiating the 'OFF' cycle of switch 15."); 6:47-48 ("Constant current source $I_1$ sets a minimum feedback current threshold for current comparator 39.").

9. **"Output Current"** ('178 patent, claims 1, 34, 41, 57; '694 patent, claim 5)

| Analog's Proposal | LTC's Proposal |
|---|---|
| The current flowing in the load. | The current that flows from the output terminal to the load having a value that is dependent upon characteristics of the load. |

LTC's observation that "[c]urrent may flow in a load from other sources from the regulator," not only relies on improper extrinsic evidence (Mr. Blauschild's declaration), but, more importantly, is irrelevant and does not show how Analog's proposed construction is incorrect. First, Analog's suggested definition does not limit from where the "output current" can come. Second, LTC's suggestion that the "output current" can come from various sources does nothing to explain how (or why) such current "ha[s] a value that is dependent upon characteristics of the load."

Rather than argue affirmatively why its construction is correct – or why Analog's is wrong – LTC (again) simplistically states that its proposed construction is correct because the defendants in the *Impala* Litigation proposed it and the district court accepted it. Again, this mistakes what occurred. The *Impala* court merely stated that the "current supplied to the load" – an entirely different claim limitation – means the output current (rather than the "inductor current"); it did not say anything about the "characteristics" of such current, or from where it comes. *See* L.J.A. at A25.

10. **"A First Means for Generating a Voltage Feedback Signal Indicative of the Voltage at the Output** ('178 patent, claim 34) and **"Means for Generating a Voltage Feedback Signal"** ('885 patent, claim 32)

| Analog's Proposal | LTC's Proposal |
|---|---|
| This paragraph of Claim 32 recites a means-plus-function and is interpreted under 35 U.S.C. § 112, ¶ 6. As such, the claim should be construed to cover the corresponding structure, material, or acts | This is a means-plus-function limitation, and is to be construed to cover the corresponding structure(s) and equivalents thereof. The corresponding structures described in the |

| | |
|---|---|
| described in the specification and equivalents thereof<br><br>The corresponding structure in the specification for carrying out the recited function is:<br><br>(i) the combination of resistors 36A and 36B;<br><br>(ii) the combination of resistors R1 and R2 and operational amplifier 602 (acting as an inverter); and<br><br>(iii) voltage feedback circuit 220. | specification include:<br><br>a resistor divider, with or without an operational amplifier, or other conventional voltage feedback circuits. |

LTC's discussion of the "restriction requirement" during the prosecution of the '178 patent is irrelevant to the parties' proposed constructions and confuses the issues.[26] Analog did not, as LTC contends in its opening brief, argue that the Wilcox patent claims are "restricted" to certain embodiments. LTC knew this before the parties filed their opening briefs, yet chose to argue it anyway. *See* LTC Op. Br. at 36 n.15.

LTC does not offer any support for its proposed construction; it merely argues that the "restriction requirement" does not limit the corresponding structures. Moreover, although LTC repeatedly emphasizes the importance of the district court's claim construction in the *Impala* Litigation, it fails to explain why Analog's nearly verbatim use of the district court's construction in this instance, *see* Analog Op. Br. at 44, is wrong. Indeed, the *Impala* court explicitly rejected the exact same construction that LTC is proposing in this case.[27] Finally, LTC's proposed definition does not identify any specific structures in the specification, but

---

[26]    Although LTC and Analog may have different views on the import of the "restriction requirement," their disagreement is not reflected in their proffered constructions. The Court therefore need not concern itself with this issue at present.

[27]    In its case against Monolithic, LTC states that the *Impala* court's construction of this claim limitation is wrong because it is "somewhat ambiguous." *See Linear Tech. Corp. v. Monolithic Power Sys. Inc.*, Civ.A No. 06-476-GMS, D.I. 52 at 37. Yet, the district court in the *Impala* Litigation considered, but did not adopt, LTC's proffered construction in this case.

rather is phrased in general terms and does not (unlike Analog's) refer to particular circuit elements in the specification that perform the claimed function.

### 11. "Output Inductor" ('178 patent, claims 44, 51; '258 patent, claim 35)

| Analog's Proposal | LTC's Proposal in Its Opening Brief | LTC's Proposal in the Amended Joint Claim Charts |
|---|---|---|
| An inductor that is coupled to the output terminal. | An inductor in the output circuit | An inductor in the output circuit coupled to the output terminal. |

This claim limitation is another example of LTC having recently changed its position. In its opening brief, LTC argued that this claim limitation does not require any construction. *See* LTC Op. Br. at 44. Yet, LTC changed its proposal after Analog filed its opening brief. Analog's proposed construction is virtually verbatim from the claim language and is therefore the "plain meaning" of this claim limitation. *See* Analog Op. Br. at 45; *see also, e g ,* '178 patent, claim 44 (describing the output circuit as "including an output terminal and an output inductor coupled thereto"). In contrast, LTC (again) relies on improper extrinsic evidence – Mr. Blauschild's declaration – to support its construction.

### E. The '178 Patent

#### 1. "A Second Means for Generating a First Control Signal . . . to Maintain the Output Voltage at the Regulated Voltage" (claim 34)

| Analog's Proposal | LTC's Proposal |
|---|---|
| This paragraph of Claim 32 recites a means-plus-function and is interpreted under 35 U S.C. § 112, ¶ 6. As such, the claim should be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.<br><br>The corresponding structure[28] in the specification for carrying out the recited function is: | This is a means-plus-function limitation, and is to be construed to cover the corresponding structure(s) and equivalents thereof. The corresponding structures described in the specification include:<br><br>The combination of drive circuit 20, transconductance amplifier 38, offset voltage $V_{OS}$ 76, reference voltage 37, current comparator 39, a feedback current path between inductor $L_1$, and |

---

[28]    Analog unintentionally omitted the word "structure" in its proposed definition in its opening brief.

| | |
|---|---|
| (i) the combination of drive circuit 20, transconductance amplifier 38, offset voltage $V_{OS}$ 76, reference circuit 37, current source $I_1$ 72, current comparator 39, and constant off time one-shot circuit 25, which output the first control signal;<br><br>(ii) combinations having a pulse width modulator circuit that provides a pulse width modulated signal in response to a control signal;<br><br>(iii) circuit 240 in FIG. 5;<br><br>(iv) the combination illustrated in the FIG. 7 (resistors $R_{SENSE}$ and $R_3$, one-shot circuit 245, current comparator 39, current source $I_1$ 72, transconductance amplifier 38, offset voltage $V_{OS}$, reference circuit 37, off-time controller 250 (operated in the constant off-time mode) and capacitor $C_{CON}$);<br><br>(v) an operational amplifier; and<br><br>(vi) the circuitry described at 13:36-46. | current comparator 39 and constant off time one-shot circuit 25, which output the first control signal;<br><br>Combinations having a pulse width modulator circuit or a variable off time one-shot circuit (e.g., circuit 240 or the circuit described at 10:15-16); and<br><br>The combination illustrated in the FIG. 7 (resistors $R_{SENSE}$ and $R_3$, one-shot circuit 245, off-time controller 250 capacitor $C_{CON}$ and $V_{REF}$ and the circuitry described at 13:36-46   Tab 4. |

Analog's proposed construction follows the district court's in the *Impala* Litigation. *See* Analog Op. Br. at 46-47; L.J.A. at A35. The *Impala* court considered and rejected the exact same definition that LTC is advancing here. *Compare* L.J.A. at A35, *with id.* at A78. Finally, LTC's argument about "pulse width modulation" circuitry, *see* LTC Op. Br. at 37, is misplaced; Analog's proposal includes such a structure.

### 2. "A Third Means for Generating a Control Signal . . . To Cause Both Switching Transistors To Be Simultaneously OFF . . ." (claim 34)

| Analog's Proposal | LTC's Proposal |
|---|---|
| This paragraph of Claim 32 recites a means-plus-function and is interpreted under 35 U.S.C. § 112, ¶ 6. As such, the claim should be construed to cover the corresponding structure, material, or acts described in the specification and equivalents | This is a means-plus-function limitation, and is to be construed to cover the corresponding structure(s) and equivalents thereof. The corresponding structures described in the specification include: |

| | |
|---|---|
| thereof.<br><br>The corresponding in the specification for carrying out the recited function is:<br><br>(i) the combination of hysteretic comparator 74, the offset voltage $V_{OS}$ 76, constant current source $I_1$ 72, logic gates 66, 68 and 69, and reference voltage 37; and<br><br>(ii) the circuitry disclosed in FIG. 7 (72, 74, $V_{OS}$, comparator 315, NAND gate 316 and related sleep control logic. | Hysteretic comparator 74, current source $I_1$ 72, and logic circuits 66, 68, and 69;<br><br>combinations such as the circuitry as disclosed in Fig. 7 (including 72, 74, 315, 316 and related sleep control logic); and<br><br>combinations such as those disclosed at 16:5-16. |

LTC's proposed definition is yet another example of its selective reliance on the *Impala* court's constructions and LTC's unnecessary argument about the "restriction requirement" in the '178 patent prosecution. *See supra* at Sections III.D.10 and III.E.2. LTC fails to offer any affirmative evidence or argument as to why the structures identified in its proposed construction are correct. *See* LTC Op. Br. at 36-38.

### 3. "Current to the Output Terminal" (claim 44)

| Analog's Proposal | LTC's Proposal |
|---|---|
| The output current | The current that flows to the output terminal from the switching transistors. |

LTC's proposed construction contradicts the specification. As Analog explained in its opening brief, the specification distinguishes between the "pulses" of current that flow from the switching transistors to the output capacitor from the "smooth" current that flows from the output capacitor to the output terminal. *See* Analog Op. Br. at 47-48. This "smooth" current is the "current to the output terminal," not the original pulses of current. *See id.*

### 4.    "Threshold Indicative of a Polarity Reversal Condition" (claim 44)

| Analog's Proposal | LTC's Proposal |
|---|---|
| Based on "polarity reversal condition" (as previously agreed to by the parties).<br><br>(The parties agreed that "polarity reversal condition" means "the condition in which the instantaneous inductor current is negative or flowing away from the load." *See* Exhibit A, Amended Joint Claim Chart for the Linear Patents.) | A measure of when either the current to the output terminal or a variable that depends on that current predicts that the switching voltage regulator is about to or has entered the polarity reversal condition. |

Analog's proposal combines the plain and ordinary meaning of another, previously

discussed, claim limitation ("threshold") and an agreed construction of "polarity reversal" to

indicate that the proper "threshold" prevents the current from flowing away from the load. *See*

Analog Op. Br. at 48-49.

As the Summary of the Invention and the specification make clear, the purpose of the

alleged invention is to ***prevent*** the switching voltage regulator from reversing polarity (not after

it "has entered" the polarity reversal condition). *See, e.g.,* 14:1-6; 14:28-45. LTC's proffered

construction – which allows for the polarity reversal condition to have already occurred before

the "threshold indicative of polarity reversal" is reached – is inconsistent with this. *See infra* at

Section III.E.5.

### 5.    "Prevent the Current to the Load from Reversing Polarity" (claim 51)

| Analog's Proposal | LTC's Proposal |
|---|---|
| The condition effected by opening (turning OFF) one of the transistors before the instantaneous inductor current reverses direction and removes power that could have been delivered to the load. | Maintaining a transistor OFF when there is an indication of a polarity reversal condition. |

LTC did not address this claim limitation in its opening brief. As Analog's opening brief

explains, LTC's proposed construction allows for a polarity reversal to take place, something

that is contrary to the purpose of the claimed invention, the specification, and the plain meaning

of the claims. *See* Analog Op. Br. at 49. Analog's proposal, on the other hand, makes clear that the claimed invention "prevents" a polarity reversal as required by the express language of the claim and as described by the specification. *See supra* at Section III.E.4.

### 6. "Prevents the Drive Circuitry from Turning on Either of the Pair of Synchronously Switched Switching Transistors" (claim 55)

| Analog's Proposal | LTC's Proposal |
|---|---|
| Both transistors must be held OFF for a period of time. | Both transistors must be prevented from turning ON. |

The language of the claim requires that the transistors must be off "for a period of time." *See* Analog Op. Br. at 50; *see also* claim 55 ("the synchronously switched switching transistors are prevented from being turned on *for a period of time*...") (emphasis added). Thus, in preventing transistors from being turned on, they are held off for a period of time.

### 7. "Selected Sleep Mode Current Level" (claim 55)

| Analog's Proposal | LTC's Proposal |
|---|---|
| A predetermined current level that represents a percentage of maximum rated output current below which the regulator is operated in a second mode of circuit operation when both transistors are off. | A current level below which the regulator enters into a second mode of operation |

Rather than address Analog's proposed definition in this case, LTC instead seeks to reargue the dispute it had with the defendants in the *Impala* Litigation. Contrary to LTC's assertions, Analog is *not* suggesting that the "percentage" in its definition needs to be a specific number. LTC admits that the plain language of claim 55 "indicates that this 'selected sleep mode level' is a level" and does not dispute that this "level" is, as Analog suggests, fixed (*i.e.*, "predetermined"). *See* LTC Op. Br. at 31. Despite this, LTC's proffered definition (and its opening brief) fail to explain what such "level" is. Analog's proposal, in contrast, makes clear

what the "level" is in a way that is consistent with the claims and the specification, namely that it is a "percentage of maximum rated output current." *See* Analog Op. Br. at 50-51.

### F.    The '694 Patent

#### 1.    "Inductive Element" (claims 1, 5)

| Analog's Proposal | LTC's Proposal |
|---|---|
| A magnetic energy storage element. | An element that acts as an inductor. |

The "plain and ordinary" meaning suggested by LTC is circular and does not explain what the claim limitation means. Analog's proposed construction, on the other hand, explains that an "inductive element" stores energy magnetically. *See* Analog Op. Br. at 51; *see also supra* at Section III.F.2.

#### 2.    "Current Comparator Circuit" (claim 1)

| Analog's Proposal | LTC's Proposal in Its Opening Brief | LTC's Proposal in the Amended Joint Claim Charts |
|---|---|---|
| A "current comparator circuit" compares two current signals and supplies a voltage signal based on the difference in the two input current signals. | A "current comparator" compares currents, or signals indicative of currents, to determine which signal is greater. The output of the current comparator normally has one of two values, but it can have a third indeterminate value. | A "current comparator" compares currents, or signals indicative of currents, to determine which signal is greater. |

In tacit agreement with Analog's argument in its opening brief, *see* Analog Op. Br. at 51-52, and in apparent recognition that its previous proposal was previously rejected by the district court in the *Impala* Litigation, LTC has removed the reference to a "third indeterminate value" from its suggested definition. LTC's recent change, however, does not go far enough. LTC still maintains that a "current comparator circuit" can compare "signals indicative of current." Rather than offering any affirmative argument or evidence why this claim limitation does not mean what it says (it compares "current," not signals), LTC suggests, without any basis, that Analog's

proposed construction reads a specific embodiment into the claim language. *See* LTC Op. Br. at 39-40. This is untrue. Analog properly bases its proposed construction on the claim language and only refers to the specification as further support for its construction. *See* Analog Op. Br. at 51-52. Despite LTC's accusations, it is LTC – not Analog – that relies on improper evidence by using Mr. Blauschild's declaration as the basis for its position. *See* LTC Op. Br. at 40.

### 3.    "Current Feedback Signal" (claim 1)

| Analog's Proposal | LTC's Proposal |
|---|---|
| A current signal proportional to the current in the inductive element generated by monitoring the current in the inductive element. | A feedback signal indicative of a current level. |

Once again, LTC proposes a circular construction – which it does not discuss in its opening brief – that provides little guidance as to the meaning of the claim limitation. Analog's proposed construction, in contrast, is supported by the specification and explains where the current is monitored and how the signal is generated. *See* Analog Op. Br. at 52.

### 4.    "First State" and "Second State" (claim 1)

| Analog's Proposals | LTC's Proposal |
|---|---|
| "first state" – A first output value of the hysteretic comparator indicative of the voltage regulator operating in a first way of operating. | "first state" –  a first output value. |
| "second state" – A second output value of the hysteretic comparator indicative of the voltage regulator operating in a second way of operating. | "second state" – a second output value. |

LTC's comments in its opening brief support (rather than undercut) Analog's proposed definition. First, LTC admits that the "first state" and the "second state" both "refer to the output values of the hysteretic comparator." LTC Op. Br. at 42. This is precisely what the first part of Analog's proffered construction makes clear. Second, LTC agrees that the outputs of the hysteretic comparator – which are "high" and "low" signals – correspond to the claimed "first"

and "second" states. LTC Op. Br. at 42. Yet, LTC then confusingly concludes that, despite the

link admitted between the "high" signal and the "first state" and the "low" signal and the "second

state," the claims do not require this.

### 5.    "Bias Source" (claim 1)

| Analog's Proposal | LTC's Proposal |
|---|---|
| "bias source" – A separate circuit that generates a current at a constant predetermined value. | "Bias source" is not limited to a separate circuit that generates a current. |

LTC does not dispute that the "bias source" produces a "constant and predetermined

value." The Court should therefore adopt, at least, this portion of Analog's proposed

construction. LTC's argument with respect to this claim limitation is that it is not limited to a

"current." See LTC Op. Br. at 39-40. This is incorrect. See FIGS. 2-3, 5-10; L.J.A. at A562-63,

Horowitz and Hill, "The Art of Electronics" at 7-8 (showing a current source symbol). [29]

### 6.    "Minimum Feedback Current Threshold" (claim 1)

| Analog's Proposal | LTC's Proposal |
|---|---|
| "minimum feedback current threshold" – A constant current level to which a current feedback signal is compared and which it will not go below. | "minimum current feedback threshold" – A predetermined current or voltage level to which a current feedback is compared.<br><br>(Predetermined means determined by design, and includes currents or voltages that may be fixed or variable.) |

LTC's proposed definition, which states that "predetermined" can be "fixed or variable,"

is inconsistent with its newly proffered construction of "switching voltage regulator." See supra

---

[29]    Because the specification supports Analog's construction, the Court should lend no weight to the opinion of Mr. Blauschild. See Vitronics Corp, 90 F.3d at 1584 ("[W]here the patent documents are unambiguous, expert testimony regarding the meaning of a claim is entitled to no weight."). In any event, Mr. Blauschild's assertion that "the use of the term 'bias source' … could refer to either a bias voltage source or a bias current source," see L.J.A. at A401, Blauschild Decl. ¶ 143, does not find support in the specification. Where a so-called "bias voltage" is used, the specification refers to a "offset voltage." See 6:21; 12:22.

at Section III.D.1. LTC cannot have it both ways – either "predetermined" is "fixed or variable" or it is not. As LTC now concedes, "predetermined" cannot be "fixed or variable," but must be "fixed." *See id.* The Court should therefore make clear that the "minimum current feedback signal" must be "fixed."

Rather than arguing about the definition of the "minimum feedback current threshold," LTC instead focuses on how a current comparator operates. *See* LTC Op. Br. at 41. The operation of a current comparator – which has the "minimum feedback current threshold" as one of its two inputs – is not helpful in understanding this claim limitation.

### G.    The '885 Patent

#### 1.    "One-Shot" (claims 1, 11, 15) and "One-Shot Circuit" (claim 32)

| Analog's Proposal | LTC's Proposal |
|---|---|
| A circuit that outputs a pulse of predetermined duration once it is triggered by an input and then returns to its original state where it remains until triggered again | A circuit that outputs a pulse once it is triggered by an input and then returns to its original state where it remains until triggered again.<br><br>(Predetermined means determined by determined by design, and includes durations that may be fixed or variable) |

LTC's decision not to discuss this claim limitation or defend its position in its opening brief is reason enough for the Court to adopt Analog's proposed construction. As Analog explained in its opening brief, a "one-shot" and a "one-shot circuit" cannot vary within a cycle (even though it can do so across cycles). *See* Analog Op. Br. at 54-55. Analog's proposal makes this clear. LTC's does not.

### 2. "Feedback Circuit" (claims 11, 35)

| Analog's Proposal | LTC's Proposal |
|---|---|
| A circuit for producing a signal at a second terminal. | A circuit for producing a signal at a second terminal that is indicative of a signal at the first terminal. |

The parties agree that a "feedback circuit" is "a circuit for producing a signal at a second terminal." LTC's proposal goes farther, however, and adds that such signal is "indicative of a signal at the first terminal." LTC's basis for this additional language is that it incorporates "the concept of feedback," while Analog's contemplated construction does not. *See* LTC Op. Br. at 43. This is untrue and LTC's citation to claims 11 and 35 do not demonstrate otherwise. Both claims merely say that a "feedback circuit" produces a "feedback signal" and the components of such "feedback circuit" – they do not state anything about the characteristics of that signal or what it may "indicate." *See, e.g.,* claim 11 (providing a "feedback circuit having a first terminal coupled to the output node, and a second terminal, the feedback circuit for producing a feedback signal at the second terminal of the feedback circuit"). LTC's suggestion to the contrary is unsupported and (once again) improperly relies on Mr. Blauschild's declaration. *See* LTC Op. Br. at 44; *cf. supra* at Section III.F.2 (discussing LTC's attempt to define a "current comparator circuit" as comparing signals "indicative of" current).

### 3. "Means for Generating a Trigger Signal Responsive to the Current Feedback Signal and the Voltage Feedback Signal" (claim 32)

| Analog's Proposal | LTC's Proposal |
|---|---|
| This paragraph of Claim 32 recites a means-plus-function and is interpreted under 35 U.S.C. § 112, ¶ 6. As such, the claim should be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.<br><br>The corresponding in the specification for carrying out the recited function are the conventional | This is a means-plus-function limitation, and is to be construed to cover the corresponding structure(s) and equivalents thereof. The corresponding structures described in the specification include:<br><br>conventional feedback control circuits such as 230 (FIG. 5), and control loop circuitry such as current mode circuitry of FIG. 2 and FIG. 7 (*e.g.,* 37, 38, |

| feedback control circuits such as 230 (FIG. 5), and control loop circuitry such as current mode circuitry of FIG. 2 and FIG. 7 (e.g., 37, 38, 39, $V_{OS}$, and 72). | and 39). |

LTC did not argue this claim limitation in its opening brief. As mentioned in Analog's opening brief, the parties' proposed constructions are virtually identical. *See* Analog Op. Br. at 57. The only difference is that Analog's suggested definition identifies all of the structures for the "current mode circuitry" in FIGS. 2 and 7 by including $V_{os}$ and 72. LTC's proposal omits these parts of the structure and its brief fails to explain why. As FIGS. 2 and 7 demonstrate, however, these circuit elements are part of the corresponding structures.

### 4. "One-Shot Means for Placing the Switch into an Off State Responsive to the Trigger Signal, the Switch Remaining in the Off State for a Period of Time Responsive to the Off-Time Control Signal" (claim 32)

| Analog's Proposal | LTC's Proposal |
|---|---|
| This paragraph of Claim 32 recites a means-plus-function and is interpreted under 35 U.S.C. § 112, ¶ 6. As such, the claim should be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.<br><br>The corresponding steps in the specification include combination of the one-shot generator 245 and the off-time control circuit 250.[30] | This is a means-plus-function limitation, and is to be construed to cover the corresponding structure(s) and equivalents thereof. The corresponding structures described in the specification include:<br><br>one-shot generator circuits such as 245 (FIG. 5), and box 245 of FIG. 7. |

As Analog mentioned in its opening brief, its proposed construction contains the structure necessary for the two necessary aspects of this claim limitation, but LTC's does not. *See* Analog Op. Br. at 57-58. Analog's proposed construction therefore identifies all of the elements necessary for the corresponding structure.

---

[30]     Analog changed the language in its proposed construction to make clear that the claim limitation was a "means-plus-function" claim and not a "step-plus-function" claim.

### 5.     "Variable Current Source" (claim 35)

| Analog's Proposal | LTC's Proposal |
|---|---|
| A current source that has its current output varied to control the discharging rate of the control capacitor. | A current source that has its current output varied. |

LTC's proffered construction is circular and merely rearranges the words of the claim limitation. It does not explain what a "current source" is, a term that is not obvious to one not of ordinary skill in the art. Analog's suggested definition, which is verbatim from the claim language, explains what the claim limitation means in the context of the claim. *See* Analog Op. Br. at 58.

IV.    **CONCLUSION**

For the foregoing reasons, and for the reasons stated in its opening brief, Analog

respectfully requests that the Court construe the claims of the Analog patents (the '909 and '633

patents) and the LTC patents (the '194, '618, '678, '178, '694, '885, '066, and '258 patents) in

accordance with Analog's proposed constructions in the Amended Joint Claim Charts.


*Kelly E. Farnan*

Frederick L. Cottrell III (#2555)
Cottrell@rlf.com
Kelly E. Farnan (#4395)
Farnan@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square, P.O. Box 551
Wilmington, DE  19899
Tel:  (302) 651-7700
Fax:  (302) 651-7701

*Attorneys for Plaintiff/Counterclaim-Defendant*
*Analog Devices, Inc.*

OF COUNSEL:

Wayne L. Stoner
Wayne M. Kennard
Donald R. Steinberg
Benjamin M. Stern
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA  02109
Tel:  (617) 526-6000
Fax:  (617) 526-5000


Dated:  June 29, 2007

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I hereby certify that on June 29, 2007, I electronically filed the foregoing with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following and which has also been served as noted:

### BY HAND DELIVERY:

Jack B. Blumenfeld
Karen Jacobs Louden
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
Wilmington, DE 19899

I hereby certify that on June 29, 2007, the foregoing document was sent to the following non-registered participants in the manner indicated:

### BY E-MAIL and FEDERAL EXPRESS (Monday delivery):

Robert C. Morgan
Laurence S. Rogers
Ropes & Gray, LLP
1251 Avenue of the Americas
New York, NY 10020

Mark D. Rowland
Ropes & Gray, LLP
525 University Avenue
Suite 300
Palo Alto, CA 94301

*Kelly E. Farnan*

Kelly E. Farnan (#4395)