IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ANALOG DEVICES, INC.,                    )
                                         )
        Plaintiff/Counterclaim Defendant,    )
                                         )
    v.                                   )        C.A. No. 06-346 (GMS)
                                         )
LINEAR TECHNOLOGY CORP.,                 )
                                         )
        Defendant/Counterclaim Plaintiff.    )

## LINEAR TECHNOLOGY CORP.'S ANSWERING CLAIM CONSTRUCTION BRIEF

Jack B. Blumenfeld (#1014)
Karen Jacobs Louden (#2881)
James W. Parrett, Jr. (#4292)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, Delaware  19899-1347
(302) 658-9200
*Attorneys for Defendant/Counterclaim Plaintiff
Linear Technology Corp.*

OF COUNSEL:

Robert C. Morgan
Laurence S. Rogers
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, New York  10036
(212) 596-9000

Mark D. Rowland
ROPES & GRAY LLP
525 University Avenue, Suite 300
Palo Alto, California  94301
(650) 617-4000

June 29, 2007

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................................... iv

I.  ADI'S CLAIM CONSTRUCTIONS ARE BASED ON A REWRITING
    OF THE '909 PATENT, ITS PROSECUTION HISTORY, AND
    TRANSISTOR PHYSICS ..................................................................................1

    A.  The Compensations Of The "Gain-Compensated" Amplifier ...............1

        1.  Intrinsic Emitter Resistance ...............................................1

        2.  Ohmic Resistance......................................................................4

        3.  Transistor Gain.........................................................................5

        4.  "Gain-compensated differential amplifier" (all claims)........................5

        5.  "Tail current $I_{tail}$" (All Claims) ..............................................7

        6.  "Control voltage" (All Claims) ...............................................9

        7.  "Control voltage generating means for generating, as the control
            voltage, a voltage which varies proportionately to absolute
            temperature" (All Claims)................................................11

        8.  "Means for functionally relating the control voltage to the
            intrinsic emitter resistance of the current source" (All Claims).............13

        9.  "$\Delta V_{BE}$ cell" (Claims 3, 5, 6, 8, 10)......................................15

II. ADI'S '633 PATENT CONSTRUCTIONS ARE NOT
    CONSTRUCTIONS AT ALL ..........................................................................16

    A.  "Bipolar transistor" (Claims 8, 17) .....................................................16

    B.  "Connected" (All Claims).....................................................................17

III. LTC'S U.S. PATENT NO. 6,144,194 ("THE '194 PATENT").......................18

    A.  "Input signal" and "Output signal" (Claims 1, 13, 30, 33)..................18

    B.  "Each of the N regulator stages providing current I/N to the output
        node" ....................................................................................................20

    C.  "N-phase timing pulses" (Claims 1, 13, 30, 33) ..................................22

IV. LTC'S U.S. PATENT NO. 5,212,618 ("THE '618 PATENT").........................22

    A.  "Semiconductor substrate" (Claims 1, 21)...........................................22

    B.  "A first semiconductor region" (Claims 1, 21).....................................23

    C.  "Formed in said first semiconductor region" (Claims 1, 21)................24

    D.  "Current limiting resistive element (Claims 1, 21)...............................24

E.     "Collector-base breakdown voltage" (Claims 1, 21), "Inactive"
(Claims 1, 21), "Forms a current path" (Claims 1, 21)..............................25

V.     LTC'S U.S. PATENT NO. 6,100,678 ("THE '678 PATENT").................................26

A.     "Charging and draining circuitry . . ." (Claim 1), "through a single
package pin" (Claim 5) ...........................................................................26

B.     "Short circuit" (Claims 1, 5) ....................................................................27

C.     "short circuit shutdown signal" (Claims 1, 5, 21)....................................27

D.     "Arming voltage" (Claims 1, 5, 21) .........................................................28

VI.     COMMON CLAIM LIMITATIONS OF U.S. PATENT NOS. '178, '694,
'885, '066 AND '258 ("THE WILCOX/FLATNESS PATENTS") ...............................28

A.     "switching voltage regulator" .................................................................29

B.     "coupled" ..............................................................................................31

C.     "load" ...................................................................................................32

D.     "regulated voltage" ...............................................................................33

E.     "substantially at the regulated voltage" ...................................................34

F.     "signal" .................................................................................................36

G.     "First state of circuit operation," "Second state of circuit
operation"..............................................................................................37

H.     "to cause" .............................................................................................41

I.     "threshold" ............................................................................................42

J.     "output current" ....................................................................................42

K.     "output inductor" ..................................................................................43

VII.     LTC'S U.S. PATENT 5,481,178 ("THE '178 PATENT") ...........................................44

A.     "a second means for generating a first control signal . . . to
maintain the output terminal at the regulated voltage"............................44

B.     "current to the output terminal" ..............................................................46

C.     Threshold indicative of a polarity reversal condition; prevent the
current to the load from reversing polarity .............................................47

D.     "prevents the drive circuitry from turning on either of the pair of
synchronously switched switching transistors" ......................................49

E.     "selected sleep mode current level" .......................................................49

VIII.     LTC'S U.S. PATENT NO. 5,731,694 ("THE '694 PATENT").................................50

A.     "Inductive element" ..............................................................................50

B. "Current comparator circuit" ...................................................................51

C. "Current feedback signal"......................................................................52

D. "Minimum feedback current threshold" ...............................................52

E. "First state" and "Second state" ...........................................................53

F. "Bias source" .........................................................................................53

IX. LTC'S U.S. PATENT NO. 5,994,885 ("THE '885 PATENT").......................54

A. "One shot"; "One-shot circuit" ...........................................................54

B. "Feedback circuit" .................................................................................55

C. "Off-time control circuit" .....................................................................56

D. "Means for generating a trigger signal responsive to the current feedback signal and the voltage feedback signal" .................................56

E. "One-shot means for placing . . ."........................................................57

F. Variable current source ........................................................................58

X. CONCLUSION..................................................................................................59

TABLE OF AUTHORITIES

Page

Cases

*ADC Telecomms., Inc. v. Switchcraft, Inc.,*
    No. 04-1590, 2005 U.S. Dist. LEXIS 19593 (D. Minn. 2005)..........................................22

*Amhil Enters. Ltd. v. Wawa, Inc.,*
    81 F.3d 1554 (Fed. Cir. 1996)....................................................................................36

*Bio-Technology Gen. Corp. v. Genentech, Inc.,*
    80 F.3d 1553 (Fed. Cir. 1996)....................................................................................35

*Deering Precision Instruments, L.L.C. v. Vector Distribution Sys., Inc.,*
    347 F.3d 1314 (Fed. Cir. 2003)..................................................................................36

*Dow Chem. Co v. U.S.,*
    226 F.3d 1334 (Fed. Cir. 2000)..................................................................................30

*EMI Group N. Am., Inc. v. Intel Corp.,*
    157 F.3d 887 (Fed. Cir. 1998)....................................................................................36

*Intamin, Ltd. v. Magnetar Tech. Corp.,*
    483 F.2d 1328 (Fed. Cir. 2007)..................................................................................21

*Intel Corp. v. US Int'l Trade Comm.,*
    946 F.2d 821 (Fed. Cir. 1991....................................................................................22

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005)..................................................................................23

*Playtex Prods., Inc. v. Procter & Gamble Co.,*
    400 F.3d 901 (Fed. Cir. 2005)....................................................................................36

*Tandon Corp. v. U.S. Int'l Trade Comm'n,*
    831 F.2d 1017 (Fed. Cir. 1987)....................................................................................9

*Toro Co. v. White Consol. Indus, Inc.,*
    199 F.2d 1295 (Fed. Cir. 1999)....................................................................................9

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996)....................................................................................39

Statutes

35 U.S.C. § 112, ¶ 6...............................................................................11, 13, 45, 57, 58

## I.   ADI'S CLAIM CONSTRUCTIONS ARE BASED ON A REWRITING OF THE '909 PATENT, ITS PROSECUTION HISTORY, AND TRANSISTOR PHYSICS

### A.   The Compensations Of The "Gain-Compensated" Amplifier

It is the rare case in which a patentee seeks to capitalize on an error in its patent – here an inconsistency in part of the description of Figure 3 – to rewrite the patent in ways contrary not only to the patent's disclosure and its prosecution history, but also to settled meanings of terms within the art and the immutable physics of transistor operation. For this reason, LTC is not only providing its understanding and arguments concerning the '909 patent, but also the original and supplemental declarations of its expert, Robert Blauschild. (A-Appx, Tabs 13 and 25.)[1]

LTC is submitting Mr. Blauschild's supplemental declaration because ADI's attempt to equate "intrinsic emitter resistance" and "ohmic resistance" – two very different transistor characteristics – was not even hinted at in its proposed claim constructions. Moreover, as a matter of the technology, ADI's position comes from so far out of left field that it was unforeseeable when LTC filed its opening Markman brief.

### 1.   Intrinsic Emitter Resistance

ADI rewrites the '909 patent, its prosecution history and transistor physics, including the transistor physics described in the patent, to make "intrinsic emitter resistance" and "ohmic resistance" the same thing. They are not.

Intrinsic emitter resistance is recognized in the transistor field as the electronic resistance, independent of geometry, which results from the physics of electron movement, current flow, in the transistor material. It is not geometry-related. (A-Appx, Tab 13, ¶ 15; A-

---

[1]      "A-Appx" refers to the Joint Claim Construction Appendix For Patents Asserted By Analog Devices, Inc., filed by ADI with its Answering Brief.

Appx, Tab 25, ¶¶ 6, 14.)  It is universally and unequivocally defined for silicon transistors by the

formula kT/qI, where k is Boltzmann's constant, T is absolute temperature, q is electronic charge

and I is current (A-Appx, Tab 13, ¶ 15; A-Appx, Tab 25, ¶¶ 8-11, A-Appx, Tab 26, B195-96;

Tab 27, B200).[2]  Textbooks note that intrinsic emitter resistance – kT/qI – is approximately 25/I

ohms at room temperature for a silicon transistor – without regard to geometry (A-Appx, Tab 26,

B196).

   In the BACKGROUND OF THE INVENTION, the '909 patent states what

"intrinsic emitter resistance" is, consistent with what everyone in the field knows it to be.  And it

is *not* ohmic emitter resistance, which the patent also later defines (A-Appx, Tab 1, 1:30-47)

(emphasis added):

> . . . $r_e$ is the ***intrinsic 'electronic' emitter resistance*** kT/qI, of each of the
> transistors 14 and 12, where k is Boltzmann's constant, T is the absolute
> temperature, q is electronic charge, and I is half the tail current in the
> lead 18;
>
> . . . .
>
> Many temperature-dependent factors appear in the foregoing equation.
> The ***intrinsic emitter resistance*** obviously is a function of
> temperature . . . .

The patent then goes on to discuss "r," "***ohmic resistances*** associated with the

device geometries" (A-Appx, Tab 1, 1:39-42; 2:65-68; emphasis added).  Ohmic resistance is

---

[2]     As another of ADI's patents, U.S. Patent No. 5,648,735, states (A-Appx, Tab 25, ¶ 10,
(A-Appx, Tab 28, 2:34-43):

> ". . . $r_e$ is the transistors' intrinsic emitter resistance, given by:
>
> $r_e = kT/qI_c$
> k = Boltzmann's constant
> T = temperature Kelvin
> Q = the electronic charge
> $I_c$ = the transistor's collector current."

2

due to the bulk properties of the transistor material (resistance to current flow and shape), analogous to a common resistor (A-Appx, Tab 25, ¶¶ 3-4).

Thus, the '909 patent says that "intrinsic emitter resistance" is precisely what LTC says it is in its proposed claim construction – kT/qI.  It is what everyone else in the transistor business also says it is.  And it is not ohmic resistance.

In a remarkable piece of legerdemain, ADI seizes on the use of the word "electronic" in conjunction with the patent's first use of "intrinsic emitter resistance" and from that says, *ipse dixit*, that "intrinsic 'electronic' emitter resistance" is not the same thing as "intrinsic emitter resistance."  From this incorrect premise, ADI then turns transistor physics on its head and says that "intrinsic emitter resistance" is really "ohmic emitter resistance."  (ADI Opening Markman Brief ("ADI Brief"), p. 19.)

When the patent puts the word "electronic" in quotes with the first use of intrinsic emitter resistance, it is a recognition that, as noted above, intrinsic emitter resistance is due to the transistor's electronic properties – how small changes in base-to-emitter voltage change the current flow.  (A-Appx, Tab 25, ¶¶ 6, 12, 13.)  It is not creating some new type of resistance.

ADI does not explain, because it cannot, how it can square its argument with the very passage in the first column of the patent to which it refers.  The patent defines "intrinsic 'electronic' emitter resistance" by the exact formula – kT/qI – recognized and known as the formula for intrinsic resistance.  The very next paragraph of the patent makes this plain.  There, the patent refers back to the temperature-dependent formula kT/qI when it says that "intrinsic emitter resistance obviously is a function of temperature" (A-Appx, Tab 1, 1:44-47).

Nor does ADI square its revisionist view with column 2, lines 47-50, which, referring to "intrinsic emitter resistance," teaches (A-Appx, Tab 1) (emphasis added):

"A first consideration in the design of a gain-stable, temperature-compensated long-tail pair is the requirement that the tail current be PTAT in order to make the *intrinsic emitter resistance* constant. . . . The use of a $\Delta V_{BE}$ cell as means to generate a tail current which is PTAT is well-documented in the literature, as prior art."

That is a direct teaching that intrinsic emitter resistance is fully compensated by a PTAT current. Such PTAT compensation, which is taught in the prior art, has nothing to do with device geometries. (A-Appx, Tab 1, 1:43-47; 2:47-50; 3:60-63.)

## 2.    Ohmic Resistance

As noted above, ohmic resistance is analogous to the resistance of a common resistor. As the '909 patent states, it is ohmic resistance that is dependent on transistor "geometry" – that is, the lengths and widths of the transistor regions (A-Appx, Tab 1, 1:66-2:2; 3:66-68; A-Appx, Tab 13, ¶¶ 16, 38; A-Appx, Tab 25, ¶¶ 20-21). The '909 patent specification explicitly states that, by use of the invention, the current source is biased to include a component "keyed to and tracking the *ohmic resistances* associated with the device *geometries*" (A-Appx, Tab 1, 1:66-68; 3:62-67).

It is for this reason that the '909 patent adds an additional compensation for *ohmic* resistance by defining the relationships of the transistor geometries. By doing so, wafer-to-wafer and lot-to-lot changes in the lengths and widths of the transistor structures will proportionally affect each transistor in a similar manner. (A-Appx, Tab 1, 2:2-5, Fig. 3; A-Appx, Tab 13, ¶¶ 39, 40; A-Appx, Tab 25, ¶¶ 20, 21.)

Accordingly, just as do those of skill in the art, the patent explicitly defines "intrinsic emitter resistance" to be kT/qI and defines the different parameter "ohmic resistance" to be resistance associated with the transistor region geometries. They are two separate resistances. Consistent with this fact, ADI specified "intrinsic emitter resistance" and "ohmic resistance" to be two different resistances in the '909 patent claims. Thus, claim 1 refers to

4

"*intrinsic emitter resistance*," dependent claim 2 refers to "tracks the **ohmic resistances** associated with the **geometries . . .**," and dependent claim 5 then speaks of "finite **intrinsic emitter resistance**." (A-Appx, Tab 1, cols. 5-6.)

### 3.   Transistor Gain

The third amplification variable that the disclosed circuit compensates for results from the variability in the beta ($\beta$) or gain of the individual transistors of the differential amplifier. The '909 patent specifies that the alleged invention compensates for this factor by including the resistor $SR_e$ in the $\Delta V_{BE}$ cell of the circuit (A-Appx, Tab 13, ¶¶ 36, 37; A-Appx, Tab 1, 4:62-66).

### 4.   "Gain-compensated differential amplifier" (all claims)

| LTC's Construction | ADI's Construction |
|---|---|
| "Differential amplifier" means a circuit, the purpose and operation of which is to amplify the difference between two input voltages.<br><br>"Gain-compensated" means that the gain of the differential amplifier is compensated simultaneously for geometry dependent parameters, temperature dependencies, and lot-to-lot variations (*i.e.*, compensated for ohmic emitter and base resistance, intrinsic emitter resistance, and beta). | A circuit that amplifies the difference between two input voltages, wherein the amplification is adjusted for environmental, process, or structural variations. |

The three separate factors impacting the overall gain of a differential amplifier – (1) intrinsic emitter resistance (affected by temperature), (2) ohmic resistance (affected by variations in device geometry), and (3) transistor beta – are each compensated for in the patent's allegedly inventive circuit. Intrinsic emitter resistance is compensated for by generating a PTAT tail current. Ohmic resistance is compensated for by relating the geometries of the circuit's transistors so that the PTAT tail current includes a component associated with the geometries.

And, transistor gain is compensated for by including a resistor having a certain value, labeled in the figures as $SR_e$, in the $\Delta V_{BE}$ cell.

Each of these three factors is compensated for simultaneously. (A-Appx, Tab 13, ¶ 41.) "Simultaneous" is the very word ADI used in arguing for allowance of claim 1 in the Patent Office. When all three factors are compensated for, as shown in Fig. 3, the circuit is said to be "gain-compensated."

ADI acknowledged that the prior art cited by the Examiner anticipated claim 1 as originally filed. As filed, that original claim lacked the last element (d). ADI added this last element by amendment, and explained at length and in detail why claim 1, as amended, was patentable over the cited prior art (A-Appx, Tab 2, B7-21).

As ADI admitted in the patent, the prior art disclosed the use of a $\Delta V_{BE}$ cell to bias a current source to generate a PTAT current for a differential amplifier "in order to make the intrinsic emitter resistance constant" (A-Appx, Tab 1, 2:47-54). So ADI in its amendment relied upon the inclusion of all three compensations in the claimed circuit, which it argued the prior art did not provide. ADI first cited the equations in columns 2 through 4 of the patent (not just equation 42), and represented that the "relationships" in the description of Figure 3 at columns 3-4 (pages 10-11 of the original application) "were not known before the present invention" (A-Appx, Tab 2, B14). ADI then stated that "[t]hese are important relationships" (A-Appx, Tab 2, B14). ADI next told the Examiner that the prior art "does not correct for ohmic resistances" and that "cumulative errors that are due to finite beta" are "also not addressed in any of the patents which the Examiner cited." (A-Appx, Tab 2, B14-15.) In these arguments, ADI correctly related ohmic resistance, not intrinsic emitter resistance, to "device geometries" (A-Appx, Tab 2, B14).

6

After this recitation and explanation of the three compensations, ADI told the Examiner (A-Appx, Tab 2, B15):

> "No one previously knew how to use a control voltage to compensate *simultaneously* for geometry-dependent–parameters, temperature dependencies and lot-to-lot variations in a differential amplifier" (emphasis added).

Following these and further arguments directed to the cited references, ADI told the Examiner (A-Appx, Tab 2, B17) (emphasis added):

> "***Having distinguished Claim 1*** from the prior art . . . no further argument is necessary to support patentability of dependent claims 2-5.

The '909 patent describes a single embodiment of the claimed differential amplifier invention – one that *simultaneously* compensates for temperature dependencies, geometry dependent parameters, and lot-to-lot variations caused by intrinsic emitter resistance, ohmic resistance, and beta. ADI relied on this teaching to distinguish claim 1 from the cited prior art. It was not "simply" describing a "benefit that was enabled by one embodiment of the '909 invention" (ADI Brief, D.I. 51 at 13).[3] Rather, ADI was describing the ***claimed*** invention and relying on that description to distinguish the prior art. ADI cannot now avoid its representations to the Patent Office. The public is entitled to rely on those representations.

### 5.     "Tail current I$_{tail}$" (All Claims)

| LTC's Construction | ADI's Construction |
| --- | --- |
| "Tail current" – The current drawn through the long-tail portion of a pair of transistors of a differential amplifier, wherein the long-tail portion is formed by the connection of the emitters of the transistors. The value of the tail current is required to be " I$_{tail}$" (see below). | "Tail current" – The current drawn through the long tail portion of a pair of transistors of a differential amplifier, wherein the long-tail portion is formed by the connection of the emitters of the transistors. |

---

[3]     Of course, there is only one embodiment disclosed, Figure 3.

| | |
|---|---|
| "$I_{tail}$" – "$I_{tail}$" is a "PTAT" current (*i.e.*, a current the value of which varies linearly with absolute (Kelvin) temperature). In addition, "$I_{tail}$" = $2I(1+1/\beta_0)$, where $I=[(V_T \ln (A))/R_g]/[1-(r/R_g)(1-1/A)]$ as defined in the '909 patent (equation 40). | "$I_{tail}$" – The current drawn through the long tail portion of a pair of transistors of a differential amplifier, wherein the long-tail portion is formed by the connection of the emitters of the transistors. |

Contrary to ADI's assertion (ADI Brief, D.I. 51 at 14), the claim term "$I_{tail}$" does not have an "ordinary meaning" ADI (A-Appx, Tab 13, ¶ 54). ADI submits no evidence that it has. Nor is $I_{tail}$ a shorthand symbolic expression for "tail current," as ADI says (ADI Brief, D.I. 51 at 14). If it were, there would be no reason to have both terms in the claims. This is further confirmed by ADI's use of the words "a current of I $(1 + 1/\beta)$" in claim 4. When the Examiner rejected the claim because the term "I" should be defined, ADI told the Examiner that I refers to a value of the current – just as $I_{tail}$ refers to a value of the tail current defined by the patent (A-Appx, Tab 2, B18).

To distinguish the claims from the prior art in the Patent Office, ADI cited to the generation of a PTAT tail current and to the equations of the '909 patent, explaining that "[t]hese are important relationships" (A-Appx, Tab 1, B54). The '909 patent specifies, through those equations and text, that $I_{tail}$ must be PTAT and it "must be 2I $(1 + 1/\beta)$, with I defined by equation 40 (A-Appx, Tab 1, 3:10-14).

Tail current of the value $I_{tail}$ is thus explicitly defined in the '909 patent and is a requirement for the circuit to be "gain-compensated." It is necessary to provide the "simultaneous compensation" and the "important relationships" ADI told the Patent Office distinguished its claims from the prior art. Accordingly, LTC includes this definition, including equation 40, in its construction.

8

ADI also asserts that the inclusion of the equation $2I(1 + 1/\beta)$ in dependent claims 4 and 9 would be rendered meaningless by LTC's construction of $I_{tail}$. (ADI Brief, D.I. 51 at 15.) ADI is incorrect.

First, an argument about claim differentiation cannot overcome representations made to the Patent Examiner about the "important relationships" defining $I_{tail}$. *Toro Co. v. White Consol. Indus., Inc.*, 199 F.2d 1295, 1302 (Fed. Cir. 1999); *Tandon Corp. v. U.S. Int'l Trade Comm'n*, 831 F.2d 1017, 1024 (Fed. Cir. 1987). Second, claims 4 and 9 depend from claims 3 and 8, respectively. Claims 3 and 8 define specific current source configurations (a common-emitter transistor current source). Claims 4 and 9 then specify where the $2I(1 + 1/\beta)$ current is to be found in those specific configurations. That is entirely consistent with $I_{tail}$ in claims 1 and 6 being construed as the '909 patent defines it and as LTC proposes. The correct construction of claims 1 and 6 includes the definition of $I_{tail}$. And claims 4 and 9 specify where current of that value occurs in the specific configurations of claims 3 and 8.

### 6.    "Control voltage" (All Claims)

| LTC's Construction | ADI's Construction |
|---|---|
| The "control voltage" is the voltage at the base of the transistor current source. | A voltage used to control a device in a circuit. |

There is only one voltage described in the '909 patent that controls the current source, to which the current source is responsive. That is the bias voltage on line 60 – the voltage applied to the base of the current source transistor (A-Appx, Tab 1, 3:63-65; 4:68-5:1, Fig. 3). It is a "control voltage" because current source transistor 24 is controlled by the bias

9

voltage on its base[4] (A-Appx, Tab 1, 2:2-5; 2:46-58; 3:60-68; 4:32-34; 4:47-51; and 4:67-5:7).

ADI knows this. In describing the alleged invention of the '909 patent in its opening brief, ADI

identified the voltage on bias line 60 in the Figure 3 circuit as "a 'control voltage' applied at

reference number 60 in Fig. 3." (ADI Brief, D.I. 51 at 4.) In another of his patents, the '909

patentee, Mr. Gilbert, refers to this base voltage as the "control bias." (A-Appx, Tab 25, ¶ 18, A-

Appx, Tab 29, Fig. 5.) Others in the art also refer to this base voltage as a "control voltage." (A-

Appx, Tab 25, ¶ 19; A-Appx, Tab 30, 7:3-8, Fig. 6.)

     No other voltage in the disclosed circuit can act as a control voltage for the

current source. Moreover, no other voltage in the disclosed circuit could have the components

required to achieve compensation for intrinsic emitter resistance, ohmic resistance and gain (A-

Appx, Tab 13, ¶ 58).

     ADI's argument about "purpose" versus "particular place" demonstrates the

vacuousness of its position (ADI Brief, D.I. 51 at 15). The voltage is a control voltage *because* it

is located at the base of the current source transistor. It is only in that way that the current source

can be "responsive to the control voltage," as the claims require. If it were not so located, it

would not be the control voltage to which the current source is responsive (A-Appx, Tab 13,

¶ 59).

     ADI has recognized this. That is why in its infringement charges it has identified

the voltage at the base of a current source transistor in LTC's accused products as the claimed

"control voltage."

---

[4]    As noted, *infra*, in explaining what a transistor is, ADI notes that a transistor is controlled
by the voltage or current on its base. (ADI Brief, D.I. 51 at 2.)

Contrary to ADI's contention, LTC's construction does not read "control" out of the claim (ADI Brief, D.I. 51 at 15). Just the opposite, LTC's construction gives that word meaning. It establishes precisely the claimed control voltage. ADI, on the other hand, wants the term "control voltage" to have no meaning at all. What ADI is trying to do with its undefined definition is to leave open the possibility to point to some other voltage somewhere, anywhere, in the LTC circuit as the "control voltage," should it turn out (as is the case) that the control voltage at the base of the LTC current source transistor is not a PTAT voltage, as the claims require.[5]

7.     **"Control voltage generating means for generating, as the control voltage, a voltage which varies proportionately to absolute temperature" (All Claims)**

| LTC's Construction | ADI's Construction |
|---|---|
| This is a means-plus-function element that must be construed pursuant to 35 U.S.C. § 112, ¶ 6. "A voltage which varies proportionately to absolute temperature" means a PTAT voltage (*i.e.*, a voltage the value of which varies linearly with absolute (Kelvin) temperature). There is no circuit structure disclosed in the patent which functions to generate the claimed PTAT control voltage. Alternatively, if there is structure in the patent for performing the claimed function, the corresponding structure of the "control voltage generating means" is $\Delta V_{BE}$ cell 20 of FIG. 3, where (1) transistor 28 has an emitter area A times that of transistor 32, and (2) transistors 28 and 32 are driven to equal current densities. | This is a means-plus-function limitation, and should be construed to cover the corresponding structure(s) and equivalents thereof. The corresponding structure(s) described in the specification is circuitry that includes a $\Delta V_{BE}$ cell. |

As LTC explained in its Opening Brief, there is no structure in the patent corresponding to the claimed "control voltage generating means" for producing a "PTAT control

_____

[5]     ADI argues that "a person of ordinary skill in the art would understand . . ." what a "control voltage" is. But ADI has submitted no evidence from any such person or from anyone who can tell the Court what such a person would understand. LTC, on the other hand, has submitted just such evidence in the declaration of Robert Blauschild. (A-Appx, Tab 13, ¶ 59; A-Appx, Tab 25, ¶¶ 18, 19, A-Appx, Tab 29, Fig. 5; A-Appx, Tab 30, 7:3, Fig. 6.)

voltage." ADI itself makes that clear in its brief where, at page 4, it identifies the voltage on line 60 as the "control voltage" of the alleged invention. (ADI Brief, D.I. 51 at 4.) The control voltage on line 60 is not and cannot be a PTAT voltage for the current source to produce a PTAT tail current.

The "$\Delta V_{BE}$ cell" that ADI identifies as structure corresponding to the means for performing the claimed function would include the *prior art* $\Delta V_{BE}$ cell, which is not and cannot be the $\Delta V_{BE}$ cell of the alleged invention. The '909 patent states that the prior art $\Delta V_{BE}$ cell cannot be used to carry out the alleged invention without modification. After describing this "well-documented" prior art $\Delta V_{BE}$ cell, the '909 patent then says that ***with the proper design*** (A-Appx, Tab 1, 3:60-68) – the design of the $\Delta V_{BE}$ cell of Figure 3 – a $\Delta V_{BE}$ cell can be used to bias the current source to carry out the additional compensations required by the invention.

The patent describes this properly designed $\Delta V_{BE}$ cell at columns 4 and 5, and illustrates it in Figure 3. Figure 3 is the only "gain-compensated" circuit in the patent. If the claim's erroneous reference to producing a PTAT voltage were changed to causing the generation by the current source of a PTAT current, it is that properly-designed Figure 3 $\Delta V_{BE}$ cell, not the prior art $\Delta V_{BE}$ cell of Figure 2, that would be the corresponding structure for this claimed means.

For this reason, LTC identified the $\Delta V_{BE}$ cell shown in Figure 3 as the alternative to no disclosure at all. And it identified the appropriate portions of that $\Delta V_{BE}$ cell structure. ADI quibbles that LTC did not designate all of the cell's structure (ADI Brief, D.I. 51 at 17). That is because LTC correctly included the remaining structure in the "means for functionally relating" of the following claim element (d).

12

8.    **"Means for functionally relating the control voltage to the intrinsic emitter resistance of the current source" (All Claims)**

| LTC's Construction | ADI's Construction |
|---|---|
| This element is a means-plus-function element that must be construed pursuant to 35 U.S.C. § 112, ¶ 6.<br><br>The "intrinsic emitter resistance" of a transistor is defined as kT/qI, where k is Boltzmann's constant, T is absolute temperature, q is electronic charge, and I is the current conducted by the transistor.<br><br>There is no circuit structure disclosed in the patent which performs the claimed function, because there is no disclosed structure corresponding to the recited "control voltage generating means" (see element (c), above). Alternatively, if there is structure in the patent for performing the claimed function, the structure for performing the claimed function of "functionally relating the control voltage to the intrinsic emitter resistance of the current source," is $\Delta V_{BE}$ cell 20 of FIG. 3, having all indicated component values, mathematical relationships, and device relationships such that the gain of the differential amplifier is compensated for geometry-dependent parameters, temperature dependencies, and lot-to-lot variations. In addition, $\Delta V_{BE}$ cell 20 has the following properties:<br><br>The value of resistor 34 ($R_g$) is chosen such that, for a desired differential mode gain G, $R_g/R_c=(1-1/A)/2G$.<br><br>The unit area emitter geometries of the transistors of $\Delta V_{BE}$ cell 20 and of the other transistors of Fig. 3 are the same.<br><br>Transistors 28 and 32 operate at different collector currents. | This is a means-plus-function limitation, and should be construed to cover the corresponding structure(s) and equivalents thereof. The corresponding structure(s) described in the specification includes the $\Delta V_{BE}$ cell structured to satisfy Equation 42. |

This last erroneously written means plus function element is one reason ADI has tied itself up in logical knots trying to equate intrinsic emitter resistance to ohmic resistance. For example, ADI baldly rewrites the patent at page 18 of its brief where it quotes from column 3 of the patent, but has to insert the words "intrinsic emitter" (ADI Brief, D.I. 51 at 18):

> "'. . . can be used to bias the current source . . . to a point which adds to the tail current a component keyed to and tracking the ohmic [*i.e.*, intrinsic emitter] resistances associated with device geometries.'"

ADI doesn't even bother putting an insertion in brackets when it cites from column 2 of the patent. The actual language is (A-Appx, Tab 1, 2:42-45) (emphasis added):

"However, this *ohmic resistance* is not easy to measure and . . . it varies significantly from one production lot to the next."  (Emphasis added.)

ADI crops the quote and then presents it this way (ADI Brief, D.I. 51 at 18) (emphasis added):

". . . the *emitter resistance* 'is not easy to measure and . . . varies significantly from one production lot to the next."  (Emphasis added.)

There is no structure disclosed in the '909 patent corresponding to the claimed means, for the reasons stated in LTC's opening Brief with respect to the control voltage generating means.  Even had the claim been drafted correctly, however, it still would not require only that the $\Delta V_{BE}$ cell structure satisfy equation 42 of the '909 patent, as ADI proposes.

First, that equation which says "in theory" that compensation can be achieved is followed by the actuality, the description of the compensating circuit itself.  It is that actual circuit which is the structure which corresponds to the means element.  In explaining what element (d) adds to the claims to distinguish the prior art, ADI cited the "important relationships" given in the patent's description of Figure 3.  Those important relationships go well beyond equation 42.  (A-Appx, Tab 13, ¶ 54.)

ADI tries at page 19 of its brief to once again say that intrinsic emitter resistance is ohmic resistance, relying on the inconsistency in part of the description of Figure 3.  (ADI Brief, D.I. 51 at 14.)  It cannot succeed.  ADI's argument fails in the face of the rest of the '909 patent, the prosecution history, the common and accepted meanings of those terms, and immutable transistor physics.[6]

---

[6]    The problem with the '909 patent, as noted in LTC's opening brief, is that it has typographical errors in it.  And the problem with ADI's constructions is that it is trying to capitalize on those errors to contradict the teachings of the patent, avoid its arguments to the Patent Office and rewrite semiconductor physics.

In setting up the nomenclature conventions to be used in the patent, the '909 patent defines "r" to stand for ohmic resistance and "$r_e$" to stand for intrinsic resistance, *e.g.*:

(Continued...)

ADI cannot keep itself straight, even in its own argument. It cites to column 1 as showing that "r" and "$r_e$" are separate variables. Indeed they are. The variable "r" is ohmic resistance, and the different variable "$r_e$" is intrinsic emitter resistance. And at column 3, lines 6-10, which ADI also cites, the patent specifically refers to "r" as "ohmic resistance."

### 9.    "$\Delta V_{BE}$ cell" (Claims 3, 5, 6, 8, 10)

| LTC's Construction | ADI's Construction |
|---|---|
| A circuit which produces a control voltage using the difference between the base-emitter voltages of two transistors, as shown in FIG. 3 (circuit 20). | A circuit that provides a control voltage that produces a current that is proportional to absolute temperature (Kelvin). |

The only $\Delta V_{BE}$ cell disclosed in the patent for use in the alleged invention is the $\Delta V_{BE}$ cell of Figure 3. There are prior art $\Delta V_{BE}$ cells. But the patent explains they are not capable of carrying out the alleged invention. Only a $\Delta V_{BE}$ cell with the "proper design" of the Figure 3 $\Delta V_{BE}$ cell is disclosed as carrying out the alleged invention.

ADI, by its definition, would include the very prior art $\Delta V_{BE}$ cells the patent says are unsuitable and which ADI told the Patent Office are not the claimed invention.

---

(…Continued)

"$r_e$ is the intrinsic 'electronic' resistance" (A-Appx, Tab 1, 1:35)

"r is the total ohmic emitter resistance" (A-Appx, Tab 1, 1:39)

"if r were known . . . however, this ohmic resistance is not easy to measure . . . ." (A-Appx, Tab 1, 2:40-43).

At the introduction of Figure 3, the patent notes that in Figure 3, "all emitter-related *ohmic* resistances [are] shown explicitly" (A-Appx, Tab 1, 4:39-43; emphasis added). The following June 28, 2007description of Figure 3, however, mixes up the terms and, in places, uses the word "intrinsic emitter resistance" when what is shown and mathematically described is ohmic resistance, *e.g.*, ". . . the other $\Delta V_{BE}$ cell transistor 28 has emitter area of A units, intrinsic emitter resistance r/A . . . ." The patent earlier defines "r" as *ohmic* resistance. And the relation of r to A units of area confirms that this discussion of Figure 3 is relevant only to ohmic resistance, which depends on geometry, not to intrinsic emitter resistance, which does not. This error does not excuse ADI's mis-constructions.

15

## II.    ADI'S '633 PATENT CONSTRUCTIONS ARE NOT CONSTRUCTIONS AT ALL

ADI would define "bipolar transistor" by omitting essential requirements acknowledged elsewhere in ADI's own brief, and would render the term "connected" meaningless.

### A.    "Bipolar transistor" (Claims 8, 17)

| LTC's Construction | ADI's Construction |
|---|---|
| A three-electrode semiconductor device with a layer of n- (or p-) type semiconductor (the base region) sandwiched between two regions of p- (or n-) type semiconductors (the collector and emitter regions), thus forming two p-n junctions back to back. The current flowing into or out of the base electrode controls the amount of current flowing between the collector and emitter electrodes. | A three-terminal semiconductor device with an n- (or p-) type semiconductor region between two p- (or n-) type semiconductor regions. |

A bipolar transistor has three terminals, or three electrodes, and it has an n- (or p-) type semiconductor region between two regions of p- (or n-) type semiconductors (LTC calls that "sandwiched"). These elements alone, however, are not enough to define a bipolar transistor, as ADI itself recognizes. In explaining a transistor, ADI explains that it also has a collector region, an emitter region and a base region and that varying the current or voltage to the base electrode controls the current flowing between the emitter and the collector. (ADI Brief, D.I. 51 at 2.) These are features defining a bipolar transistor which LTC has included in its proposed construction.

These aspects, which ADI plainly believes are required to define a bipolar transistor, are missing from ADI's proposed construction. Without these features, ADI's construction describes other types of electronic components – for example, Field Effect Transistors ("FETs"). FETs are three terminal semiconductor devices meeting ADI's definition, yet are not bipolar transistors.

ADI calls its definition an easily understood definition that does not impose erroneous structural limitations. (ADI Brief, D.I. 51 at 20.) What ADI means is that its definition is so vague and lacking in necessary structural limitations that ADI, for infringement purposes, can apply it to virtually any semiconductor device that has three regions.

**B.    "Connected" (All Claims)**

| LTC's Construction | ADI's Construction |
|---|---|
| The term "connected," when used, as here, to describe one component terminal being connected to another, means connected directly with no intervening components. | Coupled. |

To obtain issuance of the '633 patent claims, ADI amended the claims that originally stated that certain transistors were *connected between* other transistors, to specify that identified terminals of the transistor were *connected to* other identified terminals. ADI made the amendment "to better clarify the structural relationships between their respective elements" (A-Appx, Tab 4, B41).

Now ADI wants to eliminate the very statement of the structural relationships that it added to the claims to obtain their allowance. For example, although ADI changed claim 8 to specify that "the collectors of said clamp transistors are *connected* to the bases of these opposing output transistors" (A-Appx, Tab 4, B37-42 and B42-B43), under ADI's proposed construction, no such connection would be required.

ADI refers to the '633 patent's use of the term "connected between," and argues that this use shows "connected" has to allow intermediate devices. But "connected between" is exactly the language ADI replaced with "connected to" when it amended the structural relationship of the terminal connections. And that amendment was entirely consistent with the

disclosure in the '633 patent of each of those terminal connections – there are no intervening devices.

LTC's proposed construction of "connected" in the claims, where it is used with respect to two terminals, is the definition consistent with the '633 patent description and further required by ADI's amendments and arguments in the Patent Office.

## III. LTC'S U.S. PATENT NO. 6,144,194 ("THE '194 PATENT")

### A. "Input signal" and "Output signal" (Claims 1, 13, 30, 33)

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| output signal<br>'194 patent (claims 1, 13, 30, 33) | an output that can convey information | an output that conveys information |
| input signal<br>'194 patent (claims 1, 13, 30, 33) | an input that can convey information | an input that conveys information |

ADI's proposed constructions of these limitations are too narrow. The specification and claims of the '194 patent (as well as the Wilcox/Flatness patents, discussed in Section V.F, *infra*) use the term "signal" in a broad sense to refer to voltages and currents, which can convey information but do not always do so. The *Impala* court reached the same conclusion, adopting LTC's proposal and rejecting ADI's proposal. (L-Appx, Tab 2, A21; Tab 3, A59.)[7]

Claim 1 of the '194 patent uses the term "output signal" to denote the current the voltage regulator generates at the output node. The load draws this current for power; it does not use the current provided by the regulator as "information." Thus, ADI's restrictive construction makes no sense because it could not apply to claim 1's use of the limitation "output signal."

---

[7]     "L-Appx" refers to the Joint Appendix of Evidence Relating to Linear's Patents, filed by LTC with this Answering Brief.

Similarly, the "input signal" applied to the input node is just a voltage/current from a battery or other power source. It is not used as "information."

ADI argues that LTC's construction is meaningless because anything "can" convey information. (ADI Brief, D.I. 51 at 22.) LTC's construction is not meaningless. It is based on the ordinary meaning of "signal" -- "a detectable physical quantity or impulse (as a voltage, current, magnetic field strength) by which messages or information *can* be transmitted." (L-Appx, Tab 41.) Moreover, applying ADI's logic to its own construction makes it equally meaningless because *every* voltage or current has a measurable value -- that constitutes "information."

ADI further argues that the prosecution history supports its construction because LTC added the word "signal" after "output" and "input" during prosecution of the '194 patent. (ADI Brief, D.I. 51 at 23.) The claim amendments do not support ADI's construction. They make clear that "input" and "output" referred to a current or voltage as opposed to a circuit, terminal, node, some other physical component, or a location. "Input" and "output" are context specific.[8] For example, prior to these amendments, the language of claim 1 -- "an input node to which an input is applied" -- was ambiguous in that "input is applied" could mean either that a component is physically connected to the input node, or that a current or voltage is applied to the input node. As another example, the specification of the '194 patent uses these terms in two different ways in a single sentence. (*See* L-Appx, Tab 18, 7:3-7 ("Regulator stages 80a, 80b, and 80c also include current sense amplifiers 74a-c whose inputs are coupled ["***input" used to denote***

---

[8]    *See* dictionary definitions of "input" and "output": input: "(1)(b) power or energy put into a machine . . . ; (2)(a) the point at which an input (as of energy, material, or data) is made"; output: "(d)(1) power or energy delivered by a machine or system for storage . . . (d)(2) the terminal for the output on an electrical device . . . ." (L-Appx, Tab 41.)

*a physical component or location*] across sense resistors 72a-c, and whose outputs Vca-Vcc, are proportional to the input currents ["*"output" used to denote a voltage*"]").) The applicant made similar clarifying amendments during the prosecution of the '178 patent. (*See* L-Appx, Tab 7.) Nothing in the prosecution history of either the '178 or '194 patent defines "signal" as conveying information.[9]

**B.     "Each of the N regulator stages providing current I/N to the output node"**

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| each of the N regulator stages providing current I/N to the output node '194 patent (claims 1, 13, 30, 33) | each regulator stage provides a substantially equal amount of current I/N to the output node | each regulator stage provides an equal amount of current I/N to the output node |

ADI's construction of this limitation, requiring that the current I/N provided by each regulator stage be strictly equal, is overly restrictive and is contradicted by the specification, which allows for variation in the current provided by each stage. The specification states that each regulator stage provides a *substantially* equal amount of current I/N to the output node in every discussion of the stage output currents. (*See generally* L-Appx, Tab 18, 5:60-63; 6:54-7:46.) ADI cites the specification at 5:21-22 to support its arguments, but those lines merely state that "Regulator stages 70a, 70b and 70c are identical," not that the "currents are 'equal' at every stage." This statement is later qualified in the specification at column 6, lines 54-55,

---

[9]     ADI's definition of "signal" is also inconsistent with ADI's use of the term in connection with its own patents. (*See* ADI Brief, D.I. 51 at 2 ("In Fig. 1 of the '909 patent, the two input signals are (1) the "input voltage" Vin applied to the base of the transistor 12, and (2) the voltage applied to the base of transistor 14 which as shown in the figure is ground.").) Ground voltage does not carry any information.

which notes that the regulator stages are "ideally" identical, but are not necessarily identical in practice.

ADI's argument that when the patent meant to claim "substantially equal" current, it used that very language, as in claims 10 and 28, actually supports LTC's construction. Claim 10, dependent upon claim 8, which in turn is dependent upon claim 1, states that "the N feedback signals further force the monitored currents in the N regulator stages to be substantially equal." Claim 28, dependent upon claim 27, which is in turn dependent upon claim 13, contains a similar limitation. These dependent claims incorporate all of the limitations of the independent claims from which they depend, as well as all dependent claims in the chain. It would be inconsistent to construe independent claims 1 and 13 as being limited to "equal" I/N currents when dependent claims, which include all of the limitations of the independent claims, explicitly provide for "substantially equal" I/N currents. ADI's construction would improperly render independent claims 1 and 13 narrower than their dependent claims. The contrary is presumed. *See Intamin, Ltd. v. Magnetar Tech. Corp.*, 483 F.2d 1328, 1335 (Fed. Cir. 2007) ("An independent claim impliedly embraces more subject matter than its narrower dependent claim."). The principle stated in the *Modine* case ADI cites does not apply, because here the claims at issue are an independent claim and its dependent claims.

LTC agrees with ADI's statement, from a footnote of its brief, that under LTC's proposed construction, "minor variations due to component variations between stages" are covered by the '194 patent. (*See* ADI Brief, D.I. 51 at 24, n.19.) LTC does not agree, however, with ADI's argument that the '194 patent does not cover regulator designs that are intended to produce unequal currents between stages, because ADI incorrectly inserts the intent of the infringer into the claims. Questions of claim construction do not turn on what is intended by an

infringing party, but instead depend upon what the claimed invention does. *ADC Telecomms., Inc. v. Switchcraft, Inc.*, No. 04-1590, 2005 U.S. Dist. LEXIS 19593, at *15 (D. Minn. 2005) ("In general, intent is not relevant to whether a product directly infringes a patent." [*citing Intel Corp. v. US Int'l Trade Comm.*, 946 F.2d 821 at 832 (Fed. Cir. 1991)].)

### C.    "N-phase timing pulses" (Claims 1, 13, 30, 33)

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| N-phase timing pulses '194 patent (claims 1, 13, 30, 33) | pulses that provide the timing for N phases | the set of pulses that operate out of phase to provide timing for the N phases |

ADI's use of the phrase "the set" is vague and ambiguous, and does not appear in the specification or claims of the '194 patent. The phrase "operate out of phase to provide timing for the N phases" further makes no sense, and is mixing apples and oranges. It makes no sense to say that pulses "operate." The specification and the claims state that the *stages* operate out of phase, not the pulses. (L-Appx, Tab 18, 5:52-54.) Indeed, the claims do not require the timing pulses to have any particular relationship to each other.

LTC's construction is simple, comports with ordinary meaning and the specification, and will not cause any jury confusion.

### IV.    LTC'S U.S. PATENT NO. 5,212,618 ("THE '618 PATENT")

### A.    "Semiconductor substrate" (Claims 1, 21)

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| semiconductor substrate '618 patent (claims 1, 21) | a substrate made out of semiconductor material | an underlying layer or substratum below the integrated circuits on a chip |

LTC addressed this limitation in its Opening Markman Brief ("Opening Brief"), and nothing in ADI's brief refutes LTC's position. (*See* Opening Brief, D.I. 65 at 51.)  ADI fails to cite any mention in the specification or claim language of a requirement that the substrate be "below the integrated circuits on a chip."  To the contrary, the specification states that the transistor elements can be "in" or "on" the substrate. (*See* L-Appx, Tab 20, 1:18-21; 2:48-49; 2:53-54.)  ADI cites dictionary definitions of "substrate" to support its construction, but the intrinsic record takes precedence where, as here, the specification indicates a term is used differently from a dictionary definition. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1322-23 (Fed. Cir. 2005) (en banc).

### B.    "A first semiconductor region" (Claims 1, 21)

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| a first semiconductor region '618 patent (claims 1, 21) | a region formed in or on the substrate and contacting substrate material | a region formed on the substrate and contacting substrate material |

Here again, the issue is whether integrated circuit structures can be found "in" a substrate.  The answer is simple.  The specification states that the transistor elements may be formed either "on" or "in" the substrate.  ADI's proposed construction, which runs contrary to the specification, is also contradicted by the language of claims depended from claim 1.  Claim 2 states that the first semiconductor region of claim 1 is "on" the substrate, whereas claim 3 states that it is "in" the substrate.  Therefore, the first semiconductor region of claim 1 must be construed broadly enough to be either "in" or "on" the substrate, so that it could be further limited to "in" or "on" by claims 2 and 3.

ADI's statement that "the specification *never* shows the region formed 'in' . . . the substrate" is incorrect (ADI Brief, D.I. 51 at 27 (emphasis in original)).  The area 22 that

functions as the "first semiconductor region" in Figs. 2A and 3A acts as the "first semiconductor

region" in Fig. 7. This area in Fig. 7 is also numbered 22 and is shown "in" the substrate. (*See*

L-Appx, Tab 20, 4:41-43.)

### C.    "Formed in said first semiconductor region" (Claims 1, 21)

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| formed in said first semiconductor region '618 patent (claims 1, 21) | formed in said first semiconductor region | the first semiconductor region forms an element of the transistor |

ADI's construction of "formed in said first semiconductor region" improperly

attempts to import limitations from the specification, and improperly rewrites the language of

this unambiguous limitation. It may be true that, in the preferred embodiments, the "first

semiconductor region" forms an element of the transistor, but the claim is not written this way.

ADI thus rewrites the claim to import a limitation from the specification.

### D.    "Current limiting resistive element (Claims 1, 21)

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| current limiting resistive element '618 patent (claims 1, 21) | a resistance that may comprise transistor base resistance and/or an external resistance | The "current limiting resistive element" is circuitry having more than nominal resistance of at least several ohms between the base region and the emitter region. It may comprise transistor base resistance and/or an external resistance. |

ADI cites in its brief definitions for a "resistor" and a "resistor element," but the

"current limiting resistive element" limitation does not contain the term "resistor" – it recites a

*resistive* element. This resistive element can simply be the resistance inherent in the base (*See* L-

Appx, Tab 20, 3:4-8, 19-22), whatever that may be, as ADI concedes when it argues that "all

substances, even conductors, have some resistance." (*See* ADI Brief, D.I. 51 at 29.) There is

nothing inherent that would prevent the invention from working with a resistance of less than several ohms. (L-Appx, Tab 22, ¶ 153.)

E.  **"Collector-base breakdown voltage" (Claims 1, 21), "Inactive" (Claims 1, 21), "Forms a current path" (Claims 1, 21)**

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| collector-base breakdown voltage '618 patent (claims 1, 21) | a voltage, when applied between the collector and base, above which the junction between the collector and the base breaks down | the voltage, when applied between the collector and base, above which the transistor conducts current from an electrostatic discharge pulse |
| Inactive '618 patent (claims 1, 21) | where the transistor functions as a open circuit | where the transistor functions as a open circuit and no current from an electrostatic discharge pulse is being conducted to ground |
| forms a current path '618 patent (claims 1, 21) | where the transistor conducts current | where the transistor conducts current from an electrostatic discharge pulse to ground |

ADI attempts to limit these terms beyond their well-understood meanings in the art, which do not require definition with reference to "an electrostatic discharge pulse," or conduction "to ground." (L-Appx, Tab 22, ¶¶ 154-56.) ADI's insertion of the limitation "current from an electrostatic discharge pulse" in its proposed construction is redundant of the language "discharging excess charge" used in claims 1 and 21. To the extent, if any, that "current from an electrostatic discharge pulse" differs from "excess charge," ADI's proposed construction is also confusing. ADI's insertion of the limitation "to ground" in its proposed constructions of "inactive" and "forms a current path" also incorrectly imports a limitation from the specification into the claims. There is no reason the claimed invention would not work if the transistor conducted current to something other than to ground, e.g., a negative power supply.

ADI's proposed constructions for "collector-base breakdown voltage" and "inactive" are also overly restrictive to the extent they require or imply that no current from an electrostatic discharge pulse may flow to ground before the transistor becomes active. Once the voltage of the electrostatic discharge exceeds the transistor's breakdown voltage, the transistor must conduct current before it can turn on. (L-Appx, Tab 20, 1:62-2:4.) Also, even before the electrostatic discharge voltage reaches the breakdown voltage, current from the discharge may flow to ground through leakage paths or through another device in the circuit. Nothing in the claims or the specification precludes such current flow.

## V.    LTC'S U.S. PATENT NO. 6,100,678 ("THE '678 PATENT")

### A.    "Charging and draining circuitry . . ." (Claim 1), "through a single package pin" (Claim 5)

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| charging and draining circuitry, coupled to the single package pin, that charges and drains voltage on the capacitor '678 patent (claim 1) | charging and draining circuitry, coupled to the single package pin, that charges and drains voltage on the capacitor | charging and draining of the capacitor is performed using the same package pin, i.e., both the charging current and the draining current pass through the single package pin |
| through a single package pin '678 patent (claims 1, 5, 21) | using a single package pin | charging and draining of the capacitor is performed using the same package pin, i.e., both the charging current and the draining current pass through the single package pin |

In its brief, ADI argues that the '678 patent claims require charging and draining circuitry to be at one end of a pin, and an external capacitor to be at the other end of the pin. Claims 1 and 5, however, do not state any requirements regarding the geometric configuration of the charging and draining circuitry, the external capacitor, and the pin. At most, the claims only require that such circuitry and the capacitor be coupled to a single pin.

ADI also argues that the claims require that a charging current source and a draining current source both be located in a control circuit. In fact, currents and current sources are not even mentioned in claim 1 or in the broader statements of the inventions. (*See* L-Appx, Tab 21, 2:16-49). The phrase "provide a short-circuit timer function through a single package pin" which appears in the preambles of all the claims at issue use the word "through" simply to indicate that a single pin is used to "couple" certain elements of the circuit.

### B.     "Short circuit" (Claims 1, 5)

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| short circuit<br><br>'678 patent<br>(claims 1, 5) | a low resistance connection between two nodes in a circuit | zero or substantially zero resistance between two connected nodes such that there is no voltage difference between the two nodes |

ADI cites in its brief three extrinsic definitions. These definitions do not negate LTC's construction. The first says that "for all practical purposes" there is no resistance; thus its definition is qualified. The second says "near-zero," not zero or substantially zero. Near-zero is a relative term: e.g., two ohms is near zero. ADI's third definition does not even mention resistance.

In addition, the "short circuit" to which the invention of the '678 patent pertains is a non-temporary current surge that could damage the voltage regulator. (*See* L-Appx, Tab 21, 1:56-60.) The specification does not state that such a surge could occur only if the resistance is zero or substantially zero. A high enough current surge could damage the regulator even where the current passes through an area where the resistance is "low."

### C.     "short circuit shutdown signal" (Claims 1, 5, 21)

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| SHORT CIRCUIT | a signal that can be used to | a signal that causes the remainder |

| SHUTDOWN signal '678 patent (claims 1, 5, 21) | indicate to other circuitry that it should stop operating | of the regulator circuitry to shutdown |
|---|---|---|

On their face, these claims do not require the circuitry that actually shuts down the regulator, or the step(s) of shutting it down. Nor are such circuitry or steps described in the specification. These claims only require providing the "short circuit shutdown signal," which is only an indicator. These claims relate to the timer function. What is done with the "short circuit shutdown signal" that is produced as part of the timer function is not covered by these claims.

**D.     "Arming voltage" (Claims 1, 5, 21)**

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| arming voltage '678 patent (claims 1, 5, 21) | a predetermined voltage above which the short-circuit timer function is activated | a predetermined voltage above which the short circuit detection circuit is enabled |

ADI misunderstands the '678 patent. The arming voltage has nothing to do with the operation or enablement of the short circuit detection circuit, which is a different aspect of the invention, represented as element 130 in Figure 1. It is the short circuit timer function that is activated when the voltage across the capacitor $V_c$ increases to the arming voltage. (L-Appx, Tab 21, 2:66-3:1.) Once the arming voltage is reached, the capacitor voltage is drained after a short circuit detection signal is received from the short circuit detection circuit. (L-Appx, Tab 21, 3:108.) Nothing in the specification precludes the short circuit detection signal from being generated before the arming voltage is reached. ADI's specification cites actually highlight that the arming voltage and the short circuit detection signal operate independently of each other.

**VI.     COMMON CLAIM LIMITATIONS OF U.S. PATENT NOS. '178, '694, '885, '066 AND '258 ("THE WILCOX/FLATNESS PATENTS")**

A.      **"switching voltage regulator"**

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| switching voltage regulator '178 (claims 1, 34, 41, 51, 55, 57) '694 (claims 1, 5) '885 (claims 1, 11, 32, 35) '066 (claim 1) '258 (claims 1, 34, 35) | a device or circuit that receives an input voltage and provides a predetermined and regulated output voltage by controlling the opening and closing of a switch.<br><br>(Predetermined means determined by design) | a device or circuit capable of receiving a poorly-specified and fluctuating input voltage and provides a predetermined and constant output voltage by controlling the opening and closing of a switch |

ADI misconstrues LTC's proposed construction.  LTC does not agree that the output voltage must be predetermined ***and constant***.  ADI's use of the word "constant" in its proposed construction, a recurring theme in many of its proposed constructions, constitutes an attempt to limit the scope of the asserted claims to some idealized circuit – divorced from real-life – that can only operate under fixed and immutable operating conditions that can never vary.  ADI's proposed constructions in this regard are at odds with the intrinsic evidence, as well as how one of ordinary skill would understand these circuits to work in the real world.  For example, the specification does not speak in terms of a switching voltage regulator that provides a "constant" output voltage to a load in the sense of a fixed and unchanging output voltage, as ADI would have it.  Rather, it states that "[c]ircuit 10 operates by controlling inductor current IL so that the feedback voltage Vfb is regulated to be ***substantially equal*** to a reference voltage Vref." (L-Appx, Tab 4, 4:24-27)[10]

In fact, no embodiment of the Wilcox patents shows a switching voltage regulator that provides a constant output voltage.  (*See also* L-Appx, Tab 22, ¶¶ 121-22.)  ADI is simply

---

[10]      Vfb is proportional to the output voltage, Vout. (L-Appx, Tab 4, 4:19-22.)

attempting to read too much into a statement in the Background Section, which was not intended
to be a limiting definition.  For example, the Background Section of the '194 patent, which
contains a similar background discussion about switching voltage regulators uses the language
"*substantially* constant" to describe the output voltage.  (L-Appx, Tab 4, 1:14-15.)  In view of
these differing statements, it would only confuse the jury to refer to a "constant output voltage"
as part of the definition of "switching voltage regulator."[11]

       Similarly, ADI proposes construing "switching voltage regulator" as "[a] device
or circuit that is capable of receiving a poorly-specified and fluctuating input voltage . . .," which
is language found only in the Background of the Invention section of the patents that describes
certain voltage regulators.  (*See* L-Appx, Tab 4, 1:6-14.)  ADI impermissibly seeks to impose
this limitation of the claims.  *See also Dow Chem. Co v. U.S.*, 226 F.3d 1334, 1342 (Fed. Cir.
2000) ("[A]s a general rule [the] claims of a patent are not limited to the preferred
embodiment . . . or to the examples listed within the patent specification.").  Adding this
limitation to the claims would, without basis, exclude from literal coverage implementations that
use power sources that are either not poorly specified or not fluctuating over even a few cycles.
Those of skill in the art reading the patent would have known that the invention does not exclude
such implementations, however.

       Finally, ADI's argument that the *Impala* court previously rejected LTC's
proposed construction, and suggested that the output voltage of a switching voltage regulator
"must not vary," is incorrect.  The *Impala* court merely stated that in the context of the

---

[11]    To further avoid confusion about the output voltage of a switching voltage regulator,
LTC has revised its proposed construction since its Opening Brief to remove the reference to
"fixed or variable" voltages from the parenthetical about the meaning of "predetermined."

"threshold fraction of the maximum rated output current" limitation, it had difficulty discerning how that threshold fraction could be anything other than a constant percentage, because the maximum rated output was constant. (L-Appx, Tab 2, A26.) The court's statements there have nothing to do with the construction of "switching voltage regulator." "Predetermined" must mean "determined by design" to clarify that in a given switching voltage regulator, the nominal value of the regulated output voltage, Vreg, can be selected by the designer of the regulator.

**B.** "coupled"

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| coupled<br>'178 (claims 1, 34, 41, 44, 51, 55, 57)<br>'694 (claim 1)<br>'885 (claims 1, 11, 32, 35)<br>'066 (claim 1)<br>'258 (claims 1, 34, 35) | circuit elements are "coupled" when a current path exists between them | when there is an electrical or magnetic connection between circuit elements |

LTC's construction comports with the intrinsic evidence. (*See, e.g.*, L-Appx, Tab 4, 1:17-24; 15:40-46; Fig. 1.) ADI states that coupling should include arrangements in which there is no physical connection, direct or indirect, between circuit elements. ADI characterizes such arrangements as "magnetic connections." (ADI Brief, D.I. 51 at 36.) All instances of circuit element connections in the Wilcox/Flatness patents, however, are *physical*. (*See, e.g.*, L-Appx, Tab 4, Fig. 1-10.)

There is no support in the specification for construing "coupled" to include a magnetic connection. ADI's construction is also improper because the present invention relies on a current path between elements, whereas a transformer (ADI's sole example of a "magnetic connection") is used to electrically isolate structures from one another.

The *Impala* court construed "coupled" as LTC has construed it:

31

> A direct connection need not exist between circuit elements in order for them to be 'coupled.' [citations omitted] Thus, plaintiff would appear correct that circuit elements are 'coupled' when a current path exists between them.

(L-Appx, Tab 2, A20.)

ADI argues that by stating that a direct connection need not exist between circuit elements for them to be "coupled," the *Impala* court meant that the connection does not have to be electrical. (*See* ADI Brief, D.I. 51 at 37, n.25.) ADI's interpretation of the court's statement is incorrect. By rejecting the proffered "a direct connection" construction, the court meant that the current path between two coupled elements may pass through one or more intervening elements. The court did not reject a requirement for a physical connection. ADI did not raise magnetic connection between elements in the *Impala* case and the issue was not before the court. Therefore, there is no support for ADI's position.

### C.    "load"

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| load<br>'178 (claims 1, 34, 41, 44, 51, 55, 57)<br>'694 (claims 1, 5)<br>'885 (claims 1, 32)<br>'066 (claim 1)<br>'258 (claims 1, 34, 35) | a device, circuit, or system coupled to the output terminal to which the regulator can supply current | a device, circuit, or system that consumes electric power |

ADI criticizes LTC's construction, arguing that virtually anything "can be" a load. The parties agree upon what a load may be, however -- a device, a circuit, or a system. LTC's construction is consistent with the *Impala* court's construction. (*See* L-Appx, Tab 2, A20; *see also* L-Appx, Tab 22, ¶ 115.) ADI seeks to impose the additional limitation that a load "consumes electric power." The term "electric power" is not used in the Wilcox/Flatness patents.

The evidence ADI cites does not support its position. Two of the specification sections it cites merely state that the voltage is applied "to a load." One of the dictionary definitions ADI cites actually supports LTC's construction – a "load" is "an impedance or circuit that *receives* the output of a transistor or other device." (ADI Brief, D.I. 51 at 37, emphasis added.)

In addition, ADI's construction ignores one of the main problems in the art taught and disclosed in the patents; namely, that current from the load can reverse and be supplied by the load back through the inductor to ground. (L-Appx, Tab 4, 5:21-23 ("At low output currents this can cause the current in inductor L1 to reverse polarity and, thus, pull power from the load") and 5:29-32 ("This will be especially the case if the current in inductor L1 reverses and power is pulled from the load to ground through N-MOSFET 17").)

**D.      "regulated voltage"**

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| regulated voltage<br>'178 (claims 1, 34, 41, 44, 51, 55, 57)<br>'694 (claim 1, 5)<br>'885 (claim 1, 32)<br>'066 (claim 1)<br>'258 (claims 1, 34, 35)<br>'194 (claim 1)[12] | a voltage having a controlled value | a predetermined and constant output voltage |

ADI mischaracterizes the dispute with respect to "regulated voltage." It is not whether the "voltage regulator" supplies the same "regulated voltage" during both the "first" and "second" states of circuit operation. (*See* ADI Brief, D.I. 51 at 38.) Some of the claims in which

---

[12]      On occasion, claims of LTC patents-in-suit other than the Wilcox/Flatness patents contain a limitation discussed in this section of the brief, and therefore are included in this section as well.

"regulated voltage" is used, including '178 patent claims 55 and 57, '694 patent claims 1 and 5, and '885 patent claim 32, do not even refer to "first" or "second" states of operation. Rather, the dispute is whether "regulated voltage" means a "predetermined and constant output voltage" or "a voltage having a controlled value." Moreover, ADI makes the pointless and erroneous assertion that the invention requires an "overvoltage" condition to enter sleep mode (the "second state"). As LTC explained in its Opening Brief (Opening Brief, D.I. 65 at 23-24), this is a characteristic of only some embodiments. Nothing in the patent requires any difference in the voltage of the first and second states.

As described further therein and above with respect to "switching voltage regulator," the specification uses "regulated" to mean that the output voltage is controlled to be "substantially equal" to the nominal value (Vreg) set by the reference voltage (Vref) and the resistor divider network. Therefore the "regulated voltage" does not have to be constant. The *Impala* court adopted LTC's proposed construction. (L-Appx, Tab 2, A21.) The *Impala* court's use of the word "controlled" recognizes and incorporates the specification's description of "regulated." "Controlled" means that the voltage regulator tries to keep the output voltage close to Vreg, but permits the output voltage to fluctuate above and below it. ADI's construction improperly seeks to eliminate *any* fluctuation from the claim scope.

E.    **"substantially at the regulated voltage"**

| substantially at the regulated voltage '178 (claims 41)[13] '066 (claim 1) '258 (claims 1, 34) | "substantially at the regulated voltage" allows for, but does not require, greater variation in the voltage having a controlled | A voltage that has a different average value than the regulated voltage |
|---|---|---|

---

[13]    The parties incorrectly listed this limitation as present in claims 1 and 34 of the '178 patent.

34

| | value | |
|---|---|---|

The dispute over this limitation is (a) whether compared to "regulated voltage" it allows for a greater variation in the voltage; or (b) whether its average value must differ from the "regulated voltage." ADI's Brief mischaracterizes LTC's construction as effectively equating "regulated voltage" with "substantially at the regulated voltage" (ADI Brief, D.I. 51 at 39.) This is incorrect; the latter allows for *greater* variation in the output voltage.

ADI's argument that "substantially at the regulated voltage" must mean a voltage that has a different average value than the "regulated voltage" is refuted by the specification. As LTC discussed in its Opening Brief, all embodiments of the Wilcox/Flatness patents, including embodiments in which a hysteretic comparator is used, allow the average value of the output voltage to be the same in the first and second states. (*See* Opening Brief, D.I. 65 at 25.)

Furthermore, the specification states that during sleep mode, "the output voltage Vout can be maintained *substantially at* the regulated voltage Vreg by output capacitor Cout." (L-Appx, Tab 4, 5:63-65). No change in average value is mentioned or contemplated.

ADI argues that its construction of "substantially at the regulated voltage" is consistent with the ITC's Initial Determination ("ID"). However, the ID has not been reviewed by the ITC or the Federal Circuit and at any rate is not binding on subsequent district court proceedings. *See Bio-Technology Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1564 (Fed. Cir. 1996). The ITC itself will not give deference to the ALJ's findings when it reviews the ID, because it applies a *de novo* standard. *See, e.g., Certain Bar Clamps, Bar Clamp Pads and Related Packaging, Display and Other Materials*, ITC Inv. 337-TA-429 Comm. Order (Dec. 3, 2001).

The Administrative Law Judge ("ALJ") acknowledged that "[t]he term substantially might be understood to mean 'nearly' or 'for the most part.' . . . It might also in some circumstances indicate that a certain amount of leeway or difference is permitted when comparing two objects or events to determine whether or not they are the same." (L-Appx, Tab 35, A504-A505.) This ordinary meaning should apply in the absence of any disclaimer or definition in either the specification or the prosecution history to the contrary. Without pointing to any such disclaimer or special definition, however, the ALJ declined to give the term "substantially" its ordinary meaning as indicating tolerance or leeway, and instead construed "substantially at the regulated voltage" to exclude "at the regulated voltage." (L-Appx, Tab 35, A505.) The ALJ's erroneous claim construction, which was contrary to the *Impala* court's construction, cannot stand, and LTC has petitioned for a review by the ITC.

The ALJ's construction proposed here by ADI is also is contrary to numerous Federal Circuit cases construing the term "substantially." *See Deering Precision Instruments, L.L.C. v. Vector Distribution Sys., Inc.*, 347 F.3d 1314, 1322 (Fed. Cir. 2003). When construing "substantially" as a term of approximation modifying a condition, the Federal Circuit has not excluded the exact condition from the meaning of the construed term. *Playtex Prods., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 909 (Fed. Cir. 2005); *EMI Group N. Am., Inc. v. Intel Corp.*, 157 F.3d 887, 895 (Fed. Cir. 1998); *Amhil Enters. Ltd. v. Wawa, Inc.*, 81 F.3d 1554, 1562 (Fed. Cir. 1996). These cases demonstrate that "substantially at regulated voltage" should not be read to exclude "at the regulated voltage."

F.     **"signal"**

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| signal<br>'178 (claims 1, 41, 44, 51) | a voltage or current by which information can be | a voltage or current by which information is |

| | | |
|---|---|---|
| '694 (claim 5)<br>'885 (claims 1, 11, 32) | transmitted | transmitted |

LTC's position with respect to the construction of "signal" is similar to its position with respect to "output signal" and "input signal" in the '194 patent, discussed at Section III.A, *supra*. ADI's arguments divorce the word "signal" from its context in the claims. The specification and claims of the Wilcox/Flatness patents use the term "signal" in a broad sense to refer to voltages and currents, which can convey information, but do not always do so. For example, claim 1 of the '178 patent refers to "a first circuit for monitoring a signal from the output terminal." The signal can be as simple as the output voltage or inductor current. (L-Appx, Tab 4, 4:19-24.) The claims and specification also refer to control and feedback signals, which can be currents or voltages that convey information at some times (e.g., during a particular state of operation, or to initiate a certain event) and not necessarily at others. (L-Appx, Tab 4, 6:6-16, 9:39-45.) The *Impala* court reached the same conclusion, adopting LTC's proposal and rejecting ADI's proposal. (L-Appx, Tab 2, A21; Tab 3, A59.)

### G.    "First state of circuit operation," "Second state of circuit operation"

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| first state of circuit operation<br>'178 (claims 1, 34, 41, 44, 51)<br>'885 (claim 1)<br>'066 (claim 1)<br>'258 (claim 1, 34) | the state in which the switching transistors are both enabled for switching and are synchronously switched, such that one transistor is ON and the other is OFF, with a varying duty cycle to maintain a regulated voltage at the output terminal; if there is only one transistor ('885, claim 1), the transistor is enabled for switching with a varying duty cycle to maintain a regulated voltage at the output terminal. | a state in which the output voltage is maintained during high load current conditions by switching the switching transistors in a complementary manner to provide power to the load |
| second state of circuit operation<br>'178 (claims 1, 34, 41)<br>'066 (claim 1) | During the second state of operation in which the switching transistors are simultaneously off, current is supplied to | a state in which, as the result of low load current conditions, the output capacitors |

| '258 (claims 1, 34, 35) | the load by the output capacitor. The time in which "the switching transistors are simultaneously off" does not refer to dead time. | maintains the output voltage substantially at the regulated voltage, while the switching transistors are disabled. |
|---|---|---|

The *Impala* court adopted the constructions that LTC now proposes for these limitations, using language proposed by ADI and other defendants. (L-Appx, Tab 2, A21, A39; Tab 3, A61, A63.) After having persuaded that court to accept these constructions, ADI sought a broader construction in its initial claim construction chart. (*See* Opening Brief, D.I. 65 at 27.) Now ADI has proposed yet another version of these constructions which: (1) seeks to narrow the first state to apply only to "high load current conditions," and the second state to apply only to "low load current conditions"; (2) seeks to broaden the first state to encompass regulators that do not vary duty cycle of the switching transistors to maintain a regulated voltage at the output terminal; (3) inserts the ambiguous language "switching the switching transistors in a complementary manner"; and (4) improperly imports the "maintains the output voltage substantially at the regulated voltage" limitation into the "second state" limitation.

The Wilcox/Flatness patents teach two states of circuit operation: (1) a first state with synchronous switching; and (2) a second state with sleep mode or reverse current protection. ADI's description of the first and second states is mistaken. ADI describes the first state as one in which the load requires constant power and the regulator generates its maximum rated output. Neither of these is correct. The power required by a load can vary continuously during synchronous switching. That is why the regulator has feedback circuitry and a variable duty cycle for adjusting the supply of current to the load. The regulator controls the output voltage as the current demanded by the load varies. "Maximum rated output current" is the highest level of current that the regulator can safely output. ADI erroneously interprets

38

"maximum rated output current" as the only current that can be produced by the regulator when it is synchronously switching.

As to the second state, ADI incorrectly suggests that a regulator must be in the second state at low load currents. As discussed further below, a regulator may return to synchronous switching even at low load currents, as may be required to recharge the output capacitor. Although the first state *generally* occurs during high and medium load currents and the second state *generally* occurs during low load currents, the claim language does not require these conditions.

ADI bases its new constructions on the ALJ's ID, but, as discussed in Section VI.E, *supra*, the ID is not final and does not take precedence over the *Impala* court's construction.

Not only does the language of the claims of the Wilcox/Flatness patents fail to support the ALJ's overly-restrictive interpretation, the specification plainly contradicts such a construction. The specification clearly teaches that the circuit will periodically change back and forth between the second and first states even during extended periods of low load current. The periodic transition between the second and first states during extended periods of low load current is necessary to recharge the output capacitor $C_{OUT}$. (*See* L-Appx, Tab 4, 7:2-5, 10-16; 8:61-9:3; 13:14-19.)

The above-cited passages reveal that the recharging operation can occur by momentarily going back to the first state of circuit operations (*i.e.*, alternately turning the switching transistors on and off) *even though the load current demand continues to remain low for extended periods of time*. ADI's construction thus excludes an embodiment described in the specification, which is rarely correct. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576,

1581 (Fed. Cir. 1996).

In short, the proper construction for these limitations does not link these states of circuit operation to any *particular* load current levels.

ADI also seeks to eliminate the requirement that the circuit vary the duty cycle of the switching transistors. The claims of the '178, '066 and '258 patents confirm, however, that this is an inherent part of the "first state" because they all require that the duty cycle of the switching transistors is varied to maintain the output at the regulated voltage. Claim 1 of the '885 patent imposes a similar requirement using different language (it requires only one switching transistor). (*See* Opening Brief, D.I. 65 at 28.)

Furthermore, ADI's definition of how the transistors are switched -- "in a complementary manner" -- is ambiguous and undefined. LTC's language "synchronously switched, such that one transistor is ON and the other is OFF," is clear and supported by the claim language and the specification.

ADI also seeks to improperly import the "maintains the output voltage substantially at the regulated voltage" limitation into the "second state" limitation. Only some of the claims that recite the "second state" limitation also state that the output voltage is maintained substantially at the regulated voltage during the second state (e.g., '178 claim 41, '258 claims 1 and 34, '066 claim 1). The other claims that contain the "second state" limitation do not require that the output voltage is maintained substantially at the regulated voltage during the second state (e.g., '178 claims 1 and 34; '258 claim 35).

Finally, ADI's construction of "second state" requires that the switching transistors be "disabled." The word "disabled" does not appear in the specification. LTC's construction, which requires that the switching transistors be "off," is more accurate.

H.    "to cause"

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| to cause<br>'178 (claims 1, 34)<br>'885 (claim 11)<br>'066 (claim 1)<br>'258 (claim 1, 35) | To bring about a result. Unmediated causality is not required. What is important is that a chain of events is initiated that acts not just on one but on both transistors. | to bring about a result |

Both parties agree that "to cause" means "to bring about a result." ADI disputes, however, the *Impala* court's (L-Appx, Tab 2, A23-24) and LTC's construction that unmediated causality is not required. ADI again bases its position on limiting the claims to a narrow view of the specifics of the embodiment of Figure 2, ignoring other embodiments. If unmediated causality were required, the claims would exclude the preferred embodiments of Figures 2 and 7, among others. In both figures, the output of the hysteretic comparator initiates a chain of events that eventually brings about the result with the assistance of other circuitry and signals. (L-Appx, Tab 4, 6:44-46, 12:55-13:2.)

ADI argues that adopting LTC's construction would result in an "endless causality" problem because an action by a completely different circuit in a completely different area of the device could "cause" the switching transistors to turn off within the meaning of the claims. (*See* ADI Brief, D.I. 51 at 42.) ADI is incorrect. There is no "endless causality" problem with LTC's construction because the claims themselves state what causes the transistors to turn off -- the "third circuit," "third means" or "one-shot generator." It is of no consequence if some intervening circuitry participates in the chain of events that brings about the result. All that these claims require is that the "third circuit," "third means" or "one-shot generator" initiates a chain of events that brings about the result, regardless of whether there may be intervening circuitry.

41

### I.    "threshold"

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| threshold<br>'178 (claims 1, 34, 41, 44)<br><br>'694 (claims 1, 5)<br>'258 (claim 35) | predetermined level or value at which some change in circuit operation takes place<br><br>(Predetermined means determined by design, and includes levels or values that may be fixed or variable.) | a fixed value at which some operational characteristic of the circuit changes |

The plain meaning of "threshold" is a level (here, a voltage or current) to which something is compared, or at which a change takes place. ADI attempts to restrict the term "threshold" to having "a fixed value," a limitation unsupported by the specification of the Wilcox/Flatness patents. The term is used in the specification to refer to variable levels or values. (*See* L-Appx, Tab 4, 4:36-41.)

ADI argues that the *Impala* court rejected LTC's argument about a "variable" threshold. (ADI Brief, D.I. 51 at 43, n.27.) This is incorrect. There, the court was construing a different limitation that used the term "threshold" – "threshold fraction of maximum rated output current." The *Impala* court stated that because the maximum rated output is constant, it had difficulty discerning how the threshold fraction of that output could be anything other than a constant percentage. Whether the "maximum rated output" is constant is a different issue from whether the regulated output voltage is constant. Moreover, there is no indication that the court was using the word "constant" to mean that the threshold fraction must remain fixed and immutable over all operating conditions (including input voltage), as proposed by ADI.

### J.    "output current"

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| output current<br>'178 (claims 1, 34, 41, 57) | the current that flows from the output terminal to the load having a value | the current flowing |

| | | |
|---|---|---|
| '694 (claim 5) | that is dependent upon characteristics of the load | in the load |

LTC's construction, i.e., "current that flows from the output terminal to the load," is consistent with the claim language ("output terminal . . . for supplying current . . . to a load"). This construction was previously proposed by ADI and adopted by the *Impala* court. (L-Appx, Tab 2, A24-25; Tab 3, A63.)

ADI's new proposed construction of "output current," e.g., "the current flowing in the load," is too broad. Current may flow in a load from sources other than the regulator. (*See also* L-Appx, Tab 22, ¶ 120.) ADI presumes that LTC included the "flows from the output terminal to the load" language to preclude magnetic transfer of current. As discussed above in connection with "coupled," there is nothing in the Wilcox/Flatness patents supporting "magnetic transfer of current" to a load. LTC's proposed language is necessary to make clear that the current must come from the regulator, not from some other source. Finally, ADI mischaracterizes LTC's construction: LTC does not agree that the "output current" connotes current flowing *in* the load; it connotes current flowing *to* the load.

## K.    "output inductor"

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| output inductor '178 patent (claims 44, 51)  '258 patent (claim 35) | an inductor in the output circuit coupled to the output terminal[14] | an inductor that is coupled to the output terminal |

---

[14]    The construction LTC proposed for "output inductor" as used in claim 35 of the '258 patent, as it appears in Exhibit F to the Joint Claim Construction Chart, is incomplete. It should read the same as the construction proposed for the same limitation as used in the '178 patent.

43

There is one difference remaining between the parties' constructions. ADI's construction does not require that the inductor be in the "output circuit." However, ADI has already agreed to a construction of "output circuit" for claims 44 and 51 of the '178 patent that includes an inductor. (*See* L-Appx, Tab 42, A573.) ADI has not provided any valid reason why "output inductor" should not be construed commensurately.

ADI's proposed construction attempts to broaden this limitation by including inductors merely coupled to the output terminal. Such a definition encompasses inductors coupled to the output terminal but which are not part of the switching voltage regulator or output circuit. For example, an inductor in the load would not be part of the regulator, but could be coupled to the regulator output terminal. (*See also* L-Appx, Tab 22, ¶ 131.)

## VII.  LTC'S U.S. PATENT 5,481,178 ("THE '178 PATENT")

### A.  "a second means for generating a first control signal . . . to maintain the output terminal at the regulated voltage"

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| a second means for generating a first control signal during a first state of circuit operation, the first control signal being responsive to the voltage feedback signal to vary the duty cycle of the switching transistors to maintain the output terminal at the regulated voltage

'178 (claim 34) | This is a means-plus-function limitation, and it is to be construed to cover the corresponding structure(s) and equivalents thereof. The corresponding structures described in the specification include:

the combination of drive circuit 20, transconductance amplifier 38, offset voltage $V_{OS}$ 76, reference voltage 37, current comparator 39, a feedback current path between inductor $L_1$, and current comparator 39 and constant off-time one-shot circuit 25, which outputs | This paragraph of Claim 34 recites a means-plus-function and is interpreted under 35 U.S.C. §112, ¶ 6. As such, the claim should be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

The corresponding [sic] in the specification for carrying out the recited function is:

(i) the combination of drive circuit 20, transconductance amplifier 38, offset voltage $V_{OS}$ 76, |

44

| | the first control signal; | reference circuit 37, current source $I_1$ 72, current comparator 39, and constant off time one-shot circuit 25, which is output to the first control signal; |
| --- | --- | --- |
| | combinations having a pulse width modulator circuit or a variable-off-time one-shot circuit (e.g., circuit 240 or the circuit described at 10:15-16); and | (ii) combinations having a pulse width modulated signal in response to a control signal; |
| | the combination illustrated in the Fig. 7 (resistors $R_{SENSE}$ and $R_3$, one-shot circuit 245, off-time controller 250, capacitor $C_{CON}$ and $V_{REF}$) and the circuitry described at 13:36-46. Tab 4. | (iii) circuit 240 in Fig. 5; |
| | | (iv) the combination illustrated in the Fig. 7 (resistors $R_{SENSE}$ and $R_3$, one-shot circuit 245, current comparator 39, current source $I_1$ 72, transconductance amplifier 38, offset voltage $V_{OS}$, reference circuit 37, off-time controller 250 (operated in the constant off-time mode) and capacitor $C_{CON}$; |
| | | (v) an operational amplifier; and |
| | | (vi) the circuitry described at 13:36-46. |

Although ADI proposes the construction of the *Impala* court, LTC proposes a modified version of that construction, because it corrects certain ambiguities and technical inaccuracies of that construction.

The *Impala* construction includes current source $I_1$ 72 of Fig. 2 as part of the "second means" of this claim, even though it should not and cannot be so included.[15] That

---

[15]     LTC also erroneously included current source $I_1$ 72 in its previously proposed claim construction for the "second means."

current source has nothing to do with varying the duty cycle of the switching transistors during the first state of circuit operation. Instead, that current source ($I_1$ 72 of Fig. 2) is only part of the "third means" that causes both switching transistors to be simultaneously OFF during the second state of circuit operation. As the specification states, "This over voltage condition [which triggers sleep mode] is intentionally induced at low average output currents by providing a constant current source $I_1$ 72 coupled in parallel with amplifier 38. During the over voltage condition both MOSFETS 16 and 17 are maintained OFF by way of AND gate 66 and NAND gate 68." (L-Appx, Tab 4, 6:50-55.) Thus, LTC's construction more accurately describes the corresponding structures disclosed in the specification.

Also, LTC respectfully submits that the *Impala* court should not be understood to have found that an operational amplifier by itself corresponds to the "second means." The court relied on a passage in the patent specification that states that "an operational amplifier could be used to control the OFF-time." (L-Appx, Tab 4, 10:15-16; Tab 2, A35.) The patent is actually referring to the embodiment shown in Fig. 5 directed to variable off-time control. The patent states that an operational amplifier can be used instead of the OFF TIME CONTROL circuit and $I_{CON}$ with an operational amplifier to control the discharging of a control capacitor. (L-Appx, Tab 4, 10:1-16.) Although it is true that an operational amplifier could be part of a combination making up a corresponding structure, it does not by itself constitute a structure corresponding to the "second means" of this claim.

### B.    "current to the output terminal"

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| current to the output terminal '178 (claim 44) | the current that flows to the output terminal from the switching transistors | the output current |

46

This term should be construed in accordance with its plain meaning. "Current to the output terminal" is current that flows from the switching transistors, as shown in the figures of the patent. ADI proposes to replace this plain meaning with another phrase, "output current." This does not make sense, particularly in light of ADI's proposed construction for "output current," which is current flowing in the load. The claim makes explicit reference to current flowing to the output terminal, not current flowing in the load, which can come from anywhere. (*See also* L-Appx, Tab 22, ¶¶ 132-34.)

ADI argues that since the capacitor smoothes the current from the switching transistors, and since it is this "smoothed" current that then flows to the output terminal, this limitation must be limited to the current as it exists after the capacitor smoothes it. (*See* ADI Brief, D.I. 51 at 48.) ADI's construction is too narrow. Claim 44 states that the "third circuit monitor[s] the current to the output terminal to generate a second control signal." All of the embodiments show that what is being monitored is the current through the inductor or the voltage across a resistor placed directly down-stream of the inductor. Therefore, this claim cannot be limited to monitoring *only* the current down-stream of the output capacitor, as ADI suggests. Moreover, claim 45 adds the limitation "wherein the third circuit monitors the current *through the inductor* to generate the second control signal." Thus, claim 44 cannot be construed to only cover monitoring the current down-stream of the capacitor, otherwise claim 45 would be inconsistent with claim 44.

### C.    Threshold indicative of a polarity reversal condition; prevent the current to the load from reversing polarity

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| Threshold indicative of a polarity reversal | A measure of when either the current to the output terminal or a variable that depends on that | Based on "polarity reversal condition" (as previously agreed to by the parties) |

| condition '178 (claim 44) | current predicts that the switching voltage regulator is about to or has entered the polarity reversal condition. | (The parties agreed that "polarity reversal condition" means "the condition in which the instantaneous inductor current is negative or flowing away from the load." *See* Revised Exhibit A, Revised Joint Claim Charts for LTC's Patents) |
| Prevent the current to the load from reversing polarity '178 (claim 51) | Maintaining a transistor off when there is an indication of a polarity reversal condition | The condition effected by opening (turning OFF) one of the transistors before the instantaneous inductor current reverses direction and removes power that could have been delivered to the load |

The only difference between the parties' construction of "threshold indicative of a polarity reversal condition" is that ADI wishes to restrict the third circuit to generating a second control signal only before the instantaneous inductor current has reversed polarity. LTC's construction permits the second control signal to be generated either before, when, or after the current has reversed polarity.

The *Impala* court recognized that the purpose of the reversal protection feature is not to prevent any polarity reversal at all, but rather to prevent the drawing of power from the load. (L-Appx, Tab 2, A48.) Thus, it agreed with LTC's current construction, and stated that the threshold indicative of a polarity reversal condition may be set "(a) exactly when the instantaneous inductor current reverses (zero), (b) just before reversal (slightly positive), or (c) just afterwards (slightly negative) – so long as the protection feature is triggered before power is actually drawn from the load." (L-Appx, Tab 2, A48.)

In addition, claim 46 adds the limitation "wherein the third circuit prevents reversals in polarity of the current through the inductor." Thus, claim 44 must be construed more broadly – to permit a polarity reversal – to avoid rendering claim 46 redundant.

48

Claim 44 monitors a polarity reversal condition in the output inductor, and as properly construed may set the threshold for such reversal before, during, or after the instantaneous current reverses. With respect to claim 51, LTC's construction recognizes that the current to the load can be prevented from reversing polarity by either predicting when such reversal is about to occur or detecting a reversal as it occurs, and turning off one of the switching transistors in response.

**D.    "prevents the drive circuitry from turning on either of the pair of synchronously switched switching transistors"**

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| prevents the drive circuitry from turning on either of the pair of synchronously switched switching transistors '178 (claim 55) | both transistors must be prevented from turning ON | both transistors must be held OFF for a period of time |

ADI's proposed construction would rewrite the language of this limitation and should be denied. No construction is required because the words should be given their plain and ordinary meanings. Accordingly, LTC's proposed construction is the claim language itself. ADI argues that both transistors must be held off "for a period of time" because other language in the claim states as much. (ADI Brief, D.I. 51 at 50.) This is another example, however, of ADI improperly importing one claim limitation into another.

**E.    "selected sleep mode current level"**

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| selected sleep mode current level '178 (claim 55) | a current level below which the regulator enters into a second mode of operation | a predetermined current level that represents a percentage of maximum rated output current below which the regulator is operated in a second mode of circuit operation when both transistors are off |

The Wilcox/Flatness patents teach embodiments in which a regulator enters sleep mode if inductor current or output current falls below some level, set by the design of the circuit. (L-Appx, Tab 4, 6:47-69, 12:46-59, 16:5-12.) ADI argues that because sleep mode is triggered when the "threshold fraction" is reached, and because according to ADI's construction the "threshold" must be "fixed," the "selected sleep mode current level" of claim 55 must be constant. (*See* ADI Brief, D.I. 51 at 50-51.) Claim 55 recites "selected sleep mode current level" rather than a "threshold fraction of maximum rated output" of the other claims, however, so the plain language of this claim indicates that this "selected sleep mode current level" is a level, and need not represent a percentage. In fact, the term "selected" indicates that the level may vary – that there are many possible levels to "select" from. The *Impala* court rejected a similar attempt by the defendants to impose such a fraction limitation on this claim, ruling that "the plain language of this claim precludes the threshold fraction limitation." (L-Appx, Tab 2, A43.)

## VIII.  LTC'S U.S. PATENT NO. 5,731,694 ("THE '694 PATENT")

### A.  "Inductive element"

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| inductive element '694 (claims 1, 5) | an element that acts as an inductor | a magnetic energy storage element |

ADI's construction of "inductive element" is logically unsound. ADI argues that because an inductive element must include an inductor, and because inductors store energy magnetically, "inductive element" means "a magnetic energy storage element." (ADI Brief, D.I. 51 at 51.) Just because all inductors store energy magnetically does not lead logically to the

converse – that all elements that store magnetic energy are inductors. All elements that act as

inductors are necessarily inductive elements, however. Thus, LTC's construction is correct .

**B.    "Current comparator circuit"**

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| current comparator circuit '694 (claim 1) | a "current comparator" compares currents, or signals indicative of currents, to determine which signal is greater.[16] | a "current comparator circuit" compares two current signals and supplies a voltage signal based on the difference in the two input current signals |

LTC's construction was adopted by the *Impala* court. (L-Appx, Tab 2, A31.)

ADI argues that LTC's reliance on the *Impala* court's construction is misplaced because the

court made clear that a "current comparator" compares currents or signals indicative of voltage,

not current. (ADI Brief, D.I. 51 at 52.) ADI is incorrect. ADI is misreading the *Impala* court's

decision – the court gave voltage as an ***example*** of a signal indicative of a current. It did not

restrict such a signal to a voltage. The *Impala* court specifically rejected ADI's attempt to

"restrict the claim to a current comparator that compares only 'currents,' not signals indicative of

currents," reasoning that "[t]his construction is betrayed by the language of the claim, which

refers to comparing a current feedback "signal" with a reference current" and that "[i]t is also

inconsistent with Figure 7 of the specification." (L-Appx, Tab 2, A31.)

Another problem with ADI's construction is that it requires that the output of the

current comparator circuit be a voltage signal. ADI is improperly reading an embodiment from

the specification into this limitation.

---

[16]    LTC has modified its construction to remove discussion of a "third indeterminate value."

C.    "Current feedback signal"

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| current feedback signal '694 (claim 1) | a feedback signal indicative of a current level | a current signal proportional to the current in the inductive element generated by monitoring the current in the inductive element |

LTC's construction of this limitation is correct for the same reasons that its construction of "current comparator circuit" is correct. ADI improperly seeks to rewrite this claim to be limited to a feedback signal that is a current, as opposed to a signal indicative of a current level, which as discussed above may be a voltage or a current.

In addition, the specification does not state that the current feedback signal must be generated by monitoring the current in the inductive element. In fact, as described above, Figure 7 shows an embodiment where the "current feedback signal" is generated by monitoring a voltage.

D.    "Minimum feedback current threshold"

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| Minimum feedback current threshold '694 (claims 1, 5) | a predetermined current or voltage level to which a current feedback is compared (Predetermined means determined by design, and includes currents or voltages that may be fixed or variable.) | a constant current level to which a current feedback signal is compared and which it will not go below |

LTC's position with respect to this limitation is essentially the same as with respect to "threshold," addressed in Section VI.I, *supra*. ADI similarly restricts the "minimum feedback current threshold" to be a constant current level. This requirement is not imposed by any language of the claim. In addition, ADI incorrectly asserts that the current feedback will not

go below the "minimum feedback current threshold." This is the opposite of what the '694 patent teaches. (*See* Opening Brief, D.I. 65 at 41.)

### E.    "First state" and "Second state"

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| first state '694 (claim 1) | a first output value | a first output value of the hysteretic comparator indicative of the voltage regulator operating in a first way of operating |
| second state '694 (claim 1) | a second output value | a second output value of the hysteretic comparator indicative of the voltage regulator operating in a second way |

ADI has revised its construction of "second state" since LTC's Opening Brief to remove the restriction that the second state output value be different from the first output value. Nonetheless, disputes still remain regarding these limitations. ADI still attempts to insert limitations that are unwarranted. Claim 1 of the '694 patent states that "the hysteretic output chang[es] from a first state to a second state when the first and second inputs compare in a predetermined manner." This shows that the "first state" and "second state" refer to output values of the hysteretic comparator. (*See also* L-Appx, Tab 9, 6:19-46.) Each output value need not indicate a particular mode of operation of the regulator.

### F.    "Bias source"

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| bias source '694 (claim 1) | "bias source" is not limited to a separate circuit that generates a current | a circuit that generates a current at a constant predetermined value |

"Bias source" does not require construction, since "bias" has a well understood meaning in the art.[17] (*See also* L-Appx, Tab 22, ¶ 143.) ADI has revised its construction to remove the "separate circuit" restriction. Its construction still improperly attempts to narrow the ordinary meaning of this term, however, by requiring that the bias source generate only a current, not a voltage, and at a "constant predetermined value."

The language of the claim does not limit "bias source" to a circuit that generates a current. The claim recites: "a bias source coupled to an input of said current comparator circuit, said bias source setting a minimum feedback current threshold." The inputs to the current comparator circuit, which come from the bias source and a current feedback signal, can be a voltage indicative of a current level, or a current. This reading is supported by the specification and the cited prior art. (*See, e.g.*, the embodiment depicted in Fig. 7, in which the inductive element current feedback signal is a voltage measured across $R_{SENSE}$. (L-Appx, Tab 4 at 12:25-29.) ADI's citations to the specification do not support its construction – they refer to the embodiment in which the feedback signal monitors a current. ADI ignores the embodiment in which the feedback signal is a voltage measured across $R_{SENSE}$.

Finally, the bias source's output need not be constant; ADI bases its assertion that the output is constant on a misunderstanding of the patent. (*See* L-Appx, Tab 22, ¶ 145.)

IX.    LTC'S U.S. PATENT NO. 5,994,885 ("THE '885 PATENT")

A.    "One shot"; "One-shot circuit"

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| One-shot circuit | A circuit that outputs a pulse of | A circuit that outputs a pulse of |

---

[17]    "Direct current (DC) deliberately made to flow, or DC voltage deliberately applied, between two points for the purpose of controlling a circuit." (L-Appx, Tab 43.)

| '885 patent (claims 1, 11, 35) | a predetermined duration once it is triggered by an input and then returns to its original state where it remains until triggered again<br><br>(Predetermined means determined by design, and includes durations that may be fixed or variable) | predetermined duration once it is triggered by an input and then returns to its original state where it remains until triggered again |
| One-shot<br><br>'885 patent (claim 32) | A one-shot circuit or generator. A "one shot" circuit is defined by LTC in connection with Claims 1, 11 and 35 above | A circuit that outputs a pulse of predetermined duration once it is triggered by an input and then returns to its original state where it remains until triggered again |

The only difference remaining between the parties' proposed constructions appears to concern varying the duration of the pulse output by a "one-shot circuit." ADI agrees that the duration of the pulse can vary, but seeks to limit when this variation can occur. According to ADI, the duration of a pulse can only be varied before it is triggered, not after. Nothing in the claims or specification supports ADI's proposed limitation on the variability of the pulse duration. The portion of the specification to which ADI cites (10:1-10) does not limit when the duration can be varied.

**B.    "Feedback circuit"**

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| feedback circuit '885 (claims 11, 35) | a circuit for producing a signal at a second terminal that is indicative of a signal at the first terminal | a circuit for producing a signal at a second terminal |

ADI's arguments completely ignore the word "feedback," which has an ordinary meaning. A feedback signal is indicative of another signal. A feedback circuit produces a signal that is indicative of another signal. (L-Appx, Tab 22, ¶ 147.)

### C.    "Off-time control circuit"

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
| --- | --- | --- |
| off-time control circuit '885 (claims 11, 35) | a circuit that provides an output to control the OFF time of the one-shot generator based on one or both of the voltages at the input node and output node | a circuit that provides an output to control the OFF time of the one-shot generator based on both voltages at the input and output nodes |

ADI's proposed construction contradicts the plain language of claim 11. Moreover, the doctrine of claim differentiation prevents the term "off-time control circuit" from being construed to require the signal to be based on both of the voltages at the input and output nodes. Claim 19 of the '885 patent, which depends from claim 11, explicitly provides an additional "third terminal" (not in claim 11) so that the "off-time control circuit" can be coupled to both the input node and output node. To define "off-time control circuit" as generating a signal based on both the voltage and the input and output node would impermissibly eliminate any distinction between claims 11 and 19 of the '885 patent. (*See also* L-Appx, Tab 22, ¶¶ 148-50.)

The specification sections ADI cites in its brief that discuss the off-time control circuit monitoring the input and output voltages merely show that ADI is attempting to import the preferred embodiment into this claim limitation. That is improper, especially when such a construction contradicts the claim language, and would also render a dependent claim redundant.

### D.    "Means for generating a trigger signal responsive to the current feedback signal and the voltage feedback signal"

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
| --- | --- | --- |
| means for generating a trigger signal responsive to the current feedback signal and the voltage feedback | This is a means-plus function limitation, and it is to be construed to cover the corresponding structure(s) | This paragraph of Claim 32 recites a means-plus function and is interpreted under 35 U.S.C. §112, ¶ 6. |

| signal | and equivalents thereof. The corresponding structures described in the specification include: | As such, the claim should be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof. |
|---|---|---|
| '885 (claim 32) | conventional feedback control circuits such as 230 (Fig. 5); | |
| | and control loop circuitry such as current mode circuitry of Fig. 2 and Fig. 7 (e.g., 37, 38, and 39). | The corresponding structure in the specification for carrying out the recited function are the conventional feedback circuits such as 230 (Fig. 5), and control loop circuitry such as current mode circuitry of FIG. 2 and FIG. 7 (e.g., 37, 38, 39, $V_{OS}$, and 72). |

For the same reasons as those discussed above in connection with a "second means" ('178, claim 34), a "means for generating a trigger signal responsive to the current feedback and the voltage feedback signal" does not include a current source $I_1$ 72. As can be seen in the patent specification in connection with, e.g., Figs. 2 and 7, current source $I_1$ 72 is not involved in generating a trigger signal responsive to the current feedback signal and the voltage feedback signal. ADI has not identified any intrinsic evidence showing that 72 is relevant to means for generating such a signal. The only portion of the specification that ADI relies on merely lists 72 as being part of the switching voltage regulator as a whole.

### E.    "One-shot means for placing . . ."

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
|---|---|---|
| one-shot means for placing the switch into an off state responsive to the trigger signal, the switch remaining-in the off state for a period of time responsive to the off-time | This is a means-plus-function limitation, and it is to be construed to cover the corresponding structure(s) and equivalents thereof. The corresponding structures described in the | This paragraph of Claim 32 recites a means-plus-function and is interpreted under 35 U.S.C. §112, ¶ 6. As such, the claim should be construed to cover the corresponding structure, material, or acts |

| control signal <br><br> '885 (claim 32) | specification include: <br><br> one-shot generator circuits such as 245 (Fig. 5), and box 245 of Fig. 7. Tab 4. | described in the specification and equivalents thereof. <br><br> The corresponding steps in the specification for carrying out the step of this paragraph are disclosed in the steps performed by the combination of the one-shot generator 245 and the off-time control circuit 250. |
| --- | --- | --- |

ADI asks the Court to expand the one-shot means to include off-time control circuit 250. The off-time control circuit 250 actually corresponds to a different limitation of this claim, i.e., "means for generating an off-time control signal responsive to at least one of the input voltage and the output voltage." ADI does not discuss this means in its brief, as it would belie ADI's argument that 250 is structure corresponding to the "one-shot means."

F.    **Variable current source**

| Claim Term | LTC's Proposed Construction | ADI's Proposed Construction |
| --- | --- | --- |
| variable current source <br><br> '885 patent (claim 35) | A current source that has its current output varied | A current source that has its current output varied to control the discharging rate of the control capacitor |

ADI's proposed construction is another example of its repeated improper attempts to rewrite claim language. ADI's brief says that its construction is ***verbatim*** from the language of claim 35. This is not true, however, and the difference is significant. Claim 35 states: "the off-time control circuit including a variable current source that controls the discharging rate of the control capacitor." The claim requires the current source to control the discharging rate, but it does not require that its current output be varied to achieve this purpose. In embodiments described in the patent, the current source controls the discharging rate of the control capacitor

regardless of whether its output remains the same or varies.  (L-Appx, Tab 4, 10:1-3.)  Therefore,

ADI's proposed construction is improper.

## X.     CONCLUSION

For the foregoing reasons, LTC respectfully requests that its proposed claim

constructions be adopted by the Court.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


*/s/ James W. Parrett, Jr.*
_____
Jack B. Blumenfeld (#1014)
Karen Jacobs Louden (#2881)
James W. Parrett, Jr. (#4292)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jparrett@mnat.com
  *Attorneys for Defendant/Counterclaim Plaintiff*
  *Linear Technology Corporation*

OF COUNSEL:

Robert C. Morgan
Laurence S. Rogers
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY  10036
(212) 596-9000

Mark D. Rowland
Ropes & Gray LLP
525 University Avenue
Suite 300
Palo Alto, CA  94301
(650) 617-4000

June 29, 2007

## CERTIFICATE OF SERVICE

I, James W. Parrett, Jr., hereby certify that on June 29, 2007 I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

> Frederick L. Cottrell, III
> RICHARDS, LAYTON & FINGER

I also certify that copies were caused to be served on June 29, 2007 upon the following in the manner indicated:

### BY E-MAIL & HAND DELIVERY

Frederick L. Cottrell, III
Richards, Layton & Finger
One Rodney Square
Wilmington, DE 19801

### BY E-MAIL & FEDERAL EXPRESS (for delivery on July 2, 2007)

Wayne L. Stoner
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109

*/s/ James W. Parrett, Jr. (#4292)*
Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jparrett@mnat.com